DAVID J. BRODERICK, LLC
70-20 Austin Street
Suite 111
Forest Hills, New York 11375
Phone:718 830 0700
Fax: 718 732 2102
brodericklegal@gmail.com
Attorney for the Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARIA THERESA NOBLE,
Plaintiff

-against-

MOUNT OLIVET CHURCH, INC., aka, MOUNT
OLIVERT CHURCH, INC., aka MOUNT OLIVER
CHURCH INC., aka MOUNT OLIVE CHURCH INC.,
an ARACELIS STAATZ, as Trustee of Mount Olivet
Church,

MOUNT OLIVET CHURCH INC. and ARACELIS
STAATZ, as Trustee of Mount Olivet Church,          18-CV-07871-NRB

Third-Party Plaintiff,                              AMENDED
                                                    THIRD PARTY COMPLAINT
-against-

LEDWIN OVIEDO, LEDWIN ENTERPISES, INC.,
JAMIE RAMIREZ, ESQ and LAURA C. BROWNE,
ESQ.,

Third Party Defendants.

        Defendants-Third-Party Plaintiffs, MOUNT OLIVET CHURCH, INC., aka, MOUNT

OLIVERT CHURCH, INC., aka MOUNT OLIVER CHURCH INC., aka MOUNT OLIVE

CHURCH INC., and ARACELIS STAATZ, as Trustee of Mount Olivet Church,, by and through

their  attorney DAVID J. BRODERICK, LLC. as and for an ANSWER TO THE AMENDED

COMPLAINT states the following below paragraphs upon information and belief:

## NATURE OF THIRD PARTY ACTION

1.      Third Party Plaintiff's brings the within Breach of Contract(s), Breach of Fiduciary

Duties(s), Violation of RPAPL 443(4)(a), Fraud and Conspiracy to commit fraud actions for both

damages and indemnification for the delay and loss of value of the property since June of 2014.

## THE PARTIES & PLAYERS

2.      MOUNT OLIVET CHURCH, INC., aka, MOUNT OLIVERT CHURCH, INC., aka MOUNT OLIVER CHURCH INC., aka MOUNT OLIVE CHURCH INC., (collectively referred to as "CHURCH") and ARACELIS STAATZ, as Trustee of Mount Olivet Church ("STAATZ") are the Defendants and Third Party Plaintiffs in the above referenced action.  Mount Olivet Church, Inc. is a religious organization duly organized under the laws of the State of New York.  Third-Party Plaintiff MOUNT OLIVET CHURCH, INC.  and the owner of 2176 Grand Concourse, Bronx, New York.  STAATZ is the Trustee of the Church.

3.      MARIA TERESA NOBLE ("Noble") is the plaintiff and a New Jersey Resident and Real Estate Agent operating in the State of New York and out of the offices of LEDWIN ENTERPRISES, INC. and/or LEDWIN OVIEDO.  That as a real estate agent Noble was obligated to disclose the self dealing nature of any transaction she would purchase while working for, under and/or with LEDWIN ENTERPISES, INC. and/or LEDWIN OVIEDO.  NOBLE is the alleged purchaser of the subject property and self dealing real estate agent of LEDWIN OVIEDO.  NOBLE and OVIEDO not only have a business relationship but are lovers, deomestic partners, significant others prior to July of 2014.

4.      Urbany Investment Group LLC ("Urbany") is an LLC owned by Noble.  Urbany would retain Browne to represent her company on May 9, 2017, seven days prior to the 2017 contract of sale.  Neither Noble nor Urbany nor Browne would disclose this dual representation as set forth more fully below.

5.      LEDWIN ENTERPISES, INC. is a New York Corporation which Brokers real estate transactions.  LEDWIN ENTERPRISES, INC. is the alleged Seller's Broker on the above transaction by "Oral Agreement."  Unbeknownst to the Church and Staatz, Ledwin Enterprises Inc. was also serving the buyer's broker.  As the Seller's broker Ledwin Enterprises Inc. owed certain fiduciary duties to the defendants and was required to disclose not only his dual

representation[1] but the self dealing nature of the transaction to the Church and Staatz. Ledwin Enterprises, Inc. not only violated his fiduciary duties to the Church and Staatz but conspired with Noble to deceive the defendants-third party plaintiffs and drive the price down for the benefit of his lover Noble.

6. LEDWIN OVIEDO ("Oviedo") is the principal of LEDWIN ENTERPRISES, INC. Oviedo either acting on his own behalf or that of his company took upon the brokering of the subject property. As the Seller's broker Oviedo owed certain fiduciary duties to the defendants and was required to disclose not only his dual representation but the self dealing nature of the transaction to the Church and Staatz. Oviedo not only violated his fiduciary duties to the Church and Staatz but conspired with Noble to deceive the defendants-third party plaintiffs and drive the price down for the benefit of his lover Noble.

7. JAMIE RAMIREZ, ESQ. ("RAMIREZ") operated as both the Sellers' attorney and buyers attorney. RAMIREZ is believed to have represented both Noble and Oviedo in prior real estate transactions. RAMIREZ did not disclose to the Church and Staatz his conflict of interest. In addition, RAMIREZ conspired with NOBLE and/or OVIEDO to deceive the Church and Staatz into believing there was a $15,000.00 escrow check on deposit in his escrow account as of July 9, 2014. However, Ramirez has since admitted that he never deposited any such check. Rameriz has further admitted that he represented Noble in the above referenced transaction even though listed as sellers' attorney. Moreover, Ramirez has admitted that neither the Church nor Staatz signed a retaining agreement with him nor did they pay him a retaining fee. Noble and/or Oviedo hired Ramirez to represent the sellers which included the OAG paper work. As the agent and lawyer of Noble, Ramirez was either negligent, grossly negligent, reckless and/or gross

---

[1] Oviedo's dual representation became apparent in plaintiff's first complaint when Noble pled "16. Noble and her real estate broker Ledwin Oviedo (("the Broker") have invested countless hours over the last four years. . ." (Exhibit "G")

reckless in failing to prepare and file the OAG paperwork in July of 2014. It is further alleged that Ramirez received instruction from Noble and/or Oviedo not to do the paperwork so as gain an economic advantage over the Church and Staatz. Ramirez is defined as the seller's attorney in the 2014 and 2015 contracts of sale and listed as a person to be noticed for the sellers in the 2017 contract of sale.

8.      Urbany Investment Group LLC ("Urbany") is a single member LLC owned and operated by Noble. On May 9, 2017 Urbany Investment LLC would issue a retaining check to Laura C. Browne, Esq. to perform work on the contract of sale.

9.      LAURA C. BROWNE, ESQ., like Ramirez operated as both the Sellers' attorney and buyers attorney. BROWNE is believed to have represented both Noble and Oviedo in prior real estate transactions. BROWNE did not disclose to the Church and Staatz her conflict of interest nor did she obtain the necessary waivers. In addition, it is believed that BROWNE conspired with NOBLE and/or OVIEDO to deceive the Church and Staatz into believing that she had received the $15,000.00 escrow check on deposit in RAMIREZ's escrow account as of July 9, 2014. Neither the Church nor Staatz signed a retaining agreement with BROWNE nor did they pay her a retaining fee. Noble and/or Oviedo hired Browne to represent the sellers which included the completion of the OAG paper work. As the agent and lawyer of Noble and/or the Church, BROWNE was either negligent, grossly negligent, reckless and/or grossly reckless in failing to prepare and file the OAG paper work in2017. It is further alleged that Browne received instruction from Noble and/or Oviedo not to do the paper work so as gain an economic advantage over the Church and Staatz. In addition, as the alleged lawyer of the Church – Browne was well aware it would take a board resolution to fire her. No such resolution exists. The 2017 contract of sale denotes Browne as the seller's attorney.

## JURISDICTION

10.      That on or about April 17, 2020 plaintiff filed an Amended Complaint.  Pursuant to Rule

14(a) of the Federal Rules of Civil Procedure.  This Court has jurisdiction over non-diverse

parties.  That defendant is filing this Third-Party complaint within the 14 days of plaintiff's filing

the Amended Complaint.

## EXHIBITS TO THE THIRD PARTY COMPLAINT

       Exhibit A -     November 2017 - Ramirez letter he represents Maria T. Noble
       Exhibit B -     July 8, 2014 - $15,000.00 Non-negotiated Check to Ramirez
       Exhibit C -     Eviction proceedings
       Exhibit D -     Browne to Ramirez - 2014 email Sample Petition for OAG procedures
       Exhibit E -     Tereso Construction giving estimate at Oviedo's request
       Exhibit F -     2015 Contract;
       Exhibit G -     Plaintiff's 2018  Complaint - First;
       Exhibit H -     Oviedo's Deposition;
       Exhibit I -     Noble's Deposition;
       Exhibit J -     June 26, 2014 Purchase memorandum;
       Exhibit K -     July 9, 2014 Contract;
       Exhibit L -     July 9, 2015 Contract;
       Exhibit M -     June 2014 - Bronx county clerk receipt for Corporate Documents;
       Exhibit N -     May 16, 2019 – Letter Ramirez to Broderick;
       Exhibit O -     Ortiz letter to defendants;
       Exhibit P -     May 9, 2017 – Noble retaining check of Browne;
       Exhibit Q -     May 16, 2017 – alleged down payment check:
       Exhibit R -     2017 – Contract of Sale

## PRELIMINARY STATEMENT

11.      That in or about May 2014 defendant-third party plaintiff's decided to make inquiry

about selling the property known as 2176 Grand Concourse, Bronx, New York.  Staatz went to

Oviedo, a Real Estate Broker, to inquire about selling the property.  Staatz went to Oviedo with

expectation that Oviedo would use his business acumen to find a purchaser willing to pay the

best price possible for the sale of the property.  The Church and Staatz came to an Oral

agreement that Oviedo would act as the defendants – third party plaintiff's broker in the sale of

the subject property.  Upon accepting the brokerage agreement Oviedo owed certain fiduciary duties to the Church and Staatz which included to conduct himself professionally, owed a duty of loyalty, and disclose any dual representation and/or any conflict of interest.  Oviedo violated all the tenets of operating as a broker in the above referenced transaction.  In fact, as alleged below, Oviedo actually acted against the interest of the Church to the benefit of Noble.

12.     On or about June 26, 2014 Oviedo and Staatz entered into an oral agreement whereby he would receive 5% of the sale's price for the subject premises (Exhibit "H" – Oviedo Transcript, pg. 5 – 6).  Upon entering into this oral broker's agreement, Oviedo, his agents, and employees all owed the defendants certain fiduciary duties to the Church and Staatz.  Plaintiff Noble was one Oviedo's agents working inside of his office [Id. pg 8].  Thus, Noble also owed certain fiduciary duties to the defendant – the least of which was the full disclosure of her relationship with Oviedo as well as the self dealing nature of the complained of transaction.

13.     On or about June 26, 2014 Oviedo and Noble convinced the Church and Staatz to sell the property to Noble for $600,000.00 (Exhibit "J" – Purchase Memorandum).  Oviedo never listed the property so as to give his lover and agent Noble the subject property at a discounted price.  Oviedo and Noble never disclosed the self dealing nature as well as Oviedo's dual representation as required by RPAPL 443(4)(a).

14.     Noble and Oviedo induced the Church and Staatz into signing the contract by asserting that they could get all the work legal work done by Jamie Ramirez, Esq.  Noble and Oviedo never disclosed that Ramirez had represented Oviedo on 5 to 10 legal matters prior to July 9, 2014 (Exhibit "H") and had also worked with and/or represented the plaintiff prior.  In fact, neither Noble nor Ramirez informed the Church and Staatz that Ramirez actually represented Noble in this matter until November of 2017 [Exhibit "A" – Ramirez letter].

15.     As further inducement and consideration for the July 9, 2014 contract of sale ("First Contract" – Exhibit K), Noble would issue a check on July 8, 2014 in the amount of $15,000.00 which was the defined contract deposit (Exhibit "B") and reproduced below:



16.     Unbeknownst to the Church and Staatz was that check was not valid as Noble did not have the required funds in her bank account on that date and/or that Noble and/or Oviedo told Ramirez not to negotiate the check.

17.     Noble and/or Oviedo transmitted the $15,000.00 check to Ramirez who was obligated to deposit that check in his escrow account as the alleged attorney for the sellers.  Ramirez did not negotiate the $15,000.00 check.  Ramirez did not inform the Church and Staatz that he was not going to deposit the $15,000.00 check into his account.    The facts surrounding the $15,000.00 contract deposit are confusing as Ramirez, while under subpoena, produced the $15,000.00; however, Noble alleged in her first complaint an entirely different set of facts.

18.     Plaintiff alleged in her first complaint [Exhibit "G"] that she issued two checks to Ramirez in the amounts of $1,000.00 and $14,000.00 for the July 9, 2014 contract deposit of $15,000.00 [Exhibit "G"].  These alleged checks were never negotiated by Ramirez contrary to plaintiff's assertions in her first complaint and Ramirez never produced same under the subpoena issued.

19.     In paragraph 15 of her first complaint Noble details how Ramirez violated his fiduciary duties to the Church and Staatz by making a side agreement with Noble not to deposit the contract monies.  In paragraph 15 of her first complaint (Exhibit "G") Noble stated:

> 15.     Mr. Ramirez informed the Plaintiff that he would hold in escrow, but not
>
> negotiate, the $14,000 deposit check until the Church obtained the AG's approval of the sale.

It is clear that Ramirez was acting against the interest of his clients, the Church and Staatz, either by himself or in concert with Noble.  Ramirez representation of Noble remained undisclosed until November 2, 2017 when he wrote,

> This shall serve to confirm that his office represents Maria T. Noble whom entered into contract with the Mt. Olivet Church for the above referenced premises. . . (Exhibit "A" – Ramirez Letter).

20.     Ramirez's actions on behalf of Noble prejudiced the Church and Staatz at put them at significant disadvantage.   First, contract formation never took place as Noble never gave the required consideration.  Second, Ramirez defrauded the Church and Staatz into believing contractual formation had taken place.  Third, Ramirez would evict the tenants of the Church not for the benefit of the Church but for Noble.

21.     On April 8, 2015, Oviedo, unknown to the Church and Staatz, would start taking affirmative measures to drive down the price for Noble by hiring George Cobblac to conduct an appraial. Oviedo ordered this evaluation NOT for the benefit of the Church and Staatz but for that of his lover Noble as there was allegedly a signed contract of sale between the Noble and the Church for $600,000.00.  But, Oviedo's intent the drive the price down for Noble did not stop Cobblac for on April 10, 2015, Oviedo ordered the premises to be evaluated by Tereso Construction (Exhibit "E").   Again, this was not done for the benefit of the Church but for Noble.  By ordering these appraisals Oviedo violated his fiduciary duties owed to the Church and Staatz.  Oviedo's duty was to see that the Church and Staatz were paid the $600,000.00.

22.     Noble and Oviedo acted in concert to cause the devaluation of the contract price for on

or about May 4, 2015, defendants' alleged broker Ledwin Oviedo had an appraisal done of the property wherein the appraised value came back at $500,000.00. To conceal his dishonest practice and violation of his fiduciary duty, on May 11, 2015, Oviedo would write Ramirez stating that the appraisal report was for Ruby Staatz; however, Staatz did not order the report nor was the report necessary as they were the sellers and the purchaser Noble was required to conduct their own inspection at their own cost and the time period to so do had long since expired. Interestingly, Ramirez never communicated this information to the Church and Staatz his alleged clients.

23.     On July 9, 2015, Noble would use the information garnered by Oviedo and force the Church and Staatz to accept a new contract of $500,000.00 (Exhibit "F") even though they had been in contract for 1 year and Ramirez evicted the paying tenants to the detriment of the Church and to the benefit of his client Noble; thereby, giving Noble superior bargaining power. As continued inducement for the transaction, plaintiff asserted that there was a $15,000.00 down payment. However, Noble made a false statement to the Church and Staatz as there was never a $15,000.00 down payment. In fact, Ramirez did not disclose to the Church and Staatz that he never deposited the $15,000.00 check dated July 8, 2014 – which was now stale. In addition, Ramirez did not inform the Church and Staatz that he holding $1,000.00 in his escrow and $14,000.00 outside of escrow until the OAG paper work was complete as alleged in plaintiff's first complaint. Thus, Noble, Oviedo, and Ramirez conspired to defraud the defendants into believing that a contract had been formed in 2014 and now 2015 when none was formed. Clearly, Oviedo as the broker and lover of Noble was privy to all the facts.

24.     Needless to say, Ramirez did nothing to move the sale forward.

25.     In 2017 a third contract, the subject of the amended complaint, would be entered into by Noble and the Church. However, Noble's, Oviedo's and Ramirez's games of dishonesty against the Church would not stop. On or about May 9, 2017, prior to the execution of third contract of

sale, Noble through her company Urbany would retain the legal services of Laura C. Browne [Exhibit "P" – Check number 1032]:



26.    Even though a self declared sophisticated real estate investor in her amended complaint, when Noble was asked under oath about this retaining check she stated she had no idea why and/or on whose behalf the check was written (Exhibit "I"):

```
21              Q.   Did you pay the retainer for Ms.
22         Staatz?
23              A.   I don't have that answer to give
24         you right now because I don't remember it.
25         That was back in 2017.
```

27.    Neither Noble, Oviedo, Ramirez, nor Browne ever disclosed the May 9, 2017 retention of Browne to the Church and Staatz.

28.    On May 16, 2017, plaintiff and defendants allegedly entered into a third contract of sale for the same exact price of $500,000.00.  No reason has been given by the plaintiff for this alleged 3rd contract.  However, this 2017 contract now defined the defined the contract deposit amount as $1,000.00 which remains mysterious as there was allegedly already a $15,000.00 contract deposit given in 2014 which induced defendants to stay with this purchaser.

29.    On May 16, 2017 – plaintiff Noble through her company Urbany would write check number 1034 to Ms. Browne, the attorney she retained, claiming the down payment of $1,000.00 had been paid on contract.  The May 16, 2017 contract defined the sellers attorney as being

Laura C. Browne, Esq. with notice to Jamie Ramirez, Esq on the seller's side. There was no notice provision on buyer's side. In fact, if the defendants signed this third contract it was because they believed there was actually $16,000.00 on deposit, i.e. $15,000.00 given to Ramirez and an additional $1,000.00 to Browne. Browne, whom served as plaintiff's lawyer, also failed to disclose her dual representation.

30.     Noble now seeks to enforce this third contract; however, Noble hired all of the agents, Noble paid all of the agents. Noble choose all of the agents and now seeks to punish the Church and Staatz for her choices and dishonesty. As will become apparent in the facts below, Noble, Oviedo, Ramirez and/or Browne all conspired against the Church and Staatz.


**F A C T S**

31.     That in or about May 2014 Oviedo and Staatz had a meeting wherein Oviedo would act as the Seller's broker for the sale of the subject premises. Oviedo agreed to take upon the listing and find a purchaser for the Church and Staatz.

32.     That in 2014 Staatz and Oviedo allegedly entered into a verbal broker's agreement whereby he would be the seller's broker [Oveido, page 5].

33.     That Oviedo's commission was to be paid by the seller.

34.     That Oviedo's commission would be 5% of the sales price [Oviedo, Pg. 6].

35.     That upon reaching this alleged oral broker's agreement with the Church and Staatz, Oviedo owed the Church and Staatz certain fiduciary duties including loyalty.

36.     That upon reaching this alleged oral broker's agreement with the with the Church and Staatz, Oviedo's employees owed a fiduciary duty to the Church and Staatz.

37.     That upon reaching this alleged oral broker's agreement with the Church and Staatz, Oviedo's agents owed a fiduciary duty to the Church and Staatz.

38.    That upon reaching this alleged oral broker's agreement with the Church and Staatz Oviedo's real estate agents operating out of his offices owed the Church and Staatz a fiduciary duty.

39.    That Noble is "an agent for the brokerage" [Oviedo, Pg. 8].

40.    That in 2014 Noble was operating as a real estate broker under Oviedo.

41.    That in 2014 Noble was a 1099 contractor for Oviedo.

42.    That in 2014 Noble and Oviedo were significant others, lovers, and/or domestic partners.

43.    That Oviedo as the seller's broker was obligated to get the Church and Staatz the highest purchase price for the property that the market would bare.

44.    That Oviedo's office and those working therein were obligated to get the Church and Staatz the highest price the market would bare.

45.    That Oviedo never listed the Church's property for sale.

46.    That Oviedo never listed the Church's property for sale because he wanted his lover to acquire the property.

47.    That Oviedo never listed the Church's property for sale because he wanted his lover to acquire the property as a straw purchaser for himself.

48.    That Noble was a straw purchaser.

49.    Oviedo for his part found the Church a purchaser and presented Staatz with a purchase memorandum which reflected the purchaser's offer.

50.    On or about June 26, 2014, Oviedo would present the Church and Staatz with a purchase memorandum (Exhibit "J").

51.    The purchase memorandum defined the purchase price as $600,000.00.

52.    The purchase memorandum defined the down payment as $15,000.00.

53.    The purchase memorandum defined the seller as the Church.

54.    The purchase memorandum defined the purchaser as Noble.

55.     The purchase memorandum defined the sellers' attorney as Jamie Ramirez, Esq.

56.     That Oviedo worked with Jamie Ramirez prior July 9, 2014.

57.     That Noble worked with Jamie Ramirez prior to July 9, 2014.

58.     That Jamie Ramirez represented Oviedo prior to July 9, 2014.

59.     That Jamie Ramirez represented Noble prior to July 9, 2014.

60.     That Jamie Ramirez represented Oviedo on 5 to 10 legal matters prior to July 9, 2014.

61.     That Jamie Ramirez represented Noble regarding in this matter.

62.     That Oviedo worked with Laura C. Browne prior July 9, 2014.

63.     That plaintiff worked with Laura C. Browne prior to July 9, 2014.

64.     That Laura C. Browne  represented Oviedo prior to July 9, 2014.

65.     That Laura C. Browne represented plaintiff prior to July 9, 2014.

66.     That Laura C. Browne represented Noble regarding this matter.

67.     That prior to July 9, 2014 Oviedo and Noble had at least one child together.

68.     That prior to July 9, 2014 Ovideo was a licensed Real Estate Broker in the State of New York.

69.     That prior to July 9, 2014 Noble was a licensed Real Estate agent in the State of New York.

70.     That as a Real Estate Broker licensed in the State of New York Oviedo had to comply with RPAPL 443 in those transactions wherein he was conflicted,  had a dual representation and/or self dealing.

71.     That as a Real Estate Agent Noble had to comply with RPAPL 443 in those transactions wherein he was conflicted,  had a dual representation and/or self dealing.

72.     RPAPL 443(4)(a) states:

        4.    a.    For buyer-seller transactions, the following shall be the disclosure form:
                    NEW YORK STATE DISCLOSURE FORM
                    FOR BUYER AND SELLER
                    THIS IS NOT A CONTRACT

New York state law requires real estate licensees who are acting as agents of buyers or sellers of property to advise the potential buyers or sellers with whom they work of the nature of their agency relationship and the rights and obligations it creates.   This disclosure will help you to make informed choices about your relationship with the real estate broker and its sales agents.

Throughout the transaction you may receive more than one disclosure form.   The law may require each agent assisting in the transaction to present you with this disclosure form.   A real estate agent is a person qualified to advise about real estate.

If you need legal, tax or other advice, consult with a professional in that field.

DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIPS

SELLER'S AGENT

A seller's agent is an agent who is engaged by a seller to represent the seller's interests. The seller's agent does this by securing a buyer for the seller's home at a price and on terms acceptable to the seller.   A seller's agent has, without limitation, the following fiduciary duties to the seller:  reasonable care, undivided loyalty, confidentiality, full disclosure, obedience and duty to account.   A seller's agent does not represent the interests of the buyer.   The obligations of a seller's agent are also subject to any specific provisions set forth in an agreement between the agent and the seller.   In dealings with the buyer, a seller's agent should (a) exercise reasonable skill and care in performance of the agent's duties;  (b) deal honestly, fairly and in good faith;  and (c) disclose all facts known to the agent materially affecting the value or desirability of property, except as otherwise provided by law.

BUYER'S AGENT

A buyer's agent is an agent who is engaged by a buyer to represent the buyer's interests. The buyer's agent does this by negotiating the purchase of a home at a price and on terms acceptable to the buyer.   A buyer's agent has, without limitation, the following fiduciary duties to the buyer:  reasonable care, undivided loyalty, confidentiality, full disclosure, obedience and duty to account.   A buyer's agent does not represent the interests of the seller.   The obligations of a buyer's agent are also subject to any specific provisions set forth in an agreement between the agent and the buyer.   In dealings with the seller, a buyer's agent should (a) exercise reasonable skill and care in performance of the agent's duties;  (b) deal honestly, fairly and in good faith;  and (c) disclose all facts known to the agent materially affecting the buyer's ability and/or willingness to perform a contract to acquire seller's property that are not inconsistent with the agent's fiduciary duties to the buyer.

BROKER'S AGENTS

A broker's agent is an agent that cooperates or is engaged by a listing agent or a buyer's agent (but does not work for the same firm as the listing agent or buyer's agent) to assist the listing agent or buyer's agent in locating a property to sell or buy, respectively, for the listing agent's seller or the buyer agent's buyer.   The broker's agent does not have a direct

relationship with the buyer or seller and the buyer or seller can not provide instructions or direction directly to the broker's agent.   The buyer and the seller therefore do not have vicarious liability for the acts of the broker's agent.   The listing agent or buyer's agent do provide direction and instruction to the broker's agent and therefore the listing agent or buyer's agent will have liability for the acts of the broker's agent.

DUAL AGENT

A real estate broker may represent both the buyer and the seller if both the buyer and seller give their informed consent in writing.   In such a dual agency situation, the agent will not be able to provide the full range of fiduciary duties to the buyer and seller.   The obligations of an agent are also subject to any specific provisions set forth in an agreement between the agent, and the buyer and seller.   An agent acting as a dual agent must explain carefully to both the buyer and seller that the agent is acting for the other party as well.   The agent should also explain the possible effects of dual representation, including that by consenting to the dual agency relationship the buyer and seller are giving up their right to undivided loyalty.   A buyer or seller should carefully consider the possible consequences of a dual agency relationship before agreeing to such representation.   A seller or buyer may provide advance informed consent to dual agency by indicating the same on this form.

DUAL AGENT

WITH

DESIGNATED SALES AGENTS

If the buyer and the seller provide their informed consent in writing, the principals and the real estate broker who represents both parties as a dual agent may designate a sales agent to represent the buyer and another sales agent to represent the seller to negotiate the purchase and sale of real estate.   A sales agent works under the supervision of the real estate broker.   With the informed consent of the buyer and the seller in writing, the designated sales agent for the buyer will function as the buyer's agent representing the interests of and advocating on behalf of the buyer and the designated sales agent for the seller will function as the seller's agent representing the interests of and advocating on behalf of the seller in the negotiations between the buyer and seller.   A designated sales agent cannot provide the full range of fiduciary duties to the buyer or seller.   The designated sales agent must explain that like the dual agent under whose supervision they function, they cannot provide undivided loyalty.   A buyer or seller should carefully consider the possible consequences of a dual agency relationship with designated sales agents before agreeing to such representation.   A seller or buyer may provide advance informed consent to dual agency with designated sales agents by indicating the same on this form.

This form was provided to me by ………………… (print name of licensee) of ………………… (print name of company, firm or brokerage), a licensed real estate broker acting in the interest of the:

( ) Seller as a

( ) Buyer as a

(check relationship below)

(check relationship below)

( ) Seller's agent

( ) Buyer's agent

( ) Broker's agent

( ) Broker's agent

( ) Dual agent

( ) Dual agent with designated sales agents

For advance informed consent to either dual agency or dual agency with designated sales agents complete section below:

( ) Advance informed consent dual agency.

( ) Advance informed consent to dual agency with designated sales agents.

If dual agent with designated sales agents is indicated above:

………………is appointed to represent the buyer;  and

………………is appointed to represent the seller in this transaction.

(I)  (We) acknowledge receipt of a copy of this disclosure form:

Signature of { } Buyer(s) and/or { } Seller(s):

_____

_____

_____

_____

Date:_____

Date:_____

73.    That Oviedo never made the requisite RPAPL 443(4)(a) disclosure to the Church and Staatz.

74.    That Noble never made the requisite RPAPL 443(4)(a) disclosure to the disclosure to the Church and Staatz.

75.    That Oviedo violated his fiduciary duty to Staatz when he failed to have the required RPAPL 443(4)(a) signed.

76.    That Noble violated her fiduciary duty to Staatz when he failed to have the required RPAPL 443(4)(a) signed.

77.    That Noble recommended the Church and Staatz to Jamie Ramirez to serve as their lawyer in the complained about transaction.

78.    That Oviedo recommended the Church and Staatz to Jamie Ramirez to serve as defendants' lawyer in the complained about transaction.

79.    That prior to the July 9, 2014 signing of the alleged contract of sale, on or about June 27, 2014, Oviedo went with Staatz to the Bronx County Clerk's office to get the required corporate formation documents for the Church to sell the property.

80.    That the purchase memorandum defined the buyer's attorney as Ivonne Santos.

81.    On or about July 1, 2014, Oviedo emailed the corporate documents he obtained from the Bronx County Clerk to Ramirez.

82.    That when Oviedo transferred the documents to Ramirez he had the documents necessary to apply for and get OAG approval.

83.    On May 16, 2019 plaintiff's attorney Ramirez would write to defendant's counsel Broderick indicating that Ms. Staatz did not give him the requested documents even though Oviedo, Seller's agent, had sent the documetns prior to the July 9, 2014 signing.

84.    Ramirez never wrote a letter to the Church and Staatz informing them that he needed any additional documents to complete the OAG process.

85. From July 9, 2014 throughout 2015 Oviedo never wrote a letter to the Church and Staatz informing them that he needed any additional documents to complete the OAG process.

86. From July 9, 2014 throughout 2015 Noble never wrote a letter to the Church and Staatz informing them that he needed any additional documents to complete the OAG process.

87. From July 9, 2014 throughout 2015 Noble's attorney never wrote a letter to the Church and Staatz informing them that he needed any additional documents to complete the OAG process.

88. That the Church and Staatz never retained Jamie Ramirez to represent them in the above referenced matter.

89. That there was no retainer agreement between the Church and Ramirez.

90. That there was no retainer agreement between Staatz and Ramirez.

91. That there was NO retaining fee paid by Staatz to Ramirez.

92. That there was NO retaining fee paid by the Church to Ramirez.

93. That Noble paid a retaining fee to Ramirez.

94. That there is no letter of engagement between Ramirez and the Church

95. That there is no letter of engagement between Ramirez and Staatz.

96. That lawyers in the State of New York are at a minimum required to issue a letter of engagement to the Client prior to taking any actions on their alleged behalf.

97. That Oviedo never disclosed his conflict of interest to the Church.

98. That Oviedo never disclosed his conflict of interest to the Staatz.

99. That Noble never disclosed her conflict of interest to the Church.

100. That Noble never disclosed her conflict of interest to Staatz.

101. That Noble never disclosed to the Church that Ramirez was her attorney.

102. That Noble never disclosed to the Staatz that Ramirez was her attorney.

103.    That Ramirez never disclosed to the Church that Noble was a client of his throughout 2014.

104.    That Ramirez never disclosed to the Church that Noble was a client of his throughout 2015.

105.    That Ramirez never disclosed to the Church that Noble was a client of his throughout 2016.

106.    That Ramirez never disclosed to the Church that Noble was a client of his until November of 2017.

107.    That Ramirez never disclosed to the Church that Noble was his client regarding this matter throughout 2014.

108.    That Ramirez never disclosed to the Church that Noble was his client regarding this matter throughout 2015.

109.    That Ramirez never disclosed to the Church that Noble was his client regarding this matter throughout 2016.

110.    That Ramirez never disclosed to the Church that Noble was his client regarding this matter throughout until November of 2017.

111.    That Ramirez never disclosed to Staatz that Noble was a client of his throughout 2014.

112.    That Ramirez never disclosed to Staatz that Noble was a client of his throughout 2015.

113.    That Ramirez never disclosed to Staatz that Noble was a client of his throughout 2016.

114.    That Ramirez never disclosed to Staatz that Noble was a client of his until November of 2017.

115.    That Ramirez never disclosed to Staatz that Noble was his client regarding this matter throughout 2014.

116.    That Ramirez never disclosed to Staatz that Noble was his client regarding this matter throughout 2015.

117.    That Ramirez never disclosed to Staatz that Noble was his client regarding this matter throughout 2016.

118.    That Ramirez never disclosed to Staatz that Noble was his client regarding this matter throughout until November of 2017.

119.    That the laws, rules and code of ethics required Ramirez to inform the Church and Staatz of his potential conflict of interest.

120.    That Oviedo never disclosed to the Church that Ramirez was his attorney.

121.    That Oviedo never disclosed to Staatz that Ramirez was his attorney.

122.    That on or about July 9, 2014 plaintiff alleges that she and the defendants entered into a contract of sale for the property known as 2176 Grand Concourse, Bronx, New York.

123.    That the July 9, 2014 contract defined the purchase price as $600,000.00.

124.    That the July 9, 2014 contract defined the down payment as $15,000.00.

125.    That the July 9, 2014 contract defined the closing balance due as $585,000.00.

126.    That the July 9, 2014 contract required the down payment to be deposited in the seller's attorney escrow account.

127.    That there was a rider to the July 9, 2014.

128.    That the July 9, 2014 contract defined the attorney for seller as being Jaime Ramirez.

129.    That the July 9, 2014 contract did not defined the attorney for the purchaser.

130.    That the July 9, 2014 contract required all notices under the agreement be sent to the defendants' attorney Jamie Ramirez.

131.    That Noble never informed Ms. Staatz that she was in default of the July 9, 2014 contract.

132.    That Noble never informed Mr. Ramirez that Ms. Staatz of was in default of the July 9, 2014 contract.

133. That Noble's attorney never informed Mr. Ramirez that Ms. Staatz was in default of the July 9, 2014 contract.

134. That Noble never informed the Church that they were in default of the July 9, 2014 contract.

135. That Noble never informed Mr. Ramirez that the Church was in default of the July 9, 2014 contract.

136. That Noble's attorney never informed Mr. Ramirez that the Church was in default of the July 9, 2014 contract.

137. That Oviedo never wrote any letter to Staatz informing her that the Church was in default of the July 9, 2014 contract.

138. That Oviedo never wrote any letter to the Church informing it that it was in default of the July 9, 2014 contract.

139. That there is no letter from plaintiff's attorney to Oviedo informing him that the Church was in violation of the July 9, 2014 contract.

140. No one plaintiff's behalf ever sent the required default notice under the July 9, 2014 contract to the defendants.

141. The first notice of default under the July 9, 2014 contract was this action.

142. On May 16, 2019 – Ramirez wrote:

Dear Mr. Broderick:

Please find materials which were requested by your subpoena. Please note that the down payment was never deposited as I recall I had requested material from Ms. Staatz. Additionally, I did not enter into any written retainer agreements with Ms. Staaz.

Also please note that at some point Ms. Staaz substituted my office with the office of Mirna Socorro, Esq.

If you require anything additional please advise me.

Very truly yours,



Jaime Ramirez, Esq.

143.   That on or about July 8, 2014 plaintiff issued a check drawn on TD Bank in the amount of $15,000.00 which was to serve as the down payment for the purchase of the subject property.

144.   That the check below is the contract deposit allegedly given by Noble for the purchase of the property.



145.   That by issuing Check 0098 Noble was representing that she had at least $15,000.00 in her bank account on the date it was issued.

146.   That Noble did not have $15,000.00 in the TD Bank account upon which this check was drafted on July 8, 2014.

147.   That Noble did not have $15,000.00 in the TD Bank account upon which this check was drafted on July 9, 2014.

148.   That Noble told Ramirez she did not have sufficient funds in her account.

149.    That Noble told and/or instructed Ramirez not to deposit the $15,000.00 check into his escrow account.

150.    That Noble issued the $15,000.00, referenced above, to induce the Church to sell the property to Ms. Noble.

151.    That Noble issued the $15,000.00 check, referenced above, to induce the Staatz to sell the property to Ms. Noble.

152.    That Noble issued the $15,000 check, referenced above, as consideration for the July 9, 2014 contract.

153.    That Noble issued the $15,000.00 check referenced above so as to convince the defendants that plaintiff had the resources to purchase the property.

154.    To date, plaintiff has never produced a single document demonstrating that she had the $15,000.00 in her bank account at or near the time the check was written.

155.    Ramirez never negotiated the $15,000.00 check.

156.    Ramirez never negotiated the $15,000.00 check because either Oviedo and/or Noble told him not to negotiate the check.

157.    That Ramirez never informed the Church that he was not going to negotiate the check.

158.    That Ramirez never informed Staatz that he was not going to negotiate the check.

159.    That Ramirez violated his fiduciary duty to the Church when he failed to negotiate the check.

160.    That Ramirez violated his fiduciary duty to Staatz when he failed to negotiate the check.

161.    That Ramirez violated his fiduciary duty to the Church when he failed to inform the Church that he was not negotiating the $15,000.00 contract deposit.

162.    That Ramirez violated his fiduciary duty to Staatz when he failed to inform the Church that he was not negotiating the $15,000.00 contract deposit.

163.    In her first complaint, Noble, alleged that she provided Mr. Ramirez with the required $15,000.00 contract deposit.

164.    In her first complaint plaintiff Noble alleged that that she issued two checks to Ramirez which was to serve as the contract deposit for the July 9, 2014 contract.

165.    Plaintiff Noble alleged in her first complaint that she issued two checks to Ramirez in the amounts of $1,000.00 and $14,000.00 to satisfy the July 9, 2014 contract deposit of $15,000.00.

166.    Plaintiff Noble alleged in her first complaint that Ramirez negotiated the $1,000.00 check.

167.    Ramirez never negotiated the $1,000.00 check.

168.    Ramirez never negotiated the $1,000.00 check because either Oviedo and/or Noble told him not to negotiate the check.

169.    That Ramirez never informed the Church that Noble was modifying contract with the issuance of two checks in the amounts of $1,000.00 and $14,000.00.

170.    That Ramirez never informed Staatz that Noble was modifying the contract with the issuance to two checks in the amounts of $1,000.00 and $14,000.00.

171.    That Ramirez never informed the Church he was not going to negotiate the $1,000.00 check.

172.    That Ramirez never informed the Church he was not going to negotiate the $14,000.00 check.

173.    That Ramirez never informed Staatz that he was not going to negotiate the $1,000.00 check.

174.    Ramirez never informed Staatz that he was not going to negotiate the $14,000.00.

175.    Ramirez violated his fiduciary duty to the Church when he failed to inform the Church that Noble was modifying the contract by issuing two checks in the amounts of $1,000.00 and $14,000.00.

176.    Ramirez violated his fiduciary duty to Staatz when he failed to inform her that Noble was modifying the contract by issuing two checks in the amounts of $1,000.00 and $14,000.00.

177.    Ramirez violated his fiduciary duty to the Church when he failed to negotiate the $1,000.00.

178.    Ramirez violated his fiduciary duty to Staatz when he failed to negotiate the $1,000.00.

179.    Ramirez violated his fiduciary duty to the Church when he failed to negotiate the $14,000.00.

180.    Ramirez violated his fiduciary duty to Staatz when he failed to negotiate the $14,000.00.

181.    Noble told Oviedo that she was changing the contract deposit to two checks.

182.    Noble told Oviedo that she was issuing two checks to replace the $15,000.00 check referenced above.

183.    Noble told Oviedo that she was issuing a $1,000.00 and a $14,000.00 check to Ramirez to serve as the July 9, 2014 contract deposit.

184.    Noble told Oviedo that Ramirez was only to negotiate the $1,000.00 check.

185.    Noble told Oviedo that Ramirez was not going to negotiate the $14,000.00 check.

186.    That Oviedo never informed the Church that Noble was modifying the Contract deposit.

187.    That Oviedo never informed Staatz that Noble was modifying the Contract deposit.

188.    That Oviedo violated his fiduciary duty to the Church when he failed to disclose and/or notify it that Noble had modified the contract deposit.

189.    That Oviedo violated his fiduciary duty to Staatz when he failed to disclose and/or notify her that Noble had modified the contract deposit.

190.    That Oviedo violated his fiduciary duty when he failed to disclose and/or notify the church that Noble's check of $14,000.00 was not going to be deposited.

191.    That Oviedo violated his fiduciary duty when he failed to disclose and/or notify Staatz that Noble's check of $1,000.00 was not going to be deposited.

192.    To this date, Ramirez has never provided a copy of the $1,000.00 check given by Noble to the Church and/or its representative.

193.    To this date, Ramirez has never provided a copy of the $14,000.00 check given by Noble to the Church and/or its representative.

194.    That Ramirez violated his fiduciary duty to the Church by failing to turn over copies of the $1,000.00 check.

195.    That Ramirez violated his fiduciary duty to Staatz by failing to turn over copies of the $14,000.00 Check.

196.    That Ramirez violated his fiduciary duty to Staatz by failing to turn over copies of the $1,000.00 check.

197.    That Ramirez violated his fiduciary duty to the Church by failing to account for the $1,000.00 check that Noble claims he negotiated.

198.    That Ramirez violated his fiduciary duty to Staatz by failing to account for the $1,000.00 check that Noble claims he negotiated.

199.    That Oviedo was Noble's broker.

200.    That Oviedo never informed the Church that he was Noble's broker on this transaction.

201.    That Oviedo never informed Staatz that he was Noble's broker on this transaction.

202.    That Noble asserted in her first complaint that Oviedo was the real estate broker on her side of the transaction.

203.    In paragraph 16 of her first complaint, Noble asserted:

16.     Noble and her real estate broker Ledwin Oviedo (the "Broker") have invested countless hours over the last four years assisting the Defendants in its attempts to prosecute the sale.

204.    That Oviedo was both parties broker.

205.    That Oviedo was both parties broker and failed to disclose his dual representation to the Church.

206.    That Oviedo was both parties broker and failed to disclose his dual representation to Staatz.

207.    That Oviedo's failure to disclose his dual representation to the Church was a violation of RPAPL 443(4)(a).

208.    That Oviedo's failure to disclose his dual representation to Staatz was a violation of RPAPL 443(4)(a).

209.    That Oviedo's failure to disclose his dual representation to the Church was a violation of the fiduciary duty he owed to the Church.

210.    That Oviedo's failure to disclose his dual representation to Staatz was a violation of the fiduciary duty he owed to Staatz.

211.    That Noble was aware of Oviedo's dual representation.

212.    That Noble and Oviedo conspired to hide his dual representation.

213.    That Ramirez was aware of Oviedo's dual representation.

214.    That Ramirez, Oviedo and/or Noble conspired to conceal Oviedo's dual representation from the Church.

215.    That Ramirez, Oviedo and/or Noble conspired to conceal Oviedo's dual representation from Staatz.

216.    That plaintiff and Oviedo conspired to hide his dual representation from the Church so that Noble would acquire the property at a 5% discount, ie. the $30,000.00 which would her lover Oviedo would receive.

217.    That Oviedo and Noble live together.

218.    Plaintiff's attorney Ramirez did not disclose his own dual representation to the Church.

219.    Plaintiff's attorney Ramirez did not disclose his own dual representation to Staatz.

220.    On November 2, 2017, Ramirez finally revealed and disclosed his dual representation

writing:

> This shall serve to confirm that this office represents Maria T. Noble whom entered into contract with the Mt. Olivet Church for the purchase of the above referenced premises. It is my understanding that your office has taken over the file. The contract was only subject to appropriate court approval. Please note that the purchaser stands ready, willing and able to close pursuant to the terms of the contract of sale.
>
> Request is hereby made for your office to provide evidence that an application has been filed and the status of said application. Looking forward to closing this transaction promptly.
>
> Thank you for your attention to this matter, I remain
>
> Very truly yours,
>
> Jaime Ramirez, Esq.
>
> Cc: Maria T. Noble

221.    That Noble, Oviedo and Ramirez conspired to keep Ramirez's dual representation hidden

from the Church and Staatz.

222.    That Ramirez's concealment of his dual representation from the Church and Staatz was

an act of deceit .

223.    That Ramirez's concealment of his dual representation from the Church and Staatz was

an act of fraud.

224.    That Noble's, Oviedo's and Ramirez's failure to disclose Ramirez's dual representation

from the Church and Staatz the Church was an act of deceit.

225.    That Noble's, Oviedo's and Ramirez's failure to disclose Ramirez's dual representation

from the Church and Staatz the Church was an act of fraud.

226.    That Noble's, Oviedo's and Ramirez's failure to disclose Ramirez's dual representation

from the Church and Staatz the Church was an act of deceit.

227.    That Oviedo's and Ramirez's failure to disclose Ramirez's dual representation from the Church and Staatz was a violation of their fiduciary duties to the Church and Staatz.

228.    That Noble's, Oviedo's and/or Ramirez's scheme to hide the conflicts of interest in this matter clearly violated the principles of fair dealing with the regard to the contracts of sale.

229.    The July 9, 2014 contract required defendants to deliver the premises vacant.

230.    In good faith and in compliance with the vacancy provision,  the Church's purported lawyer Jamie Ramirez instituted commercial eviction proceedings against the paying tenants under L&T Index Number 901344/2014 on August 1, 2014 [Exhibit "C"].

231.    That after Ramirez had the tenants evicted Oviedo and Ramirez conspired to drive down the price of the property for Noble.

232.    That after the tenants were evicted Oviedo and/or Ramirez ordered several property appraisals even though there was no legitimate purpose to do so on behalf of the seller.

233.    That after the signing of the July 9, 2014 contract Oviedo and Ramirez agents had no legitimate purpose to order an inspection of the property.

234.    That even if there was a legitimate purpose for them to conduct an inspection on behalf of the Church and Staatz, Oviedo and Ramirez were under an obligation not to disclose same to Noble.

235.    That after the July 9, 2014 contract had been fully executed  Ramirez ordered an appraisal of the subject property.

236.    That after the July 9, 2014 contract had been fully executed Oviedo ordered an appraisal of the subject property.

237.    That there was no legitimate purpose for Oviedo and/or Ramirez to order an appraisal of the property as the seller had already achieved a purchase price of $600,000.00.

238.    That Ramirez ordered the appraisal for the benefit of Noble.

239.    That Oviedo ordered the appraisal for the benefit of Noble.

240.    That Oviedo and Ramirez were obligated to keep the appraisal report from Noble.

241.    That Oviedo violated his fiduciary duty to the Church when he disclosed the appraisal report to Noble.

242.    That Oviedo violated his fiduciary duty to the Church when he disclosed the appraisal report to Noble's attorney.

243.    That Ramirez violated his fiduciary duty to the Church when he disclosed the appraisal report to Noble.

244.    That Ramirez violated his fiduciary duty to the Church when he disclosed the appraisal report to Noble's attorney.

245.    That Ramirez disclosed the inspection report to Noble.

246.    That Ramirez disclosed the inspection report to Noble's attorney.

247.    That as a result of the inspection report ordered by and/or disclosed by Ramirez to Noble, Noble demanded a $100,000.00 reduction in the purchase of price of the subject property.

248.    That as a result of the inspection report ordered by and/or disclosed by Oviedo to Noble, Noble demanded a $100,000.00 reduction in the purchase of price of the subject property.

249.    That the conduct of Ramirez and/or Oviedo caused the Church to be damaged in the amount of $100,000.00.

250.    That on July 9, 2015 the Church and Noble would enter into a second contract at the reduced rate of $500,000.00 directly caused by the actions of Ramirez and/or Oviedo.

251.    On August 19, 2014, Laura Browne, Esq. emailed Ramirez a copy of a sample petition to complete a sale of property belonging to a not for profit (Exhibit "D").

252.    On April 10, 2015, Oviedo ordered the premises to be evaluated by Tereso Construction (Exhibit "E").

253.    Oviedo instructed Ramirez not to file the OAG documents.

254.    Oviedo instructed Ramirez not the file the OAG documents so as to get a more advantageous price for his lover and significant other Noble.

255.    Noble instructed Ramirez not to file the OAG documents.

256.    Noble instructed Ramirez not to file the OAG documents so as to get a more advantageous price.

257.    Noble, Oviedo and/or Ramirez acted in concert to cause the devaluation of the contract price.

258.    On or about May 4, 2015, defendants' alleged broker Ledwin Oviedo had an appraisal done of the property wherein the appraised value came back at $500,000.00.

259.    There was absolutely no reason for the "Seller's" broker to run an appraisal on the property when there was already a contract between the plaintiff and defendant for $600,000.00.

260.     On May 11, 2015, Oviedo wrote Ramirez stating that the appraisal report was for Ruby Staatz; however, Staatz did not order the report.

261.    On July 9, 2015, plaintiff took advantage of her superior bargaining position and forced the defendants to accept a contract of $500,000.00 (Exhibit "F").

262.    On July 9, 2015, plaintiff and defendant allegedly entered into a second contract of sale.

263.    That the July 9, 2015 contract defined the purchase price as $500,000.00

264.    That the July 9, 2015 contract defined the down payment as $15,000.00.

265.    That the July 9, 2015 contract defined the contract balance due as $485,000.00.

266.    That the July 9, 2015 contract did not define the purchaser's attorneys.

267.    That Noble never gave the $15,000.00 deposit for the July 9, 2015 contract.

268.    That Noble knew her alleged $15,000.00 deposit check on the July 9, 2014 contract was no longer able to be negotiated.

269.    That Noble knew her alleged $14,000.00 deposit check on the July 9, 2014 contract was no longer able to be negotiated.

270.     That Noble knew the $1,000.00 check deposit on the July 9, 2014 contract was never negotiated.

271.     That Ramirez has no contract deposits in his escrow account for the July 9, 2014 contract.

272.     That Ramirez has no contract deposit in his escrow account for the July 9, 2015 contract.

273.     That at the time of the execution of the July 9, 2015 contract, Ramirez failed to inform the Church that Noble had not satisfied the contract down payment provision.

274.     That at the time of the execution of the July 9, 2015 contract, Ramirez failed to inform Staatz that Noble had not satisfied the contract down payment provision.

275.     That at the time of the execution of the July 9, 2015 contract, Oviedo failed to inform the Church that Noble had not satisfied the contract down payment provision.

276.     That at the time of the execution of the July 9, 2015 contract, Oviedo failed to inform Staatz that Noble had not satisfied the contract down payment provision.

277.     That Ramirez never informed the Church that Noble failed to comply with the down payment provision of the July 9, 2014 contract.

278.     That Ramirez never informed the Church that Noble failed to comply with the down payment provision of the July 9, 2014 contract.

279.     That Ramirez's failure to inform the Church that Noble failed to comply with the down payment provision of the July 9, 2014 contract was intentional.

280.     That Ramirez's failure to inform Staatz that Noble failed to comply with the down payment provision of the July 9, 2014 contract was intentional.

281.     That Ramirez's failure to inform Staatz and/or the Church that Noble had failed to comply with the down payment provision of the July 9, 2014 contract was a violation of his fiduciary duty to the Church and/or Staatz.

282.    That Ramirez's failure to inform Staatz and/or the Church that Noble had failed to comply with the down payment provision of the July 9, 2014 contract was an act of deceit and/or fraud against the Church and/or Staatz.

283.    That Oviedo never informed the Church that Noble failed to comply with the down payment provision of the July 9, 2014 contract.

284.    That Oviedo never informed the Church that Noble failed to comply with the down payment provision of the July 9, 2014 contract.

285.    That Oviedo's failure to inform the Church that Noble failed to comply with the down payment provision of the July 9, 2014 contract was intentional.

286.    That Oviedo's failure to inform Staatz that Noble failed to comply with the down payment provision of the July 9, 2014 contract was intentional.

287.    That Oviedo's failure to inform Staatz and/or the Church that Noble had failed to comply with the down payment provision of the July 9, 2014 contract was a violation of his fiduciary duty to the Church and/or Staatz.

288.    That Oviedo's failure to inform Staatz and/or the Church that Noble had failed to comply with the down payment provision of the July 9, 2014 contract was an act of deceit and/or fraud against the Church and/or Staatz.

289.    That the July 9, 2015 contract defined the attorney for seller as Jaime Ramirez.

290.    That the July 9, 2015 contract did not defined the attorney for the purchaser.

291.    That the July 9, 2015 contract required all notices under the agreement be sent to the defendants' attorney Jamie Ramirez.

292.    That Ramirez never informed the Church that Noble failed to comply with the down payment provision of the July 9, 2015 contract.

293.    That Ramirez never informed the Church that Noble failed to comply with the down payment provision of the July 9, 2015 contract.

294.    That Ramirez's failure to inform the Church that Noble failed to comply with the down payment provision of the July 9, 2015 contract was intentional.

295.    That Ramirez's failure to inform Staatz that Noble failed to comply with the down payment provision of the July 9, 2015 contract was intentional.

296.    That Ramirez's failure to inform Staatz and/or the Church that Noble had failed to comply with the down payment provision of the July 9, 2015 contract was a violation of his fiduciary duty to the Church and/or Staatz.

297.    That Ramirez's failure to inform Staatz and/or the Church that Noble had failed to comply with the down payment provision of the July 9, 2015 contract was an act of deceit and/or fraud against the Church and/or Staatz.

298.    That Oviedo never informed the Church that Noble failed to comply with the down payment provision of the July 9, 2015 contract.

299.    That Oviedo never informed the Church that Noble failed to comply with the down payment provision of the July 9, 2015 contract.

300.    That Oviedo's failure to inform the Church that Noble failed to comply with the down payment provision of the July 9, 2015 contract was intentional.

301.    That Oviedo's failure to inform Staatz that Noble failed to comply with the down payment provision of the July 9, 2015 contract was intentional.

302.    That Oviedo's failure to inform Staatz and/or the Church that Noble had failed to comply with the down payment provision of the July 9, 2015 contract was a violation of his fiduciary duty to the Church and/or Staatz.

303. That Oviedo's failure to inform Staatz and/or the Church that Noble had failed to comply with the down payment provision of the July 9, 2015 contract was an act of deceit and/or fraud against the Church and/or Staatz.

304. That Oviedo and Ramirez conspired against the Church to conceal the fact that Noble had not given the required down payment for the July 9, 2014 contract.

305. That Oviedo and Ramirez conspired against Staatz to conceal the fact that Noble had not given the required down payment for the July 9, 2014 contract.

306. That Noble, Oviedo and Ramirez conspired against the Church to conceal the fact that Noble had not given the required down payment for the July 9, 2014 contract.

307. That Noble, Oviedo and Ramirez conspired against Staatz to conceal the fact that Noble had not given the required down payment for the July 9, 2014 contract.

308. That Noble never informed Ms. Staatz that she was in default of the July 9, 2015 contract.

309. That Noble never informed Mr. Ramirez that Ms. Staatz of was in default of the July 9, 2015 contract.

310. That Noble's attorney never informed Mr. Ramirez that Ms. Staatz was in default of the July 9, 2015 contract.

311. That Noble never informed the Church that they were in default of the July 9, 2015 contract.

312. That Noble never informed Mr. Ramirez that the Church was in default of the July 9, 2015 contract.

313. That Noble's attorney never informed Mr. Ramirez that the Church was in default of the July 9, 2015 contract.

314. No one on Noble's behalf ever sent the required default notice to the defined notice party under the July 9, 2015 contract.

315.    No one on Noble's behalf ever sent the required default notice to the defined notice party under the July 9, 2014 contract.

316.    That at the time of the purported execution of the July 9, 2015 contract Ramirez had already received all the required corporate documents from Oviedo.

317.    Oviedo instructed Ramirez not to file the OAG documents after the execution of July 9, 2015 contract.

318.    Noble instructed Ramirez not to file the OAG documents after the execution of July 9, 2015 contract.

319.    Oviedo instructed Ramirez not to file the OAG documents after the execution of July 9, 2015 contract because he knew that Noble did not have sufficient funds to close.

320.    Oviedo instructed Ramirez not to file the OAG paperwork after the execution of the July 9, 2015 contract because he knew Noble had not given the required down payment.

321.    Noble instructed Ramirez not to file the OAG paperwork after the execution of the July 9, 2015 contract because she knew that she had not given the required down payment.

322.    Ramirez never filed the required OAG paperwork.

323.    Noble is the sole member of Urbany Investment Group LLC.

324.    On May 9, 2017, seven days prior to the May 16, 2017 contract, Urbany retained the legal services of Laura C. Browne, Esq.

325.    On May 9, 2017, seven days prior to the May 16, 2017 contract, Noble retained the legal services of Laura C. Browne, Esq.

326.    On May 9, 2017, Noble through her company Urbany Investment Group LLC issued a check numbered 1032 in the amount of $1,000.00 to Laura C. Browne, Esq.

327.    On May 9, 2017, Noble through her company Urbany Investment Group LLC issued check number 1032 in the amount of $1,000.00 as a "Legal Fee Retainer" for the acquisition of "2176 Grand Concourse, Bronx".

328.    That Noble is the signatory on check number 1032 from Urbany Investment Group LLC.

329.    That the following is a copy of the Browne retainer check issued by Noble and/or Urbany (Exhibit "P"):



330.    On May 16, 2017, Noble and the Church through Staatz allegedly entered into a third contract of sale.

331.    The May 16, 2017 contract of sale defined the purchase price as $500,000.00.

332.    The May 16, 2017 contract of sale defined the deposit amount as $1,000.00.

333.    The May 16, 2017 contract of sale defined the contract balance due as $499,000.00.

334.    The May 16, 2017 contract of sale defined the sellers attorney as being Laura C. Browne, Esq.

335.    The May 16, 2017 contract of sale equired all contract notices be sent to sellers' attorneys Laura C. Browne, Esq with a copy to seller's other attorney Jamie Ramirez, Esq.

336.    The May 16, 2017 contract of sale had no addresses for notices to be sent to the purchaser.

337.    That the May 16, 2017 contract of sale defined the Broker as Ledwin Enterprises.

338.    That the May 16, 2017 Contract of sale defined Ledwin Enterprise's commission as a "Seller" commission.

339.    That the May 16, 2017 Contract of sale defined Ledwin Enterprises commission as being 5%.

340.    Noble has yet to explain what happened to the $15,000.00 deposit given on the July 9, 2014 contract.

341.    Noble has yet to explain what happened to the $15,000.00 deposit given on the July 9, 2015 contract.

342.    Ramirez has yet to explain what happened to the $15,000.00 deposit given on the July 9, 2014 contract.

343.    Ramirez has yet to explain what happened to the $15,000.00 deposit given on the July 9, 2015 contract.

344.    Oviedo has yet to explain what happened to the $15,000.00 deposit given on the July 9, 2014 contract.

345.    Oviedo has yet to explain what happened to the $15,000.00 deposit given on the July 9, 2015 contract.

346.    Plaintiff Noble never gave the required $1,000.00 contract deposit as it was given to her attorney Browne.

347.    The Church  NEVER agreed to a single $1,000.00 contract deposit.

348.    The Church was under the impression that Noble had previously given $15,000.00 and was giving an additional $1,000.00 on deposit.

349.    That the 2017 contract defines the purchaser as Maria T. Noble.

350.    That the 2017 contract defines Mt. Olivet Church, Inc. as the seller.

351.    That Maria T. Noble was required to give the contract deposit.

352.    That a company Urbany Investments allegedly gave a contract deposit on the above referenced property.

353.    Laura Browne was not retained by the Church.

354.    Laura Browne was not retained by  Staatz.

355.    There is no retainer check from Staatz to Browne.

356.    There is no retainer check from the Church to Browne.

357.    There are no letters from Ms. Browne to Staatz.

358.    There are no letters from Ms. Browne to the Church.

359.    There is no letter of engagement from Browne to Staatz.

360.    There is no letter of engagement from Browne to the Church.

361.    That Noble never informed Ms. Staatz that she was in default of the 2017 contract prior to Ortiz & Ortiz's letter of June 2018.

362.    That Noble never informed the Church that it was in default of the 2017 contract prior to Ortiz & Ortiz's letter of June 2018.

363.    That Noble never informed Mr. Ramirez that Ms. Staatz  was in default of the 2017 contract as required by the 2017 contract.

364.    That Noble never informed Ms. Browne that Ms. Staatz was in default of the 2017 contract as required by the 2017 contract.

365.    That to this date Noble has not complied with notice provision of the 2017 contract.

366.    That Noble never informed the Church that it was in default of the 2017 contract.

367.    That Noble's attorney never informed Mr. Ramirez that Ms. Staatz was in default of the 2017  contract.

368.    That Noble's attorney never informed Ramirez that the Church was in default of the 2017 contract.

369.    That Noble's attorney never informed Browne that Ms. Staatz was in default of the 2017 contract.

370.    That Noble's attorney never informed Browne that the Church was in violation of the 2017 contract.

371.    There is no letter from Staatz to Browne firing her as alleged by plaintiff.

372.    There is no letter from Browne to Staatz documenting that Staatz had fired her.

373.    There is no letter from Browne to the Church documenting that Staatz had fired her.

374.    That Browne is claiming she was fired by the Church so as to assist her client Noble in obtaining the property at a discounted price.

375.    That Noble never informed the Church that they were in default of the July 9, 2015 contract.

376.    Browne is Noble's attorney.

377.    Browne misled Staatz into believing she was acting on her behalf.

378.    Browne misled the Church into believing she was on its behalf.

379.    Browne never disclosed her conflict of interest to the Church.

380.    Browne never disclosed her conflict of interest to Staatz.

381.    Browne's failure to disclose her conflict of interest as being Noble's attorney was a violation of her fiduciary duty to the Church and/or Staatz.

382.    That Oviedo testified under oath that Ramirez was Noble's attorney for the 2017 contract.

383.    That Noble paid Browne a retaining fee for the 2017 contract.

384.    That Noble testified she paid Browne a retaining fee.

385.    That Oviedo testified that Browne was plaintiff's attorney regarding the subject property.

386.    That Oviedo testified that excluding Ms. Staatz no member of the board ever stated that they would not go through the contract.

387.    That Browne never disclosed her conflict with Staatz.

388.    That Brown never disclosed her conflict with the Church.

## AS AND FOR A FIRST CAUSE OF ACTION

## AGAINST LEDWIN OVIEDO FOR VIOLATING RPAPL 443(4)(a).

389.    Defendants – Third party plaintiffs repeat and reiterate each and every paragraph set forth above as being more fully set forth below.

390.    That there was a real estate broker contract between Oviedo and the Church for the sale of the Subject Property.

391.    That there was real estate broker contract between Oviedo and Staatz for the sale of the subject property.

392.    That there was a contract between Oviedo and the Church to sell the Church's property known as 2176 Grand Concourse, Bronx, New York.

393.    That there was a contract between Oviedo and Staatz to sell the Church's property known as 2176 Grand Concourse, Bronx, New York.

394.    That Oviedo agreed to find a purchaser for the Church in exchange for a 5% commission on the contract sale's price.

395.    That Oviedo agreed to find a purchaser for Staatz in exchange for a 5% commission on the contract sales price's.

396.    That Oviedo presented the Church with a $600,000.00 offer from Noble on or about June 26, 2014 (Exhibit "J").

397.    That on July 9, 2014, the execution date of the first contract of sale, Oviedo earned a commission of $30,000.00.

398.    That it was Oviedo's intent to pass on his $30,000.00 commission to his lover Noble.\

399.    That RPAPL 443(4)(a) required Oviedo to disclose to a client seller that he was also representing a client buyer.

400.    That in all transactions where Oviedo was a dual representative he was required to have both his clients sign a specific disclosure form.

401.    RPAPL 443(4)(a) states:

    4.    a.    For buyer-seller transactions, the following shall be the disclosure form:
                NEW YORK STATE DISCLOSURE FORM
                FOR BUYER AND SELLER
                THIS IS NOT A CONTRACT

New York state law requires real estate licensees who are acting as agents of buyers or sellers of property to advise the potential buyers or sellers with whom they work of the nature of their agency relationship and the rights and obligations it creates. This disclosure will help you to make informed choices about your relationship with the real estate broker and its sales agents.

Throughout the transaction you may receive more than one disclosure form. The law may require each agent assisting in the transaction to present you with this disclosure form. A real estate agent is a person qualified to advise about real estate.

If you need legal, tax or other advice, consult with a professional in that field.

DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIPS

SELLER'S AGENT

A seller's agent is an agent who is engaged by a seller to represent the seller's interests. The seller's agent does this by securing a buyer for the seller's home at a price and on terms acceptable to the seller. A seller's agent has, without limitation, the following fiduciary duties to the seller: reasonable care, undivided loyalty, confidentiality, full disclosure, obedience and duty to account. A seller's agent does not represent the interests of the buyer. The obligations of a seller's agent are also subject to any specific provisions set forth in an agreement between the agent and the seller. In dealings with the buyer, a seller's agent should (a) exercise reasonable skill and care in performance of the agent's duties; (b) deal honestly, fairly and in good faith; and (c) disclose all facts known to the agent materially affecting the value or desirability of property, except as otherwise provided by law.

BUYER'S AGENT

A buyer's agent is an agent who is engaged by a buyer to represent the buyer's interests. The buyer's agent does this by negotiating the purchase of a home at a price and on terms acceptable to the buyer. A buyer's agent has, without limitation, the following fiduciary duties to the buyer: reasonable care, undivided loyalty, confidentiality, full disclosure, obedience and duty to account. A buyer's agent does not represent the interests of the seller. The obligations of a buyer's agent are also subject to any specific provisions set forth in an agreement between the agent and the buyer. In dealings with the seller, a buyer's agent should (a) exercise reasonable skill and care in performance of the agent's duties; (b) deal honestly, fairly and in good faith; and (c) disclose all facts known to the agent materially affecting the buyer's ability and/or willingness to perform a contract to acquire seller's property that are not inconsistent with the agent's fiduciary duties to the buyer.

BROKER'S AGENTS

A broker's agent is an agent that cooperates or is engaged by a listing agent or a buyer's agent (but does not work for the same firm as the listing agent or buyer's agent) to assist the listing agent or buyer's agent in locating a property to sell or buy, respectively, for the listing agent's seller or the buyer agent's buyer. The broker's agent does not have a direct relationship with the buyer or seller and the buyer or seller can not provide instructions or

direction directly to the broker's agent.   The buyer and the seller therefore do not have vicarious liability for the acts of the broker's agent.   The listing agent or buyer's agent do provide direction and instruction to the broker's agent and therefore the listing agent or buyer's agent will have liability for the acts of the broker's agent.

DUAL AGENT

A real estate broker may represent both the buyer and the seller if both the buyer and seller give their informed consent in writing.   In such a dual agency situation, the agent will not be able to provide the full range of fiduciary duties to the buyer and seller.   The obligations of an agent are also subject to any specific provisions set forth in an agreement between the agent, and the buyer and seller.   An agent acting as a dual agent must explain carefully to both the buyer and seller that the agent is acting for the other party as well.   The agent should also explain the possible effects of dual representation, including that by consenting to the dual agency relationship the buyer and seller are giving up their right to undivided loyalty.   A buyer or seller should carefully consider the possible consequences of a dual agency relationship before agreeing to such representation.   A seller or buyer may provide advance informed consent to dual agency by indicating the same on this form.

DUAL AGENT

WITH

DESIGNATED SALES AGENTS

If the buyer and the seller provide their informed consent in writing, the principals and the real estate broker who represents both parties as a dual agent may designate a sales agent to represent the buyer and another sales agent to represent the seller to negotiate the purchase and sale of real estate.   A sales agent works under the supervision of the real estate broker.   With the informed consent of the buyer and the seller in writing, the designated sales agent for the buyer will function as the buyer's agent representing the interests of and advocating on behalf of the buyer and the designated sales agent for the seller will function as the seller's agent representing the interests of and advocating on behalf of the seller in the negotiations between the buyer and seller.   A designated sales agent cannot provide the full range of fiduciary duties to the buyer or seller.   The designated sales agent must explain that like the dual agent under whose supervision they function, they cannot provide undivided loyalty.   A buyer or seller should carefully consider the possible consequences of a dual agency relationship with designated sales agents before agreeing to such representation.   A seller or buyer may provide advance informed consent to dual agency with designated sales agents by indicating the same on this form.

This form was provided to me by ……………… (print name of licensee) of ……………… (print name of company, firm or brokerage), a licensed real estate broker acting in the interest of the:

( ) Seller as a

( ) Buyer as a

(check relationship below)

(check relationship below)

( ) Seller's agent

( ) Buyer's agent

( ) Broker's agent

( ) Broker's agent

( ) Dual agent

( ) Dual agent with designated sales agents

For advance informed consent to either dual agency or dual agency with designated sales agents complete section below:

( ) Advance informed consent dual agency.

( ) Advance informed consent to dual agency with designated sales agents.

If dual agent with designated sales agents is indicated above:

………………is appointed to represent the buyer;  and

………………is appointed to represent the seller in this transaction.

(I)  (We) acknowledge receipt of a copy of this disclosure form:

Signature of { } Buyer(s) and/or { } Seller(s):

_____

_____

_____

_____

Date:_____

Date:_____

402.    Oviedo never disclosed to the Church that he was Noble's broker.

403. Oviedo never disclosed to Staatz that he was Noble's broker.

404. Oviedo never disclosed to the Church that Noble was his agent.

405. Oviedo never disclosed to Staatz that Noble was his agent.

406. Oviedo never disclosed his romantic relationship with Noble to the Church.

407. Oviedo never disclosed his romantic relationship with Noble to Staatz.

408. Oviedo never disclosed his conflict of interest to the Church.

409. Oviedo never disclosed his conflict of interest to Staatz.

410. Oviedo never gave Staatz the RPAPL 443(4)(a) notice that she was entitled.

411. Oviedo never gave the Church the required RPAPL 443(4)(a) notice that it was entitled.

412. Oviedo failed to give the Church the required RPAPL 443(4)(a) notice because he wanted to conceal his involvement with Noble.

413. Oviedo failed to give the Staatz the required RPAPL 443(4)(a) notice because he wanted to conceal his involvement with Noble.

414. Oviedo failed to give the Church the required RPAPL 443(4)(a) notice because he wanted to conceal his involvement with Noble so that he could later drive the price down for the benefit of Noble.

415. Oviedo failed to give the Staatz the required RPAPL 443(4)(a) notice because he wanted to conceal his involvement with Noble so that he could later drive the price down for the benefit of Noble.

416. Oviedo failed to give the required RPAPL 443(4)(a) notice so as to get his lover Noble the property at a discount.

417. That Oviedo's failure to disclose his dual representation rendered the July 9, 2014 contract void.

418. That Oviedo's failure to disclose his dual representation rendered the July 9, 2015 contract void.

419.   That Oviedo's failure to disclose his dual representation rendered the 2017 contract of sale void.

420.   That Noble has admitted that Oviedo was her broker in paragraph 16 of her complaint when she stated:

> 16.   Noble and her real estate broker Ledwin Oviedo (the "Broker") have invested countless hours over the last four years assisting the Defendants in its attempts to prosecute the sale.

421.   Oviedo's failure to provide an RPAPL 443(4)(a) notice was an act of fraud.

422.   Oviedo's failure to provide an RPAPL 443(4)(a) notice was an act of deception.

423.   Oviedo's failure to disclose his romantic relationship with Noble was an act of fraud.

424.   Oviedo's failure to disclose his romantic relationship with Noble was an act of deception.

425.   Oviedo's failure to disclose his business relationship with Noble  was an act of fraud.

426.   Oviedo's failure to disclose his business relationship with Noble was an act of deceit.

427.   That Oviedo hid his dual representation from the Church and Staatz so that Noble would actually get the property for $570,000.00 on the July 9, 2014 contract of sale.  [$600,000.00 - $30,000.00 (commission) = $570,000.00].

428.   That Oviedo concealed his dual representation so as to drive the price down to $500,000.00 on the July 9, 2015 contract for the benefit of his lover Noble.

429.   That Ovided concealed his dual representation from the Church and Staatz so that Noble would actually get the property for $475,000.00 on the July 9, 2015 contract of sale. [$500,000.00 - $25,000.00 (commission) = $475,000.00].

430.   That Oviedo failed to disclose his dual representation prior to the July 9, 2014 contract.

431.   That Oviedo failed to disclose his dual representation prior to the July 9, 2015 contract.

432.   That Oviedo failed to disclose his dual representation prior to the 2017 contract.

433.   That Oviedo never disclosed his dual representation to the Church.

434.    That Oviedo never disclosed his dual representation to Staatz.

435.    But for Noble's 2018 complaint, the Church would have remained unaware of Oviedo's dual representation.

436.    But for the Noble's 2018 complaint, Staatz would have remained unaware of Oviedo's dual representation.

437.    That the Church and/or Staatz have been damaged by Oviedo's failure to disclose his dual representation.

438.    That the Church and/or Staatz were deprived from receiving the fair market value for the property due to Oviedo's failure to disclose his dual representation.

439.    That Oviedo is obligated to the Church and/or Staatz for the fair market value of the property.

440.    That should the Court order defendants to go through with the sale Oviedo is obligated to the Church for the difference between the fair market value and the contract price of $500,000.00.

441.    That upon information and belief, in its current state the property is worth $1,100,000.00.

442.    That upon information and belief, the property has a fixed and/or improved value of $3,000,000.00.

443.    That Oviedo is personally liable to the Church for his violation of RPAPL 443(4)(a).

444.    In light of the above, the Church and/or Staatz have been damaged in an amount that is between $600,000.00 and $2,500,000.00.

## AS AND FOR A SECOND CAUSE OF ACTION
## AGAINST OVIEDO FOR BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTIES AND BREACH OF THE WARRANTY OF GOOD FAITH & FAIR DEALING

445.    Defendants – Third party plaintiffs repeat and reiterate each and every paragraph set forth above as being more fully set forth below.

446.    That upon agreeing to act as the Church's broker Oviedo owed the Church a duty of loyalty.

447.    That upon agreeing to act as the Church's broker Oviedo owed the Church a duty of fidelity.

448.    That upon agreeing to act as the Church's broker Oviedo owed the Church a duty to act in its best interest.

449.    That upon agreeing to act as the Church's broker Oviedo owed the Church a duty to obtain a fair market price for the property.

450.    That upon agreeing to act as the Church's broker Oviedo owed the Church a duty to act in its best interest.

451.    That upon agreeing to act as the Church's broker Oviedo owed the Church a duty not to act in the best interest of the purchaser.

452.    That as the Church's real estate broker Oviedo was under a duty to disclose all relevant information about the purchaser to the Church and Staatz.

453.    That as the Church's real estate broker Oviedo was under a duty to disclose all relevant information about Noble to the Church and Staatz so that hey could make an informed business decision as to whether to execute a contract of sale.

454.    That Oviedo breached his fiduciary duty to the Church when failed to disclose that he was also Noble's broker.

455.    That Oviedo breached his fiduciary duty to the Church when he failed to disclose his romantic relationship with Noble.

456.    That Oviedo breached his fiduciary duty to the Church when he failed to disclose his business relationship with Noble.

457.    That Oviedo breached his fiduciary duty to the Church when he failed to disclose that Noble was one of his agents.

458.    That Oviedo breached his fiduciary duty to the Church when ordered an appraisal of the property after Noble had entered into the July 9, 2014 contract for $600,000.00.

459.    That Oviedo breached his fiduciary duty to the Church when he ordered an appraisal of the property in 2015 after Noble had already executed the July 9, 2014 contract of sale for $600,000.00.

460.    That Oviedo breached his fiduciary duty to the Church when he had the property evaluated by construction companies in 2015.

461.    That Oviedo ordered the property to be evaluated by Construction companies in 2015 for the benefit of Noble.

462.    That Oviedo had no legitimate purpose to order an appraisal of the property in 2015.

463.    That Oviedo ordered the 2015 appraisal for the benefit of Noble.

464.    That Oviedo never informed the Church that he was ordering an appraisal in 2015.

465.    That Oviedo never informed the Church that he was having construction companies evaluate the property for the benefit of Noble.

466.    That Oviedo breached his fiduciary duty to the Church when he disclosed the appraisal to Noble.

467.    That Oviedo breached his fiduciary duty to the Church when he disclosed the construction reports to Noble.

468.    That Oviedo breached his fiduciary duty to the Church when he failed to disclose that Ramirez was Noble's attorney.

469.    That Oviedo breached his fiduciary duty to the Church when he failed to disclose Ramirez had served as Oviedo's attorney in the past.

470.    That Oviedo breached his fiduciary duty to the Church when he failed to disclose Ramirez had represented Noble on other matters.

471.    That Oviedo was aware that Noble had issued the following check as the July 9, 2014

contract deposit:



472.    That on July 9, 2014 or shortly thereafter Oviedo learned that Noble did not give Ramirez

the $15,000.00 check bearing number 0098.

473.    Oviedo was under a duty to inform the Church that Noble did not transmit the $15,000.00

check to Ramirez when he discovered same.

474.    Oviedo breached his fiduciary duty to the Church when he failed to disclose that Noble

had "pulled back" the $15,000.00 check bearing number 0098.

475.    That on July 9, 2014 or shortly thereafter Oviedo learned that Noble allegedly replaced

the $15,000.00 check bearing number 0098 with two checks in the amount of $1,000.00 and

$14,000.

476.    That on July 9, 2014 or shortly thereafter Oviedo learned that Ramirez was only going to

negotiate the $1,000.00 check and withhold the deposit of Noble's alleged $14,000.00 check.

477.    That upon learning that Noble replaced the $15,000.00 check with the alleged $1,000.00

and $14,000.00 check, Oviedo was under a duty to disclose that fact to the Church.

478.    Oviedo was under a duty to the Church to disclose that Ramirez was only going to

negotiate the $1,000.00 check upon learning same.

479.    Oviedo was under a duty to the Church to disclose that Ramirez was going to withhold

depositing the $14,000.00 check upon learning same.

480.    Oviedo breached his fiduciary duty to the Church when he failed to disclose the facts surrounding Noble's contract deposit on the July 9, 2014 contract.

481.    Oviedo was under a duty to inform Staatz that Noble did not transmit the $15,000.00 check to Ramirez when he discovered same.

482.    Oviedo breached his fiduciary duty to Staatz when he failed to disclose that Noble had "pulled back" the $15,000.00 check bearing number 0098.

483.    That on July 9, 2014 or shortly thereafter Oviedo learned that Noble allegedly replaced the $15,000.00 check bearing number 0098 with two checks in the amount of $1,000.00 and $14,000.

484.    That on July 9, 2014 or shortly thereafter Oviedo learned that Ramirez was only going to negotiate the $1,000.00 check and withhold the deposit of Noble's alleged $14,000.00 check.

485.    That upon learning that Noble replaced the $15,000.00 check with the alleged $1,000.00 and $14,000.00 check, Oviedo was under a duty to disclose that fact to Staatz.

486.    Oviedo was under a duty to Staatz to disclose that Ramirez was only going to negotiate the $1,000.00 check upon learning same.

487.    Oviedo was under a duty to Staatz to disclose that Ramirez was going to withhold depositing the $14,000.00 check upon learning same.

488.    Oviedo breached his fiduciary duty to Staatz when he failed to disclose the facts surrounding Noble's contract deposit on the July 9, 2014 contract.

489.    That Oviedo's breach of this fiduciary duty in failing to disclose the goings on with the July 9, 2014 contract kept the Church and/or Staatz from exercising their best business judgment.

490.    That had Oviedo disclosed the goings on with the July 9, 2014 contract deposit the Church and/or Staatz would have looked for a more suitable purchaser.

491.    That Oviedo further breached his fiduciary duty to the Church when he disclosed the appraisal report to Noble to drive the contract price down to $500,000.00.

492.    That Oviedo breached his fiduciary duty to the Church when he disclosed the appraisal report to Noble's attorney to drive the contract price down to $500,000.00.

493.    That Oviedo further breached his fiduciary duty to Staatz when he disclosed the appraisal report to Noble to drive the contract price down to $500,000.00.

494.    That Oviedo breached his fiduciary duty to Staatz when he disclosed the appraisal report to Noble's attorney to drive the contract price down to $500,000.00.

495.    Oviedo breached his fiduciary duty to the Church when he instructed Ramirez not to file the OAG paper work.

496.    Oviedo breached his fiduciary duty to Staatz when he instructed Ramirez not to file the OAG paper work.

497.    Shortly after Oviedo's disclosure and/or transmittal of the appraisal and/or construction estimate to Noble and/or her representatives Noble demanded a new contract price.

498.    At the time of the second contract on July 9, 2015 Oviedo again had an opportunity to disclose his dual representation of Noble.

499.    Oviedo again failed to disclose to the Church and/or Staatz that he was also Noble's broker.

500.    Oviedo's failure to disclose this dual representation was yet another breach of his fiduciary duty to the Church.

501.    Oviedo's failure to disclose this dual representation was yet another breach of his fiduciary duty to Staatz.

502.    That on July 9, 2015 a second contract of sale entered into between Noble and the Church.

503.    The July 9, 2015 contract defined the down payment as $15,000.00.

504.    That Oviedo was under a duty to ensure the $15,000.00 contract down payment was made.

505.    That Oviedo told the Church and/or Staatz that Noble had made the $15,000.00 contract deposit in 2014.

506.    That Oviedo's statement to the Church and/or Staatz regarding the $15,000.00 contract deposit was false.

507.    That Oviedo had an opportunity to discuss with the Church and Staatz the prior goings on with the prior $15,000.00 contract deposit.

508.    Oviedo failed to the disclose to the Church on July 9, 2015 the goings on with the prior $15,000.00 contract deposit.

509.    Oviedo concealed the facts regarding the July 9, 2014 contract so that the Church would not seek out another purchaser and broker.

510.    Oviedo's failure to disclose the goings on with the $15,000.00 contract deposit on July 9, 2015 or thereafter was another breach of his fiduciary duty to the Church and/or Staatz.

511.    Implied in every contract is the State of New York is a warranty of good faith and fair dealing.

512.    Oviedo violated that warranty of good faith and fair dealing as detailed above.

513.    That the Church and/or Staatz have been damaged by Oviedo's conduct from 2014 through today.

514.    That the Church and/or Staatz were deprived from receiving the fair market value for the property due to Oviedo's conduct as detailed above.

515.    That Oviedo is obligated to the Church and/or Staatz for the fair market value of the property should the Court order the sale to go through.

516.    That should the Court order defendants to go through with the sale Oviedo is obligated to the Church for the difference between the fair market value and the contract price of $500,000.00.

517.    That upon information and belief, in its current state the property is worth $1,100,000.00.

518.    That upon information and belief, the property has a fixed and/or improved value of $3,000,000.00.

519.    That Oviedo is personally liable to the Church for his violation of RPAPL 443(4)(a).

520.    In light of the above, the Church and/or Staatz have been damaged in an amount that is between $600,000.00 and $2,500,000.00.

## AS AND FOR A THIRD CAUE OF ACTION

## AGAINST OVIEDO FOR FRAUD

521.    Defendants – Third party plaintiffs repeat and reiterate each and every paragraph set forth above as being more fully set forth below.

522.    Oviedo committed and act of fraud when he failed to disclose to the Church that he was Noble's real estate broker on July 9, 2014.

523.    Oviedo committed and act of deceit when he failed to disclose to the Church that he was Noble's real estate broker on July 9, 2014.

524.    Oviedo committed and act of fraud when he failed to disclose to Staatz that he was Noble's real estate broker on July 9, 2014.

525.    Oviedo committed and act of deceit when he failed to disclose to Staatz that he was Noble's real estate broker on July 9, 2014.

526.    Oviedo committed and act of fraud when he failed to disclose to the Church that he was Noble's real estate broker on July 9, 2015.

527.    Oviedo committed and act of deceit when he failed to disclose to the Church that he was Noble's real estate broker on July 9, 2015.

528.    Oviedo committed and act of fraud when he failed to disclose to Staatz that he was Noble's real estate broker on July 9, 2015.

529.    Oviedo committed and act of deceit when he failed to disclose to Staatz that he was Noble's real estate broker on July 9, 2015.

530. Oviedo committed and act of fraud when he failed to disclose to the Church that he was Noble's real estate broker on the 2017 contract.

531. Oviedo committed and act of deceit when he failed to disclose to the Church that he was Noble's real estate broker on the 2017 contract.

532. Oviedo committed and act of fraud when he failed to disclose to Staatz that he was Noble's real estate broker on the 2017 contract.

533. Oviedo committed and act of deceit when he failed to disclose to Staatz that he was Noble's real estate broker on the 2017 contract.

534. Oviedo made an untrue statement when he told Staatz on July 9, 2014 that Noble had given the $15,000.00 contract deposit.

535. Oviedo made an untrue statement when he told Staatz on July 9, 2015 that Noble's contract deposit was in Ramirez's escrow account.

536. Oviedo's statements to Staatz regarding the $15,000.00 contract deposit were false.

537. Oviedo knew his statements regarding the $15,000.00 contract deposit were false.

538. That Oviedo's concealment from the Church regarding the facts surrounding the July 9, 2014 contract deposit was an act of fraud.

539. That Oviedo's concealment from Staatz regarding the July 9, 2014 contract deposit was an act of deceit.

540. That Oviedo's concealment from the Church regarding the facts surrounding the July 9, 2015 contract deposit was an act of fraud.

541. That Oviedo's concealment from Staatz regarding the July 9, 2015 contract deposit was an act of deceit.

542. That the Church and/or Staatz have been damaged by Oviedo's fraudulent statements and conduct from 2014 through today.

543.     That the Church and/or Staatz were deprived from receiving the fair market value for the property due to Oviedo's fraudulent conduct as detailed above.

544.     That Oviedo is obligated to the Church and/or Staatz for the fair market value of the property should the Court order the sale to go through.

545.     That should the Court order defendants to go through with the sale Oviedo is obligated to the Church for the difference between the fair market value and the contract price of $500,000.00.

546.     That upon information and belief, in its current state the property is worth $1,100,000.00.

547.     That upon information and belief, the property has a fixed and/or improved value of $3,000,000.00.

548.     That Oviedo is personally liable to the Church for his violation of RPAPL 443(4)(a).

549.     In light of the above, the Church and/or Staatz have been damaged in an amount that is between $600,000.00 and $2,500,000.00.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST

## LEDWIN ENTERPRISES, INC. FOR VIOLATING RPAPL 443(4)(a).

550.     Defendants – Third party plaintiffs repeat and reiterate each and every paragraph set forth above as being more fully set forth below.

551.     The within actions against Ledwin Enterprises, Inc. are being brought in the alternative in the eventuality that Oviedo claims he was acting in his corporate capacity.

552.     That Ledwin Enterprises, Inc. is owned by Oviedo.

553.     That Oviedo is an officer of Ledwin Enterprises, Inc.

554.     That Oviedo is an employee of Ledwin Enterprises, Inc.

555.     That Ledwin Enterprises, Inc. is responsible for the conduct of Oviedo.

556.     Oviedo never informed the Church that he was conducting business under Ledwin Enterprises, Inc.

557.   Oviedo never informed Staatz that he was conducting business under Ledwin Enterprises, Inc.

558.   Due to the fact Oviedo claims an "oral contract" claims are being brought against his company in the eventuality that he tries to limit his financial exposure.

559.   That there was a real estate broker contract between Ledwin Enterprises, Inc.  and the Church for the sale of the Subject Property.

560.   That there was real estate broker contract between Ledwin Enterprises, Inc.  and Staatz for the sale of the subject property.

561.   That there was a contract between Ledwin Enterprises, Inc.  and the Church to sell the Church's property known as 2176 Grand Concourse, Bronx, New York.

562.   That there was a contract between Ledwin Enterprises, Inc.  and Staatz to sell the Church's property known as 2176 Grand Concourse, Bronx, New York.

563.   That Ledwin Enterprises, Inc.  agreed to find a purchaser for the Church in exchange for a 5% commission on the contract sale's price.

564.   That Ledwin Enterprises, Inc.  agreed to find a purchaser for Staatz in exchange for a 5% commission on the contract sales price's.

565.   That Ledwin Enterprises, Inc.  presented the Church with a $600,000.00 offer from Noble on or about June 26, 2014 (Exhibit "J").

566.   That on July 9, 2014, the execution date of the first contract of sale, Ledwin Enterprises, Inc.  earned a commission of $30,000.00.

567.   That it was Oviedo's intent to pass on its $30,000.00 commission to Oviedo's lover Noble.

568.   That RPAPL 443(4)(a) required Ledwin Enterprises, Inc.  to disclose to a client seller that he was also representing a client buyer.

569.  That in all transactions where Ledwin Enterprises, Inc. was a dual representative it was required to have both of its clients sign a specific disclosure form.

570.  RPAPL 443(4)(a) states:

4.  a.  For buyer-seller transactions, the following shall be the disclosure form:
NEW YORK STATE DISCLOSURE FORM
FOR BUYER AND SELLER
THIS IS NOT A CONTRACT

New York state law requires real estate licensees who are acting as agents of buyers or sellers of property to advise the potential buyers or sellers with whom they work of the nature of their agency relationship and the rights and obligations it creates. This disclosure will help you to make informed choices about your relationship with the real estate broker and its sales agents.

Throughout the transaction you may receive more than one disclosure form. The law may require each agent assisting in the transaction to present you with this disclosure form. A real estate agent is a person qualified to advise about real estate.

If you need legal, tax or other advice, consult with a professional in that field.

DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIPS

SELLER'S AGENT

A seller's agent is an agent who is engaged by a seller to represent the seller's interests. The seller's agent does this by securing a buyer for the seller's home at a price and on terms acceptable to the seller. A seller's agent has, without limitation, the following fiduciary duties to the seller: reasonable care, undivided loyalty, confidentiality, full disclosure, obedience and duty to account. A seller's agent does not represent the interests of the buyer. The obligations of a seller's agent are also subject to any specific provisions set forth in an agreement between the agent and the seller. In dealings with the buyer, a seller's agent should (a) exercise reasonable skill and care in performance of the agent's duties; (b) deal honestly, fairly and in good faith; and (c) disclose all facts known to the agent materially affecting the value or desirability of property, except as otherwise provided by law.

BUYER'S AGENT

A buyer's agent is an agent who is engaged by a buyer to represent the buyer's interests. The buyer's agent does this by negotiating the purchase of a home at a price and on terms acceptable to the buyer. A buyer's agent has, without limitation, the following fiduciary duties to the buyer: reasonable care, undivided loyalty, confidentiality, full disclosure, obedience and duty to account. A buyer's agent does not represent the interests of the seller. The obligations of a buyer's agent are also subject to any specific provisions set forth in an agreement between the agent and the buyer. In dealings with the seller, a buyer's agent should (a) exercise reasonable skill and care in performance of the agent's duties; (b) deal honestly, fairly and in good faith; and (c) disclose all facts known to the

agent materially affecting the buyer's ability and/or willingness to perform a contract to acquire seller's property that are not inconsistent with the agent's fiduciary duties to the buyer.

BROKER'S AGENTS

A broker's agent is an agent that cooperates or is engaged by a listing agent or a buyer's agent (but does not work for the same firm as the listing agent or buyer's agent) to assist the listing agent or buyer's agent in locating a property to sell or buy, respectively, for the listing agent's seller or the buyer agent's buyer.   The broker's agent does not have a direct relationship with the buyer or seller and the buyer or seller can not provide instructions or direction directly to the broker's agent.   The buyer and the seller therefore do not have vicarious liability for the acts of the broker's agent.   The listing agent or buyer's agent do provide direction and instruction to the broker's agent and therefore the listing agent or buyer's agent will have liability for the acts of the broker's agent.

DUAL AGENT

A real estate broker may represent both the buyer and the seller if both the buyer and seller give their informed consent in writing.   In such a dual agency situation, the agent will not be able to provide the full range of fiduciary duties to the buyer and seller.   The obligations of an agent are also subject to any specific provisions set forth in an agreement between the agent, and the buyer and seller.   An agent acting as a dual agent must explain carefully to both the buyer and seller that the agent is acting for the other party as well.   The agent should also explain the possible effects of dual representation, including that by consenting to the dual agency relationship the buyer and seller are giving up their right to undivided loyalty.   A buyer or seller should carefully consider the possible consequences of a dual agency relationship before agreeing to such representation.   A seller or buyer may provide advance informed consent to dual agency by indicating the same on this form.

DUAL AGENT

WITH

DESIGNATED SALES AGENTS

If the buyer and the seller provide their informed consent in writing, the principals and the real estate broker who represents both parties as a dual agent may designate a sales agent to represent the buyer and another sales agent to represent the seller to negotiate the purchase and sale of real estate.   A sales agent works under the supervision of the real estate broker.   With the informed consent of the buyer and the seller in writing, the designated sales agent for the buyer will function as the buyer's agent representing the interests of and advocating on behalf of the buyer and the designated sales agent for the seller will function as the seller's agent representing the interests of and advocating on behalf of the seller in the negotiations between the buyer and seller.   A designated sales agent cannot provide the full range of fiduciary duties to the buyer or seller.   The designated sales agent must explain that like the dual agent under whose supervision they function, they cannot provide undivided loyalty.   A buyer or seller should carefully consider the possible consequences of a dual agency relationship with designated sales

agents before agreeing to such representation.   A seller or buyer may provide advance informed consent to dual agency with designated sales agents by indicating the same on this form.

This form was provided to me by ……………… (print name of licensee) of ……………… (print name of company, firm or brokerage), a licensed real estate broker acting in the interest of the:


( ) Seller as a

( ) Buyer as a

(check relationship below)

(check relationship below)

( ) Seller's agent

( ) Buyer's agent

( ) Broker's agent

( ) Broker's agent

( ) Dual agent

( ) Dual agent with designated sales agents

For advance informed consent to either dual agency or dual agency with designated sales agents complete section below:

( ) Advance informed consent dual agency.

( ) Advance informed consent to dual agency with designated sales agents.

If dual agent with designated sales agents is indicated above:

………………is appointed to represent the buyer;  and

………………is appointed to represent the seller in this transaction.

(I)  (We) acknowledge receipt of a copy of this disclosure form:

Signature of { } Buyer(s) and/or { } Seller(s):

_____

_____

_____

_____

Date:_____

Date:_____

571.    Ledwin Enterprises, Inc.  never disclosed to the Church that he was Noble's broker.

572.    Ledwin Enterprises, Inc.  never disclosed to Staatz that he was Noble's broker.

573.    Ledwin Enterprises, Inc. never disclosed to the Church that Noble was its agent.

574.    Ledwin Enterprises, Inc.  never disclosed to Staatz that Noble was its agent.

575.    Ledwin Enterprises, Inc.  never disclosed Oviedo's romantic relationship with Noble to the Church.

576.    Ledwin Enterprises, Inc.  never disclosed Oviedo's romantic relationship with Noble to Staatz.

577.    Ledwin Enterprises, Inc.  never disclosed its conflict of interest to the Church.

578.    Ledwin Enterprises, Inc. never disclosed its conflict of interest to Staatz.

579.    Ledwin Enterprises, Inc.  never gave Staatz the RPAPL 443(4)(a) notice that she was entitled.

580.    Ledwin Enterprises, Inc. never gave the Church the required RPAPL 443(4)(a) notice that it was entitled.

581.    Ledwin Enterprises, Inc.  failed to give the Church the required RPAPL 443(4)(a) notice because it wanted to conceal Oviedo's involvement with Noble.

582.    Ledwin Enterprises, Inc. failed to give the Staatz the required RPAPL 443(4)(a) notice because it wanted to conceal Oviedo's  involvement with Noble.

583.    Ledwin Enterprises, Inc.  failed to give the Church the required RPAPL 443(4)(a) notice because it wanted to conceal Oviedo's  involvement with Noble so that he could later drive the price down for the benefit of Noble.

584.    Ledwin Enterprises, Inc.  failed to give the Staatz the required RPAPL 443(4)(a) notice because it wanted to conceal Oviedo's involvement with Noble so that he could later drive the price down for the benefit of Noble.

585.    Ledwin Enterprises, Inc.  failed to give the required RPAPL 443(4)(a) notice so as to get Oviedo's lover Noble the property at a discount.

586.    That Ledwin Enterprises, Inc.'s failure to disclose its dual representation rendered the July 9, 2014 contract void.

587.    That Ledwin Enterprises, Inc.'s failure to disclose its dual representation rendered the July 9, 2015 contract void.

588.    That Ledwin Enterprises, Inc.'s failure to disclose its dual representation rendered the 2017 contract of sale void.

589.    That Noble has admitted that Oviedo (Ledwin Enterprises, Inc. ) was her broker in paragraph 16 of her complaint when she stated:

> 16.    Noble and her real estate broker Ledwin Oviedo (the "Broker") have invested countless hours over the last four years assisting the Defendants in its attempts to prosecute the sale.

590.    Ledwin Enterprises, Inc.'s failure to provide an RPAPL 443(4)(a) notice was an act of fraud.

591.    Ledwin Enterprises, Inc.'s failure to provide an RPAPL 443(4)(a) notice was an act of deception.

592.    Ledwin Enterprises, Inc.'s  failure to disclose Oviedo's romantic relationship with Noble was an act of fraud.

593.    Ledwin Enterprises, Inc.'s failure to disclose Oviedo's romantic relationship with Noble was an act of deception.

594.    Ledwin Enterprises, Inc.'s failure to disclose its business relationship with Noble was an act of fraud.

595.    Ledwin Enterprises, Inc.'s failure to disclose its business relationship with Noble was an act of deceit.

596.    That Ledwin Enterprises, Inc. hid its dual representation from the Church and Staatz so that Noble would actually get the property for $570,000.00 on the July 9, 2014 contract of sale. [$600,000.00 - $30,000.00 (commission) = $570,000.00].

597.    That Ledwin Enterprises, Inc. concealed its dual representation so as to drive the price down to $500,000.00 on the July 9, 2015 contract for the benefit of Oviedo's lover Noble.

598.    That Ledwin Enterprises, Inc. concealed its dual representation from the Church and Staatz so that Noble would actually get the property for $475,000.00 on the July 9, 2015 contract of sale. [$500,000.00 - $25,000.00 (commission) = $475,000.00].

599.    That Ledwin Enterprises, Inc. failed to disclose its dual representation prior to the July 9, 2014 contract.

600.    That Ledwin Enterprises, Inc. failed to disclose its dual representation prior to the July 9, 2015 contract.

601.    That Ledwin Enterprises, Inc. failed to disclose its dual representation prior to the 2017 contract.

602.    That Ledwin Enterprises, Inc. never disclosed its dual representation to the Church.

603.    That Ledwin Enterprises, Inc. never disclosed its dual representation to Staatz.

604.    But for Noble's 2018 complaint, the Church would have remained unaware of Ledwin Enterprises, Inc.'s dual representation.

605.    But for the Noble's 2018 complaint, Staatz would have remained unaware of Ledwin Enterprises, Inc.'s dual representation.

606.    That the Church and/or Staatz have been damaged by Ledwin Enterprises, Inc.'s failure to disclose its dual representation.

607.    That the Church and/or Staatz were deprived from receiving the fair market value for the property due to Ledwin Enterprises, Inc.'s failure to disclose its dual representation.

608.    That Ledwin Enterprises, Inc.  is obligated to the Church and/or Staatz for the fair market value of the property.

609.    That should the Court order defendants to go through with the sale Ledwin Enterprises, Inc.  is obligated to the Church for the difference between the fair market value and the contract price of $500,000.00.

610.    That upon information and belief, in its current state the property is worth $1,100,000.00.

611.    That upon information and belief, the property has a fixed and/or improved value of $3,000,000.00.

612.    That Ledwin Enterprises, Inc. is liable to the Church for its violation of RPAPL 443(4)(a).

613.    In light of the above, the Church and/or Staatz have been damaged in an amount that is between $600,000.00 and $2,500,000.00.

### AS AND FOR A FIFTH CAUSE OF ACTION
### AGAINST Ledwin Enterprises, Inc. FOR BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTIES AND BREACH OF THE WARRANTY OF GOOD FAITH & FAIR DEALING

614.    Defendants – Third party plaintiffs repeat and reiterate each and every paragraph set forth above as being more fully set forth below.

615.    That upon agreeing to act as the Church's broker Ledwin Enterprises, Inc.  owed the Church a duty of loyalty.

616.   That upon agreeing to act as the Church's broker Ledwin Enterprises, Inc. owed the Church a duty of fidelity.

617.   That upon agreeing to act as the Church's broker Ledwin Enterprises, Inc. owed the Church a duty to act in its best interest.

618.   That upon agreeing to act as the Church's broker Ledwin Enterprises, Inc. owed the Church a duty to obtain a fair market price for the property.

619.   That upon agreeing to act as the Church's broker Ledwin Enterprises, Inc. owed the Church a duty to act in its best interest.

620.   That upon agreeing to act as the Church's broker Ledwin Enterprises, Inc. owed the Church a duty not to act in the best interest of the purchaser.

621.   That as the Church's real estate broker Ledwin Enterprises, Inc. was under a duty to disclose all relevant information about the purchaser to the Church and Staatz.

622.   That as the Church's real estate broker Ledwin Enterprises, Inc. was under a duty to disclose all relevant information about Noble to the Church and Staatz so that hey could make an informed business decision as to whether to execute a contract of sale.

623.   That Ledwin Enterprises, Inc. breached its fiduciary duty to the Church when failed to disclose that he was also Noble's broker.

624.   That Ledwin Enterprises, Inc. breached its fiduciary duty to the Church when it failed to disclose Oviedo's romantic relationship with Noble.

625.   That Ledwin Enterprises, Inc. breached fiduciary duty to the Church when it failed to disclose its business relationship with Noble.

626.   That Ledwin Enterprises, Inc. breached his fiduciary duty to the Church when it failed to disclose that Noble was one of its agents.

627.   That Ledwin Enterprises, Inc. breached its fiduciary duty to the Church when ordered an appraisal of the property after Noble had entered into the July 9, 2014 contract for $600,000.00.

628.     That Ledwin Enterprises, Inc.  breached its fiduciary duty to the Church when Oviedo ordered an appraisal of the property in 2015 after Noble had already executed the July 9, 2014 contract of sale for $600,000.00.

629.     That Ledwin Enterprises, Inc.  breached its fiduciary duty to the Church when Oviedo had the property evaluated by construction companies in 2015.

630.     That Ledwin Enterprises, Inc.  ordered the property to be evaluated by Construction companies in 2015 for the benefit of Noble.

631.     That Ledwin Enterprises, Inc.  had no legitimate purpose to order an appraisal of the property in 2015.

632.     That Ledwin Enterprises, Inc.  ordered the 2015 appraisal for the benefit of Noble.

633.     That Ledwin Enterprises, Inc.  never informed the Church that he was ordering an appraisal in 2015.

634.     That Ledwin Enterprises, Inc.  never informed the Church that he was having construction companies evaluate the property for the benefit of Noble.

635.     That Ledwin Enterprises, Inc.  breached its fiduciary duty to the Church when it disclosed the appraisal to Noble.

636.     That Ledwin Enterprises, Inc.  breached its fiduciary duty to the Church when it disclosed the construction reports to Noble.

637.     That Ledwin Enterprises, Inc.  breached its fiduciary duty to the Church when it failed to disclose that Ramirez was Noble's attorney.

638.     That Ledwin Enterprises, Inc.  breached its fiduciary duty to the Church when Oviedo failed to disclose Ramirez had served as Ledwin Enterprises, Inc. 's attorney in the past.

639.     That Ledwin Enterprises, Inc.  breached its fiduciary duty to the Church when Oviedo failed to disclose Ramirez had represented Noble on other matters.

640.    That Ledwin Enterprises, Inc.  was aware that Noble had issued the following check as the July 9, 2014 contract deposit:



641.    That on July 9, 2014 or shortly thereafter Ledwin Enterprises, Inc.  learned that Noble did not give Ramirez the $15,000.00 check bearing number 0098.

642.    Ledwin Enterprises, Inc.  was under a duty to inform the Church that Noble did not transmit the $15,000.00 check to Ramirez when he discovered same.

643.    Ledwin Enterprises, Inc.  breached its fiduciary duty to the Church when Oviedo failed to disclose that Noble had "pulled back" the $15,000.00 check bearing number 0098.

644.    That on July 9, 2014 or shortly thereafter Ledwin Enterprises, Inc.  learned that Noble allegedly replaced the $15,000.00 check bearing number 0098 with two checks in the amount of $1,000.00 and $14,000.

645.    That on July 9, 2014 or shortly thereafter Ledwin Enterprises, Inc.  learned that Ramirez was only going to negotiate the $1,000.00 check and withhold the deposit of Noble's alleged $14,000.00 check.

646.    That upon learning that Noble replaced the $15,000.00 check with the alleged $1,000.00 and $14,000.00 check, Ledwin Enterprises, Inc.  was under a duty to disclose that fact to the Church.

647.    Ledwin Enterprises, Inc.  was under a duty to the Church to disclose that Ramirez was only going to negotiate the $1,000.00 check upon learning same.

648.    Ledwin Enterprises, Inc. was under a duty to the Church to disclose that Ramirez was going to withhold depositing the $14,000.00 check upon learning same.

649.    Ledwin Enterprises, Inc. breached its fiduciary duty to the Church when Oviedo failed to disclose the facts surrounding Noble's contract deposit on the July 9, 2014 contract.

650.    Ledwin Enterprises, Inc. was under a duty to inform Staatz that Noble did not transmit the $15,000.00 check to Ramirez when he discovered same.

651.    Ledwin Enterprises, Inc. breached its fiduciary duty to Staatz when Oviedo failed to disclose that Noble had "pulled back" the $15,000.00 check bearing number 0098.

652.    That on July 9, 2014 or shortly thereafter Ledwin Enterprises, Inc. learned that Noble allegedly replaced the $15,000.00 check bearing number 0098 with two checks in the amount of $1,000.00 and $14,000.

653.    That on July 9, 2014 or shortly thereafter Ledwin Enterprises, Inc. learned that Ramirez was only going to negotiate the $1,000.00 check and withhold the deposit of Noble's alleged $14,000.00 check.

654.    That upon learning that Noble replaced the $15,000.00 check with the alleged $1,000.00 and $14,000.00 check, Ledwin Enterprises, Inc. was under a duty to disclose that fact to Staatz.

655.    Ledwin Enterprises, Inc. was under a duty to Staatz to disclose that Ramirez was only going to negotiate the $1,000.00 check upon learning same.

656.    Ledwin Enterprises, Inc. was under a duty to Staatz to disclose that Ramirez was going to withhold depositing the $14,000.00 check upon learning same.

657.    Ledwin Enterprises, Inc. breached its fiduciary duty to Staatz when Oviedo failed to disclose the facts surrounding Noble's contract deposit on the July 9, 2014 contract.

658.    That Ledwin Enterprises, Inc.'s breach of this fiduciary duty in failing to disclose the goings on with the July 9, 2014 contract kept the Church and/or Staatz from exercising their best business judgment.

659.    That had Ledwin Enterprises, Inc. disclosed the goings on with the July 9, 2014 contract deposit the Church and/or Staatz would have looked for a more suitable purchaser.

660.    That Ledwin Enterprises, Inc. further breached its fiduciary duty to the Church when Oviedo disclosed the appraisal report to Noble to drive the contract price down to $500,000.00.

661.    That Ledwin Enterprises, Inc. breached his fiduciary duty to the Church when Oviedo disclosed the appraisal report to Noble's attorney to drive the contract price down to $500,000.00.

662.    That Ledwin Enterprises, Inc. further breached his fiduciary duty to Staatz when Oviedo disclosed the appraisal report to Noble to drive the contract price down to $500,000.00.

663.    That Ledwin Enterprises, Inc. breached its fiduciary duty to Staatz when Oviedo disclosed the appraisal report to Noble's attorney to drive the contract price down to $500,000.00.

664.    Ledwin Enterprises, Inc. breached itws fiduciary duty to the Church when Oviedo instructed Ramirez not to file the OAG paper work.

665.    Ledwin Enterprises, Inc. breached its fiduciary duty to Staatz when Oviedo instructed Ramirez not to file the OAG paper work.

666.    Shortly after Ledwin Enterprises, Inc. 's disclosure and/or transmittal of the appraisal and/or construction estimate to Noble and/or her representatives Noble demanded a new contract price.

667.    At the time of the second contract on July 9, 2015 Ledwin Enterprises, Inc. again had an opportunity to disclose its dual representation of Noble.

668.    Ledwin Enterprises, Inc. again failed to disclose to the Church and/or Staatz that it was also Noble's broker.

669.    Ledwin Enterprises, Inc. 's failure to disclose this dual representation was yet another breach of its fiduciary duty to the Church.

670.    Ledwin Enterprises, Inc.'s failure to disclose this dual representation was yet another breach of its fiduciary duty to Staatz.

671.    That on July 9, 2015 a second contract of sale entered into between Noble and the Church.

672.    The July 9, 2015 contract defined the down payment as $15,000.00.

673.    That Ledwin Enterprises, Inc. was under a duty to ensure the $15,000.00 contract down payment was made.

674.    That Ledwin Enterprises, Inc. told the Church and/or Staatz that Noble had made the $15,000.00 contract deposit in 2014.

675.    That Ledwin Enterprises, Inc.'s statement made through Oviedo to the Church and/or Staatz regarding the $15,000.00 contract deposit was false.

676.    That Ledwin Enterprises, Inc. had an opportunity to discuss with the Church and Staatz the prior goings on with the prior $15,000.00 contract deposit.

677.    Ledwin Enterprises, Inc. failed to the disclose to the Church on July 9, 2015 the goings on with the prior $15,000.00 contract deposit.

678.    Ledwin Enterprises, Inc. concealed the facts regarding the July 9, 2014 contract so that the Church would not seek out another purchaser and broker.

679.    Ledwin Enterprises, Inc.'s failure to disclose the goings on with the $15,000.00 contract deposit on July 9, 2015 or thereafter was another breach of its fiduciary duty to the Church and/or Staatz.

680.    Implied in every contract is the State of New York is a warranty of good faith and fair dealing.

681.    Ledwin Enterprises, Inc. violated that warranty of good faith and fair dealing as detailed above.

682. That the Church and/or Staatz have been damaged by Ledwin Enterprises, Inc. 's conduct from 2014 through today.

683. That the Church and/or Staatz were deprived from receiving the fair market value for the property due to Ledwin Enterprises, Inc. 's conduct as detailed above.

684. That Ledwin Enterprises, Inc. is obligated to the Church and/or Staatz for the fair market value of the property should the Court order the sale to go through.

685. That should the Court order defendants to go through with the sale Ledwin Enterprises, Inc. is obligated to the Church for the difference between the fair market value and the contract price of $500,000.00.

686. That upon information and belief, in its current state the property is worth $1,100,000.00.

687. That upon information and belief, the property has a fixed and/or improved value of $3,000,000.00.

688. In light of the above, the Church and/or Staatz have been damaged in an amount that is between $600,000.00 and $2,500,000.00.

## AS AND FOR A SIXTH CAUSE OF ACTION

## AGAINST LEDWIN ENTERPRISES, INC. FOR FRAUD

689. Defendants – Third party plaintiffs repeat and reiterate each and every paragraph set forth above as being more fully set forth below.

690. Ledwin Enterprises, Inc. in is responsible for the fraudulent acts committed by Oviedo.

691. Oviedo committed and act of fraud when he failed to disclose to the Church that he was Noble's real estate broker on July 9, 2014.

692. Oviedo committed and act of deceit when he failed to disclose to the Church that he was Noble's real estate broker on July 9, 2014.

693. Oviedo committed and act of fraud when he failed to disclose to Staatz that he was Noble's real estate broker on July 9, 2014.

694.     Oviedo committed and act of deceit when he failed to disclose to Staatz that he was Noble's real estate broker on July 9, 2014.

695.     Oviedo committed and act of fraud when he failed to disclose to the Church that he was Noble's real estate broker on July 9, 2015.

696.     Oviedo committed and act of deceit when he failed to disclose to the Church that he was Noble's real estate broker on July 9, 2015.

697.     Oviedo committed and act of fraud when he failed to disclose to Staatz that he was Noble's real estate broker on July 9, 2015.

698.     Oviedo committed and act of deceit when he failed to disclose to Staatz that he was Noble's real estate broker on July 9, 2015.

699.     Oviedo committed and act of fraud when he failed to disclose to the Church that he was Noble's real estate broker on the 2017 contract.

700.     Oviedo committed and act of deceit when he failed to disclose to the Church that he was Noble's real estate broker on the 2017 contract.

701.     Oviedo committed and act of fraud when he failed to disclose to Staatz that he was Noble's real estate broker on the 2017 contract.

702.     Oviedo committed and act of deceit when he failed to disclose to Staatz that he was Noble's real estate broker on the 2017 contract.

703.     Oviedo made an untrue statement when he told Staatz on July 9, 2014 that Noble had given the $15,000.00 contract deposit.

704.     Oviedo made an untrue statement when he told Staatz on July 9, 2015 that Noble's contract deposit was in Ramirez's escrow account.

705.     Oviedo's statements to Staatz regarding the $15,000.00 contract deposit were false.

706.     Oviedo knew his statements regarding the $15,000.00 contract deposit were false.

707. That Oviedo's concealment from the Church regarding the facts surrounding the July 9, 2014 contract deposit was an act of fraud.

708. That Oviedo's concealment from Staatz regarding the July 9, 2014 contract deposit was an act of deceit.

709. That Oviedo's concealment from the Church regarding the facts surrounding the July 9, 2015 contract deposit was an act of fraud.

710. That Oviedo's concealment from Staatz regarding the July 9, 2015 contract deposit was an act of deceit.

711. That the Church and/or Staatz have been damaged by Oviedo's fraudulent statements and conduct from 2014 through today.

712. That the Church and/or Staatz were deprived from receiving the fair market value for the property due to Oviedo's fraudulent conduct as detailed above.

713. That Oviedo is obligated to the Church and/or Staatz for the fair market value of the property should the Court order the sale to go through.

714. That should the Court order defendants to go through with the sale Oviedo is obligated to the Church for the difference between the fair market value and the contract price of $500,000.00.

715. That upon information and belief, in its current state the property is worth $1,100,000.00.

716. That upon information and belief, the property has a fixed and/or improved value of $3,000,000.00.

717. In light of the above, the Church and/or Staatz have been damaged in an amount that is between $600,000.00 and $2,500,000.00.

**AS AND FOR A SEVENTH CAUSE OF ACTION
AGAINST
JAMIE RAMIREZ ESQ.
FOR BREACH OF CONTRACT
&
FIDUCIARY DUTIES**

718.   Defendants – Third party plaintiffs repeat and reiterate each and every paragraph set forth above as being more fully set forth below.

719.   That Jamie Ramirez ("Ramirez") is attorney.

720.   That Ramirez is an attorney duly licensed to practice law in the State of New York.

721.   That as an attorney in the State of New York Ramirez is required to disclose to his clients any conflicts of interest.

722.   That as an attorney in the State of New York Ramirez owes a duty of loyalty to his clients.

723.   That as an attorney in the State of New York Ramirez owes his clients a duty of dealing truthfully and honestly.

724.   That as an attorney in the State of New York Ramirez owes his clients a duty of communication.

725.   Ramirez is required to be retained prior to performing any work on behalf of a client.

726.   Ramirez is required to send a client either a retainer or a letter of engagement in all non-personal injury matters in the State of New York.

727.   That Ramirez was retained by Noble to represent her regarding the purchase of 2176 Grand Concourse.

728.   That on or about June 26, 2014 Ramirez claimed to Oviedo that he was the attorney for the Church.

729.   That on or about June 26, 2014 Ramirez claimed to Oviedo that he was the attorney for Staatz.

730.   That on or about June 26, 2014 Oviedo transmitted to Ramirez a Purchase memorandum so that he prepare a contract of sale for 2176 Grand Concourse, Bronx, New York.

731.   That Ramirez never had Staatz sign a retainer agreement to represent her or in the church with regard to the sale of the subject property.

732.    That Ramirez never had the Church sign a retainer agreement to the represent it with regard to the subject property.

733.    That Ramirez never issued a letter of engagement to Staatz regarding the subject property.

734.    That Ramirez never issued a letter of engagement to the Church regarding the subject property.

735.    That prior to July 9, 2014 Ramirez prepared a contract of sale for 2176 Grand Concourse.

736.    That prior to July 9, 2014 Ramirez prepared the contract of sale that appears as Exhibit "K" to this complaint.

737.    Ramirez defined himself as the attorney for the seller in the July 9, 2014 contract of sale which is annexed hereto as Exhibit "K".

738.    That Ramirez accepted a $15,000.00 check from Noble which was to serve as the deposit on the contract of sale for the subject property.

739.    Below is a copy of the $15,000.00 check Noble gave to Ramirez:



740.    That Ramirez was supposed to deposit the $15,000.00 check given by Noble as the Contract of Sale Deposit into his IOLA or Escrow account.

741.    That Ramirez never deposited the $15,000.00 down payment check.

742.    That Ramirez never wrote to the Church to inform it that it was not depositing the $15,000.00 deposit check.

743.    That Ramirez never wrote Staatz to inform her that he was not depositing the $15,000.00 Deposit check.

744.    That Ramirez never informed the Church in 2014 that he did not deposit Noble's $15,000.00 down payment Check.

745.    That Ramirez never informed the Church in 2015 that he did not deposit Noble's $15,000.00 down payment Check.

746.    That Ramirez never informed the Church in 2016 that he did not deposit Noble's $15,000.00 down payment Check.

747.    That Ramirez never informed the Church in 2017 that he did not deposit Noble's $15,000.00 down payment Check.

748.    That Ramirez never informed Staatz in 2014 that he did not deposit Noble's $15,000.00 down payment Check.

749.    That Ramirez never informed Staatz  in 2015 that he did not deposit Noble's $15,000.00 down payment Check.

750.    That Ramirez never informed Staatz in 2016 that he did not deposit Noble's $15,000.00 down payment Check.

751.    That Ramirez never informed Staatz in 2017 that he did not deposit Noble's $15,000.00 down payment Check.

752.    That Ramirez never informed the Church in 2014 that Noble allegedly replaced the $15,000.00 down payment check with two checks in the amounts of $1,000.00 and $14,000.00 which were to serve as the new down payment.

753.    That Ramirez never informed the Church in 2015 that Noble allegedly replaced the $15,000.00 down payment check with two checks in the amounts of $1,000.00 and $14,000.00 which were to serve as the new down payment.

754.    That Ramirez never informed the Church in 2016 that Noble allegedly replaced the $15,000.00 down payment check with two checks in the amounts of $1,000.00 and $14,000.00 which were to serve as the new down payment.

755.    That Ramirez never informed the Church in 2017 that Noble allegedly replaced the $15,000.00 down payment check with two checks in the amounts of $1,000.00 and $14,000.00 which were to serve as the new down payment.

756.    That Ramirez never informed  Staatz in 2014 that Noble allegedly replaced the $15,000.00 down payment check with two checks in the amounts of $1,000.00 and $14,000.00 which were to serve as the new down payment.

757.    That Ramirez never informed Staatz in 2015 that Noble allegedly replaced the $15,000.00 down payment check with two checks in the amounts of $1,000.00 and $14,000.00 which were to serve as the new down payment.

758.    That Ramirez never informed Staatz in 2016 that Noble allegedly replaced the $15,000.00 down payment check with two checks in the amounts of $1,000.00 and $14,000.00 which were to serve as the new down payment.

759.    That Ramirez never informed Staatz in 2017 that Noble allegedly replaced the $15,000.00 down payment check with two checks in the amounts of $1,000.00 and $14,000.00 which were to serve as the new down payment.

760.    That Noble alleged in her first complaint that Ramirez negotiated the $1,000.00 down payment check in 2014.

761.    That Ramirez never negotiated the $1,000.00 down payment check given by Noble in 2014.

762.    That Noble alleged in her first complaint that Ramirez told her that he would not negotiate the $14,000.00 check until he completed the OAG paper work.

763.    That Ramirez never informed the Church that he was only depositing a $1,000.00 check from Noble on the July 9, 2014 contract.

764.    That Ramirez never informed Staatz that he was only depositing the $1,000.00 check from Noble on the July 9, 2014 contract.

765.    That Ramirez never informed the Church that he was not going to deposit the $14,000.00 check from Noble given as a deposit on the July 9, 2014 contract.

766.    That Ramirez never informed Staatz that he was not going to deposit the $14,000.00 check from Noble given as a deposit on the July 9, 2014 contract.

767.    That Ramirez violated his fiduciary duties and obligations to the Church when he did not deposit the $15,000.00 down payment Check.

768.    That Ramirez violated his fiduciary duties and obligations to Staatz when he did not deposit the $15,000.00 down payment Check.

769.    That Ramirez violated his fiduciary duties and obligations to the Church when he failed to inform the Church that he was not going to deposit $15,000.00 down payment Check.

770.    That Ramirez violated his fiduciary duties and obligations to Staatz when he failed to inform the Church that he was not going to deposit $15,000.00 down payment Check.

771.    That Ramirez violated his fiduciary duties and obligations to the Church when he failed to inform the Church that Noble replaced the $15,000.00 down payment Check with two checks in the amounts of $1,000.00 and $14,000.00.

772.    That Ramirez violated his fiduciary duties and obligations to Staatz when he failed to inform Staatz that Noble replaced the $15,000.00 down payment Check with two checks in the amounts of $1,000.00 and $14,000.00.

773.    That Ramirez violated his fiduciary duties and obligations to the Church when he failed to deposit the alleged $1,000.00 down payment Check.

774.    That Ramirez violated his fiduciary duties and obligations to Staatz when he failed to deposit the alleged $1,000.00 down payment Check.

775.    That Ramirez violated his fiduciary duties and obligations to the Church when he failed to deposit the alleged $14,000.00 down payment Check.

776.    That Ramirez violated his fiduciary duties and obligations to Staatz when he failed to deposit the alleged $14,000.00 down payment Check.

777.    That Ramirez received instructions from Noble not to negotiate the $15,000.00 check.

778.    That Noble told Ramirez not to negotiate the $15,000.00 check because she lacked sufficient funds.

779.    That Ramirez received instructions from Oviedo not to negotiate the $15,000.00 check.

780.    That Oviedo told Ramirez not to negotiate the $15,000.00 check because Noble lacked sufficient funds.

781.    That Ramirez violated his fiduciary duty to the Church when he failed to inform the Church that Noble did not have the required funds to negotiate the $15,000.00 down payment check.

782.    That Ramirez violated his fiduciary duty to Staatz when he failed to inform her that Noble did not have the required funds to negotiate the $15,000.00 down payment check.

783.    That Ramirez violated his fiduciary duty to the Church when he followed instructions from Noble.

784.    That Ramirez violated his fiduciary duty to Staatz when he followed instructions from Noble.

785.    That Ramirez violated his fiduciary duty to the Church when he followed instructions from Oviedo which were contrary to the expectations of the Church.

786.    That Ramirez violated his fiduciary duty to Staatz when he followed instructions from Oviedo which were contrary to the expectations of Staatz.

787.   That Ramirez acted for the benefit of Noble while having the Church believe he was their lawyer.

788.   That Ramirez acted for the benefit of Noble while have Staatz believe he was her lawyer.

789.   That Ramirez conspired with Noble against the Church to drive the down the price of the property for the benefit of Noble.

790.   That Ramirez convinced the Church the property was only $500,000.00 based upon the information he received from Oviedo.

791.   That Ramirez prepared a second contract of sale between Noble and the Church for the subject property in the amount of $500,000.00.

792.   That on or about July 9, 2015 Ramirez told the Church that he was holding $15,000.00 in his escrow account that Noble had given him on July 9, 2014 contract.

793.   That on or about July 9, 2015 Ramirez told Staatz that he was holding $15,000.00 in his escrow account that Noble had given him on July 9, 2014 contract.

794.   That Ramirez's statement to the Church and Staatz on or about July 9, 2015 convinced the Church and Staatz to enter into the second contract of sale with Noble.

795.   That Ramirez's statement that he was holding $15,000.00 in his escrow account for the Church was false.

796.   That Ramirez violated his fiduciary duty to the Church on or July 9, 2015 when he falsely stated that he was holding $15,000.00 in his escrow account for the Church.

797.   That Ramirez violated his fiduciary duty to Staatz on or July 9, 2015 when he falsely stated that he was holding $15,000.00 in his escrow account for the Church.

798.   That Ramirez concealed the fact he was representing Noble regarding the sale and/or purchase of the subject property until November 2, 2017.

799.   That on November 2, 2017 Ramirez would write to Serge Joseph the following letter (Exhibit "A"):

This shall serve to confirm that this office represents Maria T. Noble whom entered into contract with the Mt. Olivet Church for the purchase of the above referenced premises. It is my understanding that your office has taken over the file. The contract was only subject to appropriate court approval. Please note that the purchaser stands ready, willing and able to close pursuant to the terms of the contract of sale.

Request is hereby made for your office to provide evidence that an application has been filed and the status of said application. Looking forward to closing this transaction promptly.

Thank you for your attention to this matter, I remain

Very truly yours,



Jaime Ramirez, Esq.

Cc: Maria T. Noble

800.    That Ramirez violated his fiduciary duty to the Church when he failed to disclose his dual representation in this matter.

801.    That as a direct result of Ramirez's advice, conduct, and statements the Church and Staatz did not seek to get another broker.

802.    That as a direct result of Ramirez's advice, conduct, and statements the Church and Staatz did not seek to get another purchaser.

803.    That Ramirez violated his fiduciary duty to Staatz when he failed to disclose his dual representation in this matter.

804.    That Ramirez violated his fiduciary duty to the Church and Staatz when he failed to complete the required paper work.

805.    That Ramirez inform the Church in June of 2014 that he had the competence to complete the OAG paper work and get Court approval for the sale.

806.    That the Church and/or Staatz have been damaged by Ramirez's violation of his fiduciary duties and fraudulent statements and misconduct from 2014 through today.

807.    That the Church and/or Staatz were deprived from receiving the fair market value for the property due to Ramirez's fraudulent conduct as detailed above.

808.    That Ramirez is obligated to the Church and/or Staatz for the fair market value of the property should the Court order the sale to go through.

809.    That should the Court order defendants to go through with the sale Ramirez is obligated to the Church for the difference between the fair market value and the contract price of $500,000.00.

810.    That upon information and belief, in its current state the property is worth $1,100,000.00.

811.    That upon information and belief, the property has a fixed and/or improved value of $3,000,000.00.

812.    In light of the above, the Church and/or Staatz have been damaged in an amount that is between $600,000.00 and $2,500,000.00.

**AS AND FOR A EIGHTH CAUSE OF ACTION
AGAINST
LAURA C. BROWNE ESQ.
DECEIT AND DECEPTION
PER THE DISCPLINARY CODE
&
BREACH OF IMPLIED CONTRACT OF GOOD FAITH**

813.    Defendants – Third party plaintiffs repeat and reiterate each and every paragraph set forth above as being more fully set forth below.

814.    The Church's actions against Browne for indemnification and damages stem from Browne's failure to adhere to the Rules of Professional Conduct which are *per se* acts of deception, dishonesty, and fraud as set forth below.  Browne as the Church's attorney owed it a fiduciary duty of honesty and full disclosure so that the Church could make informed decisions.  As noted below, Browne never disclosed to the Church that not only was Noble her prior client but that Noble had actually retained her a mere 7 days prior to represent her as the purchaser of the subject property.  Browne's failure to disclose that information was violative of numerous sections of the Rules of Professional Conduct as set forth below.  More importantly, Browne's failure to disclose that conflict caused her to act in the best interest of Noble and not the Church.

Browne's conflict is evidenced not only by her glaring omission that Noble was purchasing the property well below market value but that Oviedo was also on both sides of the transaction as buyer's and seller's broker and that Noble was also conflicted as she worked for the broker who obtained the listing from the Church as detailed above. Browne did not disclose those facts to the Church because she was Noble's attorney and in failing to disclose those facts caused the Church, also her client, harm. Moreover, whenever an attorney takes upon themselves to represent a client there is a "contract" formed whether or not that attorney is retained. Browne violated the Common Law duty to act in good faith in addition to the violations of the disciplinary code.

815.   That LAURA C. BROWNE, ESQ. ("Browne") is an attorney.

816.   That Browne is an attorney duly licensed to practice law in the State of New York.

817.   That attorneys in the State of New York are bound to follow the rules of professional conduct as promulgated.

818.   That the Appellate Divisions in each department issue decisions regarding what type of conduct including information omissions constitute deceptive conduct.

819.   That the failure to inform a client of a conflict of interest has been determined to violate the New York State Rules of Professional conduct.

820.   That as an attorney in the State of New York Browne is required to disclose to her clients any conflicts of interest prior to taking upon any representation.

821.   As an attorney in the State of New York defendant Laura Browne was obligated to follow the Rule of Professional conduct.

822.   DR 5-105(a) provides that a lawyer violates the code of conduct "in failing to decline proffered employment if the exercise of his independent professional judgment on behalf of the client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, and a disinterested

lawyer would not believe that he could competently represent the interest of each client and each client did not consent to the representation after full disclosure of the implications of the simultaneous representation and the advantages and risks involved", see *Matter of Fendick*, 31 A.D.3d 17, (N.Y. App. Div. 2006), *Matter of McKelvey*, 54 A.D.3d 24 (4th Dept 2008), see also, MATTER OF SEDOR, 276 A.D.2d 103 (N.Y. App. Div. 2000),.

823.    DR-5-105(b) states that a lawyer violates the code of conduct in "continuing multiple employment if the exercise of his independent professional judgment on behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, and a disinterested lawyer would not believe that he could competently represent the interest of each client and each client did not consent to the representation after full disclosure of the implications of the simultaneous representation and the advantages and risks involved." *Matter of Fendick*, 31 A.D.3d 17, 813 N.Y.S.2d 339, 2006 NY Slip Op 3410 (N.Y. App. Div. 2006), *Matter of McKelvey*, 54 A.D.3d 24 (4th Dept 2008).

824.    That dual representation of a buyer and seller in a real estate transaction has been found to be an act of dishonest and violative of DR1-102(a)(4),  "DR 1-102 (a) (4) (22 NYCRR 1200.3 [a] [4])—engaging in conduct involving dishonesty, fraud, deceit or misrepresentation." *Id*.

825.    That dual representation of a buyer and seller in a real estate transaction has been found to be an act of dishonesty and violative of DR1-102(a)(5), "DR 1-102 (a) (5) (22 NYCRR 1200.3 [a] [5])—engaging in conduct that is prejudicial to the administration of justice." *Id*.

826.    In the State of New York a lawyer is forbidden by Rule 1.7(a) of the New York Rules of Professional Conduct in representing both a buyer and seller as there are competing interests.

827.    At a minimum Rule 1.7(a) required Browne to obtain from both Noble and the Church a signed waiver of the conflict.

828.    Part 1215 of the Rules of Professional Conduct sets forth the rules for requiring a "Written Letter of Engagement" between an attorney and a client. It provides:

§ 1215.1 Requirements

(a) Effective March 4, 2002, an attorney who undertakes to represent a client and enters into an arrangement for, charges and collects any fee from a client shall provide to the client a written letter of engagement before commencing the representation, or within a reasonable time thereafter;

(1) if otherwise impracticable; or

(2) if the scope of services to be provided cannot be determined at the time of the commencement of representation....

(b) The letter of engagement shall address the following matters:

(1) explanation if the scope of the legal services to be provided;

(2) explanation of attorney's fees to be charged, expenses and billing practices; and

(3) where applicable, shall provide that the client may have a right to arbitrate feedisputes....

(c) Instead of providing the client with a written letter of engagement, an attorney maycomply with the provisions of subdivision (a) of this section by entering into a signed written retainer agreement with the client, before or within a reasonable time after commencing representation, provided that the agreement addresses the matters set forth in subdivision (b) of this section.

829.    That as an attorney in the State of New York Browne owes a duty of loyalty to her clients.

830.    That as an attorney in the State of New York Browne owes her clients a duty of dealing truthfully and honestly.

831.    That as an attorney in the State of New York Browne owes her clients a duty of communication.

832.    As an attorney Browne is required to be retained prior to performing any work on behalf of a client.

833.    Browne is required to send a client either a retainer or a letter of engagement in all non-personal injury matters in the State of New York.

834.    That prior to May 9, 2017 Maria Noble had retained Laura C. Browne, Esq. as her attorney on a number of transactions.

835.    That prior to and/or about May 9, 2017 Maria Noble asked Laura C. Browne to represent her as the purchaser of 2176 Grand Concourse, Bronx, New York.

836.     That on or about May 9, 2017 Laura C. Browne informed Maria Noble that she would require a retaining fee in the amount of $1,000.00 to be her attorney in the transaction regarding the purchase of 2176 Grand Concourse, Bronx, New York.

837.     On May 9, 2017 Noble issued a $1,000.00 check to Laura C. Browne, Esq. from her company known as Urbany Investment Group LLC to Laura C. Browne, Esq. for her representation and services to be performed in the purchase of 2176 Grand Concourse, Bronx, New York purchase.

838.     That Laura C. Browne received the following check baring number 1032 from Noble for the services she was expected to perform on behalf of Noble in the purchase of 2176 Grand Concourse (Exhibit "P"):



839.     That Noble documented her retention of Laura C. Browne as her attorney in the memo of Check #1032 stating, "Legal Fee Retainer 2176 Grand Concourse, Bronx, New York."

840.     That at some point in time between May 9, 2017 and May 16, 2017 Laura C. Browne, Esq. took upon the representation of the Church regarding the sale of 2176 Grand Concourse, Bronx, New York.

841.     That at some point in time between May 9, 2017 and May 16, 2017 Laura C. Browne, Esq. took upon the representation of Staatz regarding the sale of 2176 Grand Concourse, Bronx, New York.

842.    That on or about May 16, 2017 Laura C. Browne drafted a contract of sale between Noble and the Church wherein she defined herself as the seller's attorney.

843.    That when Browne drafted the May 16, 2017 contract of sale and defined herself as the seller's attorney a contract was formed between Browne and the Church wherein she was their attorney and Church was her client.

844.    On May 16, 2017 when the contract of sale was written by Browne wherein she defined herself as the seller's attorney and that contract of sale executed by the Church a separate and distinct contract was formed between the Church and Browne irrespective of a retainer and/or letter of engagement.

845.    Implied in the contract between the Church and Browne was a covenant of good faith and fair dealing [see, *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153, 746 N.Y.S.2d 131, 773 N.E.2d 496 (N.Y. 2002); *Dalton v. Educational Testing Serv.*, 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (N.Y. 1995); *Frankini v. Landmark Constr. of Yonkers, Inc.*, 91 A.D.3d 593, 595, 937 N.Y.S.2d 80 (2d Dep't 2012); *Ochal v. Television Tech. Corp.*, 26 A.D.3d 575, 576, 809 N.Y.S.2d 604; Leon C. Lazer, et al., *New York Pattern Jury Instructions – Civil* § 4.1 (2d ed. 2006)].

846.    That implied covenant formed between Browne and the Church encompasses any promises which a reasonable person in the position of the promises would be justified in understanding were included. [see, id].

847.    Implied in the contract of representation between the Church and Browne was one that Browne would be open and honest with the Church and Staatz.

848.    Implied in the contract of representation between the Church and Browne was one that Browne would be open and honest with the Church and Staatz and disclose any conflict of interest and/or potential conflict of interest.

849.    Implied in the contract of representation between the Church and Browne was one that Browne would disclose information to the Church and Staatz regarding dishonest and detrimental conduct of Noble and/or Oviedo regarding the sale of the premises.

850.    That the moment Browne took upon the representation of the Church on this transaction she was conflicted as a buyer's and seller's interests are naturally divergent.

851.    That Browne knew she was conflicted and was under an obligation to disclose her conflict of interests.

852.    That Browne was obligated by Rule 1.7(a) to get a signed waiver of conflict from both Noble and the Church.

853.    Laura C. Browne never disclosed to the Church that she had represented Noble on a number of transactions prior to the transaction involving 2176 Grand Concourse, Bronx, New York.

854.    Laura C. Browne never disclosed to the Church that Noble had retained her on May 9, 2017 which is prior in time to Browne taking upon the representation of the Church.

855.    That Browne's failure to disclose to the Church that she had represented Noble on prior transactions violated DR 5-105(A).

856.    That Browne's failure to disclose to the Church that she had represented Noble on prior transaction violated DR-5-105(B).

857.    That Browne's failure to disclose to the Church that she had been retained by Noble on May 9, 2017 to represent her in this transaction violated DR 5-105(A).

858.    That Browne's failure to disclose to the Church that she had been retained by Noble on May 9, 2017 to represent her in this transaction violated DR-5-105(B).

859.    That Browne's failure / omission to disclose her conflict of interest was an act of dishonesty.

860.    That Browne's failure / omission to disclose her conflict of interest was an act of deceit.

861.    That Browne's failure / omission to disclose her conflict of interest was a breach of the fiduciary duty owed to the Church.

862.    That the Appellate Divisions of the State of New York have determined that the failure to disclose a conflict of interest in an act of dishonesty.

863.    That Browne never disclosed to Staatz that Noble had retained her prior to the May 16, 2017 contract of sale.

864.    That on or about May 16, 2017 Browne claimed to be the attorney for the Church in the contract of sale authored by Browne.

865.    That on about May 16, 2017 Browne claimed to be the attorney for Staatz in the contract authored by Browne.

866.    There Browne never had the Church sign a retainer agreement as required.

867.    That Browne never had Staatz sign a retainer agreement as required.

868.    That Browne never issued a letter of engagement to the Church.

869.    That Browne never issued a letter of engagement to Staatz.

870.    That Browne never issued a letter of engagement so that there would be no record of "dual" representation.

871.    That Browne violated Part 1215 of the Rules of Professional Conduct when she failed to execute and/or deliver a letter of engagement to the Church.

872.    That Browne violated Part 1215 of the Rules of Professional Conduct when she failed to execute and/or deliver a letter of engagement to Staatz.

873.    That Browne's violation of Part 1215 of the Rules of Professional Conduct is an act of dishonesty.

874.    That as an attorney Browne was fully aware that a corporation can only act through resolution.

875.    That prior to or on May 16, 2017 Browne prepared the contract of sale that appears as Exhibit "R" to this complaint.

876.    That Brown received a complete file from Ramirez regarding his representation of the Church and Staatz.

877.    Browne defined herself as the attorney for the seller in the May 16, 2017 contract of sale which is annexed hereto as Exhibit "R".

878.    That the contract drafted by Browne defined herself as the Seller's attorneys.

879.    Paragraph 17. of Schedule D of the 2017 contract (Exhibit "R") defined the addresses to which notice was to be sent:

> 17. Address for notices (§15.01):
>     If to Seller:
>     LAURA C. BROWNE, ESQ.
>     1938 WILLIAMSBRIDGE ROAD, BRONX, NEW YORK 10461
>
>         with a copy to:
>     JAIME RAMIREZ, ESQ.
>     3058 CROSSBRONX EXPRESSWAY, STE 1, BRONX, NEW YORK 10465
>
>     If to Purchaser:
>
>
>         with a copy to:

880.    That Browne had a duty to communicate with the Church.

881.    That Browne had a duty to communicate with Staatz.

882.    That Browne never communicated with the Church.

883.    That Browne failed to communicate with the Church.

884.    That Browne failed to communicate with Staatz.

885.    That prior to the May 9, 2017 Browne was aware that Oviedo and Noble were in a romantic relationship.

886.    That prior to the May 9, 2017 Browne was aware that Oviedo and Noble had children together.

887.    That prior to the May 9, 2017 Browne was aware that Oviedo and Noble were working together in the real estate business.

888.    That Browne was aware that Oviedo was the seller's broker on the transaction involving 2176 Grand Concourse, Bronx, New York.

889.    That Browne was aware that Noble worked for Oviedo at the time the Church engaged Oviedo to sell the property.

890.    That on or about May 16, 2017 Browne directed Staatz to sign the 2017 Contract of Sale on behalf of the Church.

891.    That on or about May 16, 2017 Browne informed Staatz that she was the Church's attorney and that she would act in the best interest of the Church.

892.    That on or about May 16, 2017 Browne informed Staatz that even though Noble had recommended her as an attorney that she was in fact the Church's attorney and would act in its best interest.

893.    That on or about May 16, 2017 Browne informed Staatz that she would complete the OAG paperwork.

894.    Browne never completed the OAG paperwork.

895.    Browne never had any intention of completing the OAG paperwork to facilitate the closing.

896.    That on or about May 16, 2017 Browne informed Staatz that "Maria Noble was an honorable woman and always lived up to her word.  And that this was the best contract the Church could get on the open market."

897.    That on or about May 16, 2017 Browne informed Staatz that she also knew Oviedo and that he was a "good and honest broker."

898.    That on or about May 16, 2017 Staatz informed Browne that she had reservations about signing the contract and Browne assured her that "it was a good contract" and "that she had received the contract deposit(s)".

899.    That at the time Browne told Staatz that "Maria Noble was an honorable woman and always lived up to her word" - Browne was aware that Noble and Oviedo had failed to disclose the self dealing nature of the transaction.

900.    That at the time Browne told Staatz that "Maria Noble was an honorable woman and always lived up to her word" - Browne was aware that Noble and Oviedo had failed to comply with RPAPL 443(4)(a).

901.    That at the time Browne told Staatz that "Maria Noble was an honorable woman and always lived up to her word" – Browne knew that Noble did not live up to her word and had never given the contract deposit on the 2014 Contract of sale.

902.    That at the time Browne told Staatz that "Maria Noble was an honorable woman and always lived up to her word" – Browne knew she had been previously retained by Noble.

903.    That as an attorney Browne was aware that Oviedo and Noble had to disclose to the Church the self-dealing nature of the transaction.

904.    That as an attorney Browne was under an obligation to inform the Church that Oviedo and Noble were in a self-dealing transaction.

905.    That Browne did not tell the Church of the self-dealing nature of the transaction because she was beholden to Noble whom had retained her on May 9, 2017.

906.    That Browne as an attorney knew of Oviedo's and Noble's RPAPL 443(4)(a) disclosure requirement.

907.    That Browne knew that Oviedo never made the requisite RPAPL 443(4)(a) disclosure to the Church and Staatz.

908.    That Browne knew Noble never made the requisite RPAPL 443(4)(a) disclosure to the disclosure to the Church and Staatz.

909.    That Browne knew Oviedo violated his fiduciary duty to Staatz and the Church when he failed to have the required  RPAPL 443(4)(a) signed.

910.    That Browne knew the Noble violated his fiduciary duty to Staatz and the Church when she failed to have the required RPAPL 443(4)(a) signed.

911.    That Browne did not inform Staatz and the Church of Oviedo's violation of RPAPL 443(4)(a) because of she decided to protect Noble's interest over and above that of the Church.

912.    That Browne did not inform Staatz and the Church of Noble's violation of RPAPL 443(4)(a) because she decided to protect Noble's interest over and above that of the Church.

913.    That the Church and Staatz would not have signed the contract had Browne disclosed her conflict of her interest.

914.    That the Church and Staatz would not have signed the contract had Browne disclosed that Oviedo and Noble had failed to comply with RPAPL 443(4)(a).

915.    That Browne was aware of Ramirez's prior representation of the Church and Staatz regarding the sale of 2176 Grand Concourse, Bronx, New York.

916.    That Browne was aware of Ramirez's prior representation of the Church and Staatz regarding the 2014 contract of sale of 2176 Grand Concourse, Bronx, New York.

917.    That Browne was aware of Ramirez's prior representation of the Church and Staatz regarding the 2015 contract of sale of 2176 Grand Concourse, Bronx, New York.

918.    That Browne was aware that Noble claimed in 2014 to have given Ramirez a $15,000.00 down payment check for the purchase of 2176 Grand Concourse, Bronx, New York.

919.    That Browne knew and/or should have known that Noble never gave the $15,000.00 contract deposit on the 2014 Contract.

920.    That Browne did not disclose Noble's failure to give the required $15,000.00 contract deposit on the 2014 contract because she was conflicted.

921.    That Browne was under an obligation to disclose to the Church and Staatz - Noble's dishonesty in failing to give the required contract deposit on the 2014 Contract.

922.    That Browne actively concealed Noble's failure to give the $15,000.00 contract deposit from the Church and Staatz because she knew that Church and Staatz would not sign the 2017 contract she had prepared for Noble's benefit.

923.    That Browne was aware that Noble claimed have given Ramirez a contract deposit on the 2015 contract to purchase of 2176 Grand Concourse, Bronx, New York.

924.    That Browne knew and/or should have known that Noble never gave Ramirez the contract deposit on the 2015 contract for the purchase of 2176 Grand Concourse, Bronx, New York.

925.    That Browne did not disclose Noble's failure to give the required contract deposit on the 2015 contract because she was conflicted.

926.    That Browne was under an obligation to disclose to the Church and Staatz -  Noble's dishonesty in failing to give the required contract deposit on the 2015 Contract.

927.    That Browne actively concealed Noble's failure to give the contract deposit on the 2015 contract from the Church and Staatz because she knew that Church and Staatz would not sign the 2017 contract she had prepared for Noble's benefit.

928.    That Browne obligated herself to present the required paper work to the OAG's office to get approval for the sale of the property.

929.    That Browne never completed the OAG paper work necessary for the sale of the subject property.

930.    That Browne informed Noble that Staatz had fired her.

931.    That Browne informed Noble that the Church had fired her.

932.    That Browne never sent a letter to Staatz acknowledging that she had been terminated.

933.    That Browne never sent a letter to the Church asserting that Staatz had terminated her.

934.    That Browne never sent a letter to Ramirez that Staatz had terminated her.

935.    That Browne never sent Noble a letter asserting that Staatz had terminated her.

936.    That Browne never sent a letter to Ortiz & Ortiz that Staatz had terminated her.

937.    That the Church never terminated Browne.

938.    That Browne committed an act of dishonesty when informed Noble that the Church had fired her.

939.    That Browne violated Rule 4.1 when she informed Noble that the Church had terminated her.

940.    That Browne knew her statement to Noble that the Church terminated her services was false and violated Rule 4.1.

941.    That Browne's statement that the Church terminated her services violated her duties to the Church and caused Noble to bring the instant action.

942.    That Browne made the false statement to give a tactical advantage to her client Noble over her client the Church.

943.    That Browne never wrote to the Church to inform it that there was no $15,000.00 down payment check from Noble regarding the 1st Contract.

944.    That Browne never wrote Staatz to inform her that he was not depositing the $15,000.00 down payment check from Noble regarding the 1st Contract.

945.    That Browne as an attorney should have known that due to Noble's failure to provide the required consideration meant no contract was formed on July 9, 2014.

946.    That Browne was under a duty to inform the Church that Noble had breached the July 9, 2014 contract by failing to give the requisite deposit.

947.    That Browne was under a duty to inform Staatz that Noble had breached the July 9, 2014 contract by failing to give the requisite deposit.

948.    That Browne as an attorney should have known that due to Noble's failure to provide the required consideration meant no contract was formed on July 9, 2015.

949.    That Browne was under a duty to inform the Church that Noble had breached the July 9, 2015 contract by failing to give the requisite deposit.

950.    That Browne was under a duty to inform Staatz that Noble had breached the July 9, 2015 contract by failing to give the requisite deposit.

951.    That Browne violated her duty to the Church and/or Staatz by concealing the fact Noble had breach the July 9, 2014 contract.

952.    That Browne violated her duty to the Church and/or Staatz by concealing the fact Noble had breached the July 9, 2015 contract.

953.    That Browne concealed facts from the Church and/or Staatz for the benefit of Noble.

954.    Had Browne informed the Church that Noble had breached the July 9, 2014 contract they never would have entered into the 2017 contract.

955.    Had Brown informed Staatz that Noble had breached the July 9, 2015 contract she would have never have signed same.

956.    That Browne owed the Church a duty to recommend that they get a buyer other than Noble due to her prior breaches.

957.    That Browne was taking orders from Noble.

958.    That Browne was taking orders from Oviedo.

959.    That Browne violated her fiduciary duty to the Church when she followed instructions from Noble that were contrary to the Church's best interests.

960.    That Browne violated her fiduciary to Staatz when she followed instructions from Oviedo that were contrary to Staatz's best interests.

961.    That Browne acted for the benefit of Noble while having the Church believe she was their lawyer.

962.    That Browne acted for the benefit of Noble while have Staatz believe she was her lawyer.

963.    That Browne knew Ramirez was representing Noble.

964.    That Browne had a duty to disclose to the Church that Ramirez was in a conflict of interest.

965.    That Browne had a duty to disclose to Staatz that Ramirez was in a conflict of interest.

966.    That Browne concealed the fact he was representing Noble regarding the sale and/or purchase of the subject property.

967.    That there is testimony that Browne was Noble's attorney.

968.    That Browne violated her fiduciary duty to the Church when he failed to disclose her dual representation in this matter.

969.    That Browne stated to Staatz that she knew Oviedo to be an honest broker.

970.    That Browne knew Oviedo was representing both Noble and the Church on this transaction.

971.    That Browne failed to disclose Oviedo's dual representation to the Church.

972.    That Browne failed to disclose Oviedo's dual representation to the Church.

973.    That Browne violated her fiduciary duty to the Church when she failed to disclose Oviedo's dual representation.

974.    That Browne violated her fiduciary duty to Staatz when she failed to disclose Oviedo's dual representation.

975.    That Browne violated her fiduciary duty to Staatz and the Church when she failed to disclose her dual representation in other matters.

976.    That Browne violated his fiduciary duty to the Church and Staatz when she failed to complete the required paper work.

977.    That Browne informed the Church in 2017 that she had the competence to complete the OAG paper work and get Court approval for the sale.

978.    That Browne was and/or became aware that Ramirez was conflicted in his representation of the Church and Staatz.

979.    That Browne upon learning and/or becoming aware of Ramirez's conflict of interest / dual representation of both the buyer and seller of the subject property was under a duty to disclose to the Church and Staatz Ramirez's conflict of interest.

980.    That Browne actively concealed Ramirez's conflict of interest from the Church and Staatz.

981.    That Browne omitted telling the Church and Staatz of Ramirez's conflict of interest.

982.    That Browne violated the implied covenant of good faith and fair dealing in the representation contract between the Church and Browne when she failed to disclose that Noble retained Browne on other matters prior to May 9, 2017.

983.    That Browne violated the implied covenant of good faith and fair dealing in the representation contract between the Church and Browne when she failed to disclose that Noble retained Browne on May 9, 2017 to represent her in this transaction.

984.    That Browne violated the implied covenant of good faith and fair dealing in the representation contract between the Church and Browne when she failed to disclose that Ramirez was conflicted in his representation and prior representation of Noble.

985.    That Browne violated the implied covenant of good faith and fair dealing in the representation contract between the Church and Browne when she failed to disclose the information that Noble never gave the $15,000.00 contract deposit on the 2014 contract.

986.    That Browne violated the implied covenant of good faith and fair dealing in the representation contract between the Church and Browne when she failed to disclose that Noble never gave the 2015 contract deposit.

987.    That Browne violated the implied covenant of good faith and fair dealing in the representation contract between the Church and Browne when she failed to disclose that Oviedo and/or Noble violated RPAPL 443(4)(a).

988.     That Browne violated the implied covenant of good faith and fair dealing in the representation contract between the Church and Browne when she failed to exercise her best judgments in favor of the Church and Staatz.

989.     That Browne violated the implied covenant of good faith and fair dealing in the representation contract between the Church and Browne when she actively concealed relevant information from the Church and Staatz regarding Oviedo's, Noble's and/or Ramirez's prior conduct.

990.     That Browne violated the implied covenant of good faith and fair dealing in the representation contract between the Church and Browne when she failed to inform the Church that Staatz allegedly terminated her representation.

991.     That Browne made the statement that Noble "Maria Noble was an honorable woman and always lived up to her word" to induce the Church and Staatz to sign the 2017 contract.

992.     That Browne's statement that "Maria Noble was an honorable woman and always lived up to her word" convinced the Church and Staatz to sign the 2017 contract.

993.     That Browne's statement "Maria Noble was an honorable woman and always lived up to her word" was deceitful when made as Browne knew Noble and Oviedo were not only self-dealing, but knew that Ramirez never received the contract deposit.

994.     That Browne's statement that "Maria Noble was an honorable woman and always lived up to her word"  was deceitful when made as Browne knew Noble never gave the $15,000.00 contract deposit.

995.     That the Church was justified to rely upon Browne's representations that Noble was an honorable woman and always lived up to her word.

996.     That the Browne knew her statement that "Maria Noble was an honorable woman and always lived up to her word" was false when made as she knew Noble had never given the $15,000.00 contract deposit on the 2014 contract.

997.    That the Browne knew her statement that "Maria Noble was an honorable woman and always lived up to her word" was false when made as she knew Noble had never given the contract deposit on the 2015 contract.

998.    That as a result of Browne's affirmative misrepresentations regarding Noble's character and her assurance that she would complete the OAG paperwork the Church has been harmed.

999.    That Browne was aware that a Board resolution was required for the Church to fire her.

1000.   That Browne violated the implied covenant of good faith and fair dealing in the representation contract between the Church and Browne when she failed to perform the duties she undertook to get the OAG approval.

1001.   That as a result of Browne violation and/or breach of the implied covenant of good faith and fair dealing in the representation contract between the Church and Browne the Church has and will continue to incur attorney fees to defend the contract which Browne convinced the Church to obligate themselves.

1002.   That Browne's omission in failing to inform the Church and Staatz of Ramirez's conflict of interest was for the benefit of Noble.

1003.   That Browne's omission in failing to inform the Church and Staatz of Ramirez's conflict of interest was for the benefit of Noble was to the detriment of the Church and Staatz.

1004.   That Browne knew of Ramirez's conflict of interest at the time she drafted the May 16, 2017 contract of sale and omitted and/or concealed that information from the Church and Staatz.

1005.   That the Church and/or Staatz have been damaged by Browne's violation of her fiduciary duties and fraudulent statements and misconduct from 2017 through today.

1006.   That the Church and/or Staatz have been damaged by Browne's violation of the Rules of Professional Conduct as set forth above.

1007.   That there is NO board resolution terminating the Church's relationship with Browne.

1008.   That Browne has never made any motion to be relieved as the Church's attorney.

1009.   That Browne never wrote a letter to the Church that she was unable to proceed with the OAG paperwork.

1010.   That Browne never wrote a "drop letter" to the Church.

1011.   That Staatz lacked the authority to independently fire Browne.

1012.   That the Church and/or Staatz were deprived from receiving the fair market value for the property due to Browne's omissions, violations of the Rules of Professional Conduct, Breach of Fiduciary Duty, and/or conflict of interest as detailed above.

1013.   That Browne is obligated to the Church for the fair market value of the property should the Court order the sale to go through.

1014.   That should the Court order defendants to go through with the sale Browne is obligated to the Church for the difference between the fair market value and the contract price of $500,000.00.

1015.   That upon information and belief, in its current state the property is worth $1,100,000.00.

1016.   That upon information and belief, the property has a fixed and/or improved value of $3,000,000.00.

1017.   In light of the above, the Church and/or Staatz have been damaged in an amount that is between $600,000.00 and $2,500,000.00.

## AS AND FOR A NINTH CAUSE OF ACTION
## AGAINST
## OVIEDO, RAMIREZ & BROWNE
## CONSPIRACY TO COMMIT FRAUD

1018.   Defendants – Third party plaintiffs repeat and reiterate each and every paragraph set forth above as being more fully set forth below.

1019.   That as early as 2014 Browne was aware that Ramirez had worked with Noble on other transactions.

1020.   That as early as 2014 Browne was aware that Ramirez claimed to be the was the attorney for Church.

1021.   That Browne had actually provided documents to Ramirez to get the required OAG approval.

1022.   That Ramirez was aware that Browne had been retained by Noble on other matters.

1023.   That Ramirez was aware that Browne had been retained by Noble on this matter.

1024.   That Ramirez and Browne were under a duty to disclose their conflict of interest to the Church and Staatz.

1025.   That Ramirez and Browne were bound by the Rules of Professional conduct to disclose their conflict of interest to the Church and Staatz.

1026.   That Ramirez and Browne agreed not to disclose their conflict of interest to the Church and Staatz.

1027.   That Ramirez and Browne were both obligated by the Rules of Professional Conduct and their fiduciary duties to the Church and Staatz to inform them that Noble never gave the contract deposit on the 2014 contract.

1028.   That Ramirez and Browne were both obligated by the Rules of Professional Conduct and their fiduciary duties to the Church and Staatz to inform them that Noble never gave the contract deposit on the 2015 contract.

1029.   That Ramirez and Browne agreed to conceal that information from the Church and Staatz for the benefit of their client Noble.

1030.   That had Ramirez and Browne disclosed that Noble never gave the 2014 contract deposit the Church would not have signed the 2017 contract.

1031.   That had Ramirez and Browne disclosed that Noble never gave the 2015 contract deposit the Church would not have signed the 2017 contract.

1032.   That Ramirez, Oviedo, and Browne conspired to conceal their relevant conflicts of interests from the Church so as to put Noble in a superior bargaining position to the Church.

1033.   That Ramirez, Oviedo, and Browne all conspired to conceal relevant information so that Noble could acquire the property at a discounted price.

1034.   That Ramirez, Oviedo, and Browne all conspired to conceal information from the Church so that it would not seek out a more suitable buyer.

1035.   That Ramirez, Oviedo, and Browne all conspired to not use their best business judgments for the benefit of their client the Church.

1036.   That as detailed above Ramirez actively deceived the Church.

1037.   That as detailed above Ramirez actively deceived Staatz.

1038.   That as detailed above Oviedo actively deceived the Church.

1039.   That as detailed above Oviedo actively deceived Staatz.

1040.   That as detailed above Browne actively deceived the Church.

1041.   That as detailed above Browne actively deceived Staatz.

1042.   The fact that these three professionals so blatantly disregarded their fiduciary duties to the Church and Staatz is evidence of their concerted efforts.

1043.   The fact that these three professionals all omitted to provide relevant information to the Church and Staatz is  in and of itself evidence of their concerted efforts.

1044.   That had any one of them, Browne, Oviedo, and/or Ramirez acted within the bounds of professionalism they would have recommended the Church and Staatz not sell to Noble.

1045.   That Oviedo, Ramirez and Browne all conspired to violate their fiduciary duties to the Church when they followed instructions from Noble that were contrary to the Church's best interests.

1046.   That Oviedo, Ramirez and Browne all conspired to violate their fiduciary duties to Staatz when they followed instructions from Noble that were contrary to the Staatz's best interests.

1047.   That Oviedo, Ramirez and Browne all conspired to act for the benefit of Noble while claiming to the Church that they were the Church's representatives.

1048.   That Oviedo, Ramirez and Browne all conspired to act for the benefit of Noble while claiming to Staatz that they were her representatives.

1049.   That Oviedo, Ramirez and Browne all conspired to hide and/or conceal the facts surrounding the July 9, 2014 contract deposit from the Church.

1050.   That Oviedo, Ramirez and Browne all conspired to hide and/or conceal the facts surrounding the July 9, 2014 contract deposit from Staatz.

1051.   That Oviedo, Ramirez and Browne all conspired to hide and/or conceal the facts surrounding the July 9, 2015 contract deposit from the Church.

1052.   That Oviedo, Ramirez and Browne all conspired to hide and/or conceal the facts surrounding the July 9, 2015 contract deposit from Staatz.

1053.   That Oviedo, Ramirez and/or Browne all conspired to deceive the Church into believing that Noble had performed under the July 9, 2014 contract.

1054.   That Oviedo, Ramirez and/or Browne all conspired to deceive Staatz into believing that Noble had performed under the July 9, 2014 contract.

1055.   That Oviedo, Ramirez and/or Browne all conspired to deceive the Church into believing that Noble had performed under the July 9, 2015 contract.

1056.   That Oviedo, Ramirez and/or Browne all conspired to deceive Staatz into believing that Noble had performed under the July 9, 2015 contract.

1057.   But for the concerted acts of Oviedo, Ramirez and/or Browne the Church would have sought out a more suitable purchaser.

1058.   That Ramirez, Browne and Oviedo conspired to conceal Oviedo's and Noble's violation of RPAPL 443(4)(a).

1059.   But for the concerted acts of Oviedo, Ramirez and/or Browne the Church would have received a far higher contract price.

1060.   That Oviedo, Ramirez and Browne all actively conspired to conceal their conflict of interest from the Church.

1061.   That Oviedo, Ramirez and Browne all actively conspired to conceal their conflict of interest from the Church.

1062.   That each Oviedo, Ramirez and Browne agreed amongst themselves not to inform the Church of their respective dual representations.

1063.   That each Oviedo, Ramirez and Browne agreed amongst themselves to conceal the above referenced relevant facts from the Church and Staatz.

1064.   That each Oviedo, Ramirez and Browne agreed amongst themselves to conceal Noble's dishonest acts facts from the Church and Staatz so as to benefit noble at the expense of the Church and/or Staatz.

1065.   That the Church and/or Staatz have been damaged by Oviedo's, Ramirez's, and Browne's concerted violation of their fiduciary duties and fraudulent statements and misconduct from 2014 through today.

1066.   That the Church and/or Staatz were deprived from receiving the fair market value for the property due to Oviedo's, Ramirez's and Browne's concerted and agreed upon fraudulent conduct as detailed above.

1067.   That Oviedo, Ramirez and Browne are obligated to the Church and/or Staatz for the fair market value of the property should the Court order the sale to go through.

1068.   That should the Court order defendants to go through with the sale Oviedo, Ramirez, and Browne are obligated to the Church for the difference between the fair market value and the contract price of $500,000.00.

1069.   That upon information and belief, in its current state the property is worth $1,100,000.00.

1070.   That upon information and belief, the property has a fixed and/or improved value of $3,000,000.00.

1071.  In light of the above, the Church and/or Staatz have been damaged in an amount that is between $600,000.00 and $2,500,000.00.

WHEREFORE, defendants – third party plaintiffs requests judgment as follows:

1.  Declaratory Judgment that the July 9, 2014 contract is null and void;

2.  Declaratory Judgment that the July 9, 2015 contract is null and void;

3.  Declaratory Judgment that the action of Noble's representatives render the 2017 contract null and void;

4.  Judgment on the first, second, third, fourth, fifth, sixth, seventh, eighth and/or ninth cause of action in an amount exceeding $1,100,000.00; and

5.  For any further and just relief this Court deems appropriate.

Dated:        Forest Hills, New York
              July 21, 2020

                                        _/David J. Broderick_____
                                        DAVID J. BRODERICK
                                        DAVID J. BRODERICK, LLC
                                        Attorneys for Defendant(s)
                                        Mt. Olivet Church, Inc.
                                        ARACELIS STAATZ
                                        70-20 Austin Street
                                        Suite 111
                                        Forest Hills, New York 11375
                                        (718) 830-0700

EXHIBIT "A"

## The Law Office of Jaime Ramirez, Esq.
### Attorney At Law

Tel: (718) 542-6629
Fax: (718) 542-6630
ramirezlaw@optonline.net

3058 Cross Bronx Expressway, Suite 1
Bronx, New York 10465

November 2, 2017

**VIA EMAIL: SJOSEPH@HMGDJLAW.COM**
**AND USPS FIRST CLASS MAIL**
Himmelstein, McConnell, Gribben,
Donohue & Joseph, LLP.
15 Maiden Lane - 17th Floor
New York, New York 10038
**Attn: Serge Joseph, Esq.**

> **Re:** **Mt. Olivet Church, Inc. to Maria T. Noble**
> **2176 Grand Concourse, Bronx, New York 10457**

Dear Mr. Joseph:

This shall serve to confirm that this office represents Maria T. Noble whom entered into contract with the Mt. Olivet Church for the purchase of the above referenced premises. It is my understanding that your office has taken over the file. The contract was only subject to appropriate court approval. Please note that the purchaser stands ready, willing and able to close pursuant to the terms of the contract of sale.

Request is hereby made for your office to provide evidence that an application has been filed and the status of said application. Looking forward to closing this transaction promptly.

Thank you for your attention to this matter, I remain

Very truly yours,

Jaime Ramirez, Esq.

Cc: Maria T. Noble

EXHIBIT "B"

0098

55-136/212
636

Maria T. Noble
250 Bridge St. Apt 12A
Cliffside Park, NJ 07010

Pay to the Order of Jaime Ramirez, as Attorny                    $ 15,000.00

Fifteen thousand                                                  Dollars

TD Bank
America's Most Convenient Bank®

For Down Payment 2190 Grand Concourse    Maria Noble

:031201360: 4286515618" 0098

EXHIBIT "C"

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF THE BRONX

------------------------------------------------------x

MT. OLIVET CHURCH, INC.,

INDEX NO. L&T: **901344/2014**

        Petitioner (Landlord),

NOTICE OF PETITION
HOLDOVER – COMMERCIAL

        -against-

BREAD OF LIFE MISSION, JUAN MOJICA,
LISA MOJICA AND CRUZADA EVANGELICA
EN CONTRA DE LAS DROGAS, INC. D/B/A
CRUZADA EVANGELICA Y MISIONERA

Respondent's Address:
2176 Anthony Avenue, 1st Floor & Garage
Bronx, New York 10457

        Respondent (Tenant).

------------------------------------------------------x

        To the Respondent above named and described, in possession of the premises hereinafter described or claiming possession thereof:

        PLEASE TAKE NOTICE, that a hearing at which you must appear will be held at the Civil Court of the City of New York, Part 52 to be held at 851 Grand Concourse, Room 529 on **August 21, 2014**, at **2:00 PM** on the annexed petition of Mt. Olivet Church, Inc., by its attorney, Jaime Ramirez, Esq., which prays for a final judgment of eviction, awarding to the petitioner the possession of premises designated and described as follows: 2176 Anthony Avenue, 1st Floor and Garage, Bronx, NY 10457, City of New York, County of The Bronx and further granting to the petitioner such other and further relief as is demanded in the petition, which you must answer.

        TAKE NOTICE also that demand is made in the petition herein for judgment against you the Respondent, for the sum of $4,200.00.

        TAKE NOTICE that your answer may set forth any defense or counterclaim you may have against the petitioner.

        TAKE NOTICE also that if you fail to interpose and establish an defense that you may have to the allegation in the petition, you may be precluded from asserting such defense of the claim on which it is based in any other proceeding or action.

        TAKE NOTICE also that your answer maybe made at the time of hearing specified above unless this Notice of petition is served upon you on or before      in which event you must answer at least 3 days before the petition is noticed to be heard, either orally before the clerk of the court at his or her office or in writing by serving a copy thereof upon the undersigned attorney for the petitioner, and by filing the original of such written answer with proof of service thereof in the office of the clerk at least 3 days before the time the petition is noticed to be hear; in addition thereto, you must appear before the court at the time and place hereinabove set forth for the hearing.

        TAKE NOTICE that your failure to appear and answer may result in final judgment by default for the petition in the amount demanded in the petition.

        TAKE NOTICE that under section 745 of the Real Property Actions and Proceedings Law, you ay be required by the Court to make a deposit of use and occupancy, or a payment of use and occupancy to the petitioner, upon your second request for an adjournment or if the proceeding is not settled or a final determination has not been made by the court within 30 days of the first court appearance. Failure to comply with an initial deposit or payment order may result in the entry of a final judgment against you without a trial. Failure to make subsequent required deposits or payment may result in an immediate trial on the issues raised in your answer.

Dated:  August 1, 2014
       Bronx, NY

JAIME RAMIREZ, ESQ.
3058 Cross Bronx Expressway, Suite 1
Bronx, New York 10465
T. (718) 542-6629 F. (718)542-6630

_CAROL ALT_
Chief Clerk

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF THE BRONX                              Index No:

MT. OLIVET CHURCH, INC.,
                Petitioner,

      -against-

BREAD OF LIFE MISSION, JUAN MOJICA,
LISA MOJICA AND CRUZADA EVANGELICA
EN CONTRA DE LAS DROGAS, INC. D/B/A
CRUZADA EVANGELICA Y MISIONERA,

           Respondent.

## NOTICE OF PETITION HOLDOVER – COMMERCIAL

### JAIME RAMIREZ, ESQ.
Attorney for Petitioner
3058 Cross Bronx Expressway, Suite 1
Bronx, New York 10465
(718) 542-6629

Pursuant to Article 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, the contained in the annexed documents are not frivolous.

Dated: August 1, 2014           signature
                         Print Signer's Name: Jaime Ramirez, Esq.,

Service of a copy of the within             is hereby admitted.

Dated:

                         Attorney(s) for

Please take notice

NOTICE OF ENTRY
that the within is a (certified) true copy of a      duly entered in the Office of the Clerk of the within court on
        , 20 .

NOTICE OF SETTLEMENT
that an order           of which the within is true copy will be prepared for settlement to the Hon.
          one of the judges of the within named court, at             on        , 20
      at      M.

Dated,

                         Yours, etc.
                         Jaime Ramirez, Esq.
                         3058 Cross Bronx Expressway, Suite 1
To:                       Bronx, New York 10465
                         T. (718) 542-6629 F. (718)542-6630

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF THE BRONX
--------------------------------------------------------------x

MT. OLIVET CHURCH, INC.,

              Petitioner (Landlord),

      -against-

BREAD OF LIFE MISSION, JUAN MOJICA,
LISA MOJICA AND CRUZADA EVANGELICA
EN CONTRA DE LAS DROGAS, INC. D/B/A
CRUZADA EVANGELICA Y MISIONERA

           Respondent (Tenant).
--------------------------------------------------------------x

INDEX NO. L&T: 901344/2014

PETITION HOLDOVER – COMMERCIAL

Respondent's Address:
2176 Anthony Avenue, 1st Floor & Garage
Bronx, New York 10457

THE PETITION OF MT. OLIVET CHURCH, INC., by its attorney Jaime Ramirez, alleges upon information and belief that:

1.    The undersigned is Jaime Ramirez, Esq., attorney for MT. OLIVET CHURCH, INC., the Petitioner/Landlord.
2.    Respondents Bread of Life Mission, Juan Mojica, Lisa Mojica and Cruzada Evangelica En Contra De Las Drogas, Inc. D/B/A Cruzada Evangelica Y Misionera is the lawful Tenant of the premises, having entered into possession under a month to month tenancy agreement.
3.    The premises are described as 2176 Anthony Avenue, 1st Floor & Garage, Bronx, NY 10457, which is situated within the territorial jurisdiction of the Civil Court of the City of New York, County of The Bronx.
4.    Petitioner did have served upon a 30 - Day Notice of Termination terminating Respondent's tenancy. Said notice and its Affidavit of Service are attached.
5.    The term by which Respondent was to vacate the premises ended on June 30, 2014.
6.    Respondent continues in possession of the premises without the permission of the owner after the expiration of the term.
7.    That the owner has accepted no monetary compensation from Respondent from for the month of June 2014, whatsoever in exchange for Respondent's occupancy of the subject premises. The monthly rent is $600.00. Respondent has arrears of $4,200.00 for the following months: February 2014, March 2014, April 2014, May 2014, June 2014 and July 2014.
8.    The premises are not a multiple dwelling as it contains fewer than three residential units.
9.    The subject premises are not subject to rent control or rent stabilization by virtue of being a commercial building used for commercial purposes.

      WHEREFORE Petitioner requests a final judgment against Respondent for possession, awarding possession of the premises to Petitioner owner, granting Petitioner owner a final money judgment of $4,200.00 for use and occupancy and directing the issuance of a warrant to remove Respondent from possession of the premises together with cost and disbursements of this proceedings and for such other and further relief as may be just and proper.

STATE OF NEW YORK, COUNTY OF THE BRONX:    The undersigned affirms under penalty of perjury that he is one of the attorneys for the petitioner, that he has read the foregoing petition and knows the contents thereof; that the same are true to his own knowledge except as to matters stated to be upon information and belief; and as to those matters he believes them to be true. The grounds of his belief as to matter not state upon his knowledge are statements and/or records provided by the petitioner, its agents and/or employees and contained in the file in the attorney's office. This verification is made pursuant to the provisions of RPAPL 741

Dated:   August 1, 2014
          Bronx, NY

                             JAIME RAMIREZ, ESQ.
                             Attorney for Landlord –Mt. Olivet Church, Inc.
                             3058 Cross Bronx Expressway, Suite 1
                             Bronx, New York 10465
                             T. (718) 542-6629 F. (718) 542-6630

# THE RAMBADADT LAW OFFICE
### Attorneys at Law

May 23, 2014

Bread of Life Mission
2176 Anthony Ave.
Bronx, New York 10457

Juan Mojica
2176 Anthony Ave
Bronx, New York 10457

Lisa Mojica
2176 Anthony Ave
Bronx, New York 10457

Cruzada Evangelica En Contra
De Las Drogas, Inc.
d/b/a
Cruzada Evangelica Y Misionera
1111 Morris Ave
Bronx, New York 10456

Re:   Notice To Vacate

This office represents Mt. Olivet Church, Inc. owner of 2176 Anthony Ave., Bronx, New York. This letter is to inform you that you are hereby placed on notice that you will have thirty (30) days to vacate the premises and must leave the premises on or before June 30, 2014.

PLEASE TAKE NOTICE, that if you fail to vacate you will be responsible for all rental fees owed for the months of February, March, April and May 2014 and said fees must be paid timely and in full.

PLEASE TAKE FURTHER NOTICE, that if you choose not to vacate the premises in thirty (30) days, on or before June 30, 2014, eviction proceedings will be brought

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF KINGS: Bronx
——————————————————————————————X

MT. Oliver church INC
              Petitioner(s),

    -against-

Bread of Life Mission Juan Mojica, Lisa Mojica and Cruzada Evangelica En contra
            Respondent(s),
de LAS DRugs Inc
d/b/a Cruzada Evangelica y Missions
——————————————————————————————X

Index #

**AFFIDAVIT OF SERVICE**
(Housing)

STATE OF NEW YORK: COUNTY OF KINGS:

John & Reuben , being duly sworn, deposes and says, that deponent is not a party to this action, is over 18 years of age at
resides at: 2d  Virginia av Br 1st floor Bklyn ny 11207

The property sought to be recovered is: 2186 Anthony Avenue Bronx NY 10457

On MAY 30, 2014 at 4:00 a.m./(p.m.) Deponent served the within:
[•] Notice of Termination  [ ] Three/Five/Ten Day Notice  [ ] Notice of Petition and Petition  [ ] Notice to Cure
[ ] Order to Show Cause  [ ] Subpoena  [ ] Subpoena Duces Tecum
[ ] Other:

On: JUAN Mojica , hereinafter, referred to as the Respondent(s).

1. [ ] (Personal) By delivering a true copy of the above document to said Respondent(s) personally. Deponent knew the person so served to be the person
described as said Respondent(s) herein. Said Respondent(s) is described below:

| Sex | Color (Skin) | Hair | Approx. (Age) | Height | Weight |
|---|---|---|---|---|---|
| [ ] Male | [ ] Caucasian | [ ] Black  [ ] White | [ ] 14-20 yrs. | [ ] Under 5' | [ ] Under 100lbs |
| [ ] Female | [ ] Black | [ ] Brown  [ ] Balding | [ ] 21-35 yrs. | [ ] 5'0 – 5.3 | [ ] 100 – 130 lbs. |
| | [ ] Hispanic | [ ] Yellow  [ ] Blond | [ ] 36-50 yrs. | [ ] 5'4 – 5.8 | [ ] 131 – 160 lbs. |
| | [ ] Other: | [ ] Brown  [ ] Gray | [ ] 51-65yrs. | [ ] 5'9 – 6'0 | [ ] 161 – 200 lbs. |
| | | [ ] Red  [ ] Other | [ ] 65 yrs. + | [ ] Over 6'0 | [ ] Over 200 lbs. |

**Distinctive Features**
[ ] Moustache  [ ] Glasses  [ ] Birthmark  [ ] Tattoo
[ ] Beard  [ ] Contact Lens  [ ] Scars  [ ] Disabled:
Other Identifying Features:

2. [ ] (Substituted) By granting admittance to said property and delivering to and leaving a copy thereof personally with a person of suitable age and
discretion, who was willing to receive the above document and who resided and/or was employed at said property. Deponent further states that he/she
describes the person actually served as follows:_____(Name)

| Sex | Color (Skin) | Hair | Approx. (Age) | Height | Weight |
|---|---|---|---|---|---|
| [ ] Male | [ ] Caucasian | [ ] Black  [ ] White | [ ] 14-20 yrs. | [ ] Under 5' | [ ] Under 100lbs |
| [ ] Female | [ ] Black | [ ] Brown  [ ] Balding | [ ] 21-35 yrs. | [ ] 5'0 – 5'3 | [ ] 100 – 130 lbs. |
| | [ ] Hispanic | [ ] Yellow  [ ] Blond | [ ] 36-50 yrs. | [ ] 5'4 – 5'8 | [ ] 131 – 160 lbs. |
| | [ ] Other: | [ ] Brown  [ ] Gray | [ ] 51-65yrs. | [ ] 5'9 – 6'0 | [ ] 161 – 200 lbs. |
| | | [ ] Red  [ ] Other: | [ ] 65 yrs. + | [ ] Over 6'0 | [ ] Over 200 lbs. |

**Distinctive Features**
[ ] Moustache  [ ] Glasses  [ ] Birthmark  [ ] Tattoo
[ ] Beard  [ ] Contact Lens  [ ] Scars  [ ] Disabled:
Other Identifying Features:

3. [•] (Conspicuous) By affixing [ ] copies thereof upon a conspicuous part, to wit: the entrance door of said apartment at said property. Deponent was
unable to gain admittance there at or to find a person of suitable age and discretion willing to receive the document having called there on MAY 30
2014 at 11:00 a.m./p.m., and on _____ 200 at _____ a.m./p.m.

4. Mailing: On MAY 30 , 2014 , within one (1) day thereafter, Deponent completed service under the last two (2) methods of service
(conspicuous and/or substituted ) by mailing [ 2 ] copies thereof to the Respondent(s) at the property sought to be recovered which is the Respondent(s)
residence in a 1st class postage paid properly addressed envelope marked "Personal and Confidential" by depositing said copy (ies) in an official depository
under the exclusive care and custody of the United States Post Office by regular first class mail and by certified mail in the City and State of New York.

Sworn to before me on this 30 day
of _____ , 200_

_____
NOTARY PUBLIC

License No. _____

STEPHEN V. BARBARO
Notary Public - State of New York
No. 02BA4785299
Qualified in Queens County, Commission Expires
February 28, 20 18

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF KINGS: Bronx

-------------------------------------------X

MT. Oliver church INC

_Petitioner(s),_

-against-

Bread of Life Mission Juan Mojica, Lisa Mojica and Charles Evangelica En Cristo
_Respondent(s),_ De Las Drogas Inc
d/b/a Charles Evangelica y Missionent
-------------------------------------------X

Index #

**AFFIDAVIT OF SERVICE**
(Housing)

STATE OF NEW YORK: COUNTY OF KINGS:

John R. Osbon , being duly sworn, deposes and says, that deponent is not a party to this action, is over 18 years of age at

resides at: 278 Vandmin Ave Apt# Bklyn NY 11617

The property sought to be recovered is: 2176 Anthony Avenue Bronx NY 10457

On MAY 30, 2004 at 4:00 a.m./p.m. Deponent served the within:
[ a] Notice of Termination  [ ] Three/Five/Ten Day Notice  [ ] Notice of Petition and Petition  [ ] Notice to Cure
[ ] Order to Show Cause  [ ] Subpoena  [√] Subpoena Duces Tecum
[ ] Other:

On: Bread of Life Mission , hereinafter, referred to as the Respondent(s).

1. [ ]  (Personal) By delivering a true copy of the above document to said Respondent(s) personally. Deponent knew the person so served to be the person described as said Respondent(s) herein. Said Respondent(s) is described below:

| Sex | Color (Skin) | Hair | Approx. (Age) | Height | Weight |
|---|---|---|---|---|---|
| [ ] Male | [ ] Caucasian | [ ] Black  [ ] White | [ ] 14-20 yrs. | [ ] Under 5' | [ ] Under 100lbs |
| [ ] Female | [ ] Black | [ ] Brown  [ ] Balding | [ ] 21-35 yrs. | [ ] 5'0 – 5.3 | [ ] 100 – 130 lbs. |
| | [ ] Hispanic | [ ] Yellow  [ ] Blond | [ ] 36–50 yrs. | [ ] 5'4 – 5.8 | [ ] 131 – 160 lbs. |
| | [ ] Other: | [ ] Brown  [ ] Gray | [ ] 51-65yrs. | [ ] 5'9 – 6'0 | [ ] 161 – 200 lbs. |
| | | [ ] Red  [ ] Other: | [ ] 65 yrs. + | [ ] Over 6'0 | [ ] Over 200 lbs. |

**Distinctive Features**
[ ] Moustache  [ ] Glasses  [ ] Birthmark  [ ] Tattoo
[ ] Beard  [ ] Contact Lens  [ ] Scars  [ ] Disabled: _____
Other Identifying Features:

2. [ ]  (Substituted) By granting admittance to said property and delivering to and leaving a copy thereof personally with a person of suitable age and discretion, who was willing to receive the above document and who resided and/or was employed at said property. Deponent further states that he/she describes the person actually served as follows:_____ (Name)

| Sex | Color (Skin) | Hair | Approx. (Age) | Height | Weight |
|---|---|---|---|---|---|
| [ ] Male | [ ] Caucasian | [ ] Black  [ ] White | [ ] 14-20 yrs. | [ ] Under 5' | [ ] Under 100lbs |
| [ ] Female | [ ] Black | [ ] Brown  [ ] Balding | [ ] 21-35 yrs. | [ ] 5'0 – 5'3 | [ ] 100 – 130 lbs. |
| | [ ] Hispanic | [ ] Yellow  [ ] Blond | [ ] 36–50 yrs. | [ ] 5'4 – 5'8 | [ ] 131 – 160 lbs. |
| | [ ] Other: | [ ] Brown  [ ] Gray | [ ] 51-65yrs. | [ ] 5'9 – 6'0 | [ ] 161 – 200 lbs. |
| | | [ ] Red  [ ] Other: | [ ] 65 yrs. + | [ ] Over 6'0 | [ ] Over 200 lbs. |

**Distinctive Features**
[ ] Moustache  [ ] Glasses  [ ] Birthmark  [ ] Tattoo
[ ] Beard  [ ] Contact Lens  [ ] Scars  [ ] Disabled:
Other Identifying Features:

3. [ a]  (Conspicuous) By affixing [ ] copies thereof upon a conspicuous part, to wit: the entrance door of said apartment at said property. Deponent was unable to gain admittance there at or to find a person of suitable age and discretion willing to receive the document having called there on MAY 29 2004 at 11:00 a.m./p.m., and on 200 at a.m./p.m.

4. Mailing: On MAY 30 , 2004 , within one (1) day thereafter, Deponent completed service under the last two (2) methods of service (conspicuous and/or substituted) by mailing [ 2 ] copies thereof to the Respondent(s) at the property sought to be recovered which is the Respondent(s) residence in a 1st class postage paid properly addressed envelope marked "Personal and Confidential" by depositing said copy (ies) in an official depositor under the exclusive care and custody of the United States Post Office by regular first class mail and by certified mail in the City and State of New York.

Sworn to before and on this 30 day
of _____ 200

NOTARY PUBLIC

License No. 1282677

STEPHEN V. BARBARO
Notary Public - State of New York
No. 02BA4785299
Qualified in Queens County, Commission Expires
February 28, 20__

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF KINGS: Bronx
_____X

Mt. Oliver church INC
                                    Petitioner(s),

                                                        Index #

            -against-
                                                        **AFFIDAVIT OF SERVICE**
                                                        (Housing)
Bread of Life Mission, Juan Mojica, Lisa Mojica and Charles Evangelica En cuntro
                                    Respondent(s),
                                                        De Las Drugss INC
_____X       d/b/a Charles Evangelica y Missionens

STATE OF NEW YORK: COUNTY OF KINGS:

John F. Foster _____, being duly sworn, deposes and says, that deponent is not a party to this action, is over 18 years of age at

resides at: _____

The property sought to be recovered is: 2176 Anthony Avenue Bronx NY 10457

On May 30, 2014 at 4:00 a.m. (p.m), Deponent served the within:
[•] Notice of Termination   [ ] Three/Five/Ten Day Notice   [ ] Notice of Petition and Petition   [ ] Notice to Cure
[ ] Order to Show Cause   [ ] Subpoena   [√] Subpoena Duces Tecum
[ ] Other:

On: John Lisa Mojica _____, hereinafter, referred to as the Respondent(s).

1. [ ] (Personal) By delivering a true copy of the above document to said Respondent(s) personally. Deponent knew the person so served to be the person
described as said Respondent(s) herein. Said Respondent(s) is described below:

| Sex | Color (Skin) | Hair | Approx. (Age) | Height | Weight |
|-----|-------------|------|---------------|--------|--------|
| [ ] Male | [ ] Caucasian | [ ] Black [ ] White | [ ] 14-20 yrs. | [ ] Under 5' | [ ] Under 100lbs |
| [ ] Female | [ ] Black | [ ] Brown [ ] Balding | [ ] 21-35 yrs. | [ ] 5'0 - 5.3 | [ ] 100 - 130 lbs. |
| | [ ] Hispanic | [ ] Yellow [ ] Blond | [ ] 36-50 yrs. | [ ] 5'4 - 5.8 | [ ] 131 - 160 lbs. |
| | [ ] Other: | [ ] Brown [ ] Gray | [ ] 51-65yrs. | [ ] 5'9 - 6'0 | [ ] 161 - 200 lbs. |
| | | [ ] Red [ ] Other: | [ ] 65 yrs. + | [ ] Over 6'0 | [ ] Over 200 lbs. |

Distinctive Features
[ ] Moustache [ ] Glasses   [ ] Birthmark   [ ] Tattoo
[ ] Beard   [ ] Contact Lens   [ ] Scars   [ ] Disabled: _____
Other Identifying Features:

2. [ ] (Substituted) By granting admittance to said property and delivering to and leaving a copy thereof personally with a person of suitable age and
discretion, who was willing to receive the above document and who resided and/or was employed at said property. Deponent further states that he/she
describes the person actually served as follows:_____ (Name)

| Sex | Color (Skin) | Hair | Approx. (Age) | Height | Weight |
|-----|-------------|------|---------------|--------|--------|
| [ ] Male | [ ] Caucasian | [ ] Black [ ] White | [ ] 14-20 yrs. | [ ] Under 5' | [ ] Under 100lbs |
| [ ] Female | [ ] Black | [ ] Brown [ ] Balding | [ ] 21-35 yrs. | [ ] 5'0 - 5'3 | [ ] 100 - 130 lbs. |
| | [ ] Hispanic | [ ] Yellow [ ] Blond | [ ] 36-50 yrs. | [ ] 5'4 - 5'8 | [ ] 131 - 160 lbs. |
| | [ ] Other: | [ ] Brown [ ] Gray | [ ] 51-65yrs. | [ ] 5'9 - 6'0 | [ ] 161 - 200 lbs. |
| | | [ ] Red [ ] Other: | [ ] 65 yrs. + | [ ] Over 6'0 | [ ] Over 200 lbs. |

Distinctive Features
[ ] Moustache [ ] Glasses   [ ] Birthmark   [ ] Tattoo
[ ] Beard   [ ] Contact Lens   [ ] Scars   [ ] Disabled: _____
Other Identifying Features:

3. [•] (Conspicuous) By affixing [ ] copies thereof upon a conspicuous part, to wit: the entrance door of said apartment at said property. Deponent
unable to gain admittance there at or to find a person of suitable age and discretion willing to receive the document having called there on May 25
2014 at 11:00 a.m./p.m., and on _____ 200 ___ at _____ a.m./p.m.

4. Mailing: On May 30, 2014, within one (1) day thereafter, Deponent completed service under the last two (2) methods of service
(conspicuous and/or substituted ) by mailing [ 2 ] copies thereof to the Respondent(s) at the property sought to be recovered which is the Respondent(s)
residence in a 1st class postage paid properly addressed envelope marked "Personal and Confidential" by depositing said copy (ies) in an official depositer
under the exclusive care and custody of the United States Post Office by regular first class mail and by certified mail in the City and State of New York.

Sworn to before on this 30 day
of July, 2014

License No. _____

NOTARY PUBLIC

STEPHEN V. BARBARO
Notary Public - State of New York
No. 02BA4785299
Qualified in Queens County, Commission Expires
February 28, 20 1__

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF ~~KINGS:~~ Bronx

-----------------------------------------X

MT. Oliver Church INC
           Petitioner(s),

Index #

-against-

**AFFIDAVIT OF SERVICE**
(Housing)

Bread of Life Mission, Juan Mojica, Lisa Mojica and Cruzada Evangelica En Cristo
         Respondent(s), de Las Drogas Inc
-----------------------------------------X d/b/a Cruzada Evangelica y missions

STATE OF NEW YORK: COUNTY OF KINGS:

John F Fisher , being duly sworn, deposes and says, that deponent is not a party to this action, is over 18 years of age and
resides at: 28 Vanderra Ave Apt of Bklyn NY 11667

The property sought to be recovered is: 1111 Morris Avenue Bronx NY 10457

On MAY 30 , 2004 at 3:00 a.m./p.m., Deponent served the within:
[•] Notice of Termination [ ] Three/Five/Ten Day Notice [ ] Notice of Petition and Petition [ ] Notice to Cure
[ ] Order to Show Cause [ ] Subpoena [ ] Subpoena Duces Tecum      Cruzada Evangelica y.
[ ] Other: _____ de Las Drogas Inc d/b/a missions
On: Cruzada Evangelica En Cristo, de Las Drogas Inc d/b/a , hereinafter referred to as the Respondent(s).

**1. [ ] (Personal)** By delivering a true copy of the above document to said Respondent(s) personally. Deponent knew the person so served to be the person described as said Respondent(s) herein. Said Respondent(s) is described below:

| Sex | Color (Skin) | Hair | Approx. (Age) | Height | Weight |
|---|---|---|---|---|---|
| [ ] Male | [ ] Caucasian | [ ] Black [ ] White | [ ] 14-20 yrs. | [ ] Under 5' | [ ] Under 100lbs |
| [ ] Female | [ ] Black | [ ] Brown [ ] Balding | [ ] 21-35 yrs. | [ ] 5'0 - 5.3 | [ ] 100 - 130 lbs. |
| | [ ] Hispanic | [ ] Yellow [ ] Blond | [ ] 36-50 yrs. | [ ] 5'4 - 5.8 | [ ] 131 - 160 lbs. |
| | [ ] Other: | [ ] Brown [ ] Gray | [ ] 51-65yrs. | [ ] 5'9 - 6'0 | [ ] 161 - 200 lbs. |
| | | [ ] Red [ ] Other: | [ ] 65 yrs. + | [ ] Over 6'0 | [ ] Over 200 lbs. |

**Distinctive Features**
[ ] Moustache [ ] Glasses [ ] Birthmark [ ] Tattoo
[ ] Beard [ ] Contact Lens [ ] Scars [ ] Disabled: _____
Other Identifying Features:

**2. [ ] (Substituted)** By granting admittance to said property and delivering to and leaving a copy thereof personally with a person of suitable age and discretion, who was willing to receive the above document and who resided and/or was employed at said property. Deponent further states that he/she describes the person actually served as follows:_____(Name)

| Sex | Color (Skin) | Hair | Approx. (Age) | Height | Weight |
|---|---|---|---|---|---|
| [ ] Male | [ ] Caucasian | [ ] Black [ ] White | [ ] 14-20 yrs. | [ ] Under 5' | [ ] Under 100lbs |
| [ ] Female | [ ] Black | [ ] Brown [ ] Balding | [ ] 21-35 yrs. | [ ] 5'0 - 5'3 | [ ] 100 - 130 lbs. |
| | [ ] Hispanic | [ ] Yellow [ ] Blond | [ ] 36-50 yrs. | [ ] 5'4 - 5'8 | [ ] 131 - 160 lbs. |
| | [ ] Other: | [ ] Brown [ ] Gray | [ ] 51-65yrs. | [ ] 5'9 - 6'0 | [ ] 161 - 200 lbs. |
| | | [ ] Red [ ] Other: | [ ] 65 yrs. + | [ ] Over 6'0 | [ ] Over 200 lbs. |

**Distinctive Features**
[ ] Moustache [ ] Glasses [ ] Birthmark [ ] Tattoo
[ ] Beard [ ] Contact Lens [ ] Scars [ ] Disabled:_____
Other Identifying Features:

**3. [ ] (Conspicuous)** By affixing [ ] copies thereof upon a conspicuous part, to wit: the entrance door of said apartment at said property. Deponent unable to gain admittance there at or to find a person of suitable age and discretion willing to receive the document having called there on MAY 30 2004 at 10:00 a.m./p.m., and on _____ 200_ at _____ a.m./p.m.

**4. Mailing:** On MAY 30 , 200 4 , within one (1) day thereafter, Deponent completed service under the last two (2) methods of service (conspicuous and/or substituted ) by mailing [ 2 ] copies thereof to the Respondent(s) at the property sought to be recovered which is the Respondent(s) residence in a 1st class postage paid properly addressed envelope marked "Personal and Confidential" by depositing said copy (ies) in an official depositar under the exclusive care and custody of the United States Post Office by regular first class mail and by certified mail in the City and State of New York.

License No. IL92677

Sworn to before me on this 30 day of MAY , 2004

NOTARY PUBLIC

STEPHEN V. BARBARO
Notary Public - State of New York.
No. 02BA4785299
Qualified in Queens County, Commission Expires
February 28, 20___

_____
STEPHEN V. BARBARO
Notary Public - State of New York
No. 02BA4785299
Qualified in Queens County, Commission Expires
February 28, 20___



**U.S. Postal Service**
**CERTIFIED MAIL... RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com.

BRONX NY 10457

| Postage | $ | $0.49 | 0331 |
| Certified Fee | | $3.30 | 07 |
| Return Receipt Fee (Endorsement Required) | | $0.00 | |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | |
| Total Postage & Fees | $ | $3.79 | 05/30/2014 |

Postmark Here
MAY 30 2014

Sent To: Bread of Life Mission
Street, Apt No.; or PO Box No. 2176 Anthony Avenue
City, State, ZIP+4 Bronx NY 10457

PS Form 3800, August 2006      See Reverse for Instructions

7014 0150 0002 2444 5249

---

**CERTIFIED MAIL... RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com.

BRONX NY 10457

| Postage | $ | $0.49 | 0331 |
| Certified Fee | | $3.30 | 07 |
| Return Receipt Fee (Endorsement Required) | | $0.00 | |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | MAY 30 2014 |
| Total Postage & Fees | $ | $3.79 | 05/30/2014 |

Postmark Here

Sent To: Juan Mojica
Street, Apt No.; or PO Box No. 2176 Anthony Avenue
City, State, ZIP+4 Bronx NY 10457

PS Form 3800, August 2006      See Reverse for Instructions

7014 0150 0002 2444 5225

---

**U.S. Postal Service**
**CERTIFIED MAIL... RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com.

BRONX NY 10456

| Postage | $ | $0.49 | 0331 |
| Certified Fee | | $3.30 | 07 |
| Return Receipt Fee (Endorsement Required) | | $0.00 | |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | |
| Total Postage & Fees | $ | $3.79 | 05/30/2014 |

Postmark Here
MAY 30 2014

Sent To: Churches Evangelicas En Comuns
Street, Apt No.; or PO Box No. 1111 Morris Avenue
City, State, ZIP+4 Bronx NY 10456

PS Form 3800, August 2006      See Reverse for Instructions

7014 0150 0002 2444 5287

---

**U.S. Postal Service**
**CERTIFIED MAIL... RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com.

BRONX NY 10457

| Postage | $ | $0.49 | 0331 |
| Certified Fee | | $3.30 | 07 |
| Return Receipt Fee (Endorsement Required) | | $0.00 | |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | |
| Total Postage & Fees | $ | $3.79 | 05/30/2014 |

Postmark Here
MAY 30 2014

Sent To: Lisa Mojica
Street, Apt No.; or PO Box No. 2176 Anthony Avenue
City, State, ZIP+4 Bronx NY 10457

PS Form 3800, August 2006      See Reverse for Instructions

7014 0150 0002 2444 5232

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF THE BRONX                              Index No: *901344/2014*

MT. OLIVET CHURCH, INC.,
         Petitioner,

     -against-

BREAD OF LIFE MISSION, JUAN MOJICA,
LISA MOJICA AND CRUZADA EVANGELICA
EN CONTRA DE LAS DROGAS, INC. D/B/A
CRUZADA EVANGELICA Y MISIONERA,

        Respondent.

## PETITION HOLDOVER – COMMERCIAL

### JAIME RAMIREZ, ESQ.
Attorney for Petitioner
3058 Cross Bronx Expressway, Suite 1
Bronx, New York 10465
(718) 542-6629

Pursuant to Article 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, the contained in the annexed documents are not frivolous.

Dated: August 1, 2014            signature
                                 Print Signer's Name: Jaime Ramirez, Esq.,

Service of a copy of the within              is hereby admitted.

Dated:

                         Attorney(s) for

Please take notice

NOTICE OF ENTRY
that the within is a (certified) true copy of a       duly entered in the Office of the Clerk of the within court on
                 , 20 .

NOTICE OF SETTLEMENT
that an order             of which the within is true copy will be prepared for settlement to the Hon.
            one of the judges of the within named court, at             on      , 20
        at      M.

Dated,

                                 Yours, etc.
                                 Jaime Ramirez, Esq.
                                 3058 Cross Bronx Expressway, Suite 1
To:                               Bronx, New York 10465
                               T. (718) 542-6629 F. (718)542-6630

# CIVIL COURT OF THE CITY OF NEW YORK

County of _____ 
Date 10 -15 14    Part 52

Index No. L&T: _____
Page _1_ of _____
Hon. _____

Petitioner(s),

against

Respondent(s)

## STIPULATION OF SETTLEMENT

The parties understand that each party has the right to a trial, the right to see a Judge at any time and the right not to enter into a stipulation of settlement. However, after review of all the issues, the parties agree that they do not want to go to trial and instead agree to the following stipulation in settlement of the issues in this matter.

**Party (please print)**

Petitioner _____

Respondent 1 _____

Respondent 2 _____

Respondent 3 _____

Added/Amended or Deleted

Appearance   No Appearance   No Answer

**HON. JOSEPH E. CAPELLA**

OCT 15 2014

It is hereby agreed as follows:

1) Respondents appear by their attorney JAN Fambrach, Esq.

2) Respondents consent to courts jurisdiction and waive jurisdictional defenses

3) Respondents consent to judgement of possession and issuance of warrant, warrant stayed until January 2, 2015.

4) Respondents to pay use and occupancy in the sum of $600.00 per month as follows:
   Oct. 2014 u+o by October 24, 2014
   Nov. 2014 u+o by November 10, 2014
   Dec. 2014 u+o by December 10, 2014

5) Upon default warrant may be accelerated

6) Petitioner/landlord not to interfere with respondents use and enjoyment of premises

7) All alleged rent to be paid ...

CIV-LT-30 page 1 (Revised 4/07)



# New York State Unified Court System

WebHousing - Appearance Detail

County:          **Bronx**
Index Number:    **901344/2014**
Case Name:       **Mt Olivet Church Inc vs. Bread Of Life Missio,**

**Appearance Information**

| Appearance Date/Time | Calendar Category | Judge/ Part | Calen Marki |
|---|---|---|---|
| Aug 21, 2014 2:00 p.m. | Non-Housing New Holdover | Part 52, Rm 529a, 851 Grand Concourse | |

Close

Civil Court of the City of New York, County of Bronx     Index#   901344/2014

| | | |
|---|---|---|
| Mt. Olive Church, Inc., | VS | Bread of Life Mission, Juan Mojica, Lisa Mojica and Cruzada Evangelica En Contra DeLas Drogas, Inc. D/B/A Cruzada Evangelica Y. Misionera |

State of New York, County of Kings     ss.:     Service By Personal Delivery

Maurice L. Brown , being duly sworn, deposes and says that deponent is a not party to this proceeding, is over 18 years of age and resides at Kings County, Brooklyn, New York.

That on August 15th at 5:11 PM 2014, at No. 2176 Anthony, 1st Floor & Garage Bronx, New York 10457.
deponent served the within Notice of Petition & Petition Hold-Over Commercial on Juan Mojica.
       strike either (a) or (b)
(a) respondent therein named, by delivering a true copy of each to said respondent personally : deponent knew the persons so served to be the described as said respondent therein. Deponent describes the individual as

_X_male **Brown Skin**     __female     height **Over 6ft**     weight **190 lbs**     hair color **Black**     age **50 yrs**

(b) a business corporation, responding therein named, by delivering a true copy thereof to
       personally : deponent knew said corporation so served to be the corporation described therein as said
respondent and knew said individual to be the there of.

MAILING     and within 1 day thereafter, on   , 2014 by mailing 2 copies thereof enclosed in a post-
       paid properly addressed wrapper to respondent at the property sought to be recovered which is respondent's residence or
       corporate respondent's principal office or principal place of business by certified-mail, and regular mail.

*Magdalena Sliwa*
MAGDALENA SLIWA
NOTARY PUBLIC-STATE OF NEW YORK
No. 01SL6213237
Qualified in Kings County
My Commission Expires November 02, 2017

Sworn to before me on.
August 18, 2014

Maurice L. Brown
# 2006573

---

State of New York, County of Kings     ss.:         Service Other Than By Personal Delivery

       Maurice L. Brown, being duly sworn, deposes and says, that deponent is not a party to this proceeding, is over 18 years of age and resides at No. Kings County, Brooklyn New York
    Deponent was unable to serve respondent by personal delivery.
    The property sought to be recovered is No. .
    On     2014, deponent served the within..

SUBSTITUTED     by gaining admittance to said property and delivery to and leaving a copy thereof personally with
   SERVICE        a person of suitable age and discretion, who was willing to receive same and who -- resided -- was employed -- at said
         property. Deponent describes the individual as __male     __female     height
         weight     hair color     age

CONSPICUOUS     by affixing a copy thereof upon a conspicuous part, to wit : -- the entrance door
   PLACE        of said property deponent was unable to gain admittance thereat or to find a person of suitable age and discretion willing
   SERVICE     to receive the same.

MAILING     and within 1 day thereafter, on   , 2014 by mailing 2 copies thereof enclosed in a post-
       paid properly addressed wrapper to respondent at the property sought to be recovered which is respondent's residence or
       corporate respondent's principal office or principal place of business by certified-mail, and regular mail.

Sworn to before me on,

FILED
CLERK'S OFFICE
Maurice L. Brown
#2006573
AUG 1 8 2014
CIVIL COURT
BRONX COUNTY

Civil Court of the City of New York, County of Bronx    Index#   901344/2014

| Mt. Olive Church, Inc., | VS | Bread of Life Mission, Juan Mojica, |
|---|---|---|
| | | Lisa Mojica and Cruzada Evangelica |
| | | En Contra DeLas Drogas, Inc. D/B/A |
| | | Cruzada Evangelica Y. Misionera |

State of New York, County of Kings      ss.:     Service By Personal Delivery

    Maurice L. Brown , being duly sworn, deposes and says that deponent is a not party to this proceeding, is over 18 years of age and resides at Kings County, Brooklyn, New York.

That on August 15th at 5:11 PM 2014, at No 2176 Anthony, 1st Floor & Garage Bronx, New York 10457,
deponent served the within Notice of Petition & Petition Hold-Over Commercial on Bread Of Life Mission,
     strike either (a) or (b)
(a) respondent therein named, by delivering a true copy of each to said respondent personally : deponent knew the persons so served to be the described as said respondent therein. Deponent describes the individual us

_X_ male Brown Skin     ___female     height Over 6ft     weight 190 lbs     hair color Black     age 50 yrs

(b) a business corporation, responding therein named, by delivering a true copy thereof to Juan Mojica,
     personally ; deponent knew said corporation so served to be the corporation described therein as said
respondent and knew said individual to be the there of.

MAILING     and within 1 day thereafter, on    , 2014 by mailing 2 copies thereof enclosed in a post-
     paid properly addressed wrapper to respondent at the property sought to be recovered which is respondent's residence or
     corporate respondent's principal office or principal place of business by certified-mail, and regular mail

*Magdalena Sliwa*
MAGDALENA SLIWA
NOTARY PUBLIC-STATE OF NEW YORK
No. 01SL6213237
Qualified in Kings County
My Commission Expires November 02, 2017

Sworn to before me on,

August 18, 2014

Maurice L. Brown
# 2006573

---

State of New York, County of Kings      ss.:      Service Other Than By Personal Delivery
    Maurice L. Brown, being duly sworn, deposes and says, that deponent is not a party to this proceeding, is over 18 years of age and resides at No. Kings County, Brooklyn New York
    Deponent was unable to serve   respondent by personal delivery.
    The property sought to be recovered is No. .
    On     2014. deponent served the within..

SUBSTITUTED     by gaining admittance to said property and delivery to and leaving a copy thereof personally with
SERVICE      a person of suitable age and discretion, who was willing to receive same and who -- resided -- was employed -- at said
     property. Deponent describes the individual as ___male     ___female     height
     weight     hair color     age

CONSPICUOUS     by affixing a copy thereof upon a conspicuous part, to wit : -- the entrance door
PLACE     of said property deponent was unable to gain admittance thereat or to find a person of suitable age and discretion willing
SERVICE     to receive the same

MAILING     and within 1 day thereafter, on    , 2014 by mailing 2 copies thereof enclosed in a post-
     paid properly addressed wrapper to respondent at the property sought to be recovered which is respondent's residence or
     corporate respondent's principal office or principal place of business by certified-mail, and regular mail.

Sworn to before me on,

Maurice L. Brown
# 2006573

FILED
CLERK'S OFFICE

AUG 1 8 2014

CIVIL COURT
BRONX COUNTY

Civil Court of the City of New York, County of  Bronx      Index#   901344/2014

Mt. Olive Church, Inc.,                                    VS        Bread of Life Mission, Juan Mojica,
                                                                     Lisa Mojica and Cruzada Evangelica
                                                                     En Contra DeLas Drogas, Inc. D/B/A
                                                                     Cruzada Evangelica Y. Misionera

State of New York, County of K ngs              ss.:       Service By Personal Delivery

    Maurice L. Brown , being duly sworn, deposes and says that deponent is a not party to this proceeding, is over 18 years of age and resides at  Kings County, Brooklyn, New York.

That on  2014, at No.,
deponent served the within  on
        strike either (a) or  (b)
(a)  respondent therein named, by delivering a true copy of each to said respondent personally : deponent knew the persons so served to be the described as said respondent therein.  Deponent describes the individual as

__male        __female        height        weight        hair color        age

(b) a business corporation, responding therein named, by delivering a true copy thereof  to
        personally : deponent knew said  corporation so served to be the corporation described therein as said
respondent and knew said individual to be the  there of.

MAILING        and within 1 day thereafter, on    ,  2014  by mailing 2 copies thereof enclosed in a post-
        paid properly addressed wrapper to respondent at the property sought to be recovered which is respondent's residence or
        corporate respondent's principal office or principal place of business by certified-mail, and regular mail.

Sworn to before me on.

                                    Maurice L. Brown
                                    # 2006573

State of New York, County of  Kings            ss.:           Service Other Than By Personal Delivery
    Maurice L. Brown,  being duly sworn, deposes and says, that deponent is not a party to  this proceeding, is over 18 years of age and resides at No.  Kings County, Brooklyn  New York
   Deponent was unable to serve Lisa Mojica  respondent by personal delivery.
   The property sought to be recovered is No.  2176 Anthony, 1st Floor & Garage Bronx, New York 10457
   On  August 15th  at 5:11 PM  2014, deponent served the within.. Notice of Petition & Petition Hold-Over Commercial.

SUBSTITUTED  by gaining admittance to said property and delivery to and leaving a copy thereof personally with  Juan Mojica.
SERVICE       a person of suitable age and discretion, who was willing to receive same and who -- resided -- was employed -- at said
property.  Deponent describes the individual as  _X_ male Brown Skin       __female     height Over 6ft        weight  190 lbs
hair color  Black      age 50 yrs

CONSPICUOUS   by affixing a copy thereof upon a conspicuous part, to wit : -- the entrance door
   PLACE      of said property deponent was unable to gain admittance thereat or to find a person of suitable age and  discretion willing
   SERVICE    to receive the same.

MAILING       and within 1 day thereafter, on  August 16 ,  2014  by mailing 2 copies thereof enclosed in a post-
        paid properly addressed wrapper to respondent at the property sought to be recovered which is respondent's residence or
        corporate respondent's principal office or principal place of business by certified-mail, and regular mail.

Sworn to before me on,

August 18, 2014

Magdalena Sliwa

      MAGDALENA SLIWA
NOTARY PUBLIC-STATE OF NEW YORK
     No. 01SL6213237
   Qualified in Kings County
My Commission Expires November 02, 2017

                            Maurice L. Brown
                            # 2006573

FILED
CLERK'S OFFICE

AUG 1 8 2014

CIVIL COURT
BRONX COUNTY

U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

| | |
|---|---|
| Postage | $ $0.70 |
| Certified Fee | $3.30 |
| Return Receipt Fee (Endorsement Required) | $0.00 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ $4.00 |

0310
13
08/16/2014

7012 3460 0000 4770 5928

**FedEx**   Shipment Receipt

## Address Information

Ship to:                     Ship from:
MARIA                        TINA ORTIZ
GERALD WEINBERG,             JAIME RAMIREZ ESQ
P.C.
90 STATE ST                  3058 CROSS BRONX
                             EXPRESSWAY
STE 815                      SUITE1
ALBANY, NY                   THROGGS NECK, NY
122071708                    10465
US                           US
8003429856                   7185426629

## Shipment Information:

Tracking no.: 770787438961
Ship date: 08/07/2014
Estimated shipping charges: 8.55

## Package Information

Pricing option: FedEx Standard Rate
Service type: Priority Overnight
Package type: FedEx Envelope
Number of packages: 1
Total weight: 0.10  LBS
Declared Value: 0.00  USD
Special Services:
Pickup/Drop-off: Contact FedEx for courier pickup

## Billing Information:

Bill transportation to: RAMIREZ-424
Your reference: MT. OLIVET
P.O. no.:
Invoice no.:
Department no.:

Thank you for shipping online with FedEx ShipManager at fedex.com.

## Please Note

FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits; Consult the applicable FedEx Service Guide for details.
The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated.

8/7/2014 4:32 PM



EXHIBIT "D"

## Jaime Ramirez, Esq.

| | |
|---|---|
| **From:** | LAURA C. BROWNE, ESQ. [mrslawb@aol.com] |
| **Sent:** | Tuesday, August 19, 2014 9:16 AM |
| **To:** | ramirezlaw@optonline.net |
| **Subject:** | church docs |
| **Attachments:** | AFFIRMATION.docx; exparteapplicationamended2.docx; petitionamended2.docx; order updated2.docx |

sorry I forgot to send this.

*Laura C. Browne*
*Attorney At Law (Admitted in NY & CT)*
*Licensed Real Estate Broker*
1938 Williamsbridge Rd, Bronx, New York 10461
347-882-0033, 914-357-8164, 203-998-0397
fax: 347-851-4096
www.laurabrowneattorney.com

*PLEASE NOTE THAT THE OFFICE WILL BE CLOSED ON 8/22 & 8/29 - 9/2*

**Confidentiality Note.** *This message is intended only for the use of the named individual. If the recipient of this message is not the intended recipient you are hereby notified that any dissemination, distribution, etc of this message or its contents is strictly prohibited. If you have received this message in error please delete its contents immediately. Thank you.*

# Jaime Ramirez, Esq.

| | |
|---|---|
| **From:** | LAURA C. BROWNE, ESQ. [mrslawb@aol.com] |
| **Sent:** | Tuesday, August 19, 2014 9:16 AM |
| **To:** | ramirezlaw@optonline.net |
| **Subject:** | church docs |
| **Attachments:** | AFFIRMATION.docx; exparteapplicationamended2.docx; petitionamended2.docx; order updated2.docx |

sorry I forgot to send this.

*Laura C. Browne*
*Attorney At Law (Admitted in NY & CT)*
*Licensed Real Estate Broker*
1938 Williamsbridge Rd, Bronx, New York 10461
347-882-0033, 914-357-8164, 203-998-0397
fax: 347-851-4096
www.laurabrowneattorney.com

*PLEASE NOTE THAT THE OFFICE WILL BE CLOSED ON 8/22 & 8/29 - 9/2*

*Confidentiality Note. This message is intended only for the use of the named individual. If the recipient of this message is not the intended recipient you are hereby notified that any dissemination, distribution,etc of this message or its contents is strictly prohibited. If you have received this message in error please delete its contents immediately. Thank you.*

1

At IAS Part _____ of the
Supreme Court of the State of
New York, held in and for the
County of Bronx, at
851 Grand Concourse
On the _____ day of _____, 2013

P R E S E N T:

Hon. _____

       Justice

------------------------------------------------------------------X

In the matter of the Application of        INDEX NO,.

IGLESIA CRISTO NUESTRA JUSTICIA, INC.
f/k/a Adventist Evangelical Ministry, Inc.

                                     **ORDER**

                Petitioner

FOR AN ORDER PURSUANT TO THE RELIGIOUS
CORPORATION LAW, SECTION 12, TO SELL
CERTAIN REAL PROPERTY LOCATED AT
428-432 EAST 148TH STREET, BRONX, NY 10455
BLOCK 2292 LOTS 26, 27, 28
------------------------------------------------------------------X

      The Petitioner, IGLESIA CRISTO NUESTRA JUSTICIA, INC., by its attorney, LAURA C. BROWNE, ESQ.,, having petitioned this court for an order, pursuant to Article 5 of the Not-for-Profit Corporations law and section 12 of the Religious Corporation Law, authorizing the petitioner to sell the real property known as vacant land located at 428-432 East 148th Street, Bronx, New York, so that petitioner may purchase a building for a new place of worship to better suit the needs of the congregation, and to further authorize the petitioner to execute any and all documents in connection to the sale of the property referenced herein, and this matter to be heard,

NOW upon reading and filing the ex parte application and the petition duly verified on the 25th day of April, 2013, the corporate resolution passed by the Board of Directors, dated the 2nd day of March, 2013, the resolution of the Congregation dated the 2nd day of March, 2013, by which the petitioner was authorized to sell the real property located at 428-432 East 148th Street, Bronx, New York 10455, the resolution of the members of the petitioner, the petitioner was further authorized to sell the real property, and all are in support of the petition, the affirmation of Laura C. Browne, dated the 25th day of April, 2013, and the Attorney General of the State of New York having been duly served with the Ex Parte Application and Petition and having then duly waived any objection to the relief requested in the petition, and such waiver of objection having been endorsed upon this order on the _____ day of _____, 2013, and after due deliberation having been had thereon, and it appearing that both the purposes of the petitioner and the interests of the members of the petitioner, will be promoted thereby,

NOW, upon motion of LAURA C. BROWNE, attorney for the petitioner, it is

ORDERED, that the petition is hereby granted in its entirety, and that the petitioner, IGLESIA CRISTO NUESTRA JUSTICIA., be, and is hereby authorized to sell the real property located 428-432 E. 148th Street, Bronx, New York 10455, to purchaser, BAJZA 2007 CORP. in the amount of $440,000.00, and upon all other terms and conditions of the contract of sale as executed by the parties; and, it is further

ORDERED, that the petitioner is authorized to sell the real property located at 438 E. 148th Street, Bronx, New York; and, it is further

ORDERED, that the petitioner's duly appointment trustees and officers, are authorized to pay all the necessary and reasonable expenses that may be incurred in connection with the sale of the property; and, it is further

ORDERED, that the petitioner's duly appointed trustees and officers of the petitioner are authorized to execute all documents that are reasonable and necessary in order to sell the real property; and, it is further

ORDERED, that upon the entry of this order, the petitioner shall forthwith serve a copy of the duly signed order upon the Attorney General of the State of New York by certified mail, return receipt requested; and, it is further

ORDERED, that within 90 days of the signing of this order, attorney for petitioner will advise the Attorney General of the State of New York in writing, as to the status of the sale of the property; and it is further

ORDERED, upon the closing of the sale of the real property between the petitioner and the purchaser, that the net proceeds shall be held in escrow by petitioner's lawyer, Laura C. Browne, Esq., pending petitioner obtaining new premises by lease or purchase for a house of worship and subject to further order of the Court on notice to the Attorney General's Charities Bureau. Said escrow shall not be pledged or otherwise encumbered until such further order of the Court; and it is further

ORDERED, that the petitioner shall notify the Attorney General of the State of New York, in writing, by certified mail, return receipt requested, that the closing took place.

ENTER

_____
J.S.C.

Supreme Court of the State of New York
County of Bronx
-----------------------------------------------------------------X
In the matter of the Application of                    INDEX NO.

IGLESIA CRISTO NUESTRA JUSTICIA, INC.
f/k/a Adventist Evangelical Ministry, Inc.
                                                       **EXPARTE APPLICATION**
                                   Petitioner          **(ON CONSENT)**

FOR AN ORDER PURSUANT TO THE RELIGIOUS
CORPORATION LAW, SECTION 12, TO  SELL
CERTAIN REAL PROPERTY LOCATED AT
428-432  EAST 148TH STREET, BRONX, NY 10455
BLOCK 2292  LOTS 26, 27, 28
-----------------------------------------------------------------X

PEASE TAKE NOTICE that the petitioner, the Board of Trustees of the IGLESIA

CRISTO NUESTRA JUSTICIA, INC., a not-for-profit religious corporation, by its

attorney, LAURA C. BROWNE, based upon the, petition duly verified by Reverend

SAUL ROLDAN, on the 25th day of April, 2013, the resolution of the Board of Directors

approving and authorizing the petition, dated the 2nd day of March, 2013, the further

resolution of the members of the Congregation also approving and authorizing the

petition, dated the 2nd day of March, 2013, the affirmation of Laura C. Browne, dated the

25th day of April, 2013, and upon the no objection to the granting of judicial approval as

requested herein and the waiver of statutory notice by Eric T. Schneiderman, Attorney

General of the State of New York, as evidenced by an approval notice that has been

affixed to the order that is herewith being submitted, dated the _____ day of

_____, hereby petitions and applies to the Supreme Court of the State of New

York, County of Bronx, at the courthouse located at 851 Grand Concourse, Bronx, New

York, for an order to which same is being submitted herewith, pursuant to the Religious

Corporation Law,  Section 12,

1. Authorizing the petitioner to sell it's real property located at 428-432 East 148th Street, Bronx, New York;

2. To otherwise authorize the petitioner to execute all necessary documents to sell and transfer said property and pay all necessary costs and expenses in connection with said sale and transfer; and,

3. For such other and further relief as the court may deem to be just and proper.


Dated: April 25, 2013
      Bronx, New York

                Yours etc.


                     _____

                     LAURA C. BROWNE
                     Attorney for Petitioner
                     1938 Williamsbridge Road
                     Bronx, New York 10461
                     (347) 882-0033

Supreme Court of the State of New York
County of Bronx
----------------------------------------------------------------------X
In the matter of the Application of                        INDEX NO.

IGLESIA CRISTO NUESTRA JUSTICIA, INC.
f/k/a Adventist Evangelical Ministry, Inc.

**PETITION**

FOR AN ORDER PURSUANT TO THE RELIGIOUS
CORPORATION LAW, SECTION 12, TO SELL
CERTAIN REAL PROPERTY LOCATED AT
428-432 EAST 148TH STREET, BRONX, NY 10455
BLOCK 2292 LOT 26, 27, 28

----------------------------------------------------------------------X

TO THE SUPREME COURT OF THE STATE OF NEW YORK:

The Petitioner of IGLESIA CRISTO NUESTRA JUSTICIA, INC., of Bronx,
New York, respectfully shows:

1. Petitioner is a religious corporation duly organized and existing under the Religious
Corporations Law of the State of New York. A copy of the Petitioner's certificate of
incorporation and certificate of amendment, as well as its by-laws are annexed hereto as
Exhibit "A".

2. The current names of the Board of Directors of Petitioner and their places of residence
are as follows:
Director: Saul Roldan, 32 Perry Street, Belleville, NJ 07109
Director: Manuel Rabassa23 Blossom Lane, Newburgh, NY 12550
Director: Emily Monge, 1959 McGraw Avenue, Apt. 6B, Bronx, NY 10462
Secretary: Margarita Villarini a/k/a Cahre Villarini, 1800 Hunt Avenue, Bronx,
NY 10462

3. The activities, objects and purposes of Petitioner are to conduct divine worship and
other religious and charitable activities according to the doctrine, discipline and usages
of the Protestant Episcopal Church in the United States of America.

4. (a) The real property owned by Petitioner and proposed to be sold consists of vacant land which is located at 428-432 EAST 148TH STREET, BRONX, NY 10455 (hereinafter referred to as "the Property"). A copy of the Contract of Sale is annexed hereto as Exhibit "B". The property address as noted in the Contract is referenced as "428 East 148th Street, Bronx, NY 10455. Although that address is not the address as noted in the deed, ie. 428-432 East 148th Street, Bronx, NY 10455, it is of no significance because the description is the same. The address of 428 East 148th Street, Bronx, New York 10455, is the more common address used. (b). The fair market value of the Property is $450,000. This value determined by an independent appraiser. A copy of the appraisal is annexed hereto as Exhibit "C". (c) The debts and liabilities of Petitioner and the manner in which they are secured are annexed hereto as Exhibit "D".


5. (a) Petitioner proposes to sell the Property to BAJZA 2007 CORP. (purchaser) pursuant to the terms of the contract annexed hereto and made a part hereof. (Exhibit "B") The consideration of $440,000.00 to be received by Petitioner from the proposed sale is to be used for the purchase of a building to relocate Petitioner's place of worship. The Petitioner's mortgage was previously paid off. Petitioner rents their present place of worship and its lease expired on November 30, 2013. Petitioner has not renewed its lease in anticipation of the immediate sale of its property and relocation of its place of worship. Petitioner continues to rent space at its present location on a "month to month" basis, as verbally agreed upon with its landlord, until a new place of worship can be secured. A new place of worship has not been secured as of this date. (b) The dissolution of Petitioner is not contemplated after the sale of the Property. (c) The net proceeds shall be held in escrow by petitioner's lawyer, Laura C. Browne, Esq., pending petitioner obtaining new premises by lease or purchase for a house of worship and subject to further order of the Court on notice to the Attorney General's Charities Bureau. The escrow shall not be pledged or otherwise encumbered until such further order of the Court.

6. The consideration and the terms of the proposed sale are fair and reasonable to Petitioner as compared to the appraisal report. The Petitioner's purpose as above expressed will be promoted by such sale in that the funds will be utilized to purchase a

building for the purposes of spreading the good news about Jesus Christ.

7. The subject sale has been authorized by vote of the directors of Petitioner, to which there are four members, all of which were present and voted for the sale of the property, in accordance with law at a meeting duly called and held pursuant to a resolution duly adopted. The subject sale has also been authorized by vote of the congregants, to which there are eighteen congregants. All congregants were present at the meeting and said number constituted a quorum. All congregants attended the meeting and unanimously voted for the sale of the property, in accordance with law at a meeting duly called and held pursuant to a resolution duly adopted. A certified copy of both resolutions is annexed hereto and made a part hereof as Exhibit "E".

8. This is an arms length transaction. There is no relationship between the purchaser, its shareholders, directors, members, members of the Board of Directors or officers and the seller, its Pastor, shareholders, directors, members, members of the Board of Directors, officers or the members of the Congregation.

9. This Petition is made pursuant to Article 5 of the Not-for-Profit Corporations law and Article 12 of the Religious Corporations Law, both of the State of New York, which have been complied with.

10. No previous application has been made for the relief herein requested.

WHEREFORE, petitioner prays for an order of this Court granting permission to sell the property known as 428-432 East 148th Street, County of Bronx and State of New York as set forth in this Petition and to execute and deliver all necessary documents in connection therewith.

Dated: Bronx, New York
March 23, 2013

_____
LAURA C. BROWNE
Attorney for Petitioner
1938 Williamsbridge Road
Bronx, New York 10461
(347) 882-0033

## VERIFICATION

STATE OF NEW YORK        }
                         } ss.
COUNTY OF NEW YORK       }

SAUL ROLDAN, being duly sworn, deposes and says:

1.  I am the Reverend of the Petitioner herein and as such I am fully familiar with the facts and circumstances as set forth herein.
2.  That I have read the foregoing Petition and that the statements made therein are true and are made based upon my information, knowledge and belief therein.


_____
REV. SAUL ROLDAN


Sworn to before me this
___th day of April, 2013


_____
NOTARY PUBIC

EXHIBIT "E"

# TERESO CONSTRUCTION
Contractor
2755 Creston ave, Bronx.
New York 10468
347-430-9948

04-10- 2015
Attn.:. Ledwin

Reference: Building at 2176 Grand concourse Bronx NY.

Construction work:
Total interior renovation of existing 3 story building, cellar, first floor,
second floor apartment, third floor apartment, all material are included.
-General Demolition.
-Repair wall and ceiling (new sheetrock, paint and plaster).
-minor work in facade.
-Change Floor (Deck and Tile).
-Electricity.
-Plumbing kitchen and bathroom (piping work, change fixture and tile).
-Replace heater.
-Install new Doors.
-change all windows.
-New Cabinet.
-New gas boiler and new gas water heater.

Total Payment: $85,000.00

_Tereso Yes._

Terreso Yes.

# Business Certificate

I HEREBY CERTIFY *that I am conducting or transacting business under the name or designation*

of _TERESO CONSTRUCTION_

at _2755 CRESTON AVE Apt. 1A_

City or Town of _1_ _N.Y._ County of _BRONX 10468_ State of New York.

My full name is _TERESO A. YES_

Print or type name. If under 21 years of age, state "I am ........ years of age".

and I reside at _2755 CRESTON AVE Apt. 1A BRONX 10468_

I FURTHER CERTIFY *that I am the successor in interest to* _No o Ne_

*the person or persons heretofore using such name or names to carry on or conduct or transact business.*

Type of business _Construction_ *(see next page)*

IN WITNESS WHEREOF, *I have signed this certificate on* _24 of June_ _20 11_

_TERESO YES_

STATE OF NEW YORK, COUNTY OF _New York_ ss.:

On _24 OF June 20__ before me, the undersigned, personally appeared _Tereso Yes_ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

EVELYN ARIAS
STATE OF NEW YORK, COUNTY **Notary Public State of New York**
SS: L LUIS M. DIAZ, COUNTY CLERK AND **No. 01AR6092340**
CLERK OF THE SUPREME COURT **Qualified in New York County**
**Commission Expires**

_(signature and office of person taking acknowledgment)_

Notary Stamp

TRUE AND COMPLETE COPY
WITH THE ORIGINAL FILED IN MY OFFICE ON
JUN 24 2011

COPY OF THE
COUNTY
FACSIMILE SIGNATURE USED PURSUANT


Blumberg's LawProducts ® X 201 — Certificate of Conducting Business under an Assumed Name for Individual, 4-10

EXHIBIT "F"

Reorder Form No. 8068 (3/00)-- Residential contract of sale 2-91

*Jointly prepared by the Real Property Section of the New York State Bar Association, the New York State Land Title Association, the Committee on Real Property Law of the Association of the Bar of the City of New York and the Committee on Real Property Law of the New York County Lawyers' Association.*

Warning: NO REPRESENTATION IS MADE THAT THIS FORM OR CONTRACT FOR THE SALE AND PURCHASE OF REAL ESTATE COMPLIES WITH SECTION 5-702 OF THE GENERAL OBLIGATIONS LAW ("PLAIN LANGUAGE").

## CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT

**NOTE: FIRE AND CASUALTY LOSSES AND CONDEMNATION.**
This contract form does not provide for what happens in the event of fire, or other casualty loss or condemnation before the title closing. Unless different provision is made in this contract, Section 5-1311 of the General Obligations Law will apply. One part of the law makes a Purchaser responsible for fire and casualty loss upon taking possession of the Premises before the title closing.

**Date:**

**CONTRACT OF SALE**, made as of . ~~Marx~~ 7/ , 2015
BETWEEN MT. OLIVET CHURCH INC.

Residential Contract of Sale

**Parties:**

Address: 2176 GRAND CONCOURSE BRONX, NEW YORK 10456
Social Security Number/Fed. I.D. No(s):

hereinafter called "SELLER", and MARIA T. NOBLE AND/OR HER ASSIGNEE

Address: 259 GORGE ROAD APT 12 D CLIFFSIDE PARK 07010
Social Security Number/Fed. I.D. No.(s):

hereinafter called "PURCHASER".

The parties hereby agree as follows:

**Premises:**

1. Seller shall sell and convey and Purchaser shall purchase the property, together will all buildings and improvements thereon (collectively the "Premises"), more fully described on a separate page marked "Schedule A", annexed hereto and made a part hereof and also known as:

Street Address: 2176 GRAND CONCOURSE BRONX, NEW YORK

Tax Map Designation: BLOCK 3151 LOT 14

Together with Seller's ownership and rights, if any, to land lying in the bed of any street or highway, opened or proposed, adjoining the Premises to the center line thereof, including any right of Seller to any unpaid award by reason of any taking by condemnation and/or for any damage to the Premises by reason of change of grade of any street or highway. Seller shall deliver at no additional cost to Purchaser, at Closing (as hereinafter defined), or thereafter, on demand, any documents that Purchaser may reasonably require for the conveyance of such title and the assignment and collection of such award or damages.

**Personal Property:**

2. This sale also includes all fixtures and articles of personal property now attached or appurtenant to the Premises, unless specifically excluded below. Seller represents and warrants that at Closing they will paid for and owned by Seller, free and clear of all liens and encumbrances, except any existing mortgage to which this sale may be subject. They include, but are not limited to, plumbing, heating, lighting and cooking fixtures, bathroom and kitchen cabinets, mantels, door mirrors, switch plates and door hardware, venetian blinds, window treatments, shades, screens, awnings, storm windows, storm doors, window boxes, mail box, TV aerials, weather vane, flagpole, pumps, shrubbery, fencing, outdoor statuary, tool shed, dishwasher, washing machine, clothes dryer, garbage disposal unit, range, oven, refrigerator, freezer, air conditioning equipment and installations, wall to wall carpeting and built-ins not excluded below (strike out inapplicable items): ALL AS PRESENTLY EXISTING

Excluded from this sale are furniture and household furnishings and

**Purchase Price:**

3. The purchase price is $                                                        500,000.00

payable as follows:

(a) on the signing of this contract, by Purchaser's check payable to the Escrowee (as hereinafter defined), subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 6 of this contract (the "Downpayment"):      $15,000.00

(b) by allowance for the principal amount unpaid on the existing mortgage on the date hereof, payment of which Purchaser shall assume by joinder in the deed:      $0

(c) by a purchase money note and mortgage from Purchaser to Seller:      $0

(d) balance at Closing in accordance with paragraph 7:      $485,000.00

**Existing Mortgage:**

4. *(Delete if inapplicable)* If this sale is subject to an existing mortgage as indicated in paragraph 3(b) above:

(a) The premises shall be conveyed subject to the continuing lien of the existing mortgage, which is presently payable, with interest at the rate of      percent per annum, in monthly installments of $      which include principal, interest and escrow amounts, if any, and with any balance of principal being due and payable on

(b) To the extent that any required payments are made on the existing mortgage between the date hereof and Closing which reduce the unpaid principal amount thereof below the amount shown in paragraph 3(b), then the balance of the price payable at Closing under paragraph 3(d) shall be increased by the amount of the payments of principal. Seller represents and warrants that the amount shown in paragraph 3(b) is substantially correct and agrees that only payments required by the existing mortgage will be made between the date hereof and Closing.

(c) If there is a mortgage escrow account, Seller shall assign it to Purchaser, if it can be assigned, and in that case Purchaser shall pay the amount in the escrow account to Seller at Closing.

(d) Seller shall deliver to Purchaser at Closing a certificate dated not more than 30 days before Closing signed by the holder of the existing mortgage, in form for recording, certifying the amount of the unpaid principal, the date to which interest has been paid and the amounts, if any, claimed to be unpaid for principal and interest, itemizing the same. Seller shall pay the fees for recording such certificate. If the holder of the existing mortgage is a bank or other institution as defined in Section 274-a of the Real Property Law ("institutional Lender"), it may, instead of the certificate, furnish a letter signed by a duly authorized officer, employee or agent, dated not more than 30 days before Closing, containing the same information.

(e) Seller represents and warrants that (i) Seller has delivered to Purchaser true and complete copies of the existing mortgage, the note secured thereby and any extensions and modifications thereof, (ii) the existing mortgage is not now, and at the time of Closing will not be, in default, and (iii) the existing mortgage does not contain any provision that permits the holder of the mortgage to require its immediate payment in full or to change any other term thereof by reason of the sale or conveyance of the Premises.

**Purchase Money Mortgage:**

5. *(Delete if inapplicable)* If there is to be a purchase money mortgage as indicated in paragraph 3(c) above:

(a) The purchase money note and mortgage shall be drawn by the attorney for Seller in the form adopted by the New York State Land Title Association. Purchaser shall pay at Closing the mortgage recording tax, recording fees and the attorney's fees in the amount of $      for its preparation.

(b) The purchase money note and mortgage shall also provide that it is subject and subordinate to the lien of the existing mortgage and any extensions, modifications, replacements or consolidations of the existing mortgage, provided that (i) the interest rate thereof shall not be greater than percent per annum and the fixed debt service thereunder shall not be greater than $      per annum, and (ii) if the principal amount thereof shall exceed the amount of principal owing and unpaid on the existing mortgage at the time of placing such new mortgage or consolidated mortgage, the excess be paid to the holder of such purchase money mortgage in reduction of the principal thereof. The purchase money mortgage shall also provide that such payment to the holder thereof shall not alter or affect the regular installments, if any, of principal payable thereunder and that the holder thereof will, on demand and without charge therefor, execute, acknowledge and deliver any agreement or agreements further to effectuate such subordination.

**Downpayment in Escrow:**

6. (a) Seller's attorney ("Escrowee") shall hold the Downpayment for Seller's account in a segregated bank account at      until Closing or sooner termination of this contract and shall pay over or apply the Downpayment in accordance with the terms of this paragraph. Escrowee shall (not) *(Delete if inapplicable)* hold the Downpayment in an interest-bearing account for the benefit of the parties. If interest is held for the benefit of the parties, it shall be paid to the party entitled to the Downpayment and the party receiving the interest shall pay any income taxes thereon. If interest is not held for the benefit of the parties, the Downpayment shall be place in an IOLA account or as otherwise permitted or required by law. The Social Security or Federal Identification numbers of the parties shall be furnished to Escrowee upon request. At Closing, the Downpayment shall be paid by Escrowee to Seller. If for any reason Closing does not occur and either party gives Notice (as defined in paragraph 25) to Escrowee demanding payment of the Downpayment, Escrowee shall give prompt Notice to the other party of such demand. If Escrowee does not receive Notice of objection from such other party to the proposed payment within 10 business days after the giving of such Notice, Escrowee is hereby authorized and directed to make such payment. If Escrowee does receive such Notice of objection within such 10 day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by Notice from the parties to this contract or a final, nonappealable judgment, order or decree of a court. However,

Escrowee shall have the right at any time to deposit the Downpayment and the interest thereon with the clerk of a court in the county in which the Premises are located and shall give Notice of such deposit to Seller and Purchaser. Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b) Parties acknowledge that, although Escrowee is holding the Downpayment for Seller's account, for all other purposes Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally agree to defend, indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorney's fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c) Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel.

(d) Escrowee acknowledges receipt of the Downpayment by check subject to collection and Escrowee's agreement to the provision of this paragraph by signing in the place indicated on the signature page of this contract.

(e) Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee.

**Acceptable Funds:**

7. All money payable under this contract, unless otherwise specified, shall be paid by:

(a) Cash, but not over $1,000.00;

(b) Good certified check of Purchaser drawn on or official check issued by any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York, unendorsed and payable to the order of Seller, or as Seller may otherwise direct upon not less than 3 business days notice (by telephone or otherwise) to Purchaser;

(c) As to money other than the purchase price payable to Seller at Closing, un-certified check of Purchaser up to the amount of $1,000.00; and

(d) As otherwise agreed to in writing by Seller or Seller's attorney.

**Mortgage Contingency:**

8. *(Delete if inapplicable)* The obligations of Purchaser hereunder are conditioned upon issuance on or before Sept 9 , 2014, (the "Commitment Date") of a written commitment from any Institutional Lender pursuant to which such Institutional Lender agrees to make a first mortgage loan, other than a VA, FHA or other governmentally insured loan, to Purchaser, at Purchaser's sole cost and expense, of $480,000.00 or such lesser sum as Purchaser shall be willing to accept, at the prevailing fixed rate of interest not to exceed prevailing or initial adjustable rate of interest not to exceed prevailing for term of at least 30 years and on other customary commitment terms, whether or not conditioned upon any factors other than an appraisal satisfactory to the Institutional Lender. Purchaser shall (a) make prompt application to an Institutional Lender for such mortgage loan, (b) furnish accurate and complete information regarding Purchaser and members of Purchaser's family, as required, (c) pay all fees, points and charges required in connection with such application and loan, (d) pursue such application with diligence, (e) cooperate in good faith with such Institutional Lender to obtain such commitment and (f) promptly give Notice to Seller of the name and address of each Institutional Lender to which Purchaser has made application. Purchaser shall comply with all requirements of such commitment (or of any other commitment accepted by Purchaser) and shall furnish Seller with a copy thereof promptly after receipt thereof. If such commitment is not issued on or before the Commitment Date, then, unless Purchaser has accepted a commitment that does not comply with the requirements set forth above, Purchaser may cancel this contract by giving Notice to Seller within 5 business days after the Commitment Date, in which case this contract shall be deemed cancelled and thereafter neither party shall have any further rights against, or obligations or liabilities to, the other by reason of this contract, except that the Downpayment shall be promptly refunded to Purchaser and except as set forth in paragraph 27. If Purchaser fails to give such notice of cancellation then Purchaser shall be deemed to have waived Purchaser's right to cancel this contract and to receive a refund of the Downpayment by reason of the contingency contained in this paragraph.

**Permitted Exceptions:**

9. The Premises are sold and shall be conveyed subject to:

(a) Zoning and subdivision laws and regulations, and landmark, historic or wetlands designation, provided that they are not violated by the existing buildings and improvements erected on the property or their use;

(b) Consents for the erection of any structures on, under or above any streets on which the Premises abut;

(c) Encroachment of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway;

(d) Real estate taxes that are a lien, but are not yet due and payable; and

(e) The other matters, if any, including a survey exception, set forth in a Rider attached.

**Governmental Violations and Orders:**

10.   CLOSING
(a) Seller shall comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued as of the date hereof by any governmental department having authority as to lands, housing, buildings, fire, health, environmental and labor conditions affecting the Premises. The Premises shall be conveyed free of them at Closing. Seller shall furnish Purchaser with any authorizations necessary to make the searches that could disclose these matters.

(b) *(Delete if inapplicable)* All obligations affecting the Premises pursuant to the Administrative Code of the City of New York incurred prior to Closing and payable in money shall be discharged by Seller at or prior to Closing.

**Seller's Representations:**

11.   (a) Seller represents and warrants to Purchaser that:

(i) The Premises abut or have a right of access to a public road;

(ii) Seller is the sole owner of the Premises and has the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this contract;

(iii) Seller is not a "foreign person", as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code ("IRC") Section 1445, as amended, and the regulations promulgated thereunder (Collectively "FIRPTA");

(iv) The Premises are not affected by any exemptions or abatements of taxes; and

(v) Seller has been known by no other name for the past ten years, except: none

(b) Seller covenants and warrants that all of the representations and warranties set forth in this contract shall be true and correct at Closing.

(c) Except as otherwise expressly set forth in this contract, none of Seller's covenants, representations, warranties or other obligations contained in this contract shall survive Closing.

**Condition of Property:**

12. Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other property included in this sale, based on Purchaser's own inspection and investigation thereof, and that Purchaser is entering into this contract based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or oral, as to the physical condition, state of repair, use, cost of operation or any other matter related to the Premises or the other property included in the sale, given or made by Seller or its representatives, and shall accept the same "as is" in present condition and state of repair, subject to reasonable use, wear, tear and natural deterioration between the date hereof and the date of Closing (except as otherwise set forth in paragraph 16(f)), without any reduction in the purchase price or claim of any kind for any change in such condition by reason thereof subsequent to the date of this contract. Purchaser and its authorized representatives shall have the right, at reasonable times and upon reasonable notice (by telephone or otherwise) to Seller, to inspect the Premises before Closing.

**Insurable Title:**

13. Seller shall give and Purchaser shall accept such title as any reputable title company acting as willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to the matters provided for in this contract.

**Closing, Deed and Title:**

14.   (a) "Closing" means the settlement of the obligations of Seller and Purchaser to each other under this contract, including the payment of the purchase price to Seller, and the delivery to Purchaser of a bargain and sale deed with covenants deed in proper statutory short form for record, duly executed and acknowledged, so as to convey to Purchaser fee simple title to the Premises, free of all encumbrances, except as otherwise herein stated. The deed shall contain a covenant required by Seller by subd. 5 of Section 13 of the Lien Law.

(b) If Seller is a corporation, it shall deliver to Purchaser at the time of Closing (i) a resolution of its Board of Directors authorizing the sale and delivery of the deed, and (ii) a certificate by the Secretary or Assistant Secretary of the corporation certifying such resolution and setting forth facts showing that the transfer is in conformity with the requirements of Section 909 of the Business Corporation Law. The deed in such case shall contain a recital sufficient to establish compliance with that Section.

**Closing Date and Place:**

15. Closing shall take place at the office of JAIME RAMIREZ ESQ at          o'clock on SEPTEMBER 22, 2014 or, upon reasonable notice (by telephone or otherwise) by Purchaser, at the office of LENDER'S COUNSEL

**Conditions to Closing:**

16.  This contract and Purchaser's obligation to purchase the Premises are also subject to and conditioned upon the fulfillment of the following conditions precedent:

(a) The accuracy, as of the date of Closing, of the representations and warranties of Seller made in this contract.

(b) The delivery by Seller to Purchaser of a valid and subsisting Certificate of Occupancy or other required certificate of compliance, or evidence that none was required, covering the building(s) and all of the other improvements located on the property authorizing their use as a TWO family dwelling at the date of Closing.

(c) The delivery by Seller to Purchaser of a duly executed and sworn affidavit (in form prescribed by law) claiming exemption of Seller (as contemplated hereby, if such be the case, under Article 31-B of the Tax Law of the State of New York and the Regulations promulgated thereunder, as the same may be amended from time to time (collectively the "Gains Tax Law"); or if such sale shall not be exempt under the Gains Tax Law, Seller and Purchaser agree to comply in a timely manner with the requirements of the Gains Tax Law and, at Closing, Seller shall deliver to Purchaser (i) an official return showing no tax due, or (ii) an official return accompanied by a certified or official bank check drawn on a New York State banking institution payable to the order of the New York State Department of Taxation and Finance in the amount of the tax shown to be due thereon. Seller shall (x) pay promptly any additional tax than may become due under the Gains Tax Law, together with interest and penalties thereon, if any, which may be assessed or become due after Closing, and/or execute any other documents that may be required in respect thereof, and (y) indemnify, defend and save Purchaser harmless from and against any of the foregoing and any damage, liability, cost or expense (including reasonable attorney's fees) which may be suffered or incurred by Purchaser by reason of the nonpayment thereof. The provisions of this subparagraph (c) shall survive Closing.

(d) The delivery to Purchaser of a certification stating that Seller is not a foreign person, which certification shall be in the form then required by FIRPTA. If Seller fails to deliver the aforesaid certification or if Purchaser is not entitled under FIRPTA to rely on such certification, Purchaser

shall deduct and withhold from the purchase price a sum equal to 10% thereof (or any lesser amount permitted by law) and shall at Closing remit the withheld amount with the required forms to the Internal Revenue Service.

(e) The delivery of the Premises and all building(s) and improvements comprising a part thereof in broom clean condition, vacant and free of leases or tenancies, together with keys to the Premises.

(f) All plumbing (including water supply and septic systems, if any), heating and air conditioning, if any, electrical and mechanical systems, equipment and machinery in the building(s) located on the property and all appliances which are included in this sale being in working order as of the date of Closing.

(g) If the Premises are a one or two family house, delivery by the parties at Closing of affidavits in compliance with state and local law requirements to the effect that there is installed in the Premises a smoke detecting alarm device or devices.

(h) The delivery by the parties of any other affidavits required as a condition of recording the deed

**Deed Transfer and Recording Taxes:**

17. At Closing, certified or official bank checks payable to the order of the appropriate State, City or County officer in the amount of any applicable transfer and/or recording tax payable by reason of the delivery or recording of the deed or mortgage, if any, shall be delivered by the party required by law or by this contract to pay such transfer and/or recording tax, together with any required tax returns duly executed and sworn to, and such party shall cause any such checks and returns to be delivered to the appropriate officer promptly after Closing. The obligation to pay any additional tax or deficiency and any interest or penalties thereon shall survive Closing.

**Apportionments and Other Adjustments; Water Meter and Installment Assessments:**

18. (a) To the extent applicable, the following shall be apportioned as of midnight of the day before the day of Closing.

(i) Taxes, water charges and sewer rents, on the basis of the fiscal period for which assessed; (ii) fuel; (iii) interest on the existing mortgage; (iv) premiums on existing transferable insurance policies and renewals of those expiring prior to Closing; (v) vault charges; (vi) rents as and when collected.

(b) If Closing shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the immediately preceding fiscal period applied to that latest assessed valuation.

(c) If there is a water meter on the Premises, Seller shall furnish a reading to a date not more than 30 days before Closing and the unfixed meter charge and sewer rent, if any, shall be apportioned on the basis of such last reading.

(d) If at the date of Closing the Premises are affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this contract all the unpaid installments shall be considered due and shall be paid by Seller at or prior to Closing.

(e) Any errors or omissions in computing apportionments or other adjustments at closing shall be corrected within a reasonable time following Closing. This subparagraph shall survive Closing.

**Allowance for Unpaid Taxes, etc.:**

19. Seller has the option to credit Purchaser as an adjustment to the purchase price with the amount of any unpaid taxes, assessments, water charges and sewer rents, together with any interest and penalties thereon to a date not less than five business days after closing, provided that official bills therefor computed to said date are produced at Closing.

**Use of Purchase Price to Remove Encumbrances:**

20. If at Closing there are other liens or encumbrances that Seller is obligated to pay or discharge, Seller may use any portion of the cash balance of the purchase price to pay or discharge them, provided Seller shall simultaneously deliver to Purchaser at Closing instruments in recordable form and sufficient to satisfy such liens or encumbrances of record, together with the cost of recording or filing said instruments. As an alternative Seller may deposit sufficient monies with the title insurance company employed by Purchaser acceptable to and required by it to assure their discharge, but only if the title insurance company will insure Purchaser's title clear of the matters or insure against their enforcement out of the Premises and will insure Purchaser's Institutional Lender clear of such matters. Upon notice (by telephone or otherwise), given not less than 3 business days before Closing, Purchaser shall provide separate certified or official bank checks as requested to assist in clearing up these matters.

**Title Examination; Seller's Inability to Convey; Limitations of Liability:**

21. (a) Purchaser shall order an examination of title in respect of the Premises from a title company licensed or authorized to issue title insurance by the New York State Insurance Department or any agent for such title company promptly after the execution of this contract or, if this contract is subject to the mortgage contingency set forth in paragraph 8, after a mortgage commitment has been accepted by Purchaser. Purchaser shall cause a copy of the title report and of any additions thereto to be delivered to the attorney(s) for Seller promptly after receipt thereof.

(b) If at the date of Closing Seller is unable to transfer title to Purchaser in accordance with this contract, or Purchaser has other valid grounds for refusing to close, whether by reason of liens, encumbrances or other objections to title or otherwise (herein collectively called "Defects"), other than those subject to which Purchaser is obligated to accept title hereunder or which Purchaser may have waived and other that those which Seller has herein expressly agreed to remove, remedy or discharge and if Purchaser shall be unwilling to waive the same and to close title without abatement of the purchase price, then except as hereinafter set forth, Seller shall have the right, at Seller's sole election, either to take such action as Seller may deem advisable to remove, remedy, discharge or comply with such Defects or to cancel this contract; (iii) if Seller elects to take action to remove, remedy or comply with such Defects, Seller shall be entitled from time to time, upon Notice to Purchaser, to adjourn the date for Closing hereunder for a period or periods not exceeding 60 days in the aggregate (but not extending beyond the date upon which Purchaser's mortgage commitment, if any, shall expire), and the date for Closing shall be adjourned to a date specified by Seller not beyond such period. If for any reason whatsoever, Seller shall not have succeeding in removing, remedying or complying with such Defects at the expiration of such adjournment(s) and if Purchaser shall still be unwilling to waive the same and to close title without abatement of the purchase price, then either party may cancel this contract by Notice to the other given within 10 days after such adjourned date; (iii) notwithstanding the foregoing, the existing mortgage (unless this sale is subject to the same) and any matter created by Seller after the date hereof shall be released, discharged or otherwise cured by Seller at or prior to Closing.

(c) If this contract is cancelled pursuant to its terms, other than as a result of Purchaser's default, this contract shall terminate and come to an end, and neither party shall have any further rights, obligations or liabilities against or to the other hereunder or otherwise, except that: (i) Seller shall promptly refund or cause the Escrowee to refund the Downpayment to Purchaser and, unless cancelled as a result of Purchaser's default or pursuant to paragraph 8, to reimburse Purchaser for the net cost of examination of title, including any appropriate additional charges related thereto, and the net cost, if actually paid or incurred by Purchaser, for updating the existing survey of the Premises or of a new survey, and (ii) the obligations under paragraph 27 shall survive the termination of this contract.

**Affidavit as to Judgments, Bankruptcies, etc.:**

22. If a title examination discloses judgments, bankruptcies or other returns against persons having names the same as or similar to that of Seller, Seller shall deliver an affidavit at Closing showing that they are not against Seller.

**Defaults and Remedies:**

23. (a) If Purchaser defaults hereunder, Seller's sole remedy shall be to receive and retain the Downpayment as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be impossible to ascertain and that the Downpayment constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.

(b) If Seller defaults hereunder, Purchaser shall have such remedies as Purchaser shall be entitled to at law or in equity, including, but not limited to, specific performance.

**Purchaser's Lien:**

24. All money paid on account of this contract, and then reasonable expenses of examination of title to the Premises and of any survey and survey inspection charges, are hereby made liens on the Premises, but such liens shall not continue after default by Purchaser under this contract.

**Notices:**

25. Any notice or other communication ("Notice") shall be in writing and either (a) sent by either of the parties hereto or by their respective attorneys who are hereby authorized to do so on their behalf or by the Escrowee, by registered or certified mail, postage prepaid, or

(b) delivered in person or by overnight courier, with receipt acknowledged, to the respective addresses given in this contract for the party and the Escrowee, to whom the Notice is to be given, or to such other address as such party or Escrowee shall hereafter designate by Notice given to the other party or parties and the Escrowee pursuant to this paragraph. Each notice mailed shall be deemed given on the third business day following the date of mailing the same, except that any notice to Escrowee shall be deemed given only upon receipt by Escrowee and each Notice delivered in person or by overnight courier shall be deemed given when delivered

**No. Assignment:**

26. This contract may not be assigned by Purchaser without the prior written consent of Seller in each instance and any purported assignment(s) made without such consent shall be void.

**Broker:**

27. Seller and Purchaser each represents and warrants to other that it has not dealt with any broker in connection with this sale other than NONE ("Broker") and Seller shall pay Broker any commission earned pursuant to a separate agreement between Seller and Broker. Seller and Purchaser shall indemnify and defend each other against any costs, claims and expenses, including reasonable attorneys' fees, arising out of the breach on their respective parts of any representation or agreement contained in this paragraph. The provisions of this paragraph shall survive Closing or, if Closing does not occur, the termination of this contract.

**Miscellaneous:**

28. (a) All prior understandings, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this contract; it completely expresses their full agreement and has been entered into after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this contract.

(b) Neither this contract nor any provision thereof may be waived, changed or cancelled except in writing. This contract shall also apply to and bind the heirs, distributees, legal representatives, successors and permitted assigns of the respective parties. The parties hereby authorize their respective attorneys to agree in writing to any changes in dates and time periods provided for in this contract.

(c) Any singular word or term herein shall also be read as in the plural and the neuter shall include the masculine and feminine gender, whenever the sense of this contract may require it.

(d) The captions in this contract are for convenience of reference only and in no way define, limit or describe the scope of this contract and shall not be considered in the interpretation of this contract or any provision hereof.

(e) This contract shall not be binding or effective until duly executed and delivered by Seller and Purchaser.

(f) Seller and Purchaser shall comply with IRC reporting requirements, if applicable. This subparagraph shall survive Closing.

(g) Each party shall, at any time and from time to time, execute, acknowledge where appropriate and deliver such further instruments and

# 1st RIDER TO CONTRACT OF SALE

RIDER ATTACHED TO AND MADE A PART OF THE CONTRACT OF SALE BETWEEN:

SELLER:          MT. OLIVET CHURCH INC.

PURCHASER(S):   MARIA T. NOBLE AND OR ASSIGNEE

PREMISES:       2176 GRAND CONCOURSE BRONX NEW YORK

1. ADDITIONAL EXCEPTIONS. Supplementing Paragraph 9: The premises are to be sold and conveyed subject to the following matters, in addition to those matter listed in Paragraph 9:

a) Covenants, restrictions, rights of way, easements, reservations and agreements of record, if any, insofar as the same may now be in force or effect, provided same are not violated by the present structure or use of the Premises, and do not render title uninsurable;
b) Any state of facts an accurate survey of the Premises may show, provided the same does not render title unmarketable;
c) Building and zoning regulations and ordinances of the city, town or village in which the premises lie which are not violated by the existing structure or its present.
d) Rights, if any, of the municipality in which the Premises are located or of any public utility, telephone or cable television company, to install, maintain, operate and/or repair pipes, wires cables, poles and related equipment in, under, over and upon the Premises;
e) Possible encroachments of fences and variations between record lines and fences; encroachments or projections upon street or road of any stoops, areas, gratings, steps, windows, balconies, ornaments, brick, leaves, trim and cornices and the like;
f) Any state of facts a personal inspection of the Premises would show;

2.REPAIRS.It is understood and agreed that seller shall not be under any obligation whatsoever to make and/or pay for any repairs, alterations or improvements, including the cost of any and all inspections required by the lending institution or any other organization as a condition to the issuance of the mortgage commitment referred to previously.

3.ASSIGNMENTS. This contract may be assigned without the written consent of the seller.

4. DISCLOSURES. In the event the Seller or Purchaser or any of the principals, stockholders, directors, officers or employers of the Seller or Purchaser herein are licensed Real Estate Brokers/Salesman the Seller and/or Purchaser acknowledged that

full disclosure of this fact has been made to them, and that the purchaser is purchasing the property for possible resale at a profit.

5. **MORTGAGE CONTINGENCY:** If Purchaser is unable to obtain a commitment for such mortgage Seller's attorney shall, upon request, have the right to see copies of the application filed by the Purchaser (S) with the proposed mortgagee. If requested, Purchaser (s) will request, in writing, that mortgagee send a copy of the application to Seller's attorney.

If Purchaser is unable to obtain a firm commitment within such time, then either party may cancel this contract, subject to terms of preprinted contract, by written notice to the other party and upon refund of the down payment terminate without further liability on the part of either party to the other.

6. **NOTICES.** All notices under this contract shall be in writing, mailed, or delivered to the office of counsel for the respective parties, that have represented said parties at the signing of this contract, (or to successor counsel whose appearance has been so designated in writing). However, all notices under this contract which would have the effect of canceling and/or rescinding and/or otherwise terminating this contract, including but not limited to a Purchaser's failure to obtain mortgage commitment notice@ shall be so sent by certified mail. Notices signed by said counsel shall be sufficient.

7. **PERSONALITY.** All personal property included in this sale will be conveyed in as is condition, less normal wear and tear from the date of this contract to the closing of title.

8. **VIOLATIONS.** All notices of violation of law or municipal ordinance orders or requirement, which in the aggregate do not exceed Five Hundred ($500.00) Dollars to correct, noted in or issued by the Department of Housing and Buildings, Fire, Labor Health or other State or Municipal Authorities having jurisdiction against or affecting the premises at the date hereof shall be complied with by the Seller on or before closing and the premises shall be conveyed free of same or a credit at Seller's option in order to correct the violations. In the event cost of correcting such violations exceed Five Hundred ($500.00) Dollars in the aggregate, Seller shall have the right to elect, within ten (10) days of receipt of written notice, to cure and consummate the transaction contemplated hereby or to cancel this contract by written notice to Purchaser. In the event Seller elects to cancel the contact pursuant hereto, Seller's sole liability shall be limited to the return of the Deposit and the parties shall have no further rights or liabilities to each other under the terms and provisions of this contract. Notwithstanding the foregoing, Purchaser may elect to take the premises subject to such violations without any offset whatsoever and without any claim against or liability on the part of the Seller, except as herein provided.

Jaime Ramirez, P.C.
751 Commonwealth Avenue
Bronx, New York 10473
Tel.: 718-542-6629 Fax.: 718-542-6630
ramirezlaw@optonline.net

9. **TRAVEL ALLOWANCE.** In the event the closing of Title should take place outside of the New York City Metropolitan area, or Westchester County the buyer shall pay the sum of Three hundred Fifty ($350.00) as a travel allowance to the sellers attorney.

10. **TITLE EXAMINATION.** Purchaser agrees to order, immediately after obtaining a mortgage commitment, an examination of the title to the premises to be made on Purchaser's behalf, and, at least 10 days before the date for the closing of title, to send to the attorneys for Seller a copy of the report of such examination of title and a written statement of any objections to title of the closing of title hereunder. If Purchaser or Purchaser's attorney fails to Give Seller's attorney such notice of objection (other than bring down to date searches), then any defect or encumbrance of exception appearing on such report of title, or affecting the premises at the time of closing, shall not be deemed to be an objection to title or to the closing of title hereunder, and Purchaser shall take title subject hereto.

11. **INABILITY TO CONVEY TITLE.** If the Seller shall be unable to convey title in accordance with the provisions of this Agreement, any payments made by the Purchaser on account of the purchase price, shall be refunded, together with the reasonable expense incurred for examination of title (not exceeding the usual net charges of title issued, and the net cost of a survey), whereupon this Agreement shall be terminated and neither party hereto shall have any further rights again the other, except that, if the premises are affected by any encumbrance, outstanding interest or expression of title not expressly consented to herein by the Purchaser, which render the Seller's title to the premises unmarketable, and, which may, according to reasonable expectations, be removed within fifteen (15) days, the Seller shall have the privilege to remove or satisfy the same, and shall for this purpose be entitled to an adjournment of the closing of title to the premises marketable. The Purchaser may, nevertheless, accept such title as the Seller may be able to convey, without reduction of the purchase price, or any credit against the same and without liability on the part of the Seller.

12. **CONTRACT MODIFICATION AND EXTENSION.** Seller (s) does hereby appoint Seller's attorney herein as his agent and Purchaser(s) does hereby appoint his attorney, herein as his agent to execute any and all instrument in writing, having reference to this contract including but not limited to, modifications thereof and extensions of time for obtaining mortgage, if any, and extension of time for closing or otherwise.

13. **DEED ACCEPTANCE.** The acceptance of deed by Purchaser(s) shall be deemed to be full performance and discharge and every agreement and obligation on the part of the Seller(s) to be performed pursuant to the provisions of this agreement, except those, if any,

Jaime Ramirez, P.C
751 Commonwealth Avenue
Bronx, New York 10473
Tel.: 718-542-6629 Fax.: 718-542-6630
ramirezlaw@optonline.net

which are herein specifically stated to survive the delivery of the deed.

14. **SUBMISSION NOT AN OFFER.** The submission of this agreement by the Seller or their attorneys to Purchaser does not constitute an offer or an acceptance of an offer. This agreement shall not be binding upon the Sellers unless (i) the agreement has been fully executed by the Purchaser and Seller, and a fully executed copy has been delivered to each party by their respective attorneys; and (ii) Purchaser has paid the down payment pursuant to Paragraph 1 of the form printed contract.

15. **CONTRACT CANNOT BE RECORDED.** The parties agrees that neither this agreement nor any memorandum or notice thereof shall be recorded or tendered for recording in the County Clerk's Office of the County in which the land is situated. Purchaser further agrees that if this agreement, or any memorandum or short form thereof shall be recorded in any such office, this agreement, upon notice by the Seller to the Purchaser, may be deemed to void at Seller's option and of no further force and effect and such notice, if reported, shall be deemed sufficient and adequate notice to third parties that this agreement is void and of no further force and effect.

16. **CONFLICT.** If there is any conflict between the provisions contained in this Addendum and the provision of the printed form contract, the provisions in this addendum shall govern and be controlling to the extent necessary to resolve the conflict.

17. **AMBIGUITY.** Both parties shall be deemed to have drafted this Agreement. In the event any provisions are found to be ambiguous, same shall not be construed against either party.

18. Purchaser shall have the right to inspect the premises within forty-eight (48) hours prior to closing.

19. **HEATING/COOLING BILLS.** The purchasers herein acknowledged that they have a right to the summary of the heating and/or cooling bills or a complete set of said bills, under Section 17-103, Chapter 555 of the Laws of the State of New York commonly known as the Truth in Heating Law. The purchasers herein waive their right to companies of said bills and acknowledge that they have not requested them in connection with this transaction.

20. At closing, the premises will have an operable single station smoke detecting alarm device in accordance with the New York State Executive Law, Chapter 971, Section 270.5.

Jaime Ramirez, P.C.
751 Commonwealth Avenue
Bronx, New York 10473
Tel.: 718-542-6629 Fax.: 718-542-6630
ramirezlaw@optonline.net

21. <u>PURCHASER REPRESENTATIONS.</u> Purchasers warrant and represent (i) that they have assets sufficient to complete this transaction; (ii) that they have no personal knowledge of any circumstances that would render them unacceptable to any lending institution by reason of outstanding loans, obligations or liabilities which would adversely affect their credit standing; (iii) that until the closing of title, they will not deliberately or knowingly change their financial status so as to render their mortgage application unacceptable to the lending institution. Purchasers acknowledge and represent that this transaction is not contingent on the Purchasers' ability to sell any other real or personal property.

22. <u>CERTIFICATE OF OCCUPANCY.</u> Supplementing paragraph #16B of the printed contract. This presentation shall not be construed to obligate Seller to incur any cost of expense to obtain a Certificate of Occupancy, Certificate of Completion and/or letter as herein above provided; and in the event that Seller cannot comply with this representation without incurring any cost, Seller shall have the option of canceling this Contract and returning to the Purchaser the down payment paid hereunder and thereupon the rights and obligations of the parities shall cease and terminate unless Purchaser waives this condition.

23. <u>PREPARATION OF CONTRACT.</u> In the event Purchaser is unable to obtain a mortgage commitment in accordance to the terms of the Contract, Purchaser agrees to pay the Seller's attorney the sum of one hundred and fifty ($150.00) dollars for preparation of the Contract. Seller's attorney shall be authorized to deduct said amount form the downpayment

24. <u>TERMITE INSPECTION.</u> Purchasers shall order a termite inspection by a reputable company, and if premises are found to be infested with termites or other wood destroying insects, the Seller shall have the option of either canceling said contract or curing premises of said infestation. Said termite inspection shall be completed within twenty (20) days from the date hereof. The purchaser shall serve written notice upon Seller's attorney within twenty (20) days after Purchaser receives the inspection report.

25. <u>POSSESSION.</u> Vacant and broom clean possession of the ENTIRE within described premises shall be delivered to Purchaser within 7 days after the closing of title. However, the attorney for the Seller shall hold in escrow the sum of $3,500.00 security for the faithful performance of the above agreement. In the event that Seller does not deliver vacant possession as set forth, then in that event, the attorney for the Seller is authorized to pay out of said escrow deposit the sum of $375.00 per day to the Purchaser as liquidated damages for each and every additional day that Seller remains in possession beyond the agreed period. All adjustments to be as of the day of possession.

Jaime Ramirez, P.C.
751 Commonwealth Avenue
Bronx, New York 10473
Tel: 718-542-6629 Fax : 718-542-6630
ramirezlaw@optonline.net

In the event Seller unable to deliver premises vacant as of the date of closing, Seller shall be entitled to an adjournment of up to ninety (90) days to bring a disposes proceeding against its current tenant.

If after, (90) days, premises cannot be delivered vacant, Seller may at his option cancel this contract and return to Purchaser the down payment paid hereunder and all costs for any title expenses, mortgage application and cancellation fees, and appraisals. Purchaser, at his option, may take title to the premises on the date of Closing, subject to any tenancy remaining in the premises, whereby Seller shall assign any and all rights caused of action, etc., against tenant to Purchaser. Seller shall be relieved of all claims and shall bear no responsibility to continue or bring forth any proceedings against the tenant.

26. **APPLIANCES.** Notwithstanding the above, seller's liability in connection with any appliance shall be limited to the sum of **ONE HUNDRED TWENTY FIVE ($125.00) DOLLARS 00/100** per appliance. The Purchaser shall have the right to inspect the premises within forty-eight (48) hours prior to closing and of taking possession in order to ascertain the condition of the premises.

27. **PROPERTY CONDITION DISCLOSURE.** Article 14 of the Real Property Law of the State of New York ("the Property Condition Disclosure Act" or "PCDA") provides that the Seller of a one (1) to four (4) family dwelling ("the Premises") must deliver to the prospective Purchaser of the Premises prior to signing by the Purchaser of a binding Contract of Sale a certified Property Condition Disclosure Statement ("PCDS") regarding certain conditions and information concerning the Premises which are known to the Seller. Such PCDS is not a warranty of any kind by the Seller or by any agency representing the Seller in this transaction. It is not a substitute for any inspections or test which may be conducted by the Purchaser or qualified agents on behalf of the Purchaser, and the Purchaser is encouraged to obtain his or her own independent professional engineer inspections and environmental tests and is also encouraged to check public records pertaining to the premises. Seller represents that Seller does not have actual knowledge, records or personal recollection of facts and/or events suitable to accurately complete the information requested to be set forth in the state formulated PCDS.

Section 465 of the PCDA provides that in the event that a Seller fails to deliver a PCDS before the Purchaser signs a binding Contract of Sale, the Purchaser is to receive upon the transfer of title a credit against the purchase price in the sum of $500.00. Seller hereby offers to give the Purchaser, at closing, a credit against the purchase price in the sum of $500.00. Purchaser hereby accepts the offer, in return for which credit; the Purchaser hereby released the Seller from any obligation otherwise imposed by the PCDA to deliver a PCDS.

Jaime Ramirez, P C.
751 Commonwealth Avenue
Bronx, New York 10473
Tel.: 718-542-6629 Fax.: 718-542-6630
ramirezlaw@optonline.net

28.   ADJOURNMENT FEE.   In the event the seller's attorney appears at scheduled closing and the closing has to be adjourned or cancelled through no fault of the Seller, then Purchaser shall apply to the seller's attorney a fee of $250.00.

29. RETURNED CHECK.   In the event the purchaser's down payment check is dishonored then in that event seller's shall be entitled to all remedies at law including contract cancellation and the purchaser shall pay seller's attorney the sum of $100.00 as a service fee in addition to replacing said dishonored check with either a certified check or official bank check.

30.   SHORT SALE.          ( ) Short sale (check if applicable)
This transaction shall be subject to seller's mortgagee (s) accepting a short sale application for the instant premises and shall be subject to any terms requested by mortgagee (s). If any proposed terms are unacceptable to purchaser, purchaser shall have right to cancel transaction and receive return of down payment. Seller acknowledges that he or she will not receive any proceeds at closing.

31.   COURT APPROVAL.   THIS TRANSACTION SHALL BE SUBJECT TO COURT APPROVAL AS REQUIRED PURSUANT TO THE APPLICABLE RELIGIOUS CORPORATION LAWS.


_____               _____
Seller                                                   Purchaser


_____               _____
Seller                                                   Purchaser

Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards

**Lead Warning Statement**

*Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.*

**Seller's Disclosure**
(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):
    (i) ☐ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).
_____

    (ii) ☒ Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.
(b) Records and reports available to the seller (check (i) or (ii) below):
    (i) ☐ Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).
_____

    ☒ Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's Acknowledgment (initial)**
(c) _____ Purchaser has received copies of all information listed above.
(d) _____ Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home.*
(e) Purchaser has (check (i) or (ii) below):
    (i) ☒ received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or
    (ii) ☐ waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment (initial)**
(f) _____ Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**
The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| Seller | Date | Seller | Date |
|--------|------|--------|------|
| *Maria B. Nadal* | | | |
| Purchaser | Date | Purchaser | Date |
| Agent | Date | Agent | Date |

documents and take such other action as may be reasonably requested by the other in order to carry out the intent and purpose of this contract. This subparagraph shall survive Closing.

(ii) This contract is intended for the exclusive benefit of the parties hereto and, except as otherwise expressly provided herein, shall not be for the benefit of, and shall not create any rights in, or be enforceable by, any other person or entity.

IN WITNESS WHEREOF, this contract has been duly executed by the parties hereto.

_____          _____
            Seller                                       Purchaser
     MT. OLIVET CHURCH INC.                         MARIA T. NOBLE

_____          _____
            Seller                                       Purchaser
   BY: ARACELIS STAATZ


Attorney for Seller: JAIME RAMIREZ          Attorney for Purchaser:

Address: 3058 CROSS BRONX EXPRESSWAY UNIT 1     Address:
BRONX, NEW YORK 10465

                                            Tel:            Fax:
Tel: 718 542 6629          Fax: 718 542 6630


Receipt of the Down payment is acknowledged and the undersigned agrees to act in accordance with the provisions of Paragraph 6 above.




                              Escrowee


        Contract of Sale                          PREMISES

TITLE NO.                                  DISTRICT

                TO                         SECTION

        DISTRIBUTED BY                     BLOCK

     YOUR TITLE EXPERTS                     LOT
The Judicial Title Insurance Agency LLC
800-281-TITLE (8485) FAX: 800-FAX-9396     COUNTY or TOWN

                                           STREET NUMBER ADDRESS

EXHIBIT "G"

ORTIZ & ORTIZ, LLP
32-72 Steinway Street, Ste. 402
Astoria, New York 11103
Tel. (718) 522-1117
Fax (718) 596-1302
email@ortizandortiz.com
*Attorneys for the Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

MARIA TERESA NOBLE,

                    Plaintiff,

      – vs.–

MOUNT OLIVET CHURCH, INC., aka
MOUNT OLIVERT CHURCH, INC., aka
MOUNT OLIVER CHURCH INC., aka
MOUNT OLIVE CHURCH INC., and
ARACELIS STAATZ, as Trustee of
Mount Olivet Church,

                    Defendants.

-----------------------------------------------------X

**COMPLAINT**

Civil Case No.

<u>JURY TRIAL DEMANDED</u>

Maria Teresa Noble ("Plaintiff"), by and through her counsel Ortiz & Ortiz LLP, hereby

complains of Mount Olivet Church and Aracelis Staatz as Trustee (collectively, the

"Defendants") and states, upon information and belief, as follows:

## <u>NATURE OF THE ACTION</u>

1.     Mount Olivet Church (the "Church") holds title to the real property known as

2176 Grand Concourse, Bronx County, New York 10457 (the "Property").  Plaintiff entered into

a valid contract to purchase the Property in 2014 (the "Contract"), and has been misled and

stymied in her efforts to close upon the purchase of the Property since the Contract was signed.

Since the Plaintiff is a religious organization, and requires the approval of the N.Y.S. Attorney General (the "A.G.") to sell the Property, the Plaintiff has expended her time and resources attempting to assist the Defendants in obtaining the A.G.'s approval of the sale since 2014. However, the Defendants have ceased communicating with the Plaintiff and have appeared to abandon their efforts to obtain approval of the sale. The Plaintiff has been damaged by the Defendants breach of the agreement and seeks to compel compliance with the Contract.

## THE PARTIES

2.      Maria Teresa Noble ("Noble") is a New Jersey resident.

3.      Mount Olivet Church (the "Church") is a religious corporation organized under the Laws of the State of New York.

4.      Aracelis Staatz ("Staatz") refers to herself as an officer and Trustee of the Church.

## JURISDICTION

5.      This action is between citizens of different states. The amount in controversy, excluding interest and costs, exceeds the sum or value of $75,000. Jurisdiction is based upon diversity of citizenship pursuant to 28 U.S.C. §1332.

6.      Venue is deemed proper in this District pursuant to 28 U.S.C. § 1931. The events giving rise to this action took place within the jurisdiction of this court and the Property is located in this District.

## FACTS

7.      Staatz acts on behalf of the Church and controls its actions.

8.      Staatz signed a contract of sale, on behalf of the Church, to sell the Property to the

2

Plaintiff on or about July 9, 2014, for the purchase price of $600,000.00. A copy of the contract is annexed as Exhibit A.

9.     The sale of the Property was approved by the Church's members and Board of Directors.

10.    The Church was represented by counsel Jaime Ramirez P.C. with offices located in Bronx County, New York, in connection with the sale.

11.    Paragraph 1 of the contract required the Plaintiff to provide the Defendant with a fully executed contract and a $15,000.00 deposit.

12.    Paragraph 31 of the Rider to the contract provides that the sale is subject to court approval as required by applicable religious corporation law.

13.    The Plaintiff tendered a $1,000.00 deposit check upon signing the contract to Mr. Ramirez, and Mr. Ramirez negotiated the check.

14.    The Plaintiff tendered a second deposit check in the amount of $14,000.00 to Mr. Ramirez.

15.    Mr. Ramirez informed the Plaintiff that he would hold in escrow, but not negotiate, the $14,000 deposit check until the Church obtained the AG's approval of the sale.

16.    Noble and her real estate broker Ledwin Oviedo (the "Broker") have invested countless hours over the last four years assisting the Defendants in its attempts to prosecute the sale.

17.    The Church retained attorney Laura C. Browne of Bronx County to assist it in obtaining the requisite AG and court approval to sell the Property to the Plaintiff and comply with the terms of the contract.

18.     When Ms. Browne was close to completing the process of obtaining the AG's approval, Ms. Browne was discharged by the Church and Staatz.

19.     In or after May 2018, the Plaintiff attempted to contact attorney Serge Joseph, of New York County, telephonically and in writing, to inquire as to the status of the sale, and to state that the Plaintiff is ready, willing, and able to close and consummate the purchase of the Property. The Plaintiff received no response to these inquiries.

20.     In or after May 2018, the Plaintiff wrote to the Church, Staatz, the members of the Church's Board of Directors to attempt to prosecute the Contract and sale. No one has responded to these inquiries.

21.     The Plaintiff is a real estate sales person and investor and has long standing ties to the community in which the Property is located. The Plaintiff sought to purchase the Property because its location is advantageous to the Plaintiff's business.

22.     The Plaintiff presently operates from offices across the street from the Property, located at 2153 Grand Concourse, Bronx, New York.

23.     Staatz informed the Broker that she wants to recover personally some or all of the proceeds of the sale, and that she could not retain the sales proceeds for her own personal use under applicable New York religious law.

24.     The Plaintiff believes that Staatz has caused the Church to breach the contract because Staatz seeks to benefit personally from the sale.

25.     The Plaintiff is ready, willing, and able to comply with the terms of the contract, and can close upon the sale as soon as the Church obtains the requisite A.G. and court approval.

26.     The Plaintiff believes that the Church is no longer conducting services and

4

operating as a church, and Staatz does not reside in the Property.

27.    The Plaintiff believes that the Property is in a state of disrepair and has no running water.

28.    The Plaintiff seeks specific performance of the contract.  However, the Plaintiff can not, in good faith, set up a closing and a deadline for the Church to transfer the deed with the knowledge that the Church has not sought A.G. or court approval.

### FIRST CAUSE OF ACTION
### (Breach of Contract/Specific Performance)

29.    The Plaintiff reasserts and realleges the allegations contained in Paragraphs 1 though 28.

30.    The contract is a valid and binding contract between the Plaintiff and Defendants.

31.    Staatz has caused the Church to breach the contract of sale by failing to prosecute a petition before the court to approve the sale and seek the A.G.'s approval of the sale.  The Defendants' conduct constitutes a material breach of the Contract.

32.    The Plaintiff is entitled to judgment declaring that the Contract remains in full force and effect and directing the Defendants to specifically perform their obligations under the Contract, including completing the process of obtaining court and A.G. approval of the sale.

33.    The Contract relates to an interest in real property that is unique, special, and irreplaceable.  The specific performance sought by the Plaintiff relates to and affects the title to, or possession, use or enjoyment of real property.

34.    The Plaintiff has no adequate remedy at law and is entitled to specific performance, as monetary damages are inadequate.  Barring specific performance, the Plaintiff

can not be made whole by a an award of monetary damages.

## SECOND CAUSE OF ACTION
### (Breach of Covenant of Good Faith and Fair Dealing)

35.     The Plaintiff reasserts and realleges the allegations contained in Paragraphs 1

through 34.

36.     Implied in all contracts, including the Contract, is a covenant of good faith and

fair dealing which obligates the parties to act in good faith and to use their best efforts to deal

fairly with one another.

37.     The Defendants have breached the covenant of good faith and fair dealing and

have wrongfully deprived, destroyed, and injured the rights of the Plaintiff to receive the value,

benefit, and fruits of the Contract by failing to prosecute and complete the process of obtaining

court approval of the sale of the Property.

38.     The Plaintiff is entitled to judgment declaring that the Contract remains in full

force and effect and directing the Defendants to specifically perform their obligations under the

Contract, including completing the process of obtaining court and AG approval of the sale.

39.     The Contract relates to an interest in real property that is unique, special, and

irreplaceable.  The specific performance sought by the Plaintiff relates to and affects the title to,

or possession, use or enjoyment of real property.

40.     The Plaintiff has no adequate remedy at law and is entitled to specific

performance, as monetary damages are inadequate.  Barring specific performance, the Plaintiff

can not be made whole by an award of monetary damages.

WHEREFORE, the Plaintiff demands judgment against Defendants as follows:

a.      On the First Cause of Action, for a judgment declaring and adjudging that the Contract remains in full force and effect and directing that the Plaintiff comply with the terms of the Contract, including seeking court approval of the sale of the Property;

b.      On the Second Cause of Action, for a judgment declaring and adjudging that the Contract remains in full force and effect and directing that the Plaintiff comply with the terms of the Contract, including seeking court approval of the sale of the Property;

c.      And granting such other and further relief as deemed just.

Dated: August 27, 2018
        Astoria, New York

                                        S/*Norma E. Ortiz*
                                        Norma E. Ortiz
                                        Ortiz & Ortiz, L.L.P.
                                        32-72 Steinway Street, Ste. 402
                                        Astoria, New York 11103
                                        Tel. (718) 522-1117
                                        Fax (718) 596-1302
                                        *Counsel to the Plaintiff*

7

# EXHIBIT A

## (Copy of Contract of Sale)

Reorder Form No. 8068 (3/00)-- Residential contract of sale 2-91

Jointly prepared by the Real Property Section of the New York State Bar Association, the New York State Land Title Association, the Committee on Real Property Law of the Association of the Bar of the City of New York and the Committee on Real Property Law of the New York County Lawyers' Association.

Warning: NO REPRESENTATION IS MADE THAT THIS FORM OR CONTRACT FOR THE SALE AND PURCHASE OF REAL ESTATE COMPLIES WITH SECTION 5-702 OF THE GENERAL OBLIGATIONS LAW ("PLAIN LANGUAGE").

**CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT**

NOTE: FIRE AND CASUALTY LOSSES AND CONDEMNATION.
This contract form does not provide for what happens in the event of fire, or other casualty loss or condemnation before the title closing. Unless different provision is made in this contract, Section 5-1311 of the General Obligations Law will apply. One part of the law makes a Purchaser responsible for fire and casualty loss upon taking possession of the Premises before the title closing.

**Residential Contract of Sale**

*Date.*  **CONTRACT OF SALE**, made as of JULY 9, 2014
BETWEEN MT. OLIVET CHURCH INC.

*Parties:*  Address: 2176 GRAND CONCOURSE BRONX, NEW YORK 10456
Social Security Number/Fed. I.D. No(s):

hereinafter called "SELLER", and MARIA T. NOBLE AND/OR HER ASSIGNEE

Address: 250 GORGE ROAD APT 12 D CLIFFSIDE PARK 07010
Social Security Number/Fed. I.D. No.(s):

hereinafter called "PURCHASER".

The parties hereby agree as follows:

*Premises:*  1. Seller shall sell and convey and Purchaser shall purchase the property, together will all buildings and improvements thereon (collectively the "Premises"), more fully described on a separate page marked "Schedule A", annexed hereto and made a part hereof and also known as:

Street Address: 2176 GRAND CONCOURSE BRONX, NEW YORK

Tax Map Designation: BLOCK 3157 LOT 14

Together with Seller's ownership and rights, if any, to land lying in the bed of any street or highway, opened or proposed, adjoining the Premises to the center line thereof, including any right of Seller to any unpaid award by reason of any taking by condemnation and/or for any damage to the Premises by reason of change of grade of any street or highway. Seller shall deliver at no additional cost to Purchaser, at Closing (as hereinafter defined), or thereafter, on demand, any documents that Purchaser may reasonably require for the conveyance of such title and the assignment and collection of such award or damages.

*Personal Property.*  2. This sale also includes all fixtures and articles of personal property now attached or appurtenant to the Premises, unless specifically excluded below. Seller represents and warrants that at Closing they will paid for and owned by Seller, free and clear of all liens and encumbrances, except any existing mortgage to which this sale may be subject. They include, but are not limited to, plumbing, heating, lighting and cooking fixtures, bathroom and kitchen cabinets, mantels, door mirrors, switch plates and door hardware, venetian blinds, window treatments, shades, screens, awnings, storm windows, storm doors, window boxes, mail box, TV aerials, weather vane, flagpole, pumps, shrubbery, fencing, outdoor statuary, tool shed, dishwasher, washing machine, clothes dryer, garbage disposal unit, range, oven, refrigerator, freezer, air conditioning equipment and installations, wall to wall carpeting and built-ins not excluded below (strike out inapplicable items). ALL AS PRESENTLY EXISTING

Excluded from this sale are furniture and household furnishings and

*Purchase Price:*  3. The purchase price is $                                                                        600,000.00

payable as follows:

(a) on the signing of this contract, by Purchaser's check payable to the Escrowee (as hereinafter defined), subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 6 of this contract (the "Downpayment"):                 $15,000.00
(b) by allowance for the principal amount unpaid on the existing mortgage on the date hereof, payment of which Purchaser shall assume by joinder in the deed:                                                                                                                                      $0
(c) by a purchase money note and mortgage from Purchaser to Seller:                                                                     $0
(d) balance at Closing in accordance with paragraph 7:                                                                                $585,000.00

*Existing Mortgage:*  4.   (Delete if inapplicable) If this sale is subject to an existing mortgage as indicated in paragraph 3(b) above:
(a) The premises shall be conveyed subject to the continuing lien of the existing mortgage, which is presently payable, with interest at the rate of                 percent per annum, in monthly installments of $                 which include principal, interest and escrow amounts, if any, and with any balance of principal being due and payable on
(b) To the extent that any required payments are made on the existing mortgage between the date hereof and Closing which reduce the unpaid principal amount thereof below the amount shown in paragraph 3(b), then the balance of the price payable at Closing under paragraph 3(d) shall be increased by the amount of the payments of principal. Seller represents and warrants that the amount shown in paragraph 3(b) is substantially correct and agrees that only payments required by the existing mortgage will be made between the date hereof and Closing.
(c) If there is a mortgage escrow account, Seller shall assign it to Purchaser, if it can be assigned, and in that case Purchaser shall pay the amount in the escrow account to Seller at Closing.
(d) Seller shall deliver to Purchaser at Closing a certificate dated not more than 30 days before Closing signed by the holder of the existing mortgage, in form for recording, certifying the amount of the unpaid principal, the date to which interest has been paid and the amounts, if any, claimed to be unpaid for principal and interest, itemizing the same. Seller shall pay the fees for recording such certificate. If the holder of the existing mortgage is a bank or other institution as defined in Section 274-a of the Real Property Law ("Institutional Lender"), it may, instead of the certificate, furnish a letter signed by a duly authorized officer, employee or agent, dated not more than 30 days before Closing, containing the same information.
(e) Seller represents and warrants that (i) Seller has delivered to Purchaser true and complete copies of the existing mortgage, the note secured thereby and any extensions and modifications thereof, (ii) the existing mortgage is not now, and at the time of Closing will not be, in default, and (iii) the existing mortgage does not contain any provision that permits the holder of the mortgage to require its immediate payment in full or to change any other term thereof by reason of the sale or conveyance of the Premises.

*Purchase Money Mortgage*  5.   (Delete if inapplicable) If there is to be a purchase money mortgage as indicated in paragraph 3(c) above:
(a) The purchase money note and mortgage shall be drawn by the attorney for Seller in the form attached or, if not, in the standard form adopted by the New York State Land Title Association. Purchaser shall pay at Closing the mortgage recording tax, recording fees and the attorney's fees in the amount of $                 for its preparation.
(b) The purchase money note and mortgage shall also provide that it is subject and subordinate to the lien of the existing mortgage and any extensions, modifications, replacements or consolidations of the existing mortgage, provided that (i) the interest rate thereof shall not be greater than percent per annum and the total debt service thereunder shall not be greater than $                 per annum, and (ii) if the principal amount thereof shall exceed the amount of principal owing and unpaid on the existing mortgage at the time of placing such new mortgage or consolidated mortgage, the excess be paid to the holder of such prior mortgage

Escrowee shall have the right at any time to deposit the Downpayment and the interest thereon with the clerk of a court in the county in which the Premises are located and shall give Notice of such deposit to Seller and Purchaser. Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b) Parties acknowledge that, although Escrowee is holding the Downpayment for Seller's account, for all other purposes Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally agree to defend, indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorney's fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c) Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel.

(d) Escrowee acknowledges receipt of the Downpayment by check subject to collection and Escrowee's agreement to the provision of this paragraph by signing in the place indicated on the signature page of this contract.

(e) Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee.

<strong>Acceptable Funds:</strong>

7. All money payable under this contract, unless otherwise specified, shall be paid by:

(a) Cash, but not over $1,000.00;

(b) Good certified check of Purchaser drawn on or official check issued by any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York, unendorsed and payable to the order of Seller, or as Seller may otherwise direct upon not less than 3 business days notice (by telephone or otherwise) to Purchaser;

(c) As to money other than the purchase price payable to Seller at Closing, uncertified check of Purchaser up to the amount of $1,000.00; and

(d) As otherwise agreed to in writing by Seller or Seller's attorney.

<strong>Mortgage Contingency:</strong>

8. (Delete if inapplicable) The obligations of Purchaser hereunder are conditional upon issuance on or before Sept 9, , 2014, (the "Commitment Date") of a written commitment from any Institutional Lender pursuant to which such Institutional Lender agrees to make a first mortgage loan, ~~other than a VA, FHA or other governmentally insured loan,~~ to Purchaser, at Purchaser's sole cost and expense, of $480,000.00 or such lesser sum as Purchaser shall be willing to accept, at the prevailing fixed rate of interest not to exceed prevailing or Initial adjustable rate of interest not to exceed prevailing for a term of at least 30 years and on other customary commitment terms, whether or not conditional upon any factors other than an appraisal satisfactory to the Institutional Lender. Purchaser shall (a) make prompt application to an Institutional Lender for such mortgage loan, (b) furnish accurate and complete information regarding Purchaser and members of Purchaser's family, as required, (c) pay all fees, points and charges required in connection with such application and loan, (d) pursue such application with diligence, (e) cooperate in good faith with such Institutional Lender to obtain such commitment and (f) ~~promptly give Notice to Seller of the name and address of each Institutional Lender to which Purchaser has made such application~~. Purchaser shall comply with all requirements of such commitment (or of any other commitment accepted by Purchaser) and shall furnish Seller with a copy thereof promptly after receipt thereof. If such commitment is not issued on or before the Commitment Date, then, unless Purchaser has accepted a commitment that does not comply with the requirements set forth above, Purchaser may cancel this contract by giving Notice to Seller within 5 business days after the Commitment Date, in which case this contract shall be deemed cancelled and thereafter neither party shall have any further rights against, or obligations or liabilities to, the other by reason of this contract, except that the Downpayment shall be promptly refunded to Purchaser and except as set forth in paragraph 27. If ~~Purchaser fails to give notice of cancellation or if Purchaser shall accept a commitment that does not comply with the terms set forth above, then Purchaser shall be deemed to have waived Purchaser's right to cancel this contract and to receive a refund of the Downpayment by reason of the contingency contained in this paragraph.~~

<strong>Permitted Exceptions:</strong>

9 The Premises are sold and shall be conveyed subject to:

(a) Zoning and subdivision laws and regulations, and landmark, historic or wetlands designation, provided that they are not violated by the existing buildings and improvements erected on the property or their use;

(b) Consents for the erection of any structures on, under or above any streets on which the Premises abut;

~~(c)~~ Encroachment of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway;

(d) Real estate taxes that are a lien, but are not yet due and payable; and

(e) The other matters, if any, including a survey exception, set forth in a Rider attached.

<strong>Governmental Violations and Orders:</strong>

10. (a) Seller shall comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued as of the date ~~hereof~~ by any governmental department having authority as to lands, housing, buildings, fire, health, environmental and labor conditions affecting the Premises. The Premises shall be conveyed free of them at Closing. Seller shall furnish Purchaser with any authorizations necessary to make the searches that could disclose these matters.

(b) (Delete if inapplicable) All obligations affecting the Premises pursuant to the Administrative Code of the City of New York incurred prior to Closing and payable in money shall be discharged by Seller at or prior to Closing.

<strong>Seller's Representations:</strong>

11. (a) Seller represents and warrants to Purchaser that:

(i) The Premises abut or have a right of access to a public road;

(ii) Seller is the sole owner of the Premises and has the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this contract;

(iii) Seller is not a "foreign person", as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code ("IRC") Section 1445, as amended, and the regulations promulgated thereunder (collectively "FIRPTA");

(iv) The Premises are not affected by any exemptions or abatements of taxes; and

(v) Seller has been known by no other name for the past ten years, except: none

(b) Seller covenants and warrants that all of the representations and warranties set forth in this contract shall be true and correct at Closing.

(c) Except as otherwise expressly set forth in this contract, none of Seller's covenants, representations, warranties or other obligations contained in this contract shall survive Closing.

<strong>Condition of Property:</strong>

12. Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other property included in this sale, based on Purchaser's own inspection and investigation thereof, and that Purchaser is entering into this contract based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or oral, as to the physical condition, state of repair, use, cost of operation or any other matter related to the Premises or the other property included in this sale, given or made by Seller or its representatives, and shall accept the same "as is" in present condition and state of repair, subject to reasonable use, wear, tear and natural deterioration between the date hereof and the date of Closing (except as otherwise set forth in paragraph 16(f)), without any reduction in the purchase price or claim of any kind for any change in such condition by reason thereof subsequent to the date of this contract. Purchaser and its authorized representatives shall have the right, at reasonable times and upon reasonable notice (by telephone or otherwise) to Seller, to inspect the Premises before Closing.

<strong>Insurable Title:</strong>

13. Seller shall give and Purchaser shall accept such title asany reputable title company shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to the matters provided for in this contract.

<strong>Closing, Deed and Title:</strong>

14. (a) "Closing" means the settlement of the obligations of Seller and Purchaser to each other under this contract, including the payment of the purchase price to Seller, and the delivery to Purchaser of a bargain and sale deed with covenants deed in proper statutory short form for record, duly executed and acknowledged, so as to convey to Purchaser the simple title to the Premises, free of all encumbrances, except as otherwise herein stated. The deed shall contain a covenant by Seller as required by subd. 5 of Section 13 of the Lien Law.

(b) If Seller is a corporation, it shall deliver to Purchaser at the time of Closing (i) a resolution of its Board of Directors authorizing the sale and delivery of the deed, and (ii) a certificate by the Secretary or Assistant Secretary of the corporation certifying such resolution and setting forth facts showing that the transfer is in conformity with the requirements of Section 909 of the Business Corporation Law. The deed in such case shall contain a recital sufficient to establish compliance with that Section.

<strong>Closing Date and Place:</strong>

15. Closing shall take place at the office of JAIME RAMIREZ ESQ at           o'clock on SEPTEMBER 22, 2014 or, upon reasonable notice (by telephone or otherwise) by Purchaser, at the office of LENDER'S COUNSEL.

<strong>Conditions to Closing:</strong>

16 This contract and Purchaser's obligation to purchase the Premises are also subject to and conditioned upon the fulfillment of the following conditions precedent:

(a) The accuracy, as of the date of Closing, of the representations and warranties of Seller made in this contract

(b) The delivery by Seller to Purchaser of a valid and subsisting Certificate of Occupancy or other required certificate of compliance, or evidence

shall deduct and withhold from the purchase price a sum equal to 10% thereof (or any lesser amount permitted by law) and shall at Closing remit the withheld amount with the required forms to the Internal Revenue Service.

(e) The delivery of the Premises and all building(s) and improvements comprising a part thereof in broom clean condition, vacant and free of leases or tenancies, together with keys to the Premises

(f) All plumbing (including water supply and septic systems, if any), heating and air conditioning, if any, electrical and mechanical systems, equipment and machinery in the building(s) located on the property and all appliances which are included in this sale being in working order as of the date of Closing.

(g) If the Premises are a one or two family house, delivery by the parties at Closing of affidavits in compliance with state and local law requirements to the effect that there is installed in the Premises a smoke detecting alarm device or devices.

(h) The delivery by the parties of any other affidavits required as a condition of recording the deed.

**Deed Transfer and Recording Taxes:** 17. At Closing, certified or official bank checks payable to the order of the appropriate State, City or County officer in the amount of any applicable transfer and/or recording tax payable by reason of the delivery or recording of the deed or mortgage, if any, shall be delivered by the party required by law or by this contract to pay such transfer and/or recording tax, together with any required tax returns duly executed and sworn to, and such party shall cause any such checks and returns to be delivered to the appropriate officer promptly after Closing. The obligation to pay any additional tax or deficiency and any interest or penalties thereon shall survive Closing.

**Apportionments and Other Adjustments; Water Meter and Installment Assessments:** 18. (a) To the extent applicable, the following shall be apportioned as of midnight of the day before the day of Closing.
(i) Taxes, water charges and sewer rents, on the basis of the fiscal period for which assessed; (ii) fuel; (iii) interest on the existing mortgage; (iv) premiums on existing transferable insurance policies and renewals of those expiring prior to Closing; (v) vault charges; (vi) rents as and when collected.

(b) If Closing shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the immediately preceding fiscal period applied to that latest assessed valuation.

(c) If there is a water meter on the Premises, Seller shall furnish a reading to a date not more than 30 days before Closing and the unfixed meter charge and sewer rent, if any, shall be apportioned on the basis of such last reading.

(d) If at the date of Closing the Premises are affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this contract all the unpaid installments shall be considered due and shall be paid by Seller at or prior to Closing.

(e) Any errors or omissions in computing apportionments or other adjustments at closing shall be corrected within a reasonable time following Closing. This subparagraph shall survive Closing.

**Allowance for Unpaid Taxes, etc.:** 19. Seller has the option to credit Purchaser as an adjustment to the purchase price with the amount of any unpaid taxes, assessments, water charges and sewer rents, together with any interest and penalties thereon to a date not less than five business days after closing, provided that official bills therefor computed to said date are produced at Closing.

**Use of Purchase Price to Remove Encumbrances:** 20. If at Closing there are other liens or encumbrances that Seller is obligated to pay or discharge, Seller may use any portion of the cash balance of the purchase price to pay or discharge them, provided Seller shall simultaneously deliver to Purchaser at Closing instruments in recordable form and sufficient to satisfy such liens or encumbrances of record, together with the cost of recording or filing said instruments. As an alternative Seller may deposit sufficient monies with the title insurance company employed by Purchaser acceptable to and required by it to assure their discharge, but only if the title insurance company will insure Purchaser's title clear of the matters or insure against their enforcement out of the Premises and will insure Purchaser's Institutional Lender clear of such matters. Upon notice (by telephone or otherwise), given not less than 3 business days before Closing, Purchaser shall provide separate certified or official bank checks as requested to assist in clearing up these matters.

**Title Examination; Seller's Inability to Convey; Limitations of Liability.** 21. (a) Purchaser shall order an examination of title in respect of the Premises from a title company licensed or authorized to issue title insurance by the New York State Insurance Department or any agent for such title company promptly after the execution of this contract or, if this contract is subject to the mortgage contingency set forth in paragraph 8, after a mortgage commitment has been accepted by Purchaser. Purchaser shall cause a copy of the title report and of any additions thereto to be delivered to the attorney(s) for Seller promptly after receipt thereof.

(b) If at the date of Closing Seller is unable to transfer title to Purchaser in accordance with this contract, or Purchaser has other valid grounds for refusing to close, whether by reason of liens, encumbrances or other objections to title or otherwise (herein collectively called "Defects"), other than those subject to which Purchaser is obligated to accept title hereunder or which Purchaser may have waived and other than those which Seller has herein expressly agreed to remove, remedy or discharge and if Purchaser shall be unwilling to waive the same and to close title without abatement of the purchase price, then except as hereinafter set forth, Seller shall have the right, at Seller's sole election, either to take such action as Seller may deem advisable to remove, remedy, discharge or comply with such Defects or to cancel this contract; (ii) if Seller elects to take action to remove, remedy or comply with such Defects, Seller shall be entitled from time to time, upon Notice to Purchaser, to adjourn the date for Closing hereunder for a period or periods not exceeding 60 days in the aggregate (but not extending beyond the date upon which Purchaser's mortgage commitment, if any, shall expire), and the date for Closing shall be adjourned to a date specified by Seller not beyond such period. If for any reason whatsoever, Seller shall not have succeeded in removing, remedying or complying with such Defects at the expiration of such adjournment(s) and if Purchaser shall still be unwilling to waive the same and to close title without abatement of the purchase price, then either party may cancel this contract by Notice to the other given within 10 days after such adjourned date; (iii) notwithstanding the foregoing, the existing mortgage (unless this sale is subject to the same) and any matter created by Seller after the date hereof shall be released, discharged or otherwise cured by Seller at or prior to Closing.

(c) If this contract is cancelled pursuant to its terms, other than as a result of Purchaser's default, this contract shall terminate and come to an end, and neither party shall have any further rights, obligations or liabilities against or to the other hereunder or otherwise, except that: (i) Seller shall promptly refund or cause the Escrowee to refund the Downpayment to Purchaser and, unless cancelled as a result of Purchaser's default or pursuant to paragraph 8, to reimburse Purchaser for the net cost of examination of title, including any appropriate additional charges related thereto, and the net cost, if actually paid or incurred by Purchaser, for updating the existing survey of the Premises or of a new survey, and (ii) the obligations under paragraph 27 shall survive the termination of this contract.

**Affidavit as to Judgments, Bankruptcies, etc.:** 22. If a title examination discloses judgments, bankruptcies or other returns against persons having names the same as or similar to that of Seller, Seller shall deliver an affidavit at Closing showing that they are not against Seller.

**Defaults and Remedies:** 23. (a) If Purchaser defaults hereunder, Seller's sole remedy shall be to receive and retain the Downpayment as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be impossible to ascertain and that the Downpayment constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.

(b) If Seller defaults hereunder, Purchaser shall have such remedies as Purchaser shall be entitled to at law or in equity, including, but not limited to, specific performance.

**Purchaser's Lien:** 24. All money paid on account of this contract, and then reasonable expenses of examination of title to the Premises and of any survey and survey inspection charges, are hereby made liens on the Premises, but such liens shall not continue after default by Purchaser under this contract.

**Notices:** 25. Any notice or other communication ("Notice") shall be in writing and either (a) sent by either of the parties hereto or by their respective attorneys who are hereby authorized to do so on their behalf or by the Escrowee, by registered or certified mail, postage prepaid, or

(b) delivered in person or by overnight courier, with receipt acknowledged, to the respective addresses given in this contract for the party and the Escrowee, to whom the Notice is to be given, or to such other address as such party or Escrowee shall hereafter designate by Notice given to the other party or parties and the Escrowee pursuant to this paragraph. Each notice mailed shall be deemed given on the third business day following the date of mailing the same, except that any notice to Escrowee shall be deemed given only upon receipt by Escrowee and each Notice delivered in person or by overnight courier shall be deemed given when delivered

**No Assignment:** 26. This contract may not be assigned by Purchaser without the prior written consent of Seller in each instance and any purported assignment(s) made without such consent shall be void.

**Broker:** 27. Seller and Purchaser each represents and warrants to other that it has not dealt with any broker in connection with this sale other than NONE ("Broker") and Seller shall pay Broker any commission earned pursuant to a separate agreement between Seller and Broker. Seller and Purchaser shall indemnify and defend each other against any costs, claims and expenses, including reasonable attorneys' fees, arising out of the breach on their respective parts of any representation or agreement contained in this paragraph. The provisions of this paragraph shall survive Closing or, if Closing does not occur, the termination of this contract

# 1st RIDER TO CONTRACT OF SALE

RIDER ATTACHED TO AND MADE A PART OF THE CONTRACT OF SALE BETWEEN:

**SELLER:** MT. OLIVET CHURCH INC.

**PURCHASER(S):** MARIA T. NOBLE AND OR ASSIGNEE

**PREMISES:** 2176 GRAND CONCOURSE BRONX NEW YORK

1. **ADDITIONAL EXCEPTIONS.** Supplementing Paragraph 9: The premises are to be sold and conveyed subject to the following matters, in addition to those matter listed in Paragraph 9:

a) Covenants, restrictions, rights of way, easements, reservations and agreements of record, if any, insofar as the same may now be in force or effect, provided same are not violated by the present structure or use of the Premises, and do not render title uninsurable;
b) Any state of facts an accurate survey of the Premises may show, provided the same does not render title unmarketable;
c) Building and zoning regulations and ordinances of the city, town or village in which the premises lie which are not violated by the existing structure or its present.
d) Rights, if any, of the municipality in which the Premises are located or of any public utility, telephone or cable television company, to install, maintain, operate and/or repair pipes, wires cables, poles and related equipment in, under, over and upon the Premises;
e) Possible encroachments of fences and variations between record lines and fences; encroachments or projections upon street or road of any stoops, areas, gratings, steps, windows, balconies, ornaments, brick, leaves, trim and cornices and the like;
f) Any state of facts a personal inspection of the Premises would show;

2. **REPAIRS.** It is understood and agreed that seller shall not be under any obligation whatsoever to make and/or pay for any repairs, alterations or improvements, including the cost of any and all inspections required by the lending institution or any other organization as a condition to the issuance of the mortgage commitment referred to previously.

3. **ASSIGNMENTS.** This contract may be assigned without the written consent of the seller.

4. **DISCLOSURES.** In the event the Seller or Purchaser or any of the principals, stockholders, directors, officers or employers of the Seller or Purchaser herein are licensed Real Estate Brokers/Salesman the Seller and/or Purchaser acknowledged that

full disclosure of this fact has been made to them, and that the purchaser is purchasing the property for possible resale at a profit.

5.  **MORTGAGE CONTINGENCY:** If Purchaser is unable to obtain a commitment for such mortgage Seller's attorney shall, upon request, have the right to see copies of the application filed by the Purchaser (S) with the proposed mortgagee.  If requested, Purchaser (s) will request, in writing, that mortgagee send a copy of the application to Seller's attorney.

   If Purchaser is unable to obtain a firm commitment within such time, then either party may cancel this contract, subject to terms of preprinted contract, by written notice to the other party and upon refund of the down payment terminate without further liability on the part of either party to the other.

6.  **NOTICES.** All notices under this contract shall be in writing, mailed, or delivered to the office of counsel for the respective parties, that have represented said parties at the signing of this contract, (or to successor counsel whose appearance has been so designated in writing).   However, all notices under this contract which would have the effect of canceling and/or rescinding and/or otherwise terminating this contract, including but not limited to a Purchaser's failure to obtain mortgage commitment notice@ shall be so sent by certified mail.  Notices signed by said counsel shall be sufficient.

7.  **PERSONALITY.** All personal property included in this sale will be conveyed in as is condition, less normal wear and tear from the date of this contract to the closing of title.

8.  **VIOLATIONS.**  All notices of violation of law or municipal ordinance orders or requirement, which in the aggregate do not exceed Five Hundred ($500.00) Dollars to correct, noted in or issued by the Department of Housing and Buildings, Fire, Labor Health or other State or Municipal Authorities having jurisdiction against or affecting the premises at the date hereof shall be complied with by the Seller on or before closing and the premises shall be conveyed free of same or a credit at Seller's option in order to correct the violations.   In the event cost of correcting such violations exceed Five Hundred ($500.00) Dollars in the aggregate, Seller shall have the right to elect, within ten (10) days of receipt of written notice, to cure and consummate the transaction contemplated hereby or to cancel this contract by written notice to Purchaser.  In the event Seller elects to cancel the contact pursuant hereto, Seller's sole liability shall be limited to the return of the Deposit and the parties shall have no further rights or liabilities to each other under the terms and provisions of this contract.  Notwithstanding the foregoing, Purchaser may elect to take the premises subject to such violations without any offset whatsoever and without any claim against or liability on the part of the Seller, except as herein provided.

Case 1:18-cv-07871-NRB   Document 46   Filed 07/22/20   Page 172 of 335

9. **TRAVEL ALLOWANCE.** In the event the closing of Title should take place outside of the New York City Metropolitan area, or Westchester County the buyer shall pay the sum of Three hundred Fifty ($350.00) as a travel allowance to the sellers attorney.

10. **TITLE EXAMINATION.** Purchaser agrees to order, immediately after obtaining a mortgage commitment, an examination of the title to the premises to be made on Purchaser's behalf, and, at least 10 days before the date for the closing of title, to send to the attorneys for Seller a copy of the report of such examination of title and a written statement of any objections to title of the closing of title hereunder. If Purchaser or Purchaser's attorney fails to Give Seller's attorney such notice of objection (other than bring down to date searches), then any defect or encumbrance of exception appearing on such report of title, or affecting the premises at the time of closing, shall not be deemed to be an objection to title or to the closing of title hereunder, and Purchaser shall take title subject hereto.

11. **INABILITY TO CONVEY TITLE.** If the Seller shall be unable to convey title in accordance with the provisions of this Agreement, any payments made by the Purchaser on account of the purchase price, shall be refunded, together with the reasonable expense incurred for examination of title (not exceeding the usual net charges of title issued, and the net cost of a survey), whereupon this Agreement shall be terminated and neither party hereto shall have any further rights again the other, except that, if the premises are affected by any encumbrance, outstanding interest or expression of title not expressly consented to herein by the Purchaser, which render the Seller's title to the premises unmarketable, and, which may, according to reasonable expectations, be removed within fifteen (15) days, the Seller shall have the privilege to remove or satisfy the same, and shall for this purpose be entitled to an adjournment of the closing of title to the premises marketable. The Purchaser may, nevertheless, accept such title as the Seller may be able to convey, without reduction of the purchase price, or any credit against the same and without liability on the part of the Seller.

12. **CONTRACT MODIFICATION AND EXTENSION.** Seller (s) does hereby appoint Seller's attorney herein as his agent and Purchaser(s) does hereby appoint his attorney, herein as his agent to execute any and all instrument in writing, having reference to this contract including but not limited to, modifications thereof and extensions of time for obtaining mortgage, if any, and extension of time for closing or otherwise.

13. **DEED ACCEPTANCE.** The acceptance of deed by Purchaser(s) shall be deemed to be full performance and discharge and every agreement and obligation on the part of the Seller(s) to be performed pursuant to the provisions of this agreement, except those, if any,

which are herein specifically stated to survive the delivery of the deed.

14.   __SUBMISSION NOT AN OFFER.__   The submission of this agreement by the Seller or their attorneys to Purchaser does not constitute an offer or an acceptance of an offer. This agreement shall not be binding upon the Sellers unless (i) the agreement has been fully executed by the Purchaser and Seller, and a fully executed copy has been delivered to each party by their respective attorneys; and (ii) Purchaser has paid the down payment pursuant to Paragraph 1 of the form printed contract.

15.   __CONTRACT CANNOT BE RECORDED.__ The parties agrees that neither this agreement nor any memorandum or notice thereof shall be recorded or tendered for recording in the County Clerk's Office of the County in which the land is situated. Purchaser further agrees that if this agreement, or any memorandum or short form thereof shall be recorded in any such office, this agreement, upon notice by the Seller to the Purchaser, may be deemed to void at Seller's option and of no further force and effect and such notice, if reported, shall be deemed sufficient and adequate notice to third parties that this agreement is void and of no further force and effect.

16.   __CONFLICT.__   If there is any conflict between the provisions contained in this Addendum and the provision of the printed form contract, the provisions in this addendum shall govern and be controlling to the extent necessary to resolve the conflict.

17.   __AMBIGUITY.__   Both parties shall be deemed to have drafted this Agreement. In the event any provisions are found to be ambiguous, same shall not be construed against either party.

18.   Purchaser shall have the right to inspect the premises within forty-eight (48) hours prior to closing.

19.   __HEATING/COOLING BILLS.__   The purchasers herein acknowledged that they have a right to the summary of the heating and/or cooling bills or a complete set of said bills, under Section 17-103, Chapter 555 of the Laws of the State of New York commonly known as the Truth in Heating Law. The purchasers herein waive their right to companies of said bills and acknowledge that they have not requested them in connection with this transaction.

20.   At closing, the premises will have an operable single station smoke detecting alarm device in accordance with the New York State Executive Law, Chapter 971, Section 270.5.

Jaime Ramirez, P.C.
751 Commonwealth Avenue
Bronx, New York 10473
Tel.: 718-542-6629 Fax.: 718-542-6630
ramirezlaw@optonline.net

21. **PURCHASER REPRESENTATIONS.** Purchasers warrant and represent (i) that they have assets sufficient to complete this transaction; (ii) that they have no personal knowledge of any circumstances that would render them unacceptable to any lending institution by reason of outstanding loans, obligations or liabilities which would adversely affect their credit standing; (iii) that until the closing of title, they will not deliberately or knowingly change their financial status so as to render their mortgage application unacceptable to the lending institution. Purchasers acknowledge and represent that this transaction is not contingent on the Purchasers' ability to sell any other real or personal property.

22. **CERTIFICATE OF OCCUPANCY.** Supplementing paragraph #16B of the printed contract. This presentation shall not be construed to obligate Seller to incur any cost of expense to obtain a Certificate of Occupancy, Certificate of Completion and/or letter as herein above provided; and in the event that Seller cannot comply with this representation without incurring any cost, Seller shall have the option of canceling this Contract and returning to the Purchaser the down payment paid hereunder and thereupon the rights and obligations of the parities shall cease and terminate unless Purchaser waives this condition.

23. **PREPARATION OF CONTRACT.** In the event Purchaser is unable to obtain a mortgage commitment in accordance to the terms of the Contract, Purchaser agrees to pay the Seller's attorney the sum of one hundred and fifty ($150.00) dollars for preparation of the Contract. Seller's attorney shall be authorized to deduct said amount form the downpayment

24. **TERMITE INSPECTION.**    Purchasers shall order a termite inspection by a reputable company, and if premises are found to be infested with termites or other wood destroying insects, the Seller shall have the option of either canceling said contract or curing premises of said infestation. Said termite inspection shall be completed within twenty (20) days from the date hereof. The purchaser shall serve written notice upon Seller's attorney within twenty (20) days after Purchaser receives the inspection report.

25. **POSSESSION.**    Vacant and broom clean possession of the ENTIRE within described premises shall be delivered to Purchaser within 7 days after the closing of title. However, the attorney for the Seller shall hold in escrow the sum of $3,500.00 security for the faithful performance of the above agreement. In the event that Seller does not deliver vacant possession as set forth, then in that event, the attorney for the Seller is authorized to pay out of said escrow deposit the sum of $375.00 per day to the Purchaser as liquidated damages for each and every additional day that Seller remains in possession beyond the agreed period. All adjustments to be as of the day of possession.

In the event Seller unable to deliver premises vacant as of the date of closing, Seller shall be entitled to an adjournment of up to ninety (90) days to bring a disposes proceeding against its current tenant.

If after (90) days, premises cannot be delivered vacant, Seller may at his option cancel this contract and return to Purchaser the down payment paid hereunder and all costs for any title expenses, mortgage application and cancellation fees, and appraisals. Purchaser, at his option, may take title to the premises on the date of Closing, subject to any tenancy remaining in the premises, whereby Seller shall assign any and all rights caused of action, etc., against tenant to Purchaser. Seller shall be relieved of all claims and shall bear no responsibility to continue or bring forth any proceedings against the tenant.

26. **APPLIANCES.** Notwithstanding the above, seller's liability in connection with any appliance shall be limited to the sum of **ONE HUNDRED TWENTY FIVE ($125.00) DOLLARS 00/100** per appliance. The Purchaser shall have the right to inspect the premises within forty-eight (48) hours prior to closing and of taking possession in order to ascertain the condition of the premises.

27. **PROPERTY CONDITION DISCLOSURE.** Article 14 of the Real Property Law of the State of New York ("the Property Condition Disclosure Act" or "PCDA") provides that the Seller of a one (1) to four (4) family dwelling ("the Premises") must deliver to the prospective Purchaser of the Premises prior to signing by the Purchaser of a binding Contract of Sale a certified Property Condition Disclosure Statement ("PCDS") regarding certain conditions and information concerning the Premises which are known to the Seller. Such PCDS is not a warranty of any kind by the Seller or by any agency representing the Seller in this transaction. It is not a substitute for any inspections or test which may be conducted by the Purchaser or qualified agents on behalf of the Purchaser, and the Purchaser is encouraged to obtain his or her own independent professional engineer inspections and environmental tests and is also encouraged to check public records pertaining to the premises. Seller represents that Seller does not have actual knowledge, records or personal recollection of facts and/or events suitable to accurately complete the information requested to be set forth in the state formulated PCDS.

Section 465 of the PCDA provides that in the event that a Seller fails to deliver a PCDS before the Purchaser signs a binding Contract of Sale, the Purchaser is to receive upon the transfer of title a credit against the purchase price in the sum of $500.00. Seller hereby offers to give the Purchaser, at closing, a credit against the purchase price in the sum of $500.00. Purchaser hereby accepts the offer, in return for which credit; the Purchaser hereby released the Seller from any obligation otherwise imposed by the PCDA to deliver a PCDS.

28.  **ADJOURNMENT FEE.**  In the event the seller's attorney appears at scheduled closing and the closing has to be adjourned or cancelled through no fault of the Seller, then Purchaser shall apply to the seller's attorney a fee of $250.00.

29. **RETURNED CHECK.**  In the event the purchaser's down payment check is dishonored then in that event seller's shall be entitled to all remedies at law including contract cancellation and the purchaser shall pay seller's attorney the sum of $100.00 as a service fee in addition to replacing said dishonored check with either a certified check or official bank check.

30.  **SHORT SALE.**        ( )   Short sale **(check if applicable)**
This transaction shall be subject to seller's mortgagee (s) accepting a short sale application for the instant premises and shall be subject to any terms requested by mortgagee (s).  If any proposed terms are unacceptable to purchaser, purchaser shall have right to cancel transaction and receive return of down payment.  Seller acknowledges that he or she will not receive any proceeds at closing.

31.     COURT APPROVAL.  THIS TRANSACTION SHALL BE SUBJECT TO COURT APPROVAL AS REQUIRED PURSUANT TO THE APPLICABLE RELIGIOUS CORPORATION LAWS.


_____           _____
Seller                            Purchaser


_____           _____
Seller                            Purchaser

**Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards**

**Lead Warning Statement**

*Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.*

**Seller's Disclosure**

(a)  Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):

    (i) ☐  Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

    _____

    (ii) ☒  Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the seller (check (i) or (ii) below):

    (i) ☐  Seller has provided the purchaser with all available records and reports pertaining to leadbased paint and/or lead-based paint hazards in the housing (list documents below).

    _____

    ☒  Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's Acknowledgment** (initial)

(c) _____ Purchaser has received copies of all information listed above.

(d) _____ Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home.*

(e) Purchaser has (check (i) or (ii) below):

    (i) ☒  received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

    (ii) ☐  waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment** (initial)

(f) _____ Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| | | | |
|---|---|---|---|
| Seller | Date | Seller | Date |
| Purchaser *Alexa C. Nollala* | Date | Purchaser | Date |
| Agent | Date | Agent | Date |

documents and take such other action as may be reasonably requested by the other in order to carry out the intent and purpose of this contract. This subparagraph shall survive Closing.

(h) This contract is intended for the exclusive benefit of the parties hereto and, except as otherwise expressly provided herein, shall not be for the benefit of, and shall not create any rights in, or be enforceable by, any other person or entity.

IN WITNESS WHEREOF, this contract has been duly executed by the parties hereto.

_____     _____
Seller                                              Purchaser
MT. OLIVET CHURCH INC.                    MARIA T. NOBLE

_____     _____
Seller                                              Purchaser
BY: ARACELIS STAATZ

Attorney for Seller: JAIME RAMIREZ          Attorney for Purchaser:

Address: 3058 CROSS BRONX EXPRESSWAY UNIT 1     Address:
BRONX, NEW YORK 10465

                                                    Tel:                    Fax:
Tel: 718 542 6629              Fax: 718 542 6630

Receipt of the Down payment is acknowledged and the undersigned agrees to act in accordance with the provisions of Paragraph 6 above.

_____
Escrowee

Contract of Sale                                  PREMISES

TITLE NO.                                          DISTRICT

                    TO                             SECTION

**DISTRIBUTED BY**                                BLOCK

YOUR TITLE EXPERTS                                LOT
The Judicial Title Insurance Agency LLC
800-281-TITLE (8485) FAX: 800-FAX-9396           COUNTY or TOWN

                                                  STREET NUMBER ADDRESS

EXHIBIT "H"

# ORIGINAL

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    -------------------------------------------X
     MARIA TERESA NOBLE,
4

5                                    PLAINTIFF,
           - against -
6                                    18 CV 07871

7

8    MOUNT OLIVET CHURCH, INC., aka MOUNT
     OLIVERT CHURCH, INC., aka MOUNT OLIVER
     CHURCH INC. aka MOUNT OLIVE CHURCH INC.,
9    and ARACELIS STAATZ, as Trustee of Mount
     Olivet Church,
10

11                                   DEFENDANTS.
     -------------------------------------------X
12

13                      DATE:  August 16, 2019

14                      TIME:  11:40 A.M.

15

16           DEPOSITION of a non-party witness,

17    LEDWIN OVIEDO, taken by the Defendant,

18    pursuant to Court Order and to the Federal

19    Rules of Civil Procedure, held at the law

20    offices of Ortiz & Ortiz, L.L.P., 32-72

21    Steinway Street, Astoria, New York 11103,

22    before Sylvia Kemp, a Notary Public of the

23    State of New York.

24

25

```
 1

 2      A P P E A R A N C E S:

 3

 4      ORTIZ & ORTIZ, L.L.P.
            Attorneys for Plaintiff
 5          32-72 Steinway Street, Suite 402
            Astoria, New York 11103
 6          BY:  NORMA ORTIZ, ESQ.

 7

 8
        DAVID J. BRODERICK, P.C.
 9          Attorney for Defendants
            70-20 Austin Street, Suite 111
10          Forest Hills, New York 11375
            BY:  DAVID BRODERICK, ESQ.
11

12

13      ALSO PRESENT:
            Kay Suwatte, Esq. with Ortiz & Ortiz
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1
 2        F E D E R A L   S T I P U L A T I O N S
 3
 4            IT IS HEREBY STIPULATED AND AGREED by
 5        and between the counsel for the respective
 6        parties herein that the sealing, filing and
 7        certification of the within deposition be
 8        waived; that the original of the deposition
 9        may be signed and sworn to by the witness
10        before anyone authorized to administer an
11        oath, with the same effect as if signed
12        before a Judge of the Court; that an
13        unsigned copy of the deposition may be used
14        with the same force and effect as if signed
15        by the witness, 30 days after service of the
16        original & 1 copy of same upon counsel for
17        the witness.
18
19            IT IS FURTHER STIPULATED AND AGREED
20        that all objections except as to form, are
21        reserved to the time of trial.
22
23                   *     *     *     *
24
25
```

```
 1                      L. OVIEDO
 2       L E D W I N   O V I E D O,
 3       having been first duly sworn by a Notary
 4       Public of the State of New York, was
 5       examined and testified as follows:
 6       EXAMINATION BY
 7       MR. BRODERICK:
 8            Q.    Please state your name for the
 9       record.
10            A.    Ledwin Oviedo.
11            Q.    Where do you reside?
12            A.    2153 Grand Concourse, Bronx, New
13       York 10453.
14            Q.    I'm going to be asking you a
15       series of questions regarding an action
16       brought by Ms. Noble against Olivet Church
17       and Ms. Staatz.  Any time you don't
18       understand my question, let me know and I'll
19       rephrase it.  If any time you wish to speak
20       to Ms. Ortiz during this deposition, feel
21       free to do so.  If there is a question
22       pending, I ask that you answer the question
23       to the best of your ability first and make
24       your answers verbal as the court reporter
25       cannot take down head nods or head shakes.
```

```
 1                      L. OVIEDO
 2          In what capacity do you work for Ledwin
 3     Enterprises?
 4          A.   I'm the president and the real
 5     estate broker.
 6          Q.   In 2014, did you have an employee
 7     named Maria Noble?
 8          A.   She is not an employee.  She is
 9     self-employed.
10          Q.   That meant she got a 1099?
11          A.   Correct.
12          Q.   We are here about the property
13     known as 2176 Grand Concourse.  You were the
14     broker on that deal?
15          A.   Yes, I am.
16          Q.   What were the terms of that
17     brokerage?
18          A.   What do you mean the terms?
19          Q.   Who did you sign the broker's
20     agreement with?
21          A.   I didn't sign a broker agreement.
22     It was verbal agreement.
23          Q.   That verbalized agreement was with
24     whom?
25          A.   Ms. Staatz.
```

```
 1                   L. OVIEDO
 2          Q.   Were you going to receive a
 3     commission if that property was purchased?
 4          A.   That is correct.
 5          Q.   Do you recall what the commission
 6     rate was?
 7          A.   5 percent.
 8          Q.   Are you making any claim against
 9     Ms. Staatz or the church or do you intend to
10     make any claim against Ms. Staatz or the
11     church for the contract not going through?
12          A.   If the contract doesn't go
13     through, they will make a claim.
14          Q.   Prior to 2014, how long have you
15     been a real estate broker?
16          A.   Maybe ten years more or less.
17          Q.   When was Ledwin Enterprises
18     formed?
19          A.   April 18, 1991.
20          Q.   How did you come about to be the
21     broker regarding 2176 Grand Concourse?
22          A.   Ms. Staatz wanted to sell her
23     property very fast.  She was brought to me
24     by a gentleman named Javier Garcia who was
25     the music director of the church.
```

```
 1                    L. OVIEDO
 2         Q.   Do you recall roughly the time,
 3    the date when Mr. Garcia brought her to you?
 4         A.   More or less May of 2014.
 5         Q.   Do you have a file regarding the
 6    purchase of this property, brokerage of this
 7    property?
 8         A.   Yes.
 9              MR. BRODERICK:  At this time, I
10         call for production of that file.
11         A.   My attorney has that file.
12         Q.   Who is your attorney?
13         A.   Not my attorney.  I don't have an
14    attorney at this point.  I think I sent the
15    file here.
16         Q.   You sent the file to Ms. Ortiz?
17         A.   Correct.
18              (Whereupon, an off-the-record
19         discussion was held.)
20         Q.   Did you list this property at all?
21         A.   No.
22         Q.   Was there a reason why you didn't
23    list the property?
24         A.   She was looking for a buyer like
25    yesterday and she wanted a quick sale.
```

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com

```
 1                      L. OVIEDO
 2            Q.    How did Ms. Noble become the
 3      purchaser of this property?
 4            A.    She is also an agent for the
 5      brokerage and then they said we need to sell
 6      this property quick and she became
 7      interested in the property.
 8            Q.    Did you run any comps as to the
 9      value of the property at that time?
10            A.    Yes, I ran some comps.
11            Q.    What was the value of the property
12      at that time?
13            A.    Mid 500, 600.
14            Q.    Are you familiar with the July 9,
15      2014 contract for sale?
16            A.    Yes.
17            Q.    What was the purchase price of
18      that contract?
19            A.    $600,000.
20            Q.    That would be roughly the comps in
21      the area at that particular time?
22            A.    More or less.
23            Q.    Did you work with Mr. Ramirez as
24      an attorney prior to July 9, 2014?
25            A.    Yes.
```

```
 1                  L. OVIEDO
 2          Q.   In what capacity did you work with
 3     Mr. Ramirez?
 4          A.   I was a broker in deals and also a
 5     buyer of transactions.
 6          Q.   Was he always your attorney?
 7          A.   To some of the deals.
 8          Q.   Prior to July 9, 2014, how many
 9     deals roughly did he represent you on?
10          A.   I think maybe like five or ten.
11          Q.   Did you refer Ms. Staatz to
12     Mr. Ramirez?
13          A.   I gave her the option besides all
14     the options that she has because she came
15     with a set price in mind - this is what I
16     want, 600,000 for the property.  She got it
17     for the amount she asked and then asked some
18     of the attorneys and decided to go with
19     Mr. Ramirez.
20          Q.   Did you or your company pay
21     Mr. Ramirez a retaining fee for Ms. Staatz?
22          A.   No.
23          Q.   Do you know the date Ms. Noble
24     executed or signed the contract of 2014?
25          A.   No.
```

```
 1                    L. OVIEDO
 2           Q.   Did you ever come in possession of
 3      the signed contract?
 4           A.   Yes.
 5           Q.   Roughly when did you come in
 6      possession of the signed contract?
 7           A.   After it was executed by the
 8      seller.
 9           Q.   That was on or about July 9 of
10      2014?
11           A.   I don't recall the specific date.
12           Q.   I want to refer you to the
13      contract that begins on page 9 of
14      Defendant's Exhibit A and I ask you is that
15      a copy of the contract dated July 9, 2014?
16           A.   It seems to be the contract.
17           Q.   Does that refresh your
18      recollection the date Ms. Staatz executed
19      the contract?
20           A.   Yes.
21           Q.   That would be July 9, 2014?
22           A.   Correct.
23           Q.   From July 9, 2014 through today
24      only with respect to 2176 Grand Concourse,
25      have you had any communications with
```

```
 1                    L. OVIEDO
 2       Mr. Ramirez regarding this property?
 3            A.   From July 2014?  Yes.
 4            Q.   Those communications, were they
 5       oral, written, e-mail, something else?
 6            A.   All the above.
 7            Q.   Are you still in possession of any
 8       of the e-mails between yourself and
 9       Mr. Ramirez regarding this property?
10            A.   I have to check my computer.
11                 MR. BRODERICK:  I call for
12            production or e-mails between
13            Mr. Oviedo and Mr. Ramirez.
14            Q.   Do you recall writing any letters
15       to Mr. Ramirez regarding this property?
16            A.   I don't remember.
17            Q.   Would they be in your file?
18            A.   If I have them, it would be in my
19       file.  Most likely I don't think so but I
20       will see.
21            Q.   With respect to the oral
22       conversations with Mr. Ramirez, how many
23       roughly did you have with him?
24            A.   So many.  He was looking for Ms.
25       Staatz because he needed documents and then
```

```
 1                        L. OVIEDO
 2         he called her and she didn't respond and
 3         then he called me because the file was not
 4         completed when we went to his office -
 5         sorry, I'm confusing.  Yes, so she was - he
 6         was representing her so he needed more
 7         documents showing that she has some type of
 8         power to sign documents, she was involved in
 9         the church.  She didn't have any documents
10         at all.
11              Q.   You went with Ms. Staatz to the
12         Bronx County Clerk and were able to obtain
13         the corporate documents?
14              A.   By the third time I went with
15         there with her.  I went three times.
16              Q.   Who paid for the production of the
17         documents.
18              A.   I paid.
19              Q.   Did you pay checks?
20              A.   I think I paid cash.  Everything I
21         paid, I put under her name.
22              Q.   You had to go to the Bronx County
23         Clerk and not the Secretary of State because
24         the corporation, the church, was formed like
25         the 1930s.  Correct?
```

                              L. OVIEDO

1

2        A.    I believe that was somehow 1942

3    and then it was a crazy process but we got

4    it.

5        Q.    Ms. Staatz went with you and

6    complied with you?

7        A.    That is correct.

8        Q.    Do you know if there is any

9    agreement whereby Ms. Staatz in 2014 agreed

10   to comply with the AG process?

11       A.    Not that I recall but she knew she

12   had to get a set of documents in order for

13   the file to be submitted to AG.

14       Q.    How do you know she knew that?

15       A.    It was plain to her and then the

16   attorney was calling her and they talked

17   sometimes from my office because sometimes

18   her phone was disconnected.  I don't have

19   those documents her saying from my office.

20   I don't have those documents.

21       Q.    Who told her?

22       A.    The attorney, Ramirez.

23       Q.    Were you present during any of

24   these conversations?

25       A.    I was present because they did it

1                     L. OVIEDO

2        in my office.

3            Q.   Mr. Ramirez met with Ms. Staatz at

4        your office?

5            A.   No, he never came to my office.

6        She came to my office to call him from my

7        office.

8            Q.   You could only hear Ms. Staatz's

9        conversation?

10           A.   Yes.  I don't have those

11       documents.

12           Q.   Did Mr. Ramirez make an

13       application to the attorney office for Ms.

14       Staatz?

15           A.   I don't think so because he

16       doesn't have all the documents he requested.

17           Q.   Did he give you a list of

18       documents he requested?

19           A.   No, he gave it to Ms. Staatz.

20           Q.   When you say he gave it to Ms.

21       Staatz, was that in writing?

22           A.   I don't recall.

23           Q.   Did she take any notes while she

24       was in your office calling Mr. Ramirez, did

25       she take notes?

```
 1                       L. OVIEDO

 2            A.    Yes, she took some notes.

 3            Q.    Did you make a copy of those

 4       notes?

 5            A.    No.

 6            Q.    The contract for the purchase of

 7       the property dated July 9, 2014 makes

 8       reference to a $15,000 deposit.  Did you

 9       make a copy of the check?

10            A.    Yes.

11            Q.    Do you know if that check was ever

12       cashed?

13            A.    I don't believe it was cashed.

14            Q.    Do you know why that check wasn't

15       cashed?

16            A.    Because I believe he was saying he

17       is not making any more actions unless she

18       brought in all the files.  That check was

19       run by three different attorney offices and

20       none of the attorneys cashed the check.  It

21       wasn't cashed by Mr. Ramirez.

22            Q.    Are you aware if Ms. Noble wrote a

23       check to Mr. Ramirez for $1,000 for

24       a deposit of the July 2014 contract?

25            A.    I don't remember.
```

```
 1                    L. OVIEDO
 2         Q.   Are you aware if she wrote a
 3    $14,000 check on her own behalf to Mr.
 4    Ramirez for the purchase of this contract?
 5         A.   Not that I can remember.
 6              MS. ORTIZ:  Off the record.
 7              (Whereupon, an off-the-record
 8         discussion was held.)
 9         Q.   Was the July 9, 2014 contract
10    superseded by another contract?
11         A.   Meaning?
12              MS. ORTIZ:  I'll object to that
13         because it is calling for a legal
14         conclusion.
15         Q.   Did there come a time when Ms.
16    Staatz of the church entered into a second
17    contract with Ms. Noble?
18         A.   Correct.
19         Q.   I'll show you what is marked
20    Defendant's Exhibit C and I ask have you
21    ever seen that document before?
22              MS. ORTIZ:  Do you remember seeing
23         the contract is the question?
24              THE WITNESS:  No.
25         Q.   Do you recall whether in 2015 the
```

```
 1                    L. OVIEDO
 2          contract price was reduced from 600,000 to
 3          $500,000?
 4              A.   Yes, I recall it was reduced.
 5              Q.   Not the date because you said you
 6          didn't recognize this document, do you know
 7          roughly when the contract price was reduced?
 8              A.   No, I don't remember.
 9              Q.   Do you know the purpose for the
10          reduction of the contract price?
11              A.   The house was in disrepair meaning
12          that we were going nowhere in terms of the
13          process so we assume a house that you don't
14          fix gets worse so that is what happened
15          there, my understanding that is what
16          happened there.
17              Q.   I'll show you what is marked
18          Defendant's Exhibit B and have you seen that
19          document before?
20              A.   The check?
21              Q.   Yes.
22              A.   Yes, it looks familiar.
23              Q.   Was Defendant's Exhibit B, was
24          that the down payment check that Ms. Noble
25          wrote to Mr. Ramirez to the best of your
```

```
 1                    L. OVIEDO
 2     knowledge?
 3          A.   I don't recall.  I don't remember.
 4          Q.   I want to show you what is marked
 5     as Defendant's Exhibit D for identification
 6     and ask have you seen that document before?
 7          A.   Yes.
 8          Q.   What is that document?
 9          A.   Contract sale.
10          Q.   What is the date on that contract?
11          A.   May 16, 2017.
12          Q.   Was that contract executed by
13     Ms. Noble as far as you know?
14          A.   As far as I know, yes, by both of
15     them.
16          Q.   Did the board authorize that
17     contract to be signed?
18          A.   I believe it was authorized.
19          Q.   That contract, Defendant's Exhibit
20     D, makes reference to a purchase price of
21     $500,000?
22          A.   Yes.
23          Q.   As far as you know, your personal
24     knowledge, the board approved that process?
25          A.   That is correct.  When I say
```

```
 1                    L. OVIEDO
 2       approved, I don't know if they approved in
 3       writing by that time or how they approved it
 4       but they were going there and supporting her
 5       at this time of this contract.
 6            Q.   Did there come a time you are
 7       aware of that Mr. Ramirez started
 8       representing Ms. Noble with respect to this
 9       sale of this property?
10            A.   Yes.
11            Q.   When did he become her attorney?
12            A.   On the last contract as far as I
13       know.
14            Q.   On the 2017 contract?
15            A.   Yes.
16            Q.   Do you know who represented
17       Ms. Noble on the July 9, 2014 contract?
18            A.   Ms. Browne.
19            Q.   I'll show you Defendant's Exhibit
20       H and ask you have you seen that document
21       before?
22            A.   Yes.
23            Q.   Does that refresh your
24       recollection as to who represented
25       Ms. Noble?
```

<pre>
 1                    L. OVIEDO
 2         A.   Santos.
 3         Q.   That document, did that come from
 4    your file or come from someplace else?
 5         A.   It came from my file I believe.
 6         Q.   Did you have any conversations
 7    with Ms. Santos about the purchase of this
 8    property?
 9         A.   Yes.
10         Q.   Do you recall the sum and
11    substance of those conversations?
12         A.   When is she going to be able to
13    see her client was the only conversation I
14    had with her.
15         Q.   Did you ever have any e-mails
16    between you and Ms. Santos regarding this
17    property alone?
18         A.   Not that I remember.
19         Q.   I want to show you what has been
20    marked Defendant's Exhibit I.  Have you seen
21    that document before?
22         A.   Yes.
23         Q.   What is that document?
24         A.   It is an amendment to a contract.
25         Q.   Do you know if that document was
</pre>

1               L. OVIEDO
2      ever executed or signed by Ms. Noble or Ms.
3      Staatz or both?
4           A.   I don't know.
5           Q.   Do you know who prepared that
6      document?
7           A.   Seems to be Mr. Ramirez.
8           Q.   I want to show you what has been
9      marked as Defendant's Exhibit F for
10     identification.  Have you ever seen that
11     document before?
12          A.   Yes.
13          Q.   What is that document?
14          A.   The check for the down payment.
15          Q.   The down payment for which
16     property?
17          A.   2176 Grand Concourse.
18          Q.   On which contract?
19          A.   Suppose to be the 2017 contract.
20          Q.   Do you know who the owner of
21     Urvany Investment Group LLC is?
22          A.   Maria Noble is the sole member.
23          Q.   Do you have any interest in her
24     being in the investment group?
25          A.   No.

```
 1                   L. OVIEDO

 2           Q.   Defendant's Exhibit G for

 3      identification, have you seen that document

 4      before?

 5           A.   Yes.

 6           Q.   What is that document?

 7           A.   That is a retainer that was paid

 8      by the buyer to the seller's attorney

 9      because the seller's attorney decided not to

10      move forward until paid.  It is a loan from

11      the buyer to the seller.

12           Q.   Ms. Noble intended to recover that

13      money at the closing of the property?

14           A.   Correct.

15           Q.   In form of a seller's concession

16      or whatever?

17                MS. ORTIZ:  If you know.

18           A.   I don't know if she is planning to

19      recover it but she paid that money to cover

20      the retainer for the seller attorney.

21           Q.   Did you have any conversations

22      with Ms. Brown regarding the purchase of

23      this property?

24           A.   Yes.

25           Q.   What was the sum and substance of
```

```
 1                    L. OVIEDO
 2      those conversations?
 3           A.   She was representing first Maria,
 4      and after going through so many attorneys
 5      like I call her and say do you have an
 6      attorney that would be able to help this
 7      whole sale happen and she has to deal with
 8      the AG.  Then she says she may be able to
 9      help.  This was after we went through
10      Ramirez representing, Myrna Socorro and
11      third attorney is Jonathan Nelson, then
12      there was another attorney in Brooklyn that
13      Mr. Staatz got but I don't remember his
14      name.  Then we were like we don't have an
15      attorney, and then I call several attorneys
16      asking who knows about how to deal with the
17      AG process.  Then she said I would be able
18      to help, and that is how she became the
19      attorney for the church.
20           Q.   Are there any e-mails between you
21      and Ms. Browne regarding the purchase of
22      this property only?
23           A.   I would have to check.
24           MR. BRODERICK:  I call for
25           production of those documents if they
```

```
 1                    L. OVIEDO

 2          exist.

 3              Q.   Are this any written letters or

 4          faxes between you and Ms. Browne you are

 5          aware of?

 6              A.   I have to check.

 7                   MR. BRODERICK:  I call for

 8              production of those documents.

 9              Q.   You mentioned Mr. Nelson.  Did you

10          have any conversations with Mr. Nelson

11          regarding this process?

12              A.   Yes.  I don't know how we got to

13          there but I went with Ms. Staatz to

14          Mr. Nelson's office and then he asked for

15          documents, he asked for a retainer that she

16          didn't have.  We stayed there for months.

17          When I say we, we went there three times as

18          far as I remember.  He couldn't do anything

19          with the AG as well.  He was missing

20          documents and he was missing a retainer.

21              Q.   Do you have any e-mails between

22          you and Mr. Nelson?

23              A.   I don't remember but I can check.

24                   MR. BRODERICK:  I call for

25              production of any e-mails between
```

```
 1                    L. OVIEDO
 2          Mr. Nelson and Mr. Oviedo.
 3          Q.   Did Ms. Staatz state to you she
 4     was not going to complete the sale?
 5          A.   Yes.  At the end, she said she has
 6     another buyer with a higher number, higher
 7     price, that she is not going to do it.
 8          Q.   Did she tell you what that higher
 9     price is?
10          A.   No.
11          Q.   When you said higher price, did
12     she ask you to bid higher than the $500,000?
13          A.   Yes, she asked me to bid higher,
14     and I said, "Okay, I have to relay that to
15     the buyer.  What is the number you are
16     looking for?"  She didn't say anything,
17     "I'll let you know."  That was it.
18          Q.   To the best of your recollection,
19     what was the rough date, month and year of
20     that conversation?
21          A.   I think it was last year.  I don't
22     remember the date.  That was I believe after
23     she fired Laura.
24          Q.   Did you document that in any
25     writing to Ms. Staatz?
```

```
 1                     L. OVIEDO
 2          A.   Document what?
 3          Q.   Did you document conversation
 4     where Ms. Staatz told you she was not going
 5     to go through with the deal?
 6          A.   No.
 7          Q.   Did you tell Ms. Noble that Ms.
 8     Staatz did not intend to go through with the
 9     deal?
10          A.   Yes, I told her.
11          Q.   Did you put that in writing, that
12     conversation?
13          A.   No.
14          Q.   Did you put in writing to
15     Ms. Browne regarding that?
16          A.   No.
17          Q.   Do you keep a log of the phone
18     calls and conversations you had with Ms.
19     Staatz?
20          A.   No.
21          Q.   Do you know roughly how many phone
22     calls with Ms. Staatz?
23          A.   I don't know, maybe couple of
24     thousand.
25          Q.   Do you still have the same cell
```

```
 1                     L. OVIEDO
 2        phone provider?
 3             A.   Yes.
 4                  MR. BRODERICK:  I'll call for the
 5             cell phone records of Mr. Oviedo.
 6             Anything else can be blacked out but
 7             the any phone number to Ms. Staatz.
 8             Q.   Did you ever give Ms. Staatz any
 9        money to go through with this deal?
10             A.   Yes.
11             Q.   How much did you give her?
12             A.   I don't recall.  I paid her cash -
13        200, 300.
14             Q.   Not in total but you never gave
15        her 10,000, like that?
16             A.   No.
17             Q.   The petty cash was to facilitate
18        further payment of the court fees when you
19        went to court and cab fare?
20             A.   Also for food.
21             Q.   Did Ms. Staatz ever tell you that
22        she wanted a $100,000 in her pocket from
23        this deal?
24             A.   I don't recall.  She wants all the
25        money in her pocket.  She wants the entire
```

Case 1:18-cv-07781-NRB Document 46 Filed 07/22/20 Page 207 of 335

```
 1                    L. OVIEDO
 2      proceeds of the sale and that is where she
 3      got in the situation with Ms. Browne because
 4      Ms. Browne says the proceeds of the sale
 5      should go into another entity.  Then she
 6      said that is my property, I want my money.
 7      Then Ms. Browne says it is not your money,
 8      it is the church money.
 9           Q.   Were you present during that
10      conversation or was that a conversation
11      relayed to you by Ms. Browne?
12           A.   It was relayed to me by Ms. Staatz
13      and relayed to me by members of the board.
14           Q.   Other than Ms. Staatz reference to
15      a possible other purchaser, was there any
16      other indication where she said she is not
17      going through with the contract in writing
18      or otherwise?
19           A.   Yes, it is a partner she has.  She
20      has when she came to me, it is clear she had
21      another buyer for the property that was
22      Felicia Sarbong and she has a sale.  She
23      took a loan, Ms. Staatz took a loan from
24      Ms. Sarbong for $35,000 and then they
25      appeared to have a deal for 475.  After that
```

```
 1                    L. OVIEDO
 2    is when she came to me to get 600,000 that
 3    she asked for $600,000 and got her full ask.
 4         Q.   Ms. Sarbong was before the
 5    July 2014 contract or after?
 6         A.   Before.  Since that, they have
 7    some type of verbal agreement that Ms.
 8    Staatz didn't comply with.
 9         Q.   When did you discover about that
10    contract verbal agreement?
11         A.   After we got into this situation.
12         Q.   Did Ms. Sarbong or anyone on her
13    behalf ever provide you proof of this 35,000
14    payment?
15         A.   I received a document notarized
16    stating that Ms. Staatz or the church or
17    both owed Ms. Sarbong that money.
18              MR. BRODERICK:  I call for
19              production of that document.
20         Q.   Ms. Sarbong was notifying you of a
21    lien against the property of $35,000
22    basically?
23         A.   No, she lent the money to the
24    church and Ms. Staatz because she was
25    getting the real estate for $475,000 and she
```

```
 1                    L. OVIEDO
 2       didn't get this sale.  Ms. Staatz didn't
 3       went through with the sale because she found
 4       she got $600,000 she has from Ms. Noble.
 5            Q.   If the sale went through for the
 6       $600,000, was Ms. Sarbong going to be paid
 7       back the $35,000 from those proceeds if you
 8       know?
 9            A.   That is what they later on agreed
10       she would do.
11            Q.   Other than the Sarbong contract,
12       were there any other contracts that you are
13       aware of executed by the church or Ms.
14       Staatz in a document that she had this other
15       buyer for more money?
16            A.   Just verbal.  She said I have a
17       buyer and then I have she was trying to get
18       other buyer but she needs to close quick.
19            MR. BRODERICK:  I have no further
20            questions.
21       EXAMINATION BY
22       MS. ORTIZ:
23            Q.   Have you had any conversations
24       with other board members about the sale?
25            A.   Yes.
```

                            L. OVIEDO

1
2          Q.   Who have you spoken to?

3          A.   All of them.

4          Q.   Who were they?

5          A.   Auguste Nipabi, I spoke to

6     Leo Fergueson, and I spoke to

7     Felicia Sarbong.  They met at my office

8     several times for that thing for sale.

9          Q.   Could you tell me what the

10    substance of those conversations were?

11         A.   That they wanted to sell the

12    property, they were looking for help any

13    means to pay for the retainer.  They want to

14    sell.

15         Q.   Did they meet with you without Ms.

16    Staatz present?

17         A.   No, she was always present.

18         Q.   She was always present?

19         A.   Yes.

20         Q.   Is this before the contract was

21    signed or after the first contract was

22    signed in 2014?

23         A.   That was after.

24         Q.   Why did you have to give Ms.

25    Staatz money for food?  You testified

```
 1                    L. OVIEDO
 2      earlier you had to give her money for food.
 3           A.   Because she didn't have any money.
 4           Q.   Why did you say that?
 5           A.   I started lending her money, 200
 6      or $300 and she was paying me back the
 7      money, and then come the time I stopped
 8      collecting what I was lending her.  I said
 9      you don't owe me, keep the money.  She used
10      to come and give me 20, 50, 100 and I gave
11      it to her.
12           Q.   Because she needed money?
13           A.   She needed money.  She was by
14      herself so.
15           Q.   Did she ever live in the building?
16           A.   As far as I know, she lived on the
17      third floor.
18           Q.   Does she live there now?
19           A.   As far as I know, she lived there
20      now.
21           Q.   Do you still see her in the
22      office?
23           A.   No.
24                MS. ORTIZ:  That is all I have.
25      EXAMINATION AGAIN BY
```

1               L. OVIEDO

2    MR. BRODERICK:

3        Q.   Other than Ms. Staatz, because I

4    want you to understand I represent both the

5    church and Ms. Staatz, did any other member

6    of the board tell you they would not go

7    through with this sale?

8        A.   No.  The only one that was not

9    complying with Ms. Staatz was Felicia

10   Sarbong.

11           MS. ORTIZ:  What do you mean

12           complying?

13           THE WITNESS:  They have arguments

14           because she owes money.  Felicia says

15           it was more than 35,000 so they were

16           arguing.  Felicia says she didn't want

17           to do anything that has to deal with

18           Ms. Staatz, but she agreed to the sale.

19       Q.   As far as you know, Mr. Nipabi was

20   willing to sell the property?

21       A.   All of them, they signed.

22       Q.   They are still willing to sell the

23   property?

24       A.   That was the last document I saw.

25       Q.   Other than Ms. Staatz, did the

```
 1                    L. OVIEDO
 2      board fire Ms. Browne to the best of your
 3      knowledge?
 4           A.    No.
 5           Q.    Did Ms. Browne ever tell you the
 6      board fired her from proceeding forward?
 7           A.    I don't recall that.
 8           MR. BRODERICK:  No further
 9      questions.
10           (Whereupon, at 12:20 P.M., the
11      Examination Before Trial was
12      concluded.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    L. OVIEDO
 2               D E C L A R A T I O N
 3
 4          I hereby certify that having been first
 5     duly sworn to testify to the truth, I gave
 6     the above testimony.
 7
 8          I FURTHER CERTIFY that the foregoing
 9     transcript is a true and correct transcript
10     of the testimony given by me at the time and
11     place specified hereinbefore.
12
13
14     _____
                            LEDWIN OVIEDO
15
16
17     Subscribed and sworn to before me
18     This _____ day of _____ 20__.
19
20     _____
            NOTARY PUBLIC
21
22
23
24
25
```

```
 1                    L. OVIEDO

 2                E X H I B I T S

 3   DEFENDANT EXHIBITS

 4   LETTER    DESCRIPTION                   PAGE

 5   (None)

 6

 7                 I N D E X

 8

 9   EXAMINATION BY                          PAGE

10   MR. BRODERICK                           4, 33

11   MS. ORTIZ                               30

12

13

14        INFORMATION AND DOCUMENTS REQUESTED

15   INFORMATION AND/OR DOCUMENTS            PAGE

16   Purchase of property files             7

17   E-mails between Oviedo & Ramirez        11

18   E-mails between Oviedo & Browne         23

19   Letters, faxes between Oviedo & Browne  24

20   E-mails between Nelson & Oviedo         24

21   Cell phone records to Ms. Staatz        27

22   Document of money owed Sarbong          29

23

24

25
```

```
 1                    L. OVIEDO

 2              C E R T I F I C A T E

 3

 4     STATE OF NEW YORK        )
                                :  SS.:
 5     COUNTY OF NEW YORK       )

 6

 7              I, SYLVIA KEMP, a Notary Public for

 8     and within the State of New York, do hereby

 9     certify:

10              That the witness whose examination

11     is hereinbefore set forth was duly sworn and

12     that such examination is a true record of

13     the testimony given by that witness.

14              I further certify that I am not

15     related to any of the parties to this action

16     by blood or by marriage and that I am in no

17     way interested in the outcome of this

18     matter.

19              IN WITNESS WHEREOF, I have hereunto

20     set my hand this 16th day of August, 2019.

21

22              Sylvia Kemp

23              _____
                SYLVIA KEMP

24

25
```

**$**

$1,000 [1] 15/23
$100,000 [1] 27/22
$100,000 in [1] 27/22
$14,000 [1] 16/3
$15,000 [1] 15/8
$15,000 deposit [1] 15/8
$300 [1] 32/6
$35,000 [3] 28/24 29/21 30/7
$35,000 and [1] 28/24
$35,000 from [1] 30/7
$475,000 [1] 29/25
$475,000 and [1] 29/25
$500,000 [3] 17/3 18/21 25/12
$600,000 [4] 8/19 29/3 30/4 30/6
$600,000 and [1] 29/3
$600,000 she [1] 30/4

**0**

07871 [1] 1/6

**1**

10,000 [1] 27/15
100 [1] 32/10
10453 [1] 4/13
1099 [1] 5/10
11 [1] 36/17
111 [1] 2/9
11103 [2] 1/21 2/5
11375 [1] 2/10
11:40 [1] 1/14
12:20 [1] 34/10
16 [2] 1/13 18/11
16th [1] 37/20
18 [2] 1/6 6/19
1930s [1] 12/25
1942 [1] 13/2
1991 [1] 6/19

**2**

20 [3] 2/9 32/10 35/18
200 [2] 27/13 32/5
2014 [19] 5/6 6/14 7/4 8/15 8/24 9/8 9/24 10/10 10/15 10/21 10/23 11/3 13/9 15/7 15/24 16/9 19/17 29/5 31/22
2015 [1] 16/25
2017 [3] 18/11 19/14 21/19
2019 [2] 1/13 37/20
2153 [1] 4/12
2176 [4] 5/13 6/21 10/24 21/17
23 [1] 36/18
24 [2] 36/19 36/20
27 [1] 36/21
29 [1] 36/22

**3**

30 [2] 3/15 36/11
300 [1] 27/13
32-72 [2] 1/20 2/5
33 [1] 36/10
35,000 [2] 29/13 33/15

**4**

402 [1] 2/5
475 [1] 28/25

**5**

5 percent [1] 6/7
50 [1] 32/10
500 [1] 8/13

**6**

600 [1] 8/13
600,000 [3] 9/16 17/2 29/2

**7**

70-20 [1] 2/9
72 [2] 1/20 2/5

**A**

a deposit [1] 15/24
A.M [1] 1/14
ability [1] 4/23
able [5] 12/12 20/12 23/6 23/8 23/17
about [5] 5/12 6/20 10/9 20/7 23/16 29/9 30/24
above [2] 11/6 35/6
action [2] 4/15 37/15
actions [1] 15/17
administer [1] 3/10
after [10] 3/15 10/7 23/4 23/9 25/22 28/25 29/5 29/11 31/21 31/23
AG [5] 13/10 13/13 23/8 23/17 24/19 36/15
AGAIN [1] 32/25
against [5] 1/5 4/16 6/8 6/10 29/21
agent [1] 8/4
agreed [5] 3/4 3/19 13/9 30/9 33/18
agreement [7] 5/20 5/21 5/22 5/23 13/9 29/7 29/10 aka [3] 1/7 1/8 1/8
all [11] 3/20 7/20 9/13 11/6 12/10 14/16 15/18 27/24 31/3 32/24 33/21
alone [1] 20/17
also [4] 2/13 8/4 9/4 27/20
always [3] 9/6 31/17 31/18
am [3] 5/15 37/14 37/16
amendment [1] 20/24
amount [1] 9/17
AND/OR [1] 36/15
another [5] 16/10 23/12 25/6 28/5 28/21
answer [1] 4/22
answers [1] 4/24
any [32] 4/17 4/19 6/8 6/10 8/8 10/25 11/7 11/14 12/9 13/8 13/23 14/23 15/17 20/6 20/15 21/23 22/21 23/20 24/3 24/10 24/21 24/25 25/24 27/7 27/8 28/15 30/12 30/23 31/12 32/3 33/5 37/15
anyone [2] 3/10 29/12
anything [4] 24/18 25/16 27/6 33/17
appeared [1] 28/25
application [1] 14/13
approved [4] 18/24 19/2 19/2 19/3
April [1] 6/19
April 18 [1] 6/19
ARACELIS [1] 1/9
are [14] 3/20 5/12 6/8 8/14 11/7 15/22 16/2 19/6 23/20

24/3 24/4 25/15 30/12 33/22
area [1] 8/21
arguing [1] 33/16
arguments [1] 33/13
as [29] 1/9 3/11 3/14 3/20 4/5 4/24 5/13 8/8 8/23 18/5 18/13 18/13 18/14 18/14 18/23 18/23 19/12 19/12 19/24 21/9 24/17 24/18 24/19 32/16 32/16 32/19 32/19 33/19 33/19
ask [2] 4/22 10/14 16/20
asked [6] 9/17 9/17 24/14 24/15 25/13 29/3
asking [2] 4/14 23/16
assume [1] 17/13
attorney [20] 2/9 7/11 7/12 7/13 7/14 8/24 9/6 13/16 13/22 14/13 15/19 19/11 22/8 22/9 22/20 23/6 23/11 23/12 23/15 23/19
attorneys [5] 2/4 9/18 15/20 23/4 23/15
August [1] 1/13 37/20
Auguste [1] 31/5
Auguste Nipabi [1] 31/5
Austin [1] 2/9
authorize [1] 18/16
authorized [2] 3/10 18/18
aware [5] 15/22 16/2 19/7 24/5 30/13

**B**

back [2] 30/7 32/6
basically [1] 29/22
be [20] 3/7 3/9 3/13 4/14 6/20 8/20 10/16 10/21 11/17 11/18 13/13 18/17 20/12 21/7 21/19 23/6 23/8 23/17 27/6 30/6
became [2] 8/6 23/18
because [18] 9/14 11/25 12/3 12/23 13/17 13/25 14/15 15/16 16/13 17/5 22/9 28/3 29/24 30/3 32/3 32/12 33/3 33/14
become [2] 8/2 19/11
been [5] 4/3 6/15 20/19 21/8 35/4
before [15] 1/22 3/10 3/12 16/21 17/19 18/6 19/21 20/21 21/11 22/4 29/4 29/6 31/20 34/11 35/17
begins [1] 10/13
behalf [1] 16/3 29/13
being [1] 21/24
believe [6] 13/2 15/13 15/16 18/18 20/5 25/22
besides [1] 9/13
best [4] 4/23 17/25 25/18 34/2
between [12] 3/5 11/8 11/12 20/16 23/20 24/4 24/21 24/25 36/17 36/18 36/19 36/20
bid [2] 25/12 25/13
blacked [1] 27/6
blood [1] 37/16
board [7] 18/16 18/24 28/13 30/24 33/6 34/2 34/6
both [4] 18/14 21/3 29/17

33/4
BRODERICK [5] 2/8 2/10 4/7 33/2 36/10
broker [6] 5/5 5/14 5/21 6/15 6/21 9/4
broker's [1] 5/19
brokerage [3] 5/17 7/6 8/5
Bronx [3] 4/12 12/12 12/22
Brooklyn [1] 23/12
brought [4] 4/16 6/23 7/3 15/18
Brown [1] 22/22
Browne [12] 19/18 23/21 24/4 26/15 28/3 28/4 28/7 28/11 34/2 34/5 36/18 36/19
building [1] 32/15
buyer [10] 7/24 9/5 22/8 22/11 25/6 25/15 28/21 30/15 30/17 30/18

**C**

cab [1] 27/19
call [10] 7/10 11/11 14/6 23/5 23/15 23/24 24/7 24/24 27/4 29/18
called [2] 12/2 12/3
calling [3] 13/16 14/24 16/13
calls [2] 26/18 26/22
came [6] 9/14 14/5 14/6 20/5 28/20 29/2
can [3] 16/5 24/23 27/6
cannot [1] 4/25
capacity [2] 5/2 9/2
cash [3] 12/20 27/12 27/17
cashed [5] 15/12 15/13 15/15 15/20 15/21
cell [3] 26/25 27/5 36/21
certification [1] 3/7
certify [4] 35/4 35/8 37/9 37/14
check [14] 11/10 15/9 15/11 15/14 15/18 15/20 15/23 16/3 17/20 17/24 21/14 23/23 24/6 24/23
checks [1] 12/19
church [18] 1/7 1/8 1/8 1/8 1/9 4/16 6/9 6/11 6/25 12/9 12/24 16/16 23/19 28/8 29/16 29/24 30/13 33/5
Civil [1] 1/19
claim [3] 6/8 6/10 6/13
clear [1] 28/20
Clerk [2] 12/12 12/23
client [1] 20/13
close [1] 30/18
closing [1] 22/13
collecting [1] 32/8
come [9] 6/20 10/2 10/5 16/15 19/6 20/3 20/4 32/7 32/10
commission [2] 6/3 6/15
communications [2] 10/25 11/4
company [1] 9/20
complete [1] 25/4
completed [1] 12/4
complied [1] 13/6
comply [2] 13/10 29/8
complying [2] 33/9 33/12
comps [3] 8/8 8/10 8/20
computer [1] 11/10
concession [1] 22/15

## C

concluded [1] 34/12
conclusion [1] 16/14
Concourse [5] 4/12 5/13 6/21 10/24 21/17
confusing [1] 12/5
contract [39] 6/11 6/12 8/15 8/18 9/24 10/3 10/6 10/13 10/15 10/16 10/19 15/6 15/24 16/4 16/9 16/10 16/17 16/23 17/2 17/7 17/10 18/9 18/10 18/12 18/17 18/19 19/5 19/12 19/14 19/17 20/24 21/18 21/19 28/17 29/5 29/10 30/11 31/20 31/21
contracts [1] 30/12
conversation [7] 14/9 20/13 25/20 26/3 26/12 28/10 28/10
conversations [10] 11/22 13/24 20/6 20/11 22/21 23/2 24/10 26/18 30/23 31/10
copy [5] 3/13 3/16 10/15 15/3 15/9
corporate [1] 12/13
corporation [1] 12/24
correct [10] 5/11 6/4 7/17 10/22 12/25 13/7 16/18 18/25 22/14 35/9
could [2] 14/8 31/9
couldn't [1] 24/18
counsel [2] 3/5 3/16
County [3] 12/12 12/22 37/5
couple [1] 26/23
court [6] 1/2 1/18 3/12 4/24 27/18 27/19
cover [1] 22/19
crazy [1] 13/3
CV [1] 1/6

## D

date [9] 1/13 7/3 9/23 10/11 10/18 17/5 18/10 25/19 25/22
dated [2] 10/15 15/7
DAVID [2] 2/8 2/10
day [2] 35/18 37/20
days [1] 3/15
deal [9] 5/14 23/7 23/16 26/5 26/9 27/9 27/23 28/25 33/17
deals [3] 9/4 9/7 9/9
decided [2] 9/18 22/9
Defendant [2] 1/17 36/3
Defendant's [10] 10/14 16/20 17/18 17/23 18/5 18/19 19/19 20/20 21/9 22/2
DEFENDANTS [1] 1/11 2/9
deposit [2] 15/8 15/24
deposition [5] 1/16 3/7 3/8 3/13 4/20
DESCRIPTION [1] 36/4
did [52] 5/6 5/19 6/20 7/20 8/2 8/8 8/23 9/2 9/9 9/11 9/20 10/2 10/5 11/23 12/19 13/25 14/12 14/17 14/23 14/24 15/3 15/8 16/15 18/16 19/6 19/11 20/3 20/6 20/15 22/21 24/9 25/3 25/8

25/11 25/24 26/3 26/7 26/8 26/11 26/14 27/8 27/11 27/21 29/9 29/12 31/15 31/24 32/4 32/15 33/5 33/25 34/5
didn't [12] 5/21 7/22 12/2 12/9 17/6 24/16 25/16 29/8 30/2 30/2 32/3 33/16
different [1] 15/19
director [1] 6/25
disconnected [1] 13/18
discover [1] 29/9
discussion [2] 7/19 16/8
disrepair [1] 17/11
DISTRICT [2] 1/2 1/2
do [36] 4/11 4/21 5/2 5/18 6/5 6/9 7/2 7/5 9/23 11/14 13/8 13/14 15/11 15/14 16/22 16/25 17/6 17/9 19/16 20/10 20/25 21/5 21/20 21/23 23/5 24/18 24/21 25/7 26/17 26/21 26/25 30/10 32/21 33/11 33/17 37/8
document [23] 16/21 17/6 17/19 18/6 18/8 19/20 20/3 20/21 20/25 20/25 21/6 21/11 21/13 22/3 22/6 25/24 26/2 26/3 29/15 29/19 30/14 33/24 36/22
documents [18] 11/25 12/7 12/8 12/9 12/13 12/17 13/12 13/13 13/20 14/11 14/16 14/18 23/25 24/8 24/15 24/20 36/14 36/15
Does [3] 10/17 19/23 32/18
doesn't [2] 6/12 14/16
don't [29] 4/17 7/13 10/11 11/16 11/19 13/18 13/20 14/10 14/15 14/22 15/13 15/25 17/8 17/13 18/3 18/3 19/2 21/4 22/18 23/13 23/14 24/12 24/23 25/21 26/23 27/12 27/24 32/9 34/7
down [4] 4/25 17/24 21/14 21/15
duly [3] 4/3 35/5 37/11
during [3] 4/20 13/23 28/9

## E

e-mail [1] 11/5
e-mails [9] 11/8 11/12 20/15 23/20 24/21 24/25 36/17 36/18 36/20
earlier [1] 32/2
effect [2] 3/11 3/14
else [3] 11/5 20/4 27/6
employed [1] 5/9
employee [2] 5/6 5/8
end [1] 25/5
entered [1] 16/16
Enterprises [2] 5/3 6/17
entire [1] 27/25
entity [1] 28/5
ESQ [3] 2/6 2/10 2/13
estate [2] 5/5 6/15 29/25
ever [11] 10/2 15/11 16/21 20/15 21/2 21/10 27/8 27/21 29/13 32/15 34/5
Everything [1] 12/20
examination [7] 4/6 30/21 32/25 34/11 36/9 37/10 37/12

examined [1] 4/5
except [1] 3/20
executed [6] 9/24 10/7 10/18 18/12 21/2 30/13
Exhibit [10] 10/14 16/20 17/18 17/23 18/5 18/19 19/19 20/20 21/9 22/2
EXHIBITS [1] 36/3
exist [1] 24/2

## F

facilitate [1] 27/17
familiar [2] 8/14 17/22
far [8] 18/13 18/14 18/23 19/12 24/18 32/16 32/19 33/19
fare [1] 27/19
fast [1] 6/23
faxes [2] 24/4 36/19
Federal [1] 1/18
fee [1] 9/21
feel [1] 4/20
fees [1] 27/18
Felicia [5] 28/22 31/7 33/9 33/14 33/16
Felicia Sarbong [2] 28/22 31/7
Ferguson [1] 31/6
file [11] 7/5 7/10 7/11 7/15 7/16 11/17 11/19 12/3 12/13 20/4 20/5
files [2] 15/18 36/16
filing [1] 3/6
fire [1] 34/2
fired [2] 25/23 34/6
first [5] 4/3 4/23 23/3 31/21 35/4
five [1] 9/10
fix [1] 17/14
floor [1] 32/17
follows [1] 4/5
food [3] 27/20 31/25 32/2
force [1] 3/14
foregoing [1] 35/8
Forest [1] 2/10
form [2] 3/20 22/15
formed [2] 6/18 12/24
forth [1] 37/11
forward [2] 22/10 34/6
found [1] 30/3
free [1] 4/21
full [1] 29/3
further [6] 3/19 27/18 30/19 34/8 35/8 37/14

## G

Garcia [2] 6/24 7/3
gave [6] 9/13 14/19 14/20 27/14 32/10 35/5
gentleman [1] 6/24
get [4] 13/12 29/2 30/2 30/17
gets [1] 17/14
getting [1] 29/25
give [6] 14/17 27/8 27/11 31/24 32/2 32/10
given [25] 35/10 37/13
go [8] 6/12 9/18 12/22 26/5 26/8 27/9 28/5 33/6
going [12] 4/14 6/2 6/11 17/12 19/4 20/12 23/4 25/4 25/7 26/4 28/7 30/16
got [9] 5/10 9/16 13/3 23/13 24/12 28/3 29/3

29/11 30/4
Grand [5] 4/12 5/13 6/21 10/24 21/17
group [2] 21/21 21/24

## H

had [9] 10/25 12/22 13/12 24/14 26/18 28/20 30/14 30/23 32/2
hand [1] 37/20
happen [1] 23/7
happened [2] 17/14 17/16
has [12] 9/11 9/14 12/7 20/19 21/8 23/7 25/5 28/19 28/20 28/22 30/4 33/17
have [45] 5/6 6/14 7/5 7/13 10/25 11/10 11/10 11/18 11/23 12/9 13/18 13/20 14/10 19/20 20/6 20/15 20/20 21/10 21/23 22/3 22/21 22/5 23/14 23/23 24/6 24/10 24/16 24/21 25/14 26/25 28/25 29/6 30/16 30/17 30/19 30/23 31/2 31/24 32/3 32/24 33/13 37/19
having [4] 4/3 35/4
he [23] 9/6 9/9 11/24 11/25 12/2 12/3 12/5 12/6 14/5 14/15 14/16 14/17 14/18 14/20 15/16 15/16 19/11 24/14 24/15 24/18 24/19 24/20
head [2] 4/25 4/25
hear [1] 14/8
held [3] 1/19 7/19 16/8
help [4] 23/6 23/9 23/18 31/12
her [33] 6/22 7/3 9/13 12/2 12/6 12/15 12/21 13/15 13/16 13/18 13/19 13/21 16/3 19/4 19/11 20/13 20/14 21/23 23/5 26/10 27/11 27/12 27/15 27/22 27/25 29/3 29/12 32/2 32/5 32/8 32/11 32/21 34/6
here [2] 5/12 7/15
hereby [3] 3/4 35/4 37/8
herein [1] 3/6
hereinbefore [2] 35/11 37/11
hereunto [1] 37/19
herself [1] 32/14
higher [6] 25/6 25/6 25/8 25/11 25/12 25/13
Hills [2] 2/10
him [2] 11/23 14/6
his [2] 12/4 23/13
house [2] 17/11 17/13
how [12] 6/14 6/20 8/2 9/8 11/22 13/14 19/3 23/16 23/18 24/12 26/21 27/11

## I

I'll [7] 4/18 16/12 16/19 17/17 19/19 25/17 27/4
I'm [4] 4/14 5/4 12/5
identification [3] 18/5 21/10 22/3
INC [4] 1/7 1/8 1/8 1/8
indication [1] 28/16
INFORMATION [2] 36/14 36/15

**I**

intend [2] 6/9 26/8
intended [1] 22/12
interest [1] 21/23
interested [2] 8/7 37/17
investment [2] 21/21 21/24
involved [1] 12/8
is [52] 3/4 3/19 4/21 5/8 5/8 6/4 7/12 8/4 9/15 10/14 13/7 13/8 15/17 16/13 16/19 16/23 17/14 17/15 17/17 18/4 18/8 18/10 18/25 20/12 20/23 20/24 21/13 21/21 21/22 22/6 22/7 22/10 22/18 23/11 23/18 25/7 25/9 25/15 28/2 28/6 28/7 28/8 28/16 28/19 28/20 29/2 30/9 31/20 32/24 35/9 37/11 37/12
it [35] 3/4 3/19 4/19 5/22 9/16 10/7 10/16 11/18 13/3 13/4 13/15 13/25 14/19 14/20 15/13 15/20 16/13 17/4 17/22 18/18 19/3 20/5 20/24 22/10 22/19 25/7 25/17 25/21 28/7 28/8 28/12 28/19 28/20 32/11 33/15

**J**

Javier [1] 6/24
Javier Garcia [1] 6/24
Jonathan [1] 23/11
Jonathan Nelson [1] 23/11
Judge [1] 3/12
July [13] 8/14 8/24 9/8 10/9 10/15 10/21 10/23 11/3 15/7 15/24 16/9 19/17 29/5
July 2014 [1] 15/24 29/5
July 9 [10] 8/14 8/24 9/8 10/9 10/15 10/21 10/23 15/7 16/9 19/17
Just [1] 30/16

**K**

Kay [1] 2/13
keep [2] 26/17 32/9
Kemp [3] 1/22 37/7 37/23
knew [2] 13/11 13/14
know [28] 4/18 9/23 13/8 13/14 15/11 15/14 17/6 17/9 18/13 18/14 18/23 19/2 19/13 19/16 20/25 21/4 21/5 21/20 22/17 22/18 24/12 25/17 26/21 26/23 30/8 32/16 32/19 33/19
knowledge [3] 18/2 18/24 34/3
known [1] 5/13
knows [1] 23/16

**L**

L.L.P [2] 1/20 2/4
last [3] 19/12 25/21 33/24
later [1] 30/9
Laura [1] 25/23
law [1] 1/19
LEDWIN [5] 1/17 4/10 5/2 6/17 35/14
legal [1] 16/13
lending [2] 32/5 32/8
lent [1] 29/23

Leo [1] 31/6
Leo Fergueson [1] 31/6
less [3] 6/16 7/4 8/22
let [2] 4/18 25/17
LETTER [1] 36/4
letters [3] 11/14 24/3 36/19
lien [1] 29/21
like [6] 7/24 9/10 12/24 23/5 23/14 27/15
likely [1] 11/19
list [3] 7/20 7/23 14/17
live [2] 32/15 32/18
lived [2] 32/16 32/19
LLC [1] 21/21
loan [3] 21/20 28/23 28/23
log [1] 26/17
long [1] 6/14
looking [4] 7/24 11/24 25/16 31/12
looks [1] 17/22

**M**

mail [1] 11/5
mails [9] 11/8 11/12 20/15 23/20 24/21 24/25 36/17 36/18 36/20
make [6] 4/23 6/10 6/13 14/12 15/3 15/9
makes [2] 15/7 18/20
making [1] 6/8 15/17
many [5] 9/8 11/22 11/24 23/4 26/21
MARIA [4] 1/3 5/7 21/22 23/3
Maria Noble [2] 5/7 21/22
marked [5] 16/19 17/17 18/4 20/20 21/9
marriage [1] 37/16
matter [1] 37/18
may [5] 3/9 3/13 7/4 18/11 23/8
May 16 [1] 18/11
maybe [3] 6/16 9/10 26/23
me [14] 4/18 6/23 12/3 25/13 28/12 28/13 28/20 29/2 31/9 32/6 32/9 32/10 35/10 35/17
mean [2] 5/18 33/11
meaning [2] 16/11 17/11
means [1] 31/13
meant [1] 5/10
meet [1] 31/15
member [2] 21/22 23/5
members [2] 28/13 30/24
mentioned [1] 24/9
met [2] 14/3 31/7
Mid [1] 8/13
mind [1] 9/15
missing [3] 24/19 24/20
money [20] 22/13 22/19 27/9 27/25 28/6 28/7 28/8 29/17 29/23 30/15 31/25 32/3 32/3 32/5 32/7 32/9 32/12 32/13 33/14 36/22
month [1] 25/19
months [1] 24/16
more [7] 6/16 7/4 8/22 12/6 15/17 30/15 33/15
Most [1] 11/19
MOUNT [5] 1/7 1/7 1/8 1/8
move [1] 22/10
MR [15] 4/7 11/13 11/15 11/22 14/3 14/12 14/24

15/21 15/23 16/3 17/25 19/7 21/7 33/2 36/10
Mr. [18] 7/3 8/23 9/3 9/12 9/19 9/21 11/12 11/9 11/13 23/13 24/9 24/10 24/14 24/22 25/2 25/2 27/5 33/19
Mr. Garcia [1] 7/3
Mr. Nelson [4] 24/9 24/10 24/22 25/2
Mr. Nelson's [1] 24/14
Mr. Nipabi [1] 33/19
Mr. Oviedo [3] 11/13 25/2 27/5
Mr. Ramirez [7] 8/23 9/3 9/12 9/19 9/21 11/12 11/9
Mr. Staatz [1] 23/13
Ms [43] 6/22 9/11 9/21 10/18 11/24 12/11 13/5 13/9 14/3 14/8 14/13 14/19 14/20 16/15 20/16 21/2 25/3 25/25 26/4 26/7 26/18 26/22 27/7 27/8 27/21 28/12 28/14 28/23 29/7 29/16 29/24 30/2 30/13 30/22 31/15 31/24 33/3 33/5 33/9 33/18 33/25 36/11 36/21
Ms. [39] 4/16 4/17 4/20 5/25 6/9 6/10 7/16 8/2 9/23 15/22 16/17 17/24 18/13 19/8 19/17 19/18 19/25 20/7 21/2 22/12 22/22 23/21 24/13 24/24 26/7 26/15 28/3 28/4 28/7 28/11 34/2 34/5 34/5
Ms. Brown [1] 22/22
Ms. Browne [6] 19/18 23/21 24/4 26/15 28/3 28/4 28/7 28/11 34/2 34/5
Ms. Noble [14] 4/16 8/2 9/23 15/22 16/17 17/24 18/13 19/8 19/17 19/25 21/2 22/12 26/7 30/4
Ms. Ortiz [2] 4/20 7/16
Ms. Santos [1] 20/7
Ms. Sarbong [6] 28/24 29/4 29/12 29/17 29/20 30/6
Ms. Staatz [5] 4/17 5/25 6/9 6/10 24/13
much [1] 27/11
music [1] 6/25
my [17] 4/18 7/11 7/13 11/10 11/18 13/17 13/19 14/2 14/5 14/6 14/6 17/15 20/5 28/6 28/6 31/7 37/20
Myrna [2] 23/10
Myrna Socorro [1] 23/10

**N**

name [3] 4/8 12/21 23/14
named [2] 5/7 6/24
need [1] 8/5
needed [4] 11/25 12/6 32/12 32/13
needs [1] 30/18
Nelson [6] 23/11 24/9 24/10 24/22 25/2 36/20
Nelson's [1] 24/14
never [2] 14/5 27/14
NEW [10] 1/2 1/21 1/23 2/5 2/10 4/4 4/12 37/4 37/5 37/8
Nipabi [2] 31/5 33/19

no [23] 7/21 9/22 9/25 14/5 14/19 15/5 16/24 17/8 21/25 25/10 26/6 26/13 26/16 26/20 27/16 29/23 30/19 31/17 32/23 33/8 34/4 34/8 37/16
NOBLE [17] 1/3 4/16 5/7 8/2 9/23 15/22 16/17 17/24 18/13 19/8 19/17 19/25 21/2 21/22 22/12 26/7 30/4
nods [1] 4/25
non [1] 1/16
non-party [1] 1/16
none [2] 15/20 36/5
NORMA [1] 2/6
not [21] 5/8 6/11 7/13 12/3 12/23 13/11 15/17 16/5 17/5 20/18 22/9 25/4 25/7 26/4 26/8 27/14 28/7 28/16 33/6 33/8 37/14
notarized [1] 29/15
Notary [4] 1/22 4/3 35/20 37/7
notes [4] 14/23 14/25 15/2 15/4
notifying [1] 29/20
now [2] 32/18 32/20
nowhere [1] 17/12
number [3] 25/6 25/15 27/7

**O**

oath [1] 3/11
object [1] 16/12
objections [1] 3/20
obtain [1] 12/12
off [3] 7/18 16/6 16/7
off-the-record [2] 7/18 16/7
office [13] 12/4 13/17 13/19 14/2 14/4 14/5 14/6 14/7 14/13 14/24 24/14 31/7 32/22
offices [2] 1/20 15/19
Okay [1] 25/14
OLIVE [1] 1/8
OLIVER [1] 1/8
OLIVERT [1] 1/8
OLIVET [3] 1/7 1/9 4/16
one [1] 33/8
only [5] 10/24 14/8 20/13 23/22 33/8
option [1] 9/13
options [1] 9/14
oral [2] 11/5 11/21
order [2] 1/18 13/12
original [2] 3/8 3/16
Ortiz [11] 1/20 1/20 2/4 2/4 2/6 2/13 2/13 4/20 7/16 30/22 36/11
other [11] 28/14 28/15 28/16 30/11 30/12 30/14 30/18 30/24 33/3 33/5 33/25
otherwise [1] 28/18
out [1] 27/6
outcome [1] 37/17
OVIEDO [10] 1/17 4/10 11/13 25/2 27/5 35/14 36/17 36/18 36/19 36/20
owe [1] 32/9
owed [2] 29/17 36/22
owes [1] 33/14
own [1] 16/3
owner [1] 21/20

**P**

P.M [1] 34/10
page [4] 10/13 36/4 36/9 36/15
paid [9] 12/16 12/18 12/20 12/21 22/7 22/10 22/19 27/12 30/6
particular [1] 8/21
parties [2] 3/6 37/15
partner [1] 28/19
party [1] 1/16
pay [3] 9/20 12/19 31/13
paying [1] 32/6
payment [5] 17/24 21/14 21/15 27/18 29/14
pending [1] 4/22
percent [1] 6/7
personal [1] 18/23
petty [1] 27/17
phone [7] 13/18 26/17 26/21 27/2 27/5 27/7 36/21
place [1] 35/11
plain [1] 13/15
PLAINTIFF [1] 1/5 2/4
planning [1] 22/18
Please [1] 4/8
pocket [2] 27/22 27/25
point [1] 7/14
possession [3] 10/2 10/6 11/7
possible [1] 28/15
power [1] 12/8
prepared [1] 21/5
present [7] 2/13 13/23 13/25 28/9 31/16 31/17 31/18
president [1] 5/4
price [9] 8/17 9/15 17/2 17/7 17/10 18/20 25/7 25/9 25/11
prior [3] 6/14 8/24 9/8
Procedure [1] 1/19
proceeding [1] 34/6
proceeds [3] 28/2 28/4 30/7
process [6] 13/3 13/10 17/13 18/24 23/17 24/11 29/19
production [7] 7/10 11/12 12/16 23/25 24/8 24/25 29/19
proof [1] 29/13
property [31] 5/12 6/3 6/23 7/6 7/7 7/20 7/23 8/3 8/6 8/7 8/9 8/11 9/16 11/2 11/9 11/15 15/7 19/9 20/8 20/17 21/16 22/13 22/23 23/22 28/6 28/21 29/21 31/12 33/20 33/23 36/16
provide [1] 29/13
provider [1] 27/2
Public [1] 1/22 4/4 35/20 37/7
purchase [9] 7/6 8/17 15/6 16/4 18/20 20/7 22/22 23/21 36/16
purchased [1] 6/3
purchaser [2] 8/3 28/15
purpose [1] 17/9
pursuant [1] 1/18
put [3] 12/21 26/11 26/14

**Q**

question [4] 4/18 4/21 4/22 16/23

**questions** [3] 4/15 30/20 34/9
quick [1] 7/25 8/6 30/18

**R**

Ramirez [22] 8/23 9/3 9/12 9/19 9/21 11/2 11/9 11/13 11/15 11/22 13/22 14/3 14/12 14/24 15/21 15/23 16/4 17/25 19/7 21/7 23/10 36/17
ran [1] 8/10
rate [1] 6/6
real [3] 5/4 6/15 29/25
reason [1] 7/22
recall [13] 6/5 7/2 10/11 11/14 13/11 14/22 16/25 17/4 18/3 20/10 20/17 27/24 34/7
receive [1] 6/2
received [2] 10/19 15/16
recognize [1] 17/6
recollection [3] 10/18 19/24 25/18
record [5] 4/9 7/18 16/6 16/7 37/12
records [2] 27/5 36/21
recover [2] 22/12 22/19
reduced [3] 17/2 17/4 17/7
reduction [1] 17/10
refer [2] 9/11 10/12
reference [3] 15/8 18/20 28/14
refresh [2] 10/17 19/23
regarding [11] 4/15 6/21 7/5 11/2 11/9 11/15 20/16 22/22 23/21 24/11 26/15
related [1] 37/15
relay [1] 25/14
relayed [3] 28/11 28/12 28/13
remember [11] 11/16 15/25 16/5 16/22 17/8 18/23 20/18 23/13 24/18 24/23 25/22
rephrase [1] 4/19
reporter [1] 4/24
represent [2] 9/9 33/4
represented [2] 19/16 19/24
representing [4] 12/6 19/8 23/3 23/10
requested [2] 14/16 14/18 36/14
reserved [1] 3/21
reside [1] 4/11
respect [3] 10/24 11/21 19/8
respective [1] 3/5
respond [1] 4/22
retainer [5] 22/7 22/20 24/15 24/20 31/13
retaining [1] 9/21
rough [1] 25/19
roughly [7] 7/2 8/20 9/9 10/5 11/23 17/7 26/21
Rules [1] 1/19
run [2] 8/8 15/19

**S**

said [10] 8/5 17/5 23/17 25/5 25/11 25/14 28/6 28/16 30/16 32/8
sale [16] 7/25 8/15 18/9 19/9 23/7 25/4 28/2 28/4

28/22 30/2 30/3 30/5 30/24 31/8 33/7 33/16
same [4] 3/11 3/14 3/16 26/25
Santos [3] 20/2 20/7 20/16
Sarbong [11] 28/22 28/24 29/4 29/12 29/17 29/20 30/6 30/11 31/7 33/10 36/22
saw [1] 33/24
say [6] 14/20 18/25 23/5 24/17 25/16 32/4
saying [3] 13/19 15/16
says [5] 23/8 28/4 28/7 33/14 33/16
sealing [1] 3/6
second [1] 16/16
Secretary [1] 12/23
see [3] 11/20 20/13 32/21
seeing [1] 16/22
seems [2] 10/16 21/7
seen [7] 16/21 17/18 18/6 19/20 20/20 21/10 22/3
self [1] 5/9
self-employed [1] 5/9
sell [6] 6/22 8/5 31/11 31/14 33/20 33/22
seller [3] 10/8 22/11 22/20
seller's [2] 22/8 22/9 22/15
sent [2] 7/14 7/16
series [1] 4/15
service [1] 3/13
set [4] 9/15 13/12 37/11 37/20
several [2] 23/15 31/8
shakes [1] 4/25
she [88] 5/8 5/8 5/10 6/23 7/24 7/25 8/4 8/6 9/14 9/14 9/16 9/17 12/2 12/5 12/7 12/8 12/9 13/11 13/11 13/14 14/6 14/23 14/23 14/25 15/2 15/17 16/2 20/12 22/18 22/19 23/3 23/7 23/8 23/8 23/17 23/18 24/15 25/3 25/5 25/7 25/8 25/12 25/13 25/16 25/23 26/4 27/22 27/24 27/25 28/2 28/5 28/16 28/16 28/19 28/19 28/20 28/20 28/22 28/22 29/2 29/3 29/23 29/24 29/25 30/3 30/4 30/4 30/10 30/14 30/16 30/17 30/18 31/17 31/18 32/3 32/6 32/9 32/12 32/13 32/13 32/15 32/16 32/18 32/19 33/14 33/16 33/18
should [1] 28/5
show [6] 16/19 17/17 18/4 19/19 20/19 21/8
showing [1] 16/22
sign [3] 5/19 5/21 12/8
signed [11] 3/9 3/11 3/14 9/24 10/3 10/6 18/17 21/2 31/21 31/22 33/21
Since [1] 29/6
situation [2] 28/3 29/11
so [11] 4/21 11/19 11/24 12/5 12/6 14/15 17/13 17/14 23/4 32/14 33/15
Socorro [1] 23/10
sole [1] 27/4
some [6] 8/10 9/7 9/17 12/7 15/2 29/7

somehow [1] 13/2
someplace [1] 20/4
something [1] 11/5
sometimes [2] 13/17 13/17
sorry [1] 12/5
SOUTHERN [1] 1/2
speak [1] 4/19
specific [1] 10/11
specified [1] 35/11
spoke [2] 31/5 31/6
spoken [1] 31/2
SS [1] 37/4
STAATZ [46] 1/9 4/17 5/25 6/9 6/10 6/22 9/11 9/21 10/18 11/25 12/11 13/5 13/9 14/3 14/14 14/19 14/21 16/16 21/3 23/13 24/13 25/3 25/25 26/4 26/8 26/19 26/22 27/7 27/8 27/21 28/12 28/14 28/23 29/8 29/16 29/24 30/2 30/14 31/16 31/25 33/3 33/5 33/9 33/18 33/25 36/21
Staatz's [1] 14/8
started [2] 19/7 32/5
state [7] 1/23 4/4 4/8 12/23 25/3 37/4 37/8
STATES [1] 1/2
stating [1] 29/16
stayed [1] 24/16
Steinway [1] 1/21 2/5
still [4] 11/7 26/25 32/21 33/22
STIPULATED [2] 3/4 3/19
stopped [1] 32/7
Street [3] 1/21 2/5 2/9
submitted [1] 13/13
Subscribed [1] 35/17
substance [3] 20/11 22/25 31/10
such [1] 37/12
Suite [2] 2/5 2/9
sum [2] 20/10 22/25
superseded [1] 16/10
supporting [1] 19/4
Suppose [1] 21/19
Suwatte [1] 2/13
sworn [5] 3/9 4/3 35/5 35/17 37/11
Sylvia [3] 1/22 37/7 37/23

**T**

take [3] 4/25 14/23 14/25
taken [1] 1/17
talked [1] 13/16
tell [6] 25/8 26/7 27/21 31/9 33/6 34/5
ten [2] 6/16 9/10
TERESA [1] 1/3
terms [3] 5/16 5/18 17/12
testified [2] 4/5 31/25
testify [1] 35/5
testimony [3] 35/6 35/10 37/13
than [6] 25/12 28/14 30/11 33/3 33/15 33/25
that [119] 3/6 3/8 3/12 3/20 4/22 5/10 5/14 5/16 5/23 6/3 6/4 7/10 7/11 8/9 8/12 8/18 8/20 8/21 9/14 10/9 10/13 10/14 10/17 10/21 12/7 13/2 13/7 13/11 13/14 14/21 15/11 15/14 15/18

**T**

that... [86] 16/5 16/12 16/21 17/12 17/13 17/14 17/15 17/18 17/24 17/24 18/6 18/8 18/10 18/12 18/16 18/19 18/24 18/25 19/3 19/7 19/20 19/23 20/3 20/3 20/18 20/20 20/23 20/25 21/5 21/10 21/13 22/3 22/6 22/7 22/7 22/12 22/19 23/6 23/12 23/18 24/15 25/7 25/8 25/14 25/17 25/20 25/22 25/24 26/7 26/11 26/11 26/15 27/15 27/21 28/2 28/6 28/9 28/10 28/21 28/25 29/2 29/6 29/7 29/9 29/16 29/17 29/19 30/9 30/12 30/14 31/8 31/11 31/23 32/4 32/24 33/8 33/17 33/24 34/7 35/4 35/8 37/10 37/12 37/13 37/14 37/16
them [4] 11/18 18/15 31/3 33/21
then [17] 8/5 9/17 11/25 12/3 13/3 13/15 23/8 23/11 23/14 23/15 23/17 24/14 28/5 28/7 28/24 30/17 32/7
there [18] 4/21 7/22 12/15 13/8 16/15 17/15 17/16 19/4 19/6 23/12 23/20 24/13 24/16 24/17 28/15 30/12 32/18 32/19
these [1] 13/24
they [24] 6/13 8/5 11/4 11/17 13/16 13/25 19/2 19/3 19/4 23/25 28/24 29/6 30/9 31/4 31/7 31/11 31/12 31/13 31/15 33/6 33/13 33/15 33/21 33/22
thing [1] 31/8
think [6] 7/14 9/10 11/19 12/20 14/15 25/21
third [3] 12/14 23/11 32/17
this [38] 4/20 7/6 7/6 7/9 7/14 7/20 8/3 8/6 9/15 11/2 11/9 11/15 16/4 17/6 19/5 19/5 19/8 19/9 20/7 20/16 22/23 23/6 23/9 23/22 24/3 24/11 27/9 27/23 29/11 29/13 30/2 30/14 31/20 33/7 35/18 37/15 37/17 37/20
those [11] 11/4 13/19 13/20 14/10 15/3 20/11 23/2 23/25 24/8 30/7 31/10
thousand [1] 26/24
three [3] 12/15 15/19 24/17
through [12] 6/11 6/13 10/23 23/4 23/9 26/5 26/8 27/9 28/17 30/3 30/5 33/7
time [16] 1/14 3/21 4/17 4/19 7/2 7/9 8/9 8/12 8/21 12/14 16/15 19/3 19/5 19/6 32/7 35/10
times [3] 12/15 24/17 31/8
today [1] 10/23
told [3] 13/21 26/4 26/10
took [3] 15/2 28/23 28/23
total [1] 27/14
transactions [1] 9/5
transcript [2] 35/9 35/9
trial [2] 3/21 34/11

true [2] 35/9 37/12
Trustee [1] 1/9
truth [1] 35/5
trying [1] 30/17
type [2] 12/7 29/7

**U**

under [1] 12/21
understand [2] 4/18 33/4
understanding [1] 17/15
UNITED [1] 1/2
unless [1] 15/17
unsigned [1] 3/13
until [1] 22/10
upon [1] 3/16
Urvany [1] 21/21
used [2] 3/13 32/9

**V**

value [2] 8/9 8/11
verbal [5] 4/24 5/22 29/7 29/10 30/16
verbalized [1] 5/23
very [1] 6/23

**W**

waived [1] 3/8
want [9] 9/16 10/12 18/4 20/19 21/8 28/6 31/13 33/4 33/16
wanted [4] 6/22 7/25 27/22 31/11
wants [2] 27/24 27/25
was [85] 4/4 5/22 5/23 6/3 6/6 6/17 6/23 6/24 7/19 7/22 7/24 8/11 8/17 9/4 9/6 10/7 10/9 11/24 12/3 12/5 12/6 12/8 12/24 13/2 13/3 13/15 13/16 13/18 13/25 14/21 14/24 15/11 15/13 15/16 15/18 16/8 16/9 17/2 17/4 17/7 17/11 17/23 17/23 18/12 18/18 20/13 20/25 22/7 22/25 23/3 23/9 23/12 24/19 24/20 25/4 25/17 25/19 25/21 25/22 26/4 27/17 28/10 28/12 28/15 28/21 29/4 29/20 29/24 30/6 30/17 31/17 31/18 31/20 32/17 32/3 32/6 32/8 32/13 33/8 33/9 33/15 33/19 33/24 34/11 37/11
wasn't [2] 15/14 15/21
way [1] 37/17
we [14] 5/12 8/5 12/4 13/3 17/12 17/13 23/9 23/14 23/14 24/12 24/16 24/17 24/17 29/11
well [1] 24/19
went [11] 12/4 12/11 12/14 12/15 13/5 23/9 24/13 24/17 27/19 30/3 30/5
were [15] 5/13 5/16 6/2 11/4 12/12 13/23 17/12 19/4 23/14 28/9 30/12 31/4 31/10 31/12 32/13 15
what [29] 6/5 12/16 5/18 6/5 8/11 8/17 9/2 9/15 16/19 17/14 17/15 17/17 18/4 18/8 18/10 20/19 20/23 21/8 21/13 22/6 22/25 25/8 25/15 25/19 29/2 29/5 29/8 32/8 33/11

whatever [1] 22/16
when [16] 6/17 7/3 10/5 12/4 14/20 16/15 17/7 18/25 19/11 20/12 24/17 25/11 27/18 28/20 29/2 29/9
where [4] 4/11 26/4 28/2 28/16
whereby [1] 13/9
WHEREOF [1] 37/19
Whereupon [3] 7/18 16/7 34/10
whether [1] 16/25
which [2] 21/15 21/18
while [1] 14/22
who [12] 5/19 6/24 7/12 12/16 13/21 19/16 19/24 21/5 21/20 23/16 31/2 31/4
whole [1] 23/7
whom [1] 5/24
whose [1] 37/10
why [4] 7/22 15/14 31/24 32/4
will [2] 6/13 11/20
willing [2] 33/20 33/22
wish [1] 4/19
within [2] 3/7 37/8
without [1] 31/15
witness [7] 1/16 3/9 3/15 3/17 37/10 37/13 37/19
work [3] 5/2 8/23 9/2
worse [1] 17/14
would [9] 8/20 10/21 11/17 11/18 23/6 23/17 23/23 30/10 33/6
writing [7] 11/14 14/21 19/3 25/25 26/11 26/14 28/17
written [2] 11/5 24/3
wrote [3] 15/22 16/2 17/25

**Y**

year [2] 25/19 25/21
years [1] 6/16
yes [35] 5/15 7/8 8/10 8/16 8/25 10/4 10/20 11/3 12/5 14/10 15/2 15/10 17/4 17/21 17/22 18/7 18/14 18/22 19/10 19/15 19/22 20/9 20/22 21/12 22/5 22/24 24/12 25/5 25/13 26/10 27/3 27/10 28/19 30/25 31/19
yesterday [1] 7/25
YORK [10] 1/2 1/21 1/23 2/5 2/10 4/4 4/13 37/4 37/5 37/8
you [141] 4/11 4/14 4/17 4/19 4/22 5/2 5/6 5/13 5/18 5/19 6/2 6/5 6/8 6/9 6/14 6/20 7/2 7/3 7/5 7/16 7/20 7/22 8/8 8/14 8/23 9/2 9/9 9/11 9/20 9/23 10/2 10/5 10/12 10/14 10/25 11/7 11/14 11/23 12/11 12/19 12/22 13/5 13/6 13/8 13/14 13/23 14/8 14/17 14/20 15/3 15/8 15/11 15/14 15/22 16/2 16/19 16/20 16/22 16/25 17/5 17/5 17/6 17/9 17/11 17/17 17/18 18/4 18/6 18/13 18/23 19/6 19/16 19/19 19/20 19/20 20/6 20/10 20/15 20/16 20/19 20/20 20/25 21/5

21/8 21/10 21/20 21/23 22/3 22/17 22/21 23/5 23/20 24/4 24/4 24/9 24/9 24/21 24/22 25/3 25/8 25/11 25/12 25/15 25/17 25/24 26/3 26/4 26/7 26/11 26/14 26/17 26/18 26/21 26/25 27/8 27/11 27/14 27/18 27/21 28/9 28/11 29/9 29/13 29/20 30/7 30/12 30/23 31/2 31/9 31/15 31/24 31/25 32/2 32/4 32/9 32/21 33/4 33/6 33/11 33/19 34/5
your [17] 4/8 4/23 4/24 7/12 9/6 9/20 10/17 11/17 14/4 14/24 17/25 18/23 19/23 20/4 25/18 28/7 34/2
yourself [1] 11/8

## Diamond Errata Sheet

**Plaintiff(s):** _____

_____

_____

**Defendant(s):** _____

_____

_____

| Page | Line | Correction | Reason for Correction |
|------|------|------------|-----------------------|
|      |      |            |                       |
|      |      |            |                       |
|      |      |            |                       |
|      |      |            |                       |
|      |      |            |                       |
|      |      |            |                       |
|      |      |            |                       |
|      |      |            |                       |
|      |      |            |                       |
|      |      |            |                       |
|      |      |            |                       |
|      |      |            |                       |
|      |      |            |                       |
|      |      |            |                       |
|      |      |            |                       |
|      |      |            |                       |
|      |      |            |                       |
|      |      |            |                       |
|      |      |            |                       |
|      |      |            |                       |
|      |      |            |                       |
|      |      |            |                       |
|      |      |            |                       |
|      |      |            |                       |

**Date:** _____  

**Name of Witness:** _____

**Signature:** _____

Subscribed and sworn to before me

This _____ of _____ 20___.

_____

Notary Public

EXHIBIT "I"

ORIGINAL

1

2      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
3      -------------------------------------------X
       MARIA TERESA NOBLE,
4

5                                    PLAINTIFF,
              - against -
6                                    18 CV 07871

7
       MOUNT OLIVET CHURCH, INC., aka MOUNT
8      OLIVERT CHURCH, INC., aka MOUNT OLIVER
       CHURCH INC. aka MOUNT OLIVE CHURCH INC.,
9      and ARACELIS STAATZ, as Trustee of Mount
       Olivet Church,
10

11                                   DEFENDANTS.
       -------------------------------------------X
12

13                            DATE:  August 16, 2019

14                            TIME:  10:15 A.M.

15

16            DEPOSITION of the Plaintiff, MARIA

17     TERESA NOBLE, taken by the Defendant,

18     pursuant to a Court Order and to the Federal

19     Rules of Civil Procedure, held at the law

20     offices of Ortiz & Ortiz, L.L.P., 32-72

21     Steinway Street, Astoria, New York 11103,

22     before Sylvia Kemp, Notary Public of the

23     State of New York.

24

25

1

2          A P P E A R A N C E S:

3

4          ORTIZ & ORTIZ, L.L.P.
                Attorneys for Plaintiff
5               32-72 Steinway Street, Suite 402
                Astoria, New York 11103
6               BY:  NORMA ORTIZ, ESQ.

7

8

           DAVID J. BRODERICK, P.C.
9               Attorney for Defendants
                70-20 Austin Street, Suite 111
10              Forest Hills, New York 11375
                BY:  DAVID BRODERICK, ESQ.
11

12

13         ALSO PRESENT:
                Kay Suwatte, Esq. with Ortiz & Ortiz
14

15

16

17

18

19

20

21

22

23

24

25

1

2          F E D E R A L   S T I P U L A T I O N S

3

4          IT IS HEREBY STIPULATED AND AGREED by

5     and between the counsel for the respective

6     parties herein that the sealing, filing and

7     certification of the within deposition be

8     waived; that the original of the deposition

9     may be signed and sworn to by the witness

10    before anyone authorized to administer an

11    oath, with the same effect as if signed

12    before a Judge of the Court; that an

13    unsigned copy of the deposition may be used

14    with the same force and effect as if signed

15    by the witness, 30 days after service of the

16    original & 1 copy of same upon counsel for

17    the witness.

18

19         IT IS FURTHER STIPULATED AND AGREED

20    that all objections except as to form, are

21    reserved to the time of trial.

22

23              *      *      *      *

24

25

```
 1                   M. NOBLE
 2      M A R I A   T E R E S A   N O B L E,
 3      having been first duly sworn by a Notary
 4      Public of the State of New York, was
 5      examined and testified as follows:
 6      EXAMINATION BY
 7      MR. BRODERICK:
 8          Q.   Please state your name for the
 9      record.
10          A.   Maria Teresa Noble.
11          Q.   Where do you reside?
12          A.   250 Gorge Road, Apartment 2D,
13      Cliffside Park, New jersey 07010.
14          Q.   My name is David Broderick.  I
15      represent the Defendant Mount Olivet Church
16      and Aracelis Staatz in an action you brought
17      regarding the property 2176 Grand Concourse,
18      Bronx, New York.  If any time during this
19      deposition you need to speak with your
20      Counsel, let me know.  If there is a
21      question pending, I ask that you answer the
22      question first and then speak with your
23      Counsel.  If you do not understand my
24      question, let me know and I'll rephrase.  If
25      I speak too fast, please tell me to slow
```

5

```
 1                    M. NOBLE
 2      down and make all your answers verbal as the
 3      court reporter cannot take down any nods or
 4      head shakes.
 5            A.   Okay.
 6            Q.   In 2014, more specifically July of
 7      2014, what was your occupation?
 8            A.   A real estate agent.
 9            Q.   How long had you been a real
10      estate agent in 2014?
11            A.   Since 2004.
12            Q.   You have considerable knowledge
13      regarding acquisition of properties?
14            A.   Correct.
15            Q.   2176 Grand Concourse, Bronx, New
16      York, was this going to be the first
17      property you were investing in or other
18      properties?
19            A.   That was my first property.
20            Q.   How did you come about discovering
21      this property for sale?
22            A.   Through Ledwin Enterprises Inc.
23            Q.   Did you work for Mr. Ledwin Oviedo
24      in 2014?
25            A.   Yes.
```

```
 1                    M. NOBLE
 2          Q.   Was Mr. Oviedo the broker for the
 3     church?  Which party does he represent?
 4          A.   The broker for the church.
 5          Q.   Did Mr. Oviedo ever tell you there
 6     might be a conflict in selling the property
 7     to one of the employees?
 8          A.   No.
 9          Q.   Prior to July 9, 2014, you never
10     purchased any property for investment
11     purposes?
12          A.   Yes.
13          Q.   Do you have any relationship with
14     Mr. Oviedo other than being his employee?
15          A.   He is my significant other.
16          Q.   How long has he been your
17     significant other?
18          A.   Since July 2005.
19          Q.   Do you have any children together?
20          A.   We have three children.
21          Q.   Are you business partners at all?
22          A.   Yes.
23          Q.   When did you become business
24     partners?
25          A.   Well, exactly business partner in
```

```
 1                    M. NOBLE
 2      papers, no; but before we were together as
 3      significant others, I had my office on 180
 4      and Grand Concourse so I met him through
 5      work.  Then when we got together in 2007, he
 6      told me that I can join him in his office to
 7      bring my clients and my business into his
 8      office so we can work together in the same
 9      office.
10           Q.   In 2014, were you an employee or
11      his partner or both?
12                MS. ORTIZ:  Could you clarify,
13           because that is a little bit of a legal
14           question?
15           Q.   In 2014, did you have any interest
16      in Ledwin Enterprises who was the broker for
17      this property that we are here for today?
18           A.   When you say interest, what type
19      of interest?
20           Q.   Stockholder.
21           A.   No.
22           Q.   Were you an officer of the
23      corporation?
24           A.   No.
25           Q.   Did you have signing rights on any
```

```
 1                    M. NOBLE

 2     of the bank accounts?

 3          A.    No.

 4          Q.    Were you an employee?

 5          A.    I was self-employed meaning since

 6     I'm a real estate agent I'm self-employed

 7     because I don't go by the payroll.

 8          Q.    You were a 1099 contractor?

 9          A.    Correct.

10          Q.    From Ledwin Enterprises, did you

11     receive any 1099 forms from them in 2014 for

12     the tax year of 2014?

13          A.    Yes.

14                MR. BRODERICK:  Mark for

15                identification Defendant's Exhibits A

16                through E.

17                     (Whereupon, the documents

18                were marked as Defendant Exhibits A

19                through E for identification as of this

20                date by the Reporter.)

21          Q.    Defendant's Exhibit A is a copy of

22     the complaint you filed against the

23     Defendants Ms. Staatz and the church.  I'll

24     refer to them in the future as the

25     Defendants to make it easy.  Have you seen
```

```
 1                      M. NOBLE
 2      that document before?
 3           A.   This was the document that was
 4      prepared, yes.
 5           Q.   Is there any corrections you would
 6      like to make to that document before I ask
 7      you questions about it, anything inaccurate
 8      about that document?
 9                MS. ORTIZ:   I'll object because it
10                calls for a legal conclusion.
11           Q.   Next to the complaint was a copy
12      of the contract and I direct your attention
13      to page 9 of 20.   Have you seen that
14      document before from page 9 to 20?
15           A.   That is the first contract of
16      sale.
17           Q.   That contract is dated July 9,
18      2014?
19           A.   Yes.
20           Q.   That was for the purchase of 2176
21      Grand Concourse?
22           A.   Correct.
23           Q.   Prior to entering into that
24      contract, did you conduct any due diligence
25      regarding 2176 Grand Concourse?
```

1                        M. NOBLE

2           A.    In what terms, specific what?

3           Q.    Researching property, who was the

4    owner, who had the power to sell and things

5    like that.

6           A.    I know it was the church because

7    it was across from the office and I visited

8    the person on the property to see how was

9    the condition of the property, and I knew

10   Ms. Staatz was the president of the board

11   because this is a church.

12          Q.    Did you search ACRIS to see who

13   the owner of the property was prior to

14   entering into the contract?

15          A.    No.

16          Q.    Did you see a copy of the deed

17   prior to entering that contract?

18          A.    No.

19          Q.    Did you execute the contract in

20   Defendant's Exhibit A?

21          A.    No.

22          Q.    Did you sign the contract?

23          A.    This one, yes.

24          Q.    When you signed that contract, was

25   Ms. Staatz present?

<pre>
 1                    M. NOBLE

 2         A.   No.

 3         Q.   Were you present when Ms. Staatz

 4    signed the contract?

 5         A.   No.

 6         Q.   Did Ms. Staatz ever tell you she

 7    signed that contract in any capacity other

 8    than as president or trustee of the church?

 9         A.   No.

10         Q.   Who prepared that contract?

11         A.   I believe the first contract,

12    Jaime Ramirez was the one that prepared the

13    contract.

14         Q.   July 9, 2014 when you signed the

15    contract, did you have an attorney?

16         A.   Ms. Ramirez.

17         Q.   Mr. Ramirez represented you?

18         A.   In this first contract.

19         Q.   He represented Ms. Staatz?

20         A.   No.

21         Q.   Take a look at page 20 of 20 of

22    Defendant's Exhibit A.  In this contract,

23    you were the purchaser.  Correct?

24         A.   Yes.

25         Q.   Ms. Staatz was the seller?
</pre>

```
 1                   M. NOBLE

 2         A.   Yes.

 3         Q.   Page 20 of 20 of Defendant's

 4    Exhibit A, who does Mr. Ramirez identify

 5    himself as representing?

 6         A.   The seller.

 7         Q.   Did you pay Mr. Ramirez a retainer

 8    to represent you in this matter?

 9         A.   No.

10         Q.   Did you pay Mr. Ramirez any money

11    to represent Ms. Staatz in this matter?

12         A.   No.

13         Q.   Did anyone pay Mr. Ramirez on

14    behalf of Ms. Staatz?

15         A.   No.

16         Q.   Did anyone pay Mr. Ramirez to

17    draft that contract that you are aware of?

18         A.   No.

19         Q.   Did you sign a retainer with

20    Mr. Ramirez regarding this particular

21    contract?

22         A.   No.

23         Q.   Are you aware if Ms. Staatz signed

24    a retainer with Mr. Ramirez?

25         A.   I don't know.
```

```
1                    M. NOBLE
2          Q.   Did you ever have any contact with
3     Mr. Ramirez to be an attorney prior to this
4     case?
5          A.   For one of my cases that I sold,
6     since I was a real estate agent he was
7     representing one of my clients there.  I was
8     selling an apartment.  He was representing
9     the client so I met Mr. Ramirez back in 2004
10    because of selling to this client.
11         Q.   From 2004 to July 9, 2014, did you
12    have any other cases which involved
13    Mr. Ramirez?
14         A.   No.
15         Q.   Did Mr. Oviedo have any other case
16    involving Mr. Ramirez that you are aware of?
17         A.   That question Mr. Oviedo needs to
18    answer.
19         Q.   You were an employee of
20    Mr. Oviedo's company?
21         A.   Self-employed.
22         Q.   Is it that you don't have any
23    knowledge regarding that fact or is
24    uncomfortable answering it?
25         A.   I have no knowledge and I don't
```

```
 1                    M. NOBLE

 2    know, it wasn't my part in the office.

 3         Q.   Have you read the contract of

 4    July 9, 2014 prior to today?

 5         A.   Back in 2014.

 6         Q.   Under the terms of that contact,

 7    was Ms. Staatz required to assist in the AG

 8    process to dissolve the church?

 9              MS. ORTIZ:  I object because she

10              is a lay person, how is she really

11              going to know what the terms of the

12              contract are?

13              MR. BRODERICK:  I'm just asking

14              her, she said she read it and I'm

15              asking if she knows.

16              MS. ORTIZ:  Either you know or you

17              don't know.

18              THE WITNESS:  No.

19         Q.   Are you in any possession of any

20    written documents signed by Ms. Staatz where

21    she agreed to apply to the New York Attorney

22    General to dispense with the property?

23         A.   If I have any documents that says

24    she was going to apply?

25         Q.   Yes.
```

```
 1                          M. NOBLE
 2          A.   I don't understand the question.
 3          Q.   Are you aware if Ms. Staatz had to
 4     go through a process of the office of the
 5     attorney general of New York in order to
 6     sell the property?
 7          A.   Yes, I'm aware.
 8          Q.   Are you in possession of any
 9     documents where Ms. Staatz agreed to that
10     process?
11          A.   No.
12          Q.   Are you aware of anybody who has
13     possession of any documents where she agreed
14     with or on her own behalf to comply with the
15     AG process for the sale of this property?
16          A.   I don't know.
17          Q.   Did Ms. Staatz ever make any oral
18     statements to you regarding applying to the
19     New York Attorney General to sell the
20     property?
21          A.   No.
22          Q.   How many times did you contact Ms.
23     Staatz regarding her compliance with the New
24     York Attorney General's procedures?
25          A.   Personally, I didn't contact her,
```

```
 1                    M. NOBLE
 2     Ms. Staatz.
 3          Q.   With respect to that, have you had
 4     any conversations with Ms. Staatz?
 5          A.   Just hello, how are you; and in
 6     terms of other business, no.
 7          Q.   Did Ms. Staatz ever tell you she
 8     didn't want to sell the property to you?
 9          A.   Never.
10          Q.   The purchase price for the July 9,
11     2014 contract was for $600,000.  Correct?
12          A.   Correct.
13          Q.   The down payment for that contract
14     was $15,000?
15          A.   Correct.
16          Q.   I want to show you what is marked
17     Defendant's Exhibit B for identification.
18     Have you ever seen that document before?
19          A.   Yes.
20          Q.   What is that document?
21          A.   It is a copy of a check for the
22     deposit down payment for 2170 Grand
23     Concourse that is the church.
24          Q.   Is the property address for the
25     church 2176 Grand Concourse or 2170 Grand
```

```
 1                   M. NOBLE

 2        Concourse?

 3             A.   2176.

 4             Q.   The memo references 2170 Grand

 5        Concourse?

 6             A.   Yes.

 7             Q.   That was an error?

 8             A.   That was an error.

 9             Q.   Defendant's Exhibit B seems to be

10        a new check, correct, from the bank?

11             A.   Yes.

12             Q.   When did you open that account?

13             A.   I opened that account in 2014.

14                  MS. ORTIZ:  Could you define

15             initial check because this is 98.

16                  MR. BRODERICK:  Off the record.

17                  (Whereupon, an off-the-record

18             discussion was held.)

19             Q.   When I said the initial check, it

20        didn't have your name preprinted on the

21        check.  Correct?

22             A.   Correct.

23             Q.   You handwrote your name on the

24        check?

25             A.   Yes.
```

```
 1                      M. NOBLE
 2          Q.   Was that check ever cashed?
 3          A.   No.
 4          Q.   Did you open this account for the
 5     sole purpose of purchasing 2176 Grand
 6     Concourse?
 7          A.   No.
 8          Q.   How long before July 8, 2014 did
 9     you open the account?
10          A.   I don't remember exactly.
11          Q.   Do you know how much money was in
12     your account on July 8, 2014?
13          A.   I can't answer that question.
14          Q.   Did it have at least $15,000?
15          A.   I know it had some money but I
16     can't tell you exactly the amount.
17          Q.   Is that account still open today?
18          A.   No, I closed that account.
19          Q.   Do you have any records regarding
20     that account?
21          A.   I have to - I can't answer you
22     that now.
23               MR. BRODERICK:  I'll leave a blank
24          in the transcript for production of the
25          records for that particular account TD
```

```
 1                    M. NOBLE
 2        Bank.
 3             MS. ORTIZ:  What records are you
 4        asking?
 5             MR. BRODERICK:  Initial opening of
 6        the account until the day it was
 7        closed.  I withdraw that.
 8        Q.   When did you close that account?
 9        A.   I don't remember.
10        Q.   Was it in 2014?
11        A.   I don't remember exactly.
12             MR. BRODERICK:  I call for the
13        production of the register for that
14        account as it existed in July 2014.
15        Q.   That check was made payable to
16   Mr. Ramirez as the attorney?
17        A.   Correct.
18        Q.   Did you give that check to
19   Mr. Ramirez?
20        A.   Yes.
21        Q.   Did you tell him not to deposit
22   that check?
23        A.   No.
24        Q.   Did Mr. Ramirez tell you he wasn't
25   going to deposit the check?
```

1                    M. NOBLE

2          A.   No.

3          Q.   Did you write any other checks to

4     Mr. Ramirez regarding the down payment for

5     the July 9, 2014 contract?

6          A.   No.

7          Q.   I want you to take a look at

8     paragraph 14 of your complaint.  In

9     paragraph 14 of your complaint you

10    referenced a $14,000 check.  Was such a

11    check ever written?

12         A.   I don't remember.  I have to go

13    back to the files but I don't remember.  I

14    don't recall that.

15              MR. BRODERICK:  I call for the

16         production of the $14,000 check if one

17         does exist.

18         Q.   Would the $14,000 check exist,

19    would it be drawn on any other bank other

20    than TD Bank?

21         A.   I can't answer that question.

22         Q.   Do you know if the $14,000 check

23    was ever negotiated?

24         A.   I can't answer that.

25         Q.   In paragraph 13 of your complaint,

1                    M. NOBLE

2      you reference a $1,000 check.  You see that?

3           A.   Yes.

4           Q.   Did you give Mr. Ramirez a

5      $1,000 check for this deposited on the

6      July 2014 contract?

7           A.   I don't want to give you the wrong

8      answer so I don't have that information now

9      off the top of my head.

10          Q.   Do you know if the $1,000 check

11     was deposited or negotiated by Mr. Ramirez?

12          A.   I can't answer that question.

13          Q.   Did the board approve the

14     $600,000 contract to the best of your

15     knowledge?

16          A.   I know the board approved the

17     sale.

18          Q.   And Ms. Staatz is part of the

19     board as far as you know?

20          A.   Yes.

21          Q.   She approved the sale of the

22     $600,000?

23          A.   The board.

24          Q.   She is part of the board?

25          A.   Yes, she is part of the board.

M. NOBLE

1

2      Q.   In order for the sale to go

3   through, she would have to vote for it as

4   well?

5      A.   Correct.

6      Q.   Since the board approved it, she

7   cooperated with respect to the execution of

8   this July 9, 2014 contract.  Correct?

9      A.   Yes.

10      Q.   Paragraph 15 of your complaint you

11   state that Mr. Ramirez informed you that he

12   would hold the $14,000 check in escrow but

13   not negotiate it until the AG approved the

14   sale of the contract.  Correct?

15      A.   Correct.

16      Q.   Does that refresh your

17   recollection whether you gave Mr. Ramirez a

18   $14,000 deposit?

19      A.   No.

20      Q.   Did Mr. Ramirez ever tell you he

21   would apply to the AG's office on behalf of

22   the church to have the property sold?

23      A.   That is legal terms of a lawyer

24   that he is the one to do anything that has

25   to pertain to his client.  Whatever he has

```
1                        M. NOBLE

2    to do, he has to do, so he mentioned that to

3    me that it was a process and he has to go

4    through the AG.

5         Q.   At this time, he represented both

6    you and...

7         A.   No.  He was representing Ms.

8    Staatz.

9         Q.   He represented the Defendants?

10        A.   Yes.

11        Q.   Are you aware of Ms. Staatz ever

12   authorizing Mr. Ramirez not to negotiate the

13   check?

14        A.   No.

15        Q.   Did the board ever authorize Mr.

16   Ramirez not to negotiate the deposit check?

17        A.   That information, I don't know.

18        Q.   Do you know if there is a

19   retaining agreement between the board and

20   Mr. Ramirez?

21        A.   I don't know.

22        Q.   Do you know if there was a

23   retainer between Mr. Ramirez and Ms. Staatz?

24        A.   That information, I don't know.

25        Q.   At some point of time regarding
```

```
 1                    M. NOBLE
 2    this contract of sale, Mr. Ramirez did
 3    represent you.  Correct?
 4         A.   When you say at some time,
 5    exactly?
 6         Q.   By November 2, 2017, you had
 7    retained Mr. Ramirez to represent you?
 8         A.   That was on the second contract of
 9    sale.
10         Q.   I'll let you clarify.  At some
11    point of time, you retained Mr. Ramirez to
12    represent you?
13         A.   Correct.
14         Q.   Did Mr. Ramirez state anything
15    about a potential conflict for him to you?
16         A.   No.
17         Q.   Did Mr. Ramirez tell you he never
18    negotiated the check when you retained him
19    in November of 2017?
20              MS. ORTIZ:  What check?
21              MR. BRODERICK:  The
22         $14,000 deposit check or $15,000.
23         A.   Ask the question again?
24         Q.   Did you retain Mr. Ramirez, sign a
25    physical retainer with Mr. Ramirez, about
```

```
 1                     M. NOBLE
 2     November of 2017 regarding the purchase of
 3     2176 Grand Concourse?
 4          A.   Yes.
 5          Q.   How much was the retainer you paid
 6     him?
 7          A.   That information, I cannot tell
 8     because I don't remember.
 9          Q.   Did Mr. Ramirez tell you or advise
10     you that he would be conflicted to represent
11     you in this matter?
12          MS. ORTIZ:  Objection.  You asked
13          her that.
14          A.   No.
15          Q.   What was the purpose you retained
16     Mr. Ramirez?
17          A.   When you say what was the purpose,
18     exactly what do you mean by that?
19          Q.   What was the purpose you retained
20     him with respect to this property in 2017?
21          A.   Because he is a lawyer and I have
22     worked with him in other deals and he is one
23     of the lawyers that I use to do purchases,
24     investments.
25          Q.   In paragraph 1 of the complaint it
```

<pre>
1                         M. NOBLE

2         states that Ms. Staatz or the Defendant

3         stopped communicating with you regarding

4         this property.  What day did she stop?

5              A.    The day exactly, I cannot tell you

6         but we were at the beginning when we signed

7         the first contract in 2014, we were

8         communicating but she communicated more with

9         Mr. Oviedo; and I know she looked for some

10        papers and then she disappeared meaning that

11        she didn't return calls, she didn't answer

12        calls, and she wasn't around the property

13        either.

14             Q.    When you say she did not return

15        calls, did she not return your phone calls

16        or she didn't return Mr. Oviedo's phone

17        calls?

18             A.    We are talking about me, not

19        Mr. Oviedo.

20             Q.    How many times did you call her?

21             A.    I cannot recall how many times but

22        you can say a couple of times.

23             Q.    Did you call her from your cell

24        phone or the office phone?

25             A.    From my cell phone and from the
</pre>

```
 1                    M. NOBLE
 2      office phone.
 3           Q.   Do you still have the same cell
 4      phone number?
 5           A.   Yes.
 6           Q.   Same provider?
 7           A.   Yes.
 8                MR. BRODERICK:  I call for the
 9                production of the records to
10                demonstrate all calls to Mr. Staatz
11                regarding this matter.
12           Q.   In paragraph 1...
13           A.   I believe she doesn't have the
14      same phone number.
15           Q.   With respect to the production of
16      the phone line, black out all numbers which
17      are not any number used by Ms. Staatz.
18                MS. ORTIZ:  Would you remember?
19                THE WITNESS:  I have some numbers,
20                yes, but I don't remember the number
21                exactly but I have it in the office.
22           Q.   In paragraph 1 of your complaint,
23      you allege that the Defendants misled you
24      regarding the purchase of the property since
25      the contract was signed.  How did Ms. Staatz
```

```
1                          M. NOBLE
2        mislead you?
3                A.    Mislead.
4                MS. ORTIZ:  I'll show her the
5                paragraph of this complaint, "The
6                Plaintiff entered into a valid contract
7                to purchase the property in 2014 and
8                has been misled and stymied in her
9                efforts to close upon the purchase the
10               contract was signed."  Is that what you
11               are referring to?
12               MR. BRODERICK:  Yes.
13               A.    Ask the question again?
14               Q.    In what way did Ms. Staatz mislead
15       you?
16               MS. ORTIZ:  Mislead is when she is
17               not being honest, she is not being
18               honest with you.  She is saying
19               something that is not true.  Stymied
20               means I'm frustrating whatever you are
21               trying to do so I'm not being honest.
22               A.    At the beginning when she came and
23       she said she wanted to sell the property and
24       I was interested, I say okay I'm going to do
25       as my first investment this property.  Then
```

```
1                   M. NOBLE

2        when she needed to get all the other

3        paperwork that she needs to bring to the AG

4        in order for us to do the closing, one of

5        the things was she wasn't complying with her

6        part meaning she needed to get documents and

7        papers to her lawyer and she wasn't around

8        because she is in front of our office so she

9        used to come and talk to Mr. Oviedo in

10       regard to the errands and things she needed

11       to do.  I felt like once she signed the

12       contract, then she didn't want to do the

13       sale, I don't know for what reason but that

14       is the way I felt because we signed the

15       first contract in 2014 and it is 2019 and we

16       are still in this sale of contract.

17            Q.   Who told you she wasn't complying

18       with the contract?

19            A.   Nobody told me that she was not

20       complying with the contract, but she used to

21       come to the office and talk to Mr. Oviedo.

22       With me, we didn't have a lot of

23       conversations, just in terms of selling and

24       that was it.

25            Q.   Did Mr. Ramirez ever tell you he
```

                        M. NOBLE

1   told Ms. Staatz what she had to do to apply

2   with the AG process?

3        A.   No, I don't know that.  I don't

4   know the conversation that Mr. Ramirez had

5   with Ms. Staatz.

6        Q.   In paragraph 16 of your complaint

7   you state you invested countless hours in

8   the attempt to prosecute the sale.  With

9   respect to that countless hours with respect

10  to the July 9, 2014 contract that you were

11  referencing?

12       A.   Yes.

13       Q.   Do you know how many hours you

14  endeavored to prosecute the sale with

15  respect to the July 9, 2014 contract?

16       A.   I cannot answer you that question.

17       Q.   Did you keep a log or a journal on

18  a day-to-day?

19       A.   No.

20       Q.   Do you have a file with respect to

21  purchasing of this property?

22       A.   Files with papers, yes, but the

23  not the sale of contract or copies of checks

24  and all the things like legal stuff, papers,

```
 1                        M. NOBLE
 2        anything I have from the church I have in
 3        the file.
 4             Q.   Do you have any notes, handwritten
 5        notes?
 6             A.   Handwritten notes with exactly
 7        what?
 8             Q.   Concerning the purchase of this
 9        property, conversations you may have had
10        with somebody.
11             A.   No.  I'm not that organized.
12                  MS. ORTIZ:  We will take a break.
13                  (Whereupon, a short recess was
14             taken.)
15             Q.   Do you have a copy of the
16        brokerage agreement between Mr. Oviedo and
17        Ms. Staatz of the church?
18             A.   No, I don't.
19             Q.   Mr. Oviedo would not be paid until
20        the sale was consummated, if you know?
21             A.   I don't know.
22             Q.   Other than the down payment check,
23        were you out any other money regarding the
24        2014 contract?
25             A.   What do you mean by that?
```

```
 1                     M. NOBLE
 2          Q.   Did you have to write any checks
 3     or spend any money other than the down
 4     payment of the July 9, 2014 contract, retain
 5     a lawyer, retain documents or anything like
 6     that?
 7          A.   For retaining a lawyer and that
 8     was it.
 9          Q.   What lawyer did you retain for the
10     2014 contract?
11          A.   I don't want to give you a wrong
12     answer.  I don't have that information to
13     give you right now.
14          Q.   Do you have a copy of the check
15     retaining the lawyer for the 2014 contract?
16          A.   I might have that in the office.
17               THE WITNESS:  Do you have that?
18               MS. ORTIZ:  No, I don't have that.
19          Do you want to call for that?
20               MR. BRODERICK:  I call for
21          production of the check if one exists
22          or the retainer of the lawyer to
23          represent Ms. Noble on the 2014
24          contract.
25          Q.   In your complaint, you make
```

```
 1                        M. NOBLE

 2      reference to Mr. Oviedo's efforts regarding

 3      his endeavors on the July 9, 2014 contract.

 4      Do you know what they were?

 5              A.   Not specifically, no.

 6              Q.   Do you know what money he spent

 7      with respect to the July 9, 2014 contract?

 8              A.   I cannot answer that question.

 9      That question Mr. Oviedo needs to answer.

10              Q.   In paragraph 17 of your complaint,

11      you state that the church retained Laura C.

12      Browne to assist in the AG process?

13              A.   Yes.

14              Q.   Do you know what date the church

15      retained Ms. Browne?

16              A.   I don't know exactly the date but

17      it was on the second contract of sale that

18      Ms. Staatz hired Ms. Browne.

19              Q.   Did Ms. Staatz pay Ms. Browne?

20              A.   I don't know about that.

21              MR. BRODERICK:   Mark for

22              identification Defendant's Exhibit F.

23                   (Whereupon, the check was

24              marked as Defendant Exhibit F for

25              identification as of this date by the
```

```
 1                     M. NOBLE
 2          Reporter.)
 3          Q.    I want to show you what is marked
 4     Defendant's Exhibit F.  Have you ever seen
 5     that document before?
 6          A.    This was a check, yes.
 7          Q.    Did you write that check?
 8          A.    Yes.
 9          Q.    What company is that check from?
10          A.    Urvany Investment Group.
11          Q.    What is your position of being the
12     investment group?
13          A.    I'm the sole member of that
14     company.
15          Q.    The check you wrote was for
16     Ms. Browne?
17          A.    Correct.
18          Q.    That was for what?
19          A.    Down payment for 2176 Grand
20     Concourse.
21               MR. BRODERICK:  Mark for
22          identification Defendant's Exhibit G.
23                    (Whereupon, the 5/16/17 check
24          to Ms. Browne was marked as Defendant
25          Exhibit G for identification as of this
```

```
 1                    M. NOBLE
 2          date by the Reporter.)
 3          Q.   What was the date of that check?
 4          A.   May 16, 2017.
 5          Q.   You wrote that to Ms. Browne
 6     because she represented who?
 7          A.   Ms. Staatz.
 8          Q.   I want to show you what has been
 9     marked Defendant's Exhibit G for
10     identification.  Have you ever seen that
11     document before?
12          A.   Yes.
13          Q.   Who signed that check?
14          A.   I did.
15          Q.   From what company was that check
16     issued?
17          A.   Urvany Investment Group.
18          Q.   What was the purpose of that
19     check?
20          A.   Legal fee retainer.
21          Q.   Did you retain Ms. Browne for you
22     or did you retain Ms. Browne for Ms. Staatz?
23              MS. ORTIZ:  Objection.  She didn't
24          say she retained Ms. Browne.  You want
25          to clarify?
```

```
 1                    M. NOBLE
 2         Q.   What is the date on that check?
 3         A.   May 9, 2017.
 4         Q.   It says retainer for 2176 Grand
 5    Concourse.  Did you retain Ms. Browne for
 6    yourself?
 7         A.   No.
 8         Q.   Did you retain Ms. Browne for Ms.
 9    Staatz?
10              MS. ORTIZ:  Objection.  She didn't
11              say she retained her.  It says legal
12              fee retainer.
13              MR. BRODERICK:  I didn't say she
14              did.  It is a question.
15         Q.   Did you retain Ms. Browne for Ms.
16    Staatz?
17              MS. ORTIZ:  Retain means legal
18              contract that is different did you pay
19              a retainer for, so which is the
20              question to be clear?
21         Q.   Did you pay the retainer for Ms.
22    Staatz?
23         A.   I don't have that answer to give
24    you right now because I don't remember it.
25    That was back in 2017.
```

1                    M. NOBLE

2          Q.   Did you ever sign a retainer from

3     yourself with Ms. Browne?

4          A.   Yes.

5          Q.   Do you know if the church ever

6     authorized Ms. Staatz to retain Ms. Browne?

7          A.   That information, I cannot answer.

8          Q.   In paragraph 18 of your complaint,

9     you state that Ms. Browne was close to

10    completing the AG approval process when she

11    was discharged.

12         A.   Who are you talking about - Ms.

13    Browne?

14         Q.   Yes.  Paragraph 18 of your

15    complaint.

16              MS. ORTIZ:  Discharge is when she

17         was fired.

18         A.   Yes.

19         Q.   Who fired Ms. Browne?

20         A.   According to Ms. Browne, Ms.

21    Staatz.

22         Q.   Do you know what day Ms. Browne

23    was discharged?

24         A.   I cannot answer that question

25    because I don't know what day exactly.

```
 1                        M. NOBLE
 2           Q.    You had a conversation with Ms.
 3     Browne where she told you she was
 4     discharged?
 5           A.    Because I called her to see if we
 6     had a date for closing and she told me no
 7     because she was fired.
 8           Q.    Do you recall roughly when that
 9     was?
10           A.    No, I don't.
11           Q.    Did Ms. Browne provide you with
12     any documents regarding her communications
13     regarding the termination?
14           A.    No.
15           Q.    Did Ms. Browne e-mail you?
16           A.    No.
17           Q.    Do you know if Ms. Browne e-mailed
18     Mr. Oviedo?
19           A.    That information, I cannot answer.
20           Q.    Did Ms. Browne tell you how far
21     along in the process she was with the AG
22     before being terminated?
23           A.    I cannot answer you that question
24     because those are legal stuff for an
25     attorney to do so I don't know what is the
```

```
 1                    M. NOBLE
 2   whole process with the AG.
 3        Q.   What was the closing date for the
 4   July 9, 2014 contract?
 5        A.   We never had a closing date
 6   because of the recollection of the papers
 7   that Ms. Staatz needed to bring to the
 8   lawyer.
 9        Q.   I want to show you what is marked
10   Defendant's Exhibit C.  Have you ever seen
11   that document before?
12        A.   This is the second contract
13   because I see here the price was changed.
14        Q.   The date of that contract, is it
15   July 7 or July 9 of 2015, if you recall?
16        A.   I don't recall.
17        Q.   It is fair to say it was in July
18   of 2015?
19        A.   That is what the date says there.
20   I don't remember exactly.
21        Q.   Did you sign that particular
22   contract?
23        A.   Yes.
24        Q.   At that point of time on the 2015
25   contract, who drafted that contract if you
```

```
 1                      M. NOBLE

 2        know?

 3              A.   Mr. Ramirez.

 4              Q.   2015, was Mr. Ramirez still

 5        representing the seller or was he now

 6        representing you the purchaser?

 7              A.   The seller.

 8              Q.   There was a change in the contract

 9        price, correct?

10              A.   Yes.

11              Q.   The contract price went down?

12              A.   Yes.

13              Q.   How much did it go down?

14              A.   It was for 600 the first one and

15        second one was for 500.

16              Q.   There was a 100,000 reduction in

17        the purchase price?

18              A.   Correct.

19              Q.   Do you know it the board approved

20        that 100,000 reduction?

21              A.   That question, I can not answer.

22              Q.   Do you know what the purpose of

23        that 100,000 reduction was?

24              A.   The purpose of the 100,000

25        reduction I don't know but I believe we went
```

```
 1                    M. NOBLE
 2      through an appraisal to appraise the
 3      property and I believe that the price was
 4      lower than we first agreed so they did a
 5      second contract.
 6           Q.   Is it fair to say, when Ms. Staatz
 7      agreed to a $100,000 reduction, she was
 8      still cooperating for the purchase of this
 9      property?
10           A.   Correct.
11           Q.   I want to go back to Defendant's
12      Exhibit C.  This contract makes reference to
13      a deposit, correct?
14           A.   Yes.
15           Q.   How much was the deposit you were
16      supposed to put down on the contract?
17           A.   The check for the $15,000.
18           Q.   Did you give Mr. Ramirez a new
19      check for the 15,000?
20           A.   No.
21           Q.   The check from 2014 was still the
22      check for the 2015 contract?
23           A.   Yes.
24           Q.   Do you know how long a check is
25      good for, only if you know?
```

```
 1                    M. NOBLE
 2         A.   I can't answer that question.
 3         Q.   Defendant's Exhibit D for
 4    identification, have you ever seen that
 5    document before?
 6         A.   That is the new contract of sale
 7    for 2017.
 8         Q.   The 2017 contract of sale, who
 9    wrote that document?
10         A.   Ms. Browne.
11         Q.   You signed that contract?
12         A.   Yes.
13         Q.   What is the purchase price in
14    2017?
15         A.   500.
16         Q.   What was the down payment on this
17    contract?
18         A.   1,000.
19         Q.   Did you write a check for $1,000?
20         A.   It was the check you just showed
21    me before.  Yes.
22         Q.   That would be Defendant's Exhibit
23    F, correct?
24         A.   Yes, down payment.
25         Q.   Was that check negotiated?
```

```
 1                    M. NOBLE
 2            A.   When you say negotiated?
 3            Q.   Was that check cashed?
 4            A.   Yes.
 5            Q.   Did that contract to your
 6       knowledge require Ms. Staatz to comply with
 7       the AG process?
 8            A.   Yes.
 9            Q.   What paragraph was that, if you
10       know?
11            MS. ORTIZ:  Objection.
12            A.   I don't know that answer.
13            Q.   But you believe that the term in
14       the contract which compelled her to comply
15       with the AG process?
16            MS. ORTIZ:  Objection.  There is
17                nothing that says she believes there
18                was a term in the contract.
19            MR. BRODERICK:  She said there was
20                a term in the contract.
21            MS. ORTIZ:  No, she didn't say
22                that.  She didn't say there was a term
23                in the contract.  She didn't say that.
24            Q.   I want you to take a look at
25       Defendant's Exhibit D.  It makes reference
```

                           M. NOBLE

1
2       to Exhibit B.  Do you know what Exhibit B
3       was?
4                MS. ORTIZ:  Off the record.
5                (Whereupon, an off-the-record
6                discussion was held.)
7                Q.   Other than Exhibit B, is that
8       contract complete to the best of your
9       knowledge?
10               A.   What do you mean?
11               MR. BRODERICK:  Withdraw that.
12               Q.   Was there a rider to the best of
13      your knowledge to Exhibit D?
14               A.   I cannot answer you that question
15      because I don't know.
16               Q.   To the best of your knowledge, the
17      terms of the contract, that is the full
18      document?  Not the exhibits or any rider but
19      the terms of the contract, that is a full
20      document?
21               MS. ORTIZ:  Objection.  You are
22               asking her to tell you, because if
23               there is a rider it is usually
24               incorporated in the contract.
25               MR. BRODERICK:  I didn't see it.

```
 1                    M. NOBLE
 2          Q.   To the best of your knowledge can
 3     Exhibit D is the contract for the purchase
 4     of the property that was signed in 2017?
 5          A.   Yes.
 6               MR. BRODERICK:  Mark for
 7          identification Defendant's Exhibit H.
 8               (Whereupon, the document
 9          referencing Yvon Santos was marked as
10          Defendant Exhibit H for identification
11          as of this date by the Reporter.)
12          Q.   I'll show you what has been marked
13     Exhibit H for identification.  Have you seen
14     that document before?
15          A.   Yes.
16          Q.   That document makes reference to
17     Yvon Santos?
18          A.   Yes.  Now, I remember.
19          Q.   Was she your attorney with respect
20     to this?
21          A.   Yes.
22          Q.   She would possess any documents
23     regarding the 2014 or communications between
24     Mr. Ramirez and her regarding the 2014
25     contract?
```

```
 1                     M. NOBLE

 2          A.   Yes.

 3               MR. BRODERICK:  At this time, I

 4          call for the production of the file of

 5          Ms. Santos regarding the purchase of

 6          2176 Grand Concourse.

 7          Q.   Did Ms. Santos's representation of

 8     you end at some point of time?

 9          A.   That question I cannot answer

10     because I don't have the information to give

11     you.

12               MR. BRODERICK:  Mark for

13          identification Defendant's Exhibit I.

14               (Whereupon, the amendment to

15          the contract was marked as Defendant

16          Exhibit I for identification as of this

17          date by the Reporter.)

18          Q.   Showing you what is marked

19     Defendant's Exhibit I for identification,

20     have you ever seen that document before?

21          A.   I don't remember.

22          Q.   Do you recall ever signing that

23     document?

24          A.   I don't remember.

25          Q.   Did you ever communicate with
```

```
 1                         M. NOBLE
 2      anyone other than your attorneys regarding
 3      2176 Grand Concourse by e-mail?
 4           A.   I cannot answer you that question
 5      because I don't remember.
 6                MR. BRODERICK:  At this time, I
 7           call for a search of your e-mail
 8           accounts for any non-privileged e-mails
 9           regarding 2176 Grand Concourse.
10           Q.   Do you have any knowledge of the
11      eviction proceedings brought by Olivet
12      Church to evict tenants of the building?
13           A.   I cannot answer that question
14      because I don't know.
15           Q.   Other than Ms. Santos and Ms.
16      Ortiz, have you been represented by any
17      other attorney not mentioned today in
18      connection with 2176?
19           A.   No.
20                MS. ORTIZ:  You were asked whether
21           you retained Laura Browne and you said
22           yes but you didn't specify in what
23           connection because he asked you did you
24           ever retain Laura Browne but there was
25           no date and no mention for what
```

```
1                      M. NOBLE
2           purpose.  Can you clarify what did you
3           retain her for?
4                THE WITNESS:  I cannot answer that
5           question because I have used Laura for
6           other deals that I have done.  As I was
7           reading the check retainer, but I
8           cannot give you a specific answer to
9           that question.
10               Q.   When was the first time you used
11     Ms. Browne to the best of your recollection?
12               A.   That question I can't answer
13     because I don't remember the date I used
14     her.
15               Q.   Do you recall if it was in the
16     time before 2017?
17               A.   I cannot answer you that question
18     because I don't want to tell you something
19     that is incorrect.
20               Q.   Do you have any recollection other
21     than with respect to 2176 Grand Concourse
22     having used Ms. Browne before that retaining
23     check that we spoke about earlier today?
24               MS. ORTIZ:  Which was what year?
25               MR. BRODERICK:  2017.
```

```
 1                        M. NOBLE

 2          A.    I don't remember.

 3               MR. BRODERICK:   I have no further

 4          questions.

 5               (Whereupon, at 11:30 A.M., the

 6          Examination Before Trial was

 7          concluded.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    M. NOBLE

 2                D E C L A R A T I O N

 3

 4        I hereby certify that having been first

 5    duly sworn to testify to the truth, I gave

 6    the above testimony.

 7

 8        I FURTHER CERTIFY that the foregoing

 9    transcript is a true and correct transcript

10    of the testimony given by me at the time and

11    place specified hereinbefore.

12

13

14                     _____
                         MARIA TERESA NOBLE
15

16

17    Subscribed and sworn to before me

18    This _____ day of _____ 20__.

19

20    _____
             NOTARY PUBLIC
21

22

23

24

25
```

51

```
 1                    M. NOBLE

 2                E X H I B I T S

 3    DEFENDANT EXHIBITS

 4    EXHIBIT    EXHIBIT
      LETTER     DESCRIPTION                  PAGE
 5

 6    A          Complaint filed on church   8

 7    B          Check deposit for church    8

 8    C          Second contract of 2015     8

 9    D          2017 contract of sale       8

10    E          Document                    8

11    F          $1,000 check down payment   33

12    G          5/16/17 check for Ms. Browne 34

13    H          Document about Yvon Santos  45

14    I          Amendment to contract       46

15             (Exhibits retained by Counsel)

16

17

18                  I N D E X

19

20    EXAMINATION BY                         PAGE

21    MR. BRODERICK                          4

22

23

24

25
```

1                    M. NOBLE

2          INFORMATION AND DOCUMENTS REQUESTED

3     INFORMATION AND/OR DOCUMENTS              PAGE

4     TD Bank records for 2014                  18

5     $14,000 check                            20

6     Witness phone call records for Staatz    27

7     Check for lawyer for 2014 contract       32

8     Santos file of 2176 purchase             46

9     Non-privileged e-mails of 2176           47

10

11

12              QUESTIONS MARKED FOR RULING

13    PAGE LINE QUESTION

14    (None)

15

16

17

18

19

20

21

22

23

24

25

1                          M. NOBLE

2                    C E R T I F I C A T E

3

4        STATE OF NEW YORK        )
                                  :  SS.:
5        COUNTY OF NEW YORK       )

6

7                I, SYLVIA KEMP, a Notary Public for

8        and within the State of New York, do hereby

9        certify:

10               That the witness whose examination

11       is hereinbefore set forth was duly sworn and

12       that such examination is a true record of

13       the testimony given by that witness.

14               I further certify that I am not

15       related to any of the parties to this action

16       by blood or by marriage and that I am in no

17       way interested in the outcome of this

18       matter.

19               IN WITNESS WHEREOF, I have hereunto

20       set my hand this 16th day of August, 2019.

21

22                          *Sylvia Kemp*

23                          _____
                            SYLVIA KEMP

24

25

**$**

**$1,000 [5]** 21/2 21/5 21/10 42/19 51/11
**$1,000 check [2]** 21/2 21/5
**$100,000 [1]** 41/7
**$100,000 reduction [1]** 41/7
**$14,000 [8]** 20/10 20/16 20/18 20/22 22/12 22/18 24/22 52/5
**$14,000 check [4]** 20/10 20/16 20/18 20/22
**$14,000 deposit [2]** 22/18 24/22
**$15,000 [1]** 16/14 18/14 24/22 41/17
**$600,000 [3]** 16/11 21/14 21/22
**$600,000 contract [1]** 21/14

**0**

**07010 [1]** 4/13
**07871 [1]** 1/6

**1**

**1,000 [1]** 42/18
**100,000 [4]** 40/16 40/20 40/23 40/24
**1099 [2]** 8/8 8/11
**10:15 [1]** 1/14
**111 [1]** 2/9
**11103 [2]** 1/21 2/5
**11375 [2]** 2/10
**11:30 [1]** 49/5
**13 [1]** 20/25
**14 [2]** 20/8 20/9
**15 [1]** 22/10
**15,000 [1]** 41/19
**16 [3]** 1/13 30/7 35/4
**16th [1]** 53/20
**17 [3]** 33/10 34/23 51/12
**18 [4]** 1/6 37/8 37/14 52/4
**180 [1]** 7/3

**2**

**20 [9]** 2/9 9/13 9/14 11/21 11/21 12/3 12/3 50/18 52/5
**2004 [3]** 5/11 13/9 13/11
**2005 [1]** 6/18
**2007 [1]** 7/5
**2014 [41]** 5/6 5/7 5/10 5/24 6/9 7/10 7/15 8/11 8/12 9/18 11/14 13/11 14/4 14/5 16/11 17/13 18/8 18/12 19/10 19/14 20/5 21/6 22/8 26/7 28/7 29/15 30/11 30/16 31/24 32/4 32/10 32/15 32/23 33/3 33/7 39/4 41/21 45/23 45/24 52/4 52/7
**2015 [6]** 39/15 39/18 39/24 40/4 41/22 51/8
**2017 [14]** 24/6 24/19 25/2 25/20 35/4 36/3 36/25 42/7 42/8 42/14 45/4 48/16 48/25 51/9
**2019 [3]** 1/13 29/15 53/20
**2170 [3]** 16/22 16/25 17/4
**2176 [17]** 4/17 5/15 9/20 9/25 16/25 17/3 18/5 25/3 34/19 36/4 46/6 47/3 47/9 47/18 48/21 52/8 52/9
**250 [1]** 4/12
**27 [1]** 52/6

**2D [1]** 4/12

**3**

**30 [1]** 3/15
**32 [1]** 52/7
**32-72 [2]** 1/20 2/5
**33 [1]** 51/11
**34 [1]** 51/12

**4**

**402 [1]** 2/5
**45 [1]** 51/13
**46 [2]** 51/14 52/8
**47 [1]** 52/9

**5**

**5/16/17 [2]** 34/23 51/12
**500 [2]** 40/15 42/15

**6**

**600 [1]** 40/14

**7**

**70-20 [1]** 2/9
**72 [2]** 1/20 2/5

**9**

**98 [1]** 17/15

**A**

**A.M [1]** 1/14 49/5
**about [10]** 5/20 9/7 9/8 24/15 24/25 26/18 33/20 37/12 48/23 51/13
**above [1]** 50/6
**According [1]** 37/20
**account [12]** 17/12 17/13 18/4 18/9 18/12 18/17 18/18 18/20 18/25 19/6 19/8 19/14
**accounts [2]** 8/2 47/8
**acquisition [1]** 5/13
**ACRIS [1]** 10/12
**across [1]** 10/7
**action [2]** 4/16 53/15
**address [1]** 16/24
**administer [1]** 3/10
**advise [1]** 25/9
**after [1]** 3/15
**AG [12]** 14/7 15/15 22/13 23/4 29/3 30/3 33/12 37/10 38/21 39/2 43/7 43/15
**AG's [1]** 22/21
**again [2]** 24/23 28/13
**against [2]** 1/5 8/22
**agent [4]** 5/8 5/10 8/6 13/6
**agreed [7]** 3/4 3/19 14/21 15/9 15/13 41/4 41/7
**agreement [2]** 23/19 31/16
**aka [3]** 1/7 1/8 1/8
**all [7]** 3/20 5/2 6/21 27/10 27/16 29/2 30/25
**allege [1]** 27/23
**along [1]** 38/21
**ALSO [1]** 2/13
**am [2]** 53/14 53/16
**amendment [2]** 46/14 51/14
**amount [1]** 18/16
**AND/OR [1]** 52/3
**answer [2]** 4/21 13/18 18/13 18/21 20/21 20/24 21/8 21/12 26/11 30/17 32/12 33/8 33/9 36/23 37/7 37/24 38/19 38/23 40/21

**42/2** 43/12 44/14 46/9 47/4 47/13 48/4 48/8 48/12 48/17
**answering [1]** 13/24
**answers [1]** 5/2
**any [39]** 4/18 5/3 6/10 6/13 6/19 7/15 7/25 8/11 9/5 9/24 11/17 12/10 13/2 13/12 13/15 13/22 14/19 14/19 14/23 15/8 15/13 15/17 16/4 18/19 20/3 20/19 27/17 31/4 31/23 32/2 32/3 38/12 44/18 45/22 47/8 47/10 47/16 48/20 53/15
**anybody [1]** 15/12
**anyone [4]** 3/10 12/13 12/16 47/2
**anything [5]** 9/7 22/24 24/14 31/2 32/5
**apartment [2]** 4/12 13/8
**apply [4]** 14/21 14/24 22/21 30/2
**applying [1]** 15/18
**appraisal [1]** 37/10
**appraise [1]** 41/2
**approval [1]** 37/10
**approve [1]** 21/13
**approved [5]** 21/16 21/21 22/6 22/13 40/19
**ARACELIS [2]** 1/9 4/16
**are [22]** 3/20 6/21 7/17 12/17 12/23 13/16 14/12 14/19 15/3 15/8 15/12 16/5 19/3 23/11 26/18 27/17 28/11 28/20 29/16 37/12 38/24 44/21
**around [2]** 26/12 29/7
**as [27]** 1/9 3/11 3/14 3/20 4/5 5/2 7/2 8/18 8/19 8/24 11/8 12/5 19/14 19/16 21/19 21/19 22/3 28/25 33/24 33/25 34/24 34/25 45/9 45/11 46/15 46/16 48/6
**ask [4]** 4/21 9/6 24/23 28/13
**asked [3]** 25/12 47/20 47/23
**asking [4]** 14/13 14/15 19/4 44/22
**assist [1]** 14/7 33/12
**Astoria [2]** 1/21 2/5
**attempt [1]** 30/9
**attention [1]** 9/12
**attorney [11]** 2/9 11/15 13/3 14/21 15/5 15/19 15/24 19/16 38/25 45/19 47/2
**attorneys [2]** 2/4 47/2
**August [2]** 1/13 53/20
**Austin [1]** 2/9
**authorize [1]** 23/15
**authorized [2]** 3/10 37/6
**authorizing [1]** 23/12
**aware [7]** 12/17 12/23 13/16 15/3 15/7 15/12 23/11

**B**

**back [5]** 13/9 14/5 20/13 36/25 41/11
**bank [6]** 8/2 17/10 19/2 20/19 20/20 22/3 42/5
**be [12]** 3/7 3/9 3/13 5/16 6/6 13/3 17/9 20/19 25/10

**31/19** 36/20 42/22
**because [29]** 7/13 8/7 9/9 10/6 10/11 13/10 14/9 17/15 25/8 25/21 29/8 29/14 35/6 36/24 37/25 38/5 38/7 38/24 39/6 39/13 44/15 44/22 46/10 47/5 47/14 47/23 48/5 48/13 48/18
**become [1]** 6/23
**been [8]** 4/3 5/9 6/16 28/8 35/8 45/12 47/16 50/4
**before [21]** 1/22 3/10 3/12 7/2 9/2 9/6 9/14 16/18 18/8 34/5 35/11 38/22 39/11 42/5 42/21 45/14 46/20 48/16 48/22 49/6 50/17
**beginning [2]** 26/6 28/22
**behalf [3]** 12/14 15/14 22/21
**being [6]** 6/14 28/17 28/17 28/21 34/11 38/22
**believe [5]** 11/11 27/13 40/25 41/3 43/13
**believes [1]** 43/17
**best [6]** 21/14 44/8 44/12 44/16 45/2 48/11
**between [2]** 3/5 23/19 23/23 31/16 45/23
**bit [1]** 7/13
**black [1]** 27/16
**blank [1]** 18/23
**blood [1]** 53/16
**board [11]** 10/10 21/13 21/16 21/19 21/23 21/24 21/25 22/6 23/15 23/19 40/19
**both [2]** 7/11 23/5
**break [1]** 31/12
**bring [3]** 7/7 29/3 39/7
**BRODERICK [5]** 2/8 2/10 4/7 4/14 51/21
**broker [3]** 6/2 6/4 7/16
**brokerage [1]** 31/16
**Bronx [2]** 4/18 5/15
**brought [2]** 4/16 47/11
**Browne [31]** 33/12 33/15 33/18 33/19 34/16 34/24 35/5 35/21 35/22 35/24 36/5 36/8 36/15 37/3 37/6 37/9 37/13 37/19 37/20 38/17 38/20 42/10 47/21 47/24 48/11 48/22 51/12 **building [1]** 47/12
**business [5]** 6/21 6/23 6/25 7/7 16/6

**C**

**call [10]** 19/12 20/15 26/20 26/23 27/8 32/19 32/20 46/4 47/7 52/6
**called [1]** 38/5
**calls [7]** 9/10 26/11 26/12 26/15 26/15 26/17 27/10
**came [1]** 28/22
**can [6]** 7/6 7/8 26/22 40/21 45/2 48/2
**can't [8]** 18/13 18/16 18/21 20/21 20/24 21/12 42/2 48/12
**cannot [17]** 5/3 25/7 26/5 26/21 30/17 33/8 37/7 37/24 38/19 38/23 44/14

# C

cannot... [6] 46/9 47/4
47/13 48/4 48/8 48/17
capacity [1] 11/7
case [2] 13/4 13/15
cases [2] 13/5 13/12
cashed [2] 18/2 43/3
cell [3] 26/23 26/25 27/3
certification [1] 3/7
certify [4] 50/4 50/8 53/9
53/14
change [1] 40/8
changed [1] 39/13
check [55] 16/21 17/10
17/15 17/19 17/21 17/24
18/2 19/15 19/18 19/22
19/25 20/10 20/11 20/16
20/18 20/22 21/2 21/5
21/10 22/12 23/13 23/16
24/18 24/20 24/22 31/22
32/14 32/21 33/23 34/6
34/7 34/9 34/15 34/23 35/3
35/13 35/15 35/19 36/2
41/17 41/19 41/21 41/22
41/24 42/19 42/20 42/25
43/3 48/7 48/23 51/7 51/11
51/12 52/5 52/7
check in [1] 22/12
checks [3] 20/3 30/24 32/2
children [2] 6/19 6/20
church [24] 1/7 1/8 1/8 1/8
1/9 4/15 6/3 6/4 8/23 10/6
10/11 11/8 14/8 16/23
16/25 22/22 31/2 31/17
33/11 33/14 37/5 47/12
51/6 51/7
Civil [1] 1/19
clarify [4] 7/12 24/10 35/25
48/2
clear [1] 36/20
client [3] 13/9 13/10 22/25
clients [2] 7/7 13/7
Cliffside [1] 4/13
close [3] 19/8 28/9 37/9
closed [2] 18/18 19/7
closing [4] 29/4 38/6 39/3
39/5
come [5] 5/20 29/9 29/21
communicate [1] 46/25
communicated [1] 26/8
communicating [2] 26/3
26/8
communications [2] 38/12
45/23
company [4] 13/20 34/9
34/14 35/15
compelled [1] 43/14
complaint [15] 8/22 9/11
20/8 20/9 20/25 22/10
25/25 27/22 28/5 30/7
32/25 33/10 37/8 37/15
51/6
complete [1] 44/8
completing [1] 37/10
compliance [1] 15/23
comply [3] 15/14 43/6
43/14
complying [3] 29/5 29/17
29/20
Concerning [1] 31/8
concluded [1] 49/7
conclusion [1] 9/10
Concourse [17] 4/17 5/15

condition [1] 10/9
conduct [1] 9/24
conflict [2] 6/6 24/15
conflicted [1] 25/10
connection [2] 47/18 47/23
considerable [1] 5/12
consummated [1] 31/20
contact [4] 13/2 14/6 15/22
15/25
contract [83] 9/12 9/15 9/17
9/24 10/14 10/17 10/19
10/22 10/24 11/4 11/7
11/10 11/11 11/13 11/15
11/18 11/22 12/17 12/21
14/3 14/12 16/11 16/13
20/5 21/6 21/14 22/8 22/14
24/2 24/8 26/7 27/25 28/6
28/10 29/12 29/15 29/16
29/18 29/20 30/11 30/16
30/24 31/24 32/4 32/10
32/15 32/24 33/3 33/7
33/17 36/18 39/4 39/12
39/14 39/22 39/25 39/25
40/8 40/11 41/5 41/12
41/16 41/22 42/6 42/8
42/11 42/17 43/5 43/14
43/18 43/20 43/23 44/8
44/17 44/19 44/24 45/3
45/25 46/15 51/8 51/9
51/14 52/7
contractor [1] 8/8
conversation [2] 30/5 38/2
conversations [3] 16/4
29/23 31/9
cooperated [1] 22/7
cooperating [1] 41/8
copies [1] 30/24
copy [8] 3/13 3/16 8/21
9/11 10/16 16/21 31/15
32/14
corporation [1] 7/23
correct [24] 5/14 8/9 9/22
11/23 16/11 16/12 16/15
17/10 17/21 17/22 19/17
22/5 22/8 22/14 22/15 24/3
24/13 34/17 40/9 40/18
41/10 41/13 42/23 50/9
corrections [1] 9/5
Could [1] 7/12 17/14
counsel [5] 3/5 3/16 4/20
4/23 51/15
countless [2] 30/8 30/10
COUNTY [1] 53/5
couple [1] 26/22
court [4] 1/2 1/18 3/12 5/3
CV [1] 1/6

# D

date [17] 1/13 8/20 33/14
33/16 33/25 35/2 35/3 36/2
38/6 39/3 39/5 39/14 39/19
45/11 46/17 47/25 48/13
dated [1] 9/17
DAVID [3] 2/8 2/10 4/14
day [9] 19/6 26/4 26/5
30/19 30/19 37/22 37/25
50/18 53/20
day-to-day [1] 30/19
days [1] 3/15
deals [2] 25/22 48/6
deed [1] 10/16

Defendant [9] 1/17 4/15
8/18 26/2 33/24 34/24
45/10 46/15 51/3
Defendant's [19] 8/15 8/21
10/20 11/22 12/3 16/17
17/9 33/22 34/4 34/22 35/9
39/10 41/11 42/3 42/22
43/25 45/7 46/13 46/19
DEFENDANTS [6] 1/11 2/9
8/23 8/25 23/9 27/23
define [1] 17/14
demonstrate [1] 27/10
deposit [9] 16/22 19/21
19/25 22/18 23/16 24/22
41/13 41/15 51/7
deposited [2] 21/5 21/11
deposition [5] 1/16 3/7 3/8
3/13 4/19
DESCRIPTION [1] 51/4
did [79] 5/20 5/23 6/5 6/23
7/15 7/25 8/10 9/24 10/12
10/16 10/19 10/22 11/6
11/15 12/7 12/10 12/13
12/16 12/19 13/2 13/11
13/15 15/17 15/22 16/7
17/12 18/4 18/8 18/14 19/8
19/18 19/21 19/24 20/3
21/4 21/13 22/20 23/15
24/2 24/14 24/17 24/24
25/9 26/4 26/14 26/15
26/20 26/23 27/25 28/6
29/25 30/18 32/2 32/9
33/19 34/7 35/14 35/21
35/22 36/5 36/8 36/14
36/15 36/18 36/21 37/2
38/11 38/15 38/20 39/21
40/13 41/4 41/18 42/19
43/5 46/7 46/25 47/23 48/2
didn't [16] 15/25 16/8 17/20
26/11 26/11 26/16 29/12
29/22 35/23 36/10 36/13
43/21 43/22 43/23 44/25
47/22
different [1] 36/18
diligence [1] 9/24
direct [1] 9/12
disappeared [1] 26/10
Discharge [1] 37/16
discharged [3] 37/11 37/23
38/4
discovering [1] 5/20
discussion [2] 17/18 44/6
dispense [1] 14/22
dissolve [1] 14/8
DISTRICT [1] 1/2 1/2
do [48] 4/11 4/23 6/13 6/19
18/11 18/19 20/22 21/10
22/24 23/2 23/2 23/18
23/22 25/18 25/23 27/3
28/21 28/24 29/4 29/11
29/12 30/2 30/14 30/21
31/4 31/15 31/25 32/14
32/17 32/19 33/4 33/6
33/14 37/5 37/22 38/8
38/17 38/25 40/19 40/22
41/24 44/2 44/10 46/22
47/10 48/15 48/20 53/8
document [21] 9/2 9/3 9/6
9/8 9/14 16/18 16/20 34/5
35/11 39/11 42/5 42/9
44/18 44/20 45/8 45/14
45/16 46/20 46/23 51/10
51/13
documents [11] 8/17 14/20

14/23 15/9 15/13 29/6 32/5
38/12 45/22 52/2 52/3
does [4] 6/3 12/4 20/17
22/16
doesn't [1] 27/13
don't [48] 8/7 12/25 13/22
13/25 14/17 15/2 15/16
18/10 19/9 19/11 20/12
20/13 20/14 21/7 21/8
23/17 23/21 23/24 25/8
27/20 29/13 30/4 30/4
31/18 31/21 32/11 32/12
32/18 33/16 33/20 36/23
36/24 37/25 38/10 38/25
39/16 39/20 40/25 43/12
44/15 46/10 46/21 46/24
47/5 47/14 48/13 48/18
49/2
done [1] 48/6
down [14] 5/2 5/3 16/13
16/22 20/4 31/22 32/3
34/19 40/11 40/13 41/16
42/16 42/24 51/11
draft [1] 12/17
drafted [1] 39/25
drawn [1] 20/19
due [1] 9/24
duly [3] 4/3 50/5 53/11
during [1] 4/18

# E

e-mail [3] 38/15 47/3 47/7
e-mailed [1] 38/17
e-mails [2] 47/8 52/9
earlier [1] 48/23
easy [1] 8/25
effect [2] 3/11 3/14
efforts [2] 28/9 33/2
either [2] 14/16 26/13
employed [3] 8/5 8/6 13/21
employee [4] 6/14 7/10 8/4
13/19
employees [1] 6/7
end [1] 46/8
endeavored [1] 30/15
endeavors [1] 33/3
entered [1] 28/6
entering [2] 9/23 10/14
10/17
Enterprises [3] 5/22 7/16
8/10
errands [1] 29/10
error [2] 17/7 17/8
escrow [1] 22/12
ESQ [3] 2/6 2/10 2/13
estate [4] 5/8 5/10 8/6 13/6
ever [23] 6/5 11/6 13/2
15/17 16/7 16/18 18/2
20/11 20/23 22/20 23/11
23/15 29/25 34/4 35/10
37/2 37/5 39/10 42/4 46/20
46/22 46/25 47/24
evict [1] 47/12
eviction [1] 47/11
exactly [12] 6/25 18/10
18/16 19/11 24/5 25/18
26/5 27/21 31/6 33/16
37/25 39/20
examination [5] 4/6 49/6
51/20 53/10 53/12
examined [1] 4/5
except [1] 3/20
execute [1] 10/19
execution [1] 22/7

**E**

Exhibit [30]  8/21 10/20
11/22 12/4 16/17 17/9
33/22 33/24 34/4 34/22
34/25 35/9 39/10 41/12
42/3 42/22 43/25 44/2 44/2
44/7 44/13 45/3 45/7 45/10
45/13 46/13 46/16 46/19
51/4 51/4
exhibits [5]  8/15 8/18 44/18
51/3 51/15
exist [2]  20/17 20/18
existed [1]  19/14
exists [1]  32/21

**F**

fact [1]  13/23
fair [2]  39/17 41/6
far [2]  21/19 38/20
fast [1]  4/25
Federal [1]  1/18
fee [2]  35/20 36/12
felt [2]  29/11 29/14
file [4]  30/21 31/3 46/4 52/8
filed [2]  8/22 51/6
files [2]  20/13 30/23
filing [1]  3/6
fired [3]  37/17 37/19 38/7
first [14]  4/3 4/22 5/16 5/19
9/15 11/11 11/18 26/7
28/25 29/15 40/14 41/4
48/10 50/4
follows [1]  4/5
force [1]  3/14
foregoing [1]  50/8
Forest [1]  2/10
form [1]  3/20
forms [1]  8/11
forth [1]  53/11
front [1]  29/8
frustrating [1]  28/20
full [2]  44/17 44/19
further [4]  3/19 49/3 50/8
53/14
future [1]  8/24

**G**

gave [2]  22/17 50/5
general [3]  14/22 15/5
15/19
General's [1]  15/24
get [2]  29/2 29/6
give [9]  19/18 21/4 21/7
32/11 32/13 36/23 41/18
46/10 48/8
given [2]  50/10 53/13
go [7]  8/7 15/4 20/12 22/2
23/3 40/13 41/11
going [5]  5/16 14/11 14/24
19/25 28/24
good [1]  41/25
Gorge [1]  4/12
got [1]  7/5
Grand [17]  4/17 5/15 7/4
9/21 9/25 16/22 16/25
16/25 17/4 18/5 25/3 34/19
36/4 46/6 47/3 47/9 48/21
group [3]  34/10 34/12
35/17

**H**

had [13]  5/9 7/3 10/4 15/3
16/3 18/15 24/6 30/2 30/5

31/9 38/2 38/6 39/5
hand [1]  53/20
handwritten [2]  31/4 31/6
handwrote [1]  17/23
has [9]  6/16 15/12 22/24
22/25 23/2 23/3 28/8 35/8
45/12
have [59]  5/12 6/13 6/19
6/20 7/15 7/25 8/25 9/13
11/15 13/2 13/12 13/15
13/22 13/25 14/3 14/23
16/3 16/18 17/20 18/14
18/19 18/21 20/12 21/8
22/3 22/22 25/21 27/3
27/13 27/19 27/21 29/22
30/21 31/2 31/2 31/4 31/9
31/15 32/2 32/12 32/14
32/16 32/17 32/18 34/4
35/10 36/23 39/10 42/4
45/13 46/10 46/20 47/10
47/16 48/5 48/6 48/20 49/3
53/19
having [3]  4/3 48/22 50/4
he [26]  6/3 6/15 6/16 7/5
11/19 13/6 13/8 19/24
22/11 22/20 22/24 22/25
23/2 23/2 23/3 23/5 23/7
23/9 24/17 25/10 25/21
25/22 29/25 33/6 40/5
47/23
head [2]  5/4 21/9
held [3]  1/19 17/18 44/6
hello [1]  16/5
her [19]  14/14 15/14 15/23
15/25 25/13 26/20 26/23
28/4 28/8 29/5 29/7 36/11
38/5 38/12 43/14 44/22
45/24 48/3 48/14
here [2]  7/17 39/13
hereby [3]  3/4 50/4 53/8
herein [1]  3/6
hereinbefore [2]  50/11
53/11
hereunto [1]  53/19
Hills [1]  2/10
him [8]  7/4 7/6 19/21 24/15
24/18 25/6 25/20 25/22
himself [1]  12/5
hired [1]  33/18
his [6]  6/14 7/6 7/7 7/11
22/25 33/3
hold [1]  22/12
honest [3]  28/17 28/18
28/21
hours [3]  30/8 30/10 30/14
how [18]  5/9 5/20 6/16 10/8
14/10 15/22 16/5 18/8
18/11 25/5 26/20 26/21
27/25 30/14 38/20 40/13
41/15 41/24

**I**

I'll [7]  4/24 8/23 9/9 18/23
24/10 28/4 45/12
I'm [10]  8/6 8/6 14/13 14/14
15/7 28/20 28/21 28/24
31/11 34/13
identification [15]  8/15 8/19
11/17 33/22 33/25 34/22
34/25 35/10 42/4 45/7
45/10 45/13 46/13 46/16
46/19
identify [1]  12/4
inaccurate [1]  9/7

**INC** [5]  1/7 1/8 1/8 1/8 5/22
incorporated [1]  44/24
incorrect [1]  48/19
information [10]  21/8 23/17
23/24 25/7 32/12 37/7
38/19 46/10 52/2 52/3
informed [1]  22/11
initial [3]  17/15 17/19 19/5
interest [3]  7/15 7/18 7/19
interested [2]  28/24 53/17
invested [1]  30/8
investing [1]  5/17
investment [5]  6/10 28/25
34/10 34/12 35/17
investments [1]  25/24
involved [1]  13/12
involving [1]  13/16
is [69]  3/4 3/19 4/14 4/20
6/15 7/13 8/21 9/5 9/15
9/17 10/11 13/22 13/23
14/10 14/10 16/16 16/20
16/21 16/23 16/24 17/15
18/17 21/18 21/24 21/25
22/23 22/24 23/18 25/21
25/22 28/10 28/16 28/16
28/17 28/18 28/19 29/8
29/14 29/15 34/3 34/9
34/11 36/2 36/14 36/18
36/19 37/16 38/25 39/9
39/12 39/14 39/17 39/19
41/6 41/24 42/6 42/13
43/16 44/7 44/17 44/19
44/23 44/25 45/3 46/18
48/19 50/9 53/11 53/12
issued [1]  35/16
it [45]  3/4 3/19 8/25 9/7 9/9
10/6 10/7 13/22 13/24 14/2
14/14 16/21 17/19 18/14
18/15 19/6 19/10 19/14
20/19 22/3 22/6 22/13 23/3
32/8 33/17 36/4 36/11
36/14 36/24 39/14 39/17
39/17 40/13 40/14 40/19
41/6 42/20 43/25 44/23
44/25 48/15

**J**

Jaime [1]  11/12
Jaime Ramirez [1]  11/12
jersey [1]  4/13
join [1]  7/6
journal [1]  30/18
Judge [1]  3/12
July [23]  5/6 6/9 6/18 9/17
11/14 13/11 14/4 16/10
18/8 18/12 19/14 20/5 21/6
22/8 30/11 30/16 32/4 33/3
33/7 39/4 39/15 39/15
39/17
July 2005 [1]  6/18
July 2014 [2]  19/14 21/6
July 7 [1]  39/15
July 8 [2]  18/8 18/12
July 9 [15]  6/9 9/17 11/14
13/11 14/4 16/10 20/5 20/8
30/11 30/16 32/4 33/3 33/7
39/4 39/15
just [4]  14/13 16/5 29/23
42/20

**K**

Kay [1]  2/13
keep [1]  30/18

**Kemp** [3]  1/22 53/7 53/23
knew [1]  10/9
know [48]  4/20 4/24 10/6
12/25 14/2 14/11 14/16
14/17 15/16 18/11 18/15
20/22 21/10 21/16 21/19
23/17 23/18 23/21 23/22
23/24 26/9 29/13 30/4 30/5
30/14 31/20 31/21 33/4
33/6 33/14 33/16 33/20
37/5 37/22 37/25 38/17
38/25 40/2 40/19 40/22
40/25 41/24 41/25 43/10
43/12 44/2 44/25 47/14
knowledge [10]  5/12 13/23
13/25 21/15 43/6 44/9
44/13 44/16 45/2 47/10
knows [1]  14/15

**L**

L.L.P [2]  1/20 2/4
Laura [4]  33/11 47/21 47/24
48/5
Laura C [1]  33/11
law [1]  1/19
lawyer [10]  22/23 25/21
29/7 32/5 32/7 32/9 32/15
32/22 39/8 52/7
lawyers [1]  25/23
lay [1]  14/10
least [1]  18/14
leave [1]  18/23
Ledwin [4]  5/22 5/23 7/16
8/10
legal [8]  7/13 9/10 22/23
30/25 35/20 36/11 36/17
38/24
let [3]  4/20 4/24 24/10
LETTER [1]  51/4
like [5]  9/6 10/5 29/11
30/25 32/5
line [2]  27/16 52/13
little [1]  7/13
log [1]  30/18
long [4]  5/9 6/16 18/8 41/24
look [3]  11/21 20/7 43/24
looked [1]  26/9
lot [1]  29/22
lower [1]  41/4

**M**

made [1]  19/15
mail [3]  38/15 47/3 47/7
mailed [1]  38/17
mails [2]  47/8 52/9
make [5]  5/2 8/25 9/6 15/17
32/25
makes [3]  41/12 43/25
45/16
many [4]  15/22 26/20 26/21
30/14
MARIA [4]  1/3 1/16 4/10
50/14
Mark [5]  8/14 33/21 34/21
45/6 46/12
marked [12]  8/18 16/16
33/24 34/3 34/24 35/9 39/9
45/9 45/12 46/15 46/18
52/12
marriage [1]  53/16
matter [5]  12/8 12/11 25/11
27/11 53/18
may [5]  3/9 3/13 31/9 35/4
36/3

**M**

May 16 [1] 35/4
May 9 [1] 36/3
me [12] 4/20 4/24 4/25 7/6
23/3 26/18 29/19 29/22
38/6 42/21 50/10 50/17
mean [3] 25/18 31/25 44/10
meaning [3] 8/5 26/10 29/6
means [2] 28/20 36/17
member [1] 34/13
memo [1] 17/4
mention [1] 47/25
mentioned [2] 23/2 47/17
met [2] 7/4 13/9
might [2] 6/6 32/16
mislead [4] 28/2 28/3 28/14
28/16
misled [2] 27/23 28/8
money [6] 12/10 18/11
18/15 31/23 32/3 33/6
more [2] 5/6 26/8
MOUNT [6] 1/7 1/7 1/8 1/8
1/9 4/15
MR [27] 4/7 19/24 20/4 21/4
21/11 22/11 22/17 22/20
23/12 23/15 23/20 23/23
24/2 24/7 24/11 24/14
24/17 24/24 24/25 25/9
25/16 29/25 30/5 40/4
41/18 45/24 51/21
Mr. [33] 5/23 6/2 6/5 6/14
11/17 12/4 12/7 12/10
12/13 12/16 12/20 12/24
13/3 13/9 13/13 13/15
13/16 13/17 13/20 19/16
19/19 26/9 26/16 26/19
29/19 29/21 31/16
31/19 32/3 33/9 38/18 40/3
Mr. Ledwin Oviedo [1] 5/23
Mr. Oviedo [13] 6/2 6/5
6/14 13/15 13/17 26/9
26/19 29/19 29/21 31/16
31/19 33/9 38/18
Mr. Oviedo's [3] 13/20
26/16 33/2
Mr. Ramirez [15] 11/17 12/4
12/7 12/10 12/13 12/16
12/20 12/24 13/3 13/9
13/13 13/16 19/16 19/19
40/3
Mr. Staatz [1] 27/10
Ms [56] 8/23 15/3 15/9
15/17 15/22 16/2 16/4 16/7
21/18 23/7 23/11 23/23
26/2 27/17 27/25 28/14
30/2 30/6 31/17 33/18
33/19 34/24 35/5 35/7
35/21 35/22 35/22 35/24
36/5 36/8 36/8 36/15 36/15
36/21 37/3 37/6 37/6 37/9
37/12 37/19 37/20 37/20
37/22 38/2 38/11 38/15
38/17 38/20 39/7 41/6
42/10 43/6 47/15 48/11
48/22 51/12
Ms. [20] 10/10 10/25 11/3
11/6 11/16 11/19 11/25
12/11 12/14 12/23 14/7
14/20 32/23 33/15 33/18
33/19 34/16 46/5 46/7
47/15
Ms. Browne [4] 33/15 33/18
33/19 34/16

Ms. Noble [1] 32/23
Ms. Ramirez [1] 11/16
Ms. Santos [2] 46/5 47/15
Ms. Santos's [1] 46/7
Ms. Staatz [11] 10/10 10/25
11/3 11/6 11/19 11/25
12/11 12/14 12/23 14/7
14/20
much [4] 18/11 25/5 40/13
41/15
my [14] 4/11 4/23 5/19 6/15
7/3 7/7 7/7 13/5 13/7 14/2
21/9 26/25 28/25 53/20

**N**

name [4] 4/8 4/14 17/20
17/23
need [1] 4/19
needed [4] 29/2 29/6 29/10
39/7
needs [3] 13/17 29/3 33/9
negotiate [3] 22/13 23/12
23/16
negotiated [5] 20/23 21/11
24/18 42/25 43/2
never [4] 6/9 16/9 24/17
39/5
new [19] 1/2 1/21 1/23 2/5
2/10 4/4 4/13 4/18 5/15
14/21 15/5 15/19 15/23
17/10 41/18 42/6 53/4 53/5
53/8
Next [1] 9/11
no [52] 6/8 7/2 7/21 7/24
8/3 10/15 10/18 10/21 11/2
11/5 11/9 11/20 12/9 12/12
12/15 12/18 12/22 13/14
13/25 14/18 15/11 15/21
16/6 18/3 18/7 18/18 19/23
20/2 20/6 22/19 23/7 23/14
24/16 25/14 30/4 30/20
31/11 31/18 32/18 33/5
36/7 38/6 38/10 38/14
38/16 41/20 43/21 47/19
47/25 47/25 49/3 53/16
NOBLE [5] 1/3 1/17 4/10
32/23 50/14
Nobody [1] 29/19
nods [1] 5/3
non [2] 47/8 52/9
non-privileged [4] 47/8 52/9
None [1] 52/14
NORMA [1] 2/6
not [22] 4/23 19/21 22/13
23/12 23/16 26/14 26/15
26/18 27/17 28/17 28/17
28/21 28/21 29/19 30/24
31/11 31/19 33/5 40/21
44/18 47/17 53/14
Notary [4] 1/22 4/3 50/20
53/7
notes [3] 31/4 31/5 31/6
nothing [1] 43/17
November [3] 24/6 24/19
25/2
November 2 [1] 24/6
now [6] 18/22 21/8 32/13
36/24 40/5 45/18
number [4] 27/4 27/14
27/17 27/20
numbers [2] 27/16 27/19

**O**

oath [1] 3/11

object [2] 9/9 14/9
Objection [6] 25/12 35/23
36/10 43/11 43/16 44/21
objections [1] 3/20
occupation [1] 5/7
off [5] 17/16 17/17 21/9
44/4 44/5
off-the-record [2] 17/17
44/5
office [14] 7/3 7/6 7/8 7/9
10/7 14/2 15/4 22/21 26/24
27/2 27/21 29/8 29/21
32/16
officer [1] 7/22
offices [1] 1/20
okay [2] 5/5 28/24
OLIVE [1] 1/8
OLIVER [1] 1/8
OLIVERT [1] 1/8
OLIVET [4] 1/7 1/9 4/15
47/11
once [1] 29/11
one [12] 6/7 10/23 11/12
13/5 13/7 20/16 22/24
25/22 29/4 32/21 40/14
40/15
only [1] 41/25
open [4] 17/12 18/4 18/9
18/17
opened [1] 17/13
opening [1] 19/5
oral [1] 15/17
order [4] 1/18 15/5 22/2
29/4
organized [1] 31/11
original [2] 3/8 3/16
Ortiz [8] 1/20 1/20 2/4 2/4
2/6 2/13 2/13 47/16
other [22] 5/17 6/14 6/15
6/17 11/7 13/12 13/15 16/6
20/3 20/19 20/19 25/22
29/2 31/22 31/23 32/3 44/7
47/2 47/15 47/17 48/6
48/20
others [1] 7/3
our [1] 29/8
out [2] 27/16 31/23
outcome [1] 5/17
Oviedo [14] 5/23 6/2 6/5
6/14 13/15 13/17 26/9
26/19 29/9 29/21 31/16
31/19 33/9 38/18
Oviedo's [1] 13/20 26/16
33/2
own [1] 15/14
owner [2] 10/4 10/13

**P**

P.C [1] 2/8
page [8] 9/13 9/14 11/21
12/3 51/4 51/20 52/3 52/13
paid [2] 25/5 31/19
papers [6] 7/2 26/10 29/7
30/23 30/25 39/6
paperwork [1] 29/3
paragraph [13] 20/8 20/9
20/25 22/10 25/25 27/12
27/22 28/5 30/7 33/10 37/8
37/14 43/9
Park [1] 4/13
part [5] 14/2 21/18 21/24
21/25 29/6
particular [3] 12/20 12/25
39/21

parties [2] 3/6 53/15
partner [2] 6/25 7/11
partners [2] 6/21 6/24
party [1] 6/3
pay [7] 12/7 12/10 12/13
12/16 33/19 36/18 36/21
payable [1] 19/15
payment [9] 16/13 16/22
20/4 31/22 32/4 34/19
42/16 42/24 51/11
payroll [1] 8/7
pending [1] 4/21
person [2] 10/8 14/10
Personally [1] 15/25
pertain [1] 22/25
phone [10] 26/15 26/16
26/24 26/24 26/25 27/2
27/4 27/14 27/16 52/6
physical [1] 24/25
place [2] 50/11
PLAINTIFF [4] 1/5 1/16 2/4
28/6
please [2] 4/8 4/25
point [4] 23/25 24/11 39/24
46/8
position [1] 34/11
possess [1] 45/22
possession [3] 14/19 15/8
15/13
potential [1] 24/15
power [1] 10/4
prepared [3] 9/4 11/10
11/12
preprinted [1] 17/20
present [3] 2/13 10/25 11/3
president [2] 10/10 11/8
price [7] 16/10 39/13 40/9
40/11 40/17 41/3 42/13
prior [6] 6/9 9/23 10/13
10/17 13/3 14/4
privileged [2] 47/8 52/9
Procedure [1] 1/19
procedures [1] 15/24
proceedings [12] 14/8 15/4
15/10 15/15 23/3 30/3
33/12 37/10 38/21 39/2
43/7 43/15
production [7] 18/24 19/13
20/16 27/9 27/15 32/21
46/4
properties [2] 5/13 5/18
property [30] 4/17 5/17
5/19 5/21 6/6 6/10 7/17
10/3 10/8 10/9 10/13 14/22
15/6 15/15 15/20 16/8
16/24 22/22 25/20 26/4
26/12 27/24 28/7 28/23
28/25 30/22 31/9 41/3 41/9
45/4
prosecute [2] 30/9 30/15
provide [1] 38/11
provider [1] 27/6
Public [4] 1/22 4/4 50/20
53/7
purchase [13] 9/20 16/10
25/2 27/24 28/7 28/9 31/8
40/17 41/8 42/13 45/3 46/5
52/8
purchased [1] 6/10
purchaser [1] 11/23 40/6
purchases [1] 25/23
purchasing [1] 18/5 30/22
purpose [8] 18/5 25/15

**P**

purpose... [6] 25/17 25/19
35/18 40/22 40/24 48/2
purposes [1] 6/11
pursuant [1] 1/18
put [1] 41/16

**Q**

question [29] 4/21 4/22
4/24 7/14 13/17 15/2 18/13
20/21 21/12 24/23 28/13
30/17 33/8 33/9 36/14
36/20 37/24 38/23 40/21
42/2 44/14 46/9 47/4 47/13
48/5 48/9 48/12 48/17
52/13
questions [3] 9/7 49/4
52/12

**R**

Ramirez [42] 11/12 11/16
11/17 12/4 12/7 12/10
12/13 12/16 12/20 12/24
13/3 13/9 13/13 13/16
19/16 19/19 19/24 20/4
21/4 21/11 22/11 22/17
22/20 23/12 23/16 23/20
23/23 24/2 24/7 24/11
24/14 24/17 24/24 24/25
25/9 25/16 29/25 30/5 40/3
40/4 41/18 45/24
read [2] 14/3 14/14
reading [1] 48/7
real [4] 5/8 5/9 8/6 13/6
really [1] 14/10
reason [1] 29/13
recall [7] 20/14 26/21 38/8
39/15 39/16 46/22 48/15
receive [1] 8/11
recess [1] 31/13
recollection [2] 22/17 39/6
48/11 48/20
record [6] 4/9 17/16 17/17
44/4 44/5 53/12
records [6] 18/19 18/25
19/3 27/9 52/4 52/6
reduction [5] 40/16 40/20
40/23 40/25 41/7
refer [1] 8/24
reference [5] 21/2 33/2
41/12 43/25 45/16
referenced [1] 20/10
references [1] 17/4
referencing [2] 30/12 45/9
referring [1] 28/11
refresh [1] 22/16
regard [1] 29/10
regarding [23] 4/17 5/13
9/25 12/20 13/23 15/18
15/23 18/19 20/4 23/25
25/2 26/3 27/11 27/24
31/23 33/2 38/12 38/13
45/23 45/24 46/5 47/2 47/9
register [1] 19/13
related [1] 53/15
relationship [1] 6/13
remember [16] 18/10 19/9
19/11 20/12 20/13 25/8
27/18 27/20 36/24 39/20
45/18 46/21 46/24 47/5
48/13 49/2
rephrase [1] 4/24
reporter [6] 5/3 8/20 34/2
35/2 45/11 46/17
represent [9] 4/15 6/3 12/8
12/11 24/3 24/7 24/12
25/10 32/23
representation [1] 46/7
represented [6] 11/17
11/19 23/5 23/9 35/6 47/16
representing [6] 12/5 13/7
13/8 23/7 40/5 40/6
REQUESTED [1] 52/2
require [1] 43/6
required [1] 14/7
Researching [1] 10/3
reserved [1] 3/21
reside [1] 4/11
respect [11] 16/3 22/7
25/20 27/15 30/10 30/10
30/16 30/21 33/7 45/19
48/21
respective [1] 3/5
retain [13] 24/24 32/4 32/5
32/9 35/21 35/22 36/5 36/8
36/15 36/17 37/6 47/24
48/3
retained [11] 24/7 24/11
24/18 25/15 25/19 33/11
33/15 35/24 36/11 47/21
51/15
retainer [14] 12/7 12/19
12/24 23/23 24/25 25/5
32/22 35/20 36/4 36/12
36/19 36/21 37/2 48/7
retaining [4] 23/19 32/7
32/15 48/22
return [4] 26/11 26/14
26/15 26/16
rider [3] 42/12 44/18 44/23
right [2] 32/13 36/24
rights [1] 7/25
Road [1] 4/12
roughly [1] 38/8
Rules [1] 1/19
RULING [1] 52/12

**S**

said [5] 14/14 17/19 28/23
43/19 47/21
sale [19] 5/21 9/16 15/15
21/17 21/21 22/2 22/14
24/2 24/9 29/13 29/16 30/9
30/15 30/24 31/20 33/17
42/6 42/8 51/9
same [7] 3/11 3/14 3/16 7/8
27/3 27/6 27/14
Santos [6] 45/9 45/17 46/5
47/15 51/13 52/8
Santos's [1] 46/7
say [15] 7/18 24/4 25/17
26/14 26/22 28/24 35/24
36/11 36/13 39/17 41/6
43/2 43/21 43/22 43/23
saying [1] 28/18
says [5] 14/23 36/4 36/11
39/19 43/17
sealing [1] 3/6
search [2] 10/12 47/7
second [6] 24/8 33/17
39/12 40/15 41/5 51/8
see [7] 10/8 10/12 10/16
21/2 38/5 39/13 44/25
seems [1] 17/9
seen [9] 8/25 9/13 16/18
34/4 35/10 39/10 42/4
45/13 46/20
self [3] 8/5 8/6 13/21
self-employed [3] 8/5 8/6
13/21
sell [5] 10/4 15/6 15/19
16/8 28/23
seller [4] 11/25 12/6 40/5
40/7
selling [4] 6/6 13/8 13/10
29/23
service [1] 3/15
set [2] 53/11 53/20
shakes [1] 5/4
she [67] 11/6 14/9 14/10
14/14 14/14 14/15 14/21
14/24 15/13 16/7 21/21
21/24 21/25 22/3 22/6 26/4
26/8 26/9 26/10 26/11
26/11 26/12 26/14 26/15
26/16 27/13 28/16 28/17
28/18 28/22 28/23 28/23
29/2 29/3 29/5 29/6 29/7
29/8 29/8 29/10 29/11
29/12 29/17 29/19 29/20
30/2 35/6 35/23 35/24
36/10 36/11 36/13 37/10
37/16 38/3 38/3 38/6 38/7
38/21 41/7 43/17 43/19
43/21 43/22 43/23 45/19
45/22
short [1] 31/13
show [6] 16/16 28/4 34/3
35/8 39/9 45/12
showed [1] 42/20
Showing [1] 46/18
sign [5] 10/22 12/19 24/24
37/2 39/21
signed [17] 3/9 3/11 3/14
10/24 11/4 11/7 11/14
12/23 14/20 26/6 27/25
28/10 29/11 29/14 35/13
42/11 45/4
significant [3] 6/15 6/17 7/3
signing [2] 7/25 46/22
since [6] 5/11 6/18 8/5 13/6
22/6 27/24
slow [1] 4/25
so [10] 7/4 7/8 13/9 21/8
23/2 28/21 29/8 36/19
38/25 41/4
sold [2] 13/5 22/22
sole [2] 18/5 34/13
some [7] 18/15 23/25 24/4
24/10 26/9 27/19 46/8
somebody [1] 31/10
something [2] 28/19 48/18
SOUTHERN [1] 1/2
speak [3] 4/19 42/2 42/5
specific [2] 10/2 48/8
specifically [2] 5/6 33/5
specified [1] 50/11
specify [1] 47/22
spend [1] 32/3
spent [1] 33/3
spoke [1] 48/23
SS [1] 53/4
STAATZ [46] 1/9 4/16 8/23
10/10 10/25 11/3 11/6
11/19 11/25 12/11 12/14
12/23 14/7 14/20 15/3 15/9
15/17 15/23 16/2 16/4 16/7
21/18 23/8 23/11 23/23
26/2 27/10 27/17 28/14
28/14 30/2 30/6 31/17
33/18 33/19 35/7 35/22
self [3] 8/5 8/6 13/21
36/9 36/16 36/22 37/6
37/21 39/7 41/6 43/6 52/9
state [10] 1/23 4/4 4/8
22/11 24/14 30/8 33/11
37/9 53/4 53/8
statements [1] 15/18
states [2] 1/2 26/2
Steinway [2] 1/21 2/5
still [6] 18/17 27/3 29/16
40/4 41/8 41/21
STIPULATED [2] 3/4 3/19
Stockholder [1] 7/20
stop [1] 26/4
stopped [1] 26/3
Street [3] 1/21 2/5 2/9
stuff [2] 30/25 38/24
stymied [2] 28/8 28/19
Subscribed [1] 50/17
such [2] 20/10 53/12
Suite [2] 2/5 2/9
supposed [1] 41/16
Suwatte [2] 2/13
sworn [5] 3/9 4/3 50/5
50/17 53/11
Sylvia [3] 1/22 53/7 53/23

**T**

take [5] 5/3 11/21 20/7
31/12 43/24
taken [2] 1/17 31/14
talk [2] 29/9 29/21
talking [2] 26/18 37/12
tax [1] 8/12
TD [3] 18/25 20/20 52/4
tell [16] 4/25 6/5 11/6 16/7
18/16 19/21 19/24 22/20
24/17 25/7 25/9 26/5 29/25
38/20 44/22 48/18
tenants [1] 47/12
TERESA [4] 1/3 1/17 4/10
50/14
term [4] 43/13 43/18 43/20
43/22
terminated [1] 38/22
termination [1] 38/13
terms [8] 10/2 14/6 14/11
16/6 22/23 29/23 44/17
44/19
testified [1] 4/5
testify [1] 53/9
testimony [3] 50/6 50/10
53/13
than [10] 6/14 11/8 20/20
31/22 32/3 41/4 44/7 47/2
47/15 48/21
that [181] 3/6 3/8 3/12 3/20
4/21 5/19 7/6 7/13 7/17 9/2
9/3 9/6 9/8 9/13 9/15 9/17
9/20 9/23 10/5 10/17 10/24
11/7 11/10 11/12 12/17
13/15 13/16 13/17
13/22 13/23 14/6 14/23
16/20 16/23 17/7 17/8
17/12 17/13 18/2 18/13
18/17 18/18 18/20 18/22
18/25 19/7 19/8 19/13
19/15 19/18 19/22 20/14
20/21 20/24 21/2 21/8
21/12 22/11 22/11 22/16
22/23 22/24 22/24 23/2
23/3 23/17 23/24 24/8 25/7
25/10 25/13 25/18 25/23
26/2 26/10 27/23 28/10

**T**

that... [99] 28/19 29/3 29/13 29/19 29/24 30/4 30/5 30/10 30/11 30/17 31/11 31/25 32/6 32/7 32/12 32/16 32/17 32/18 32/19 33/8 33/9 33/11 33/17 33/20 34/5 34/7 34/9 34/13 34/18 35/3 35/5 35/10 35/13 35/15 35/18 36/2 36/18 36/23 36/25 37/7 37/9 37/24 38/8 38/19 38/23 39/7 39/11 39/14 39/19 39/21 39/24 39/25 40/20 40/21 40/23 41/3 42/2 42/4 42/6 42/9 42/11 42/22 42/25 43/3 43/5 43/9 43/12 43/13 43/17 43/22 43/23 44/7 44/11 44/14 44/17 44/19 45/4 45/14 45/16 46/9 46/20 46/22 47/4 47/13 48/4 48/6 48/9 48/12 48/17 48/19 48/22 48/23 50/4 50/8 53/10 53/12 53/13 53/14 53/16
them [2] 8/11 8/24
then [5] 4/22 7/5 26/10 28/25 29/12
there [16] 4/20 6/5 9/5 13/7 23/18 23/22 39/19 40/8 40/16 43/16 43/17 43/19 43/22 44/12 44/23 47/24
they [2] 33/4 41/4
things [4] 10/4 29/5 29/10 30/25
this [47] 4/18 5/16 5/21 7/17 8/19 9/3 10/11 10/23 11/18 11/22 12/8 12/11 12/20 13/3 13/10 15/15 17/15 18/4 21/5 22/8 23/5 24/2 25/11 25/20 26/4 27/11 28/5 28/25 29/16 30/22 31/8 33/25 34/6 34/25 39/12 41/8 41/12 42/16 45/11 45/20 46/3 46/16 47/6 50/18 53/15 53/17 53/20
those [1] 38/24
three [1] 6/20
through [8] 5/22 7/4 8/16 8/19 15/4 22/3 23/4 41/2
time [14] 1/14 3/21 4/18 23/5 23/25 24/4 24/11 39/24 46/3 46/8 47/6 48/10 48/16 50/10
times [4] 15/22 26/20 26/21 26/22
today [5] 7/17 14/4 18/17 47/17 48/23
together [4] 6/19 7/2 7/5 7/8
told [6] 7/6 29/17 29/19 30/2 38/3 38/6
too [1] 4/25
top [1] 21/9
transcript [3] 18/24 50/9 50/9
trial [2] 3/21 49/6
true [3] 28/19 50/9 53/12
trustee [2] 1/9 11/8
truth [1] 50/5
trying [1] 28/21
type [1] 7/18

**U**

uncomfortable [1] 13/24
Under [1] 14/6
understand [2] 4/23 15/2
UNITED [1] 1/2
unsigned [1] 3/13
until [3] 19/6 22/13 31/19
upon [2] 3/16 28/9
Urvany [2] 34/10 35/17
us [1] 29/4
use [1] 25/23
used [8] 3/13 27/17 29/9 29/20 48/5 48/10 48/13 48/22
usually [1] 44/23

**V**

valid [1] 28/6
verbal [1] 5/2
visited [1] 10/7
vote [1] 22/3

**W**

waived [1] 3/8
want [14] 16/8 16/16 20/7 21/7 29/12 32/11 32/19 34/3 35/8 35/24 39/9 41/11 43/24 48/18
wanted [1] 28/23
was [110] 4/4 5/7 5/16 5/19 6/2 7/16 8/5 9/3 9/3 9/11 9/20 10/3 10/6 10/7 10/8 10/10 10/13 10/24 11/12 11/25 13/6 13/6 13/7 13/8 14/7 14/24 16/11 16/14 17/7 17/8 17/18 18/2 18/11 19/6 19/10 19/15 20/10 20/23 21/11 23/3 23/7 23/22 24/8 25/5 25/15 25/17 25/19 27/25 28/10 28/24 29/5 29/19 29/24 31/13 31/20 32/8 33/17 33/23 34/6 34/15 34/18 34/24 35/3 35/15 35/18 36/5 37/9 37/11 37/17 37/23 38/3 38/7 38/9 38/21 39/3 39/13 39/17 40/4 40/5 40/8 40/14 40/15 40/16 41/21 42/16 42/20 42/25 43/3 43/9 43/18 43/19 43/22 44/3 44/6 44/12 45/4 45/9 45/19 46/15 47/24 48/6 48/10 48/15 48/24 49/6 53/11
wasn't [6] 14/2 19/24 26/12 29/5 29/7 29/17
way [3] 28/14 29/14 53/17
we [18] 6/20 7/2 7/5 7/8 7/17 26/6 26/7 26/18 29/14 29/15 29/22 31/12 38/5 39/5 40/25 41/4 48/23
well [2] 6/25 22/4
went [2] 40/11 40/25
were [17] 5/17 7/2 7/10 7/22 8/4 8/8 8/18 11/3 11/23 13/19 26/6 26/7 30/11 31/23 33/4 41/15 47/20
what [51] 5/7 7/18 10/2 10/2 14/11 16/16 16/20 19/3 24/20 25/15 25/17 25/18 25/19 26/4 28/10

28/14 29/13 30/2 31/7 31/25 32/9 33/4 33/6 33/14 34/3 34/9 34/11 34/18 35/3 35/8 35/15 35/18 36/2 37/22 37/25 38/25 39/3 39/9 39/19 40/22 42/13 42/16 43/9 44/2 44/10 45/12 46/18 47/22 47/25 48/2 48/24
whatever [2] 22/25 28/20
when [23] 6/23 7/5 7/18 10/24 11/3 11/14 17/12 17/19 19/8 24/4 24/18 25/17 26/6 26/14 28/16 28/22 29/2 37/10 37/16 38/8 41/6 43/2 48/10
where [5] 4/11 14/20 15/9 15/13 38/3
WHEREOF [1] 53/19
Whereupon [9] 8/17 17/17 31/13 33/23 34/23 44/5 45/8 46/14 49/5
whether [2] 22/17 47/20
which [6] 6/3 13/12 27/16 36/19 43/14 48/24
who [14] 7/16 10/3 10/4 10/12 11/10 12/4 15/12 29/17 35/6 35/13 37/12 37/19 39/25 42/8
whole [1] 39/2
whose [1] 53/10
will [1] 31/12
withdraw [2] 19/7 44/11
within [2] 3/7 53/8
witness [7] 3/9 3/15 3/17 52/6 53/10 53/13 53/19
work [3] 5/23 7/5 7/8
worked [1] 25/22
would [11] 9/5 20/18 20/19 22/3 22/12 22/21 25/10 27/18 31/19 42/22 45/22
write [4] 20/3 32/2 34/7 42/19
written [2] 14/20 20/11
wrong [2] 21/7 32/11
wrote [3] 34/15 35/5 42/9

**Y**

year [2] 8/12 48/24
yes [51] 5/25 6/12 6/22 8/13 9/4 9/19 10/23 11/24 12/2 14/25 15/7 16/19 17/6 17/11 17/25 19/20 21/3 21/20 21/25 22/9 23/10 25/4 27/5 27/7 27/20 28/12 30/13 30/23 33/13 34/6 34/8 35/12 37/4 37/14 37/18 39/23 40/10 40/12 41/14 41/23 42/12 42/21 42/24 43/4 43/8 45/5 45/15 45/18 45/21 46/2 47/22
YORK [15] 1/2 1/21 1/23 2/5 2/10 4/4 4/18 5/16 14/21 15/5 15/19 15/24 53/4 53/5 53/8
you [243] 4/11 4/16 4/19 4/21 4/23 5/9 5/12 5/17 5/20 5/23 6/5 6/9 6/14 6/16 6/21 6/23 7/10 7/12 7/15 7/18 7/22 7/25 8/4 8/8 8/24 8/22 8/25 9/5 9/7 9/13 9/24 10/12 10/16 10/18 10/22 10/24 11/3 11/6 11/14 11/15 11/17 11/23 12/7

12/8 12/10 12/17 12/19 12/23 13/2 13/11 13/13 13/19 13/22 14/3 14/16 14/16 14/19 15/3 15/8 15/12 15/18 15/22 16/3 16/5 16/7 16/8 16/16 16/18 17/12 17/14 17/23 18/4 18/9 18/11 18/16 18/19 18/21 19/3 19/8 19/18 19/21 19/24 20/3 20/7 20/9 20/22 21/2 21/2 21/4 21/7 21/10 21/19 22/10 22/11 22/17 22/20 23/6 23/11 23/18 23/22 24/3 24/4 24/6 24/7 24/10 24/11 24/12 24/15 24/17 24/18 24/24 25/5 25/9 25/12 25/18 25/12 25/15 25/17 25/18 25/19 26/3 26/5 26/14 26/20 26/22 26/23 27/3 27/18 27/23 27/23 28/2 28/10 28/15 28/28 28/29 29/17 29/25 30/8 30/8 30/11 30/14 30/14 30/17 30/18 30/21 31/4 31/9 31/15 31/20 31/23 31/25 32/2 32/9 32/11 32/13 32/14 32/17 32/19 32/25 33/4 33/6 33/11 33/14 34/3 34/4 34/7 34/15 35/5 35/8 35/10 35/21 35/12 35/22 35/24 36/5 36/8 36/15 36/18 36/21 36/24 37/2 37/5 37/9 37/12 37/22 38/2 38/3 38/8 38/11 38/15 38/17 38/20 38/23 39/9 39/10 39/15 39/21 39/25 40/6 40/19 40/22 41/15 41/18 41/24 41/25 42/4 42/11 42/19 42/20 43/2 43/9 43/13 43/24 44/2 44/10 44/14 44/21 44/22 45/12 45/13 46/8 46/11 46/18 46/20 46/22 46/25 47/4 47/10 47/16 47/20 47/21 47/21 47/23 47/23 48/2 48/2 48/8 48/10 48/15 48/17 48/18 48/20
your [34] 4/8 4/19 4/22 5/2 5/7 6/9 6/12 17/20 17/23 18/12 20/8 20/9 20/25 21/14 22/10 22/16 26/15 26/23 27/22 30/7 32/25 33/10 34/11 37/8 37/14 43/5 44/8 44/13 44/16 45/2 45/19 47/2 47/7 48/11
yourself [2] 36/6 37/3
Yvon [3] 45/9 45/17 51/13

## Diamond Errata Sheet

**Plaintiff(s):** _____

_____

_____

**Defendant(s):** _____

_____

_____

| Page | Line | Correction | Reason for Correction |
|------|------|------------|----------------------|
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |
|      |      |            |                      |

**Date:** _____

**Name of Witness:** _____

**Signature:** _____

_____

Subscribed and sworn to before me

This _____ of _____ 20____.

_____

**Notary Public**

EXHIBIT "J"

# PURCHASE MEMORANDUM

June 26, 2014

**PROPERTY ADDRESS:**   **2176 Grand Concourse,**
**Bronx, NY 10457**

**SALES OFFER:**   **$600,000.00 contract amount**

**DOWN PAYMENT:**   **$15,000.00**
Upon signing more formal contract

**MORTGAGE AMOUNT:**   **$480,000.00**

---

**BUYER:**
**Maria T. Noble and or assigns**
**250 Gorge Rd. Apt. 12D**
**Cliffside Park, NJ 07010**
**Tel. 718-741-3100**
**Cel. 212-810-1113**

**Buyer Attorney:**
**Ivonne Santos, esq**

**SELLER:**
**MT. Olivet Church Inc.**
**2176 Grand Concourse,**
**Bronx, NY 10456**
**Tel. 718-584-0155**
**Cel 347-291-2501**

**Sellers Attorney:**
**Jaime Ramirez, esq**

ADDITIONAL INFORMATION
The sale will be in a as is condition. The property will be delivered vacant by the
seller and without any tenants disputes. Thank you.

① Need et order to Sell  — Check a/ Judicial
S/w Angelo

② family dwelling

EXHIBIT "K"

Reorder Form No. 8068 (3/00)- Residential contract of sale J-91

Jointly prepared by the Real Property Section of the New York State Bar Association, the New York State Land Title Association, the Committee on Real Property Law of the Association of the Bar of the City of New York and the Committee on Real Property Law of the New York County Lawyers' Association.

Warning: NO REPRESENTATION IS MADE THAT THIS FORM OR CONTRACT FOR THE SALE AND PURCHASE OF REAL ESTATE COMPLIES WITH SECTION 5-702 OF THE GENERAL OBLIGATIONS LAW ("PLAIN LANGUAGE").

**CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT.**

NOTE: FIRE AND CASUALTY LOSSES AND CONDEMNATION.
This contract form does not provide for what happens in the event of fire, or other casualty loss or condemnation before the title closing. Unless different provision is made in this contract, Section 5-1311 of the General Obligations Law will apply. One part of the law makes a Purchaser responsible for fire and casualty loss upon taking possession of the Premises before the title closing.

**Residential Contract of Sale**

**Date:** CONTRACT OF SALE, made as of JULY 9 , 2014
BETWEEN MT. OLIVET CHURCH INC.

**Parties:** Address 2176 GRAND CONCOURSE BRONX, NEW YORK 10456
Social Security Number/Fed. I.D. No(s):

hereinafter called "SELLER", and MARIA T. NOBLE AND/OR HER ASSIGNEE

Address 350 GORGE ROAD APT 12 D CLIFFSIDE PARK 07010
Social Security Number/Fed. I.D. No.(s):

hereinafter called "PURCHASER".

The parties hereby agree as follows:

**Premises:** 1. Seller shall sell and convey and Purchaser shall purchase the property, together with all buildings and improvements thereon (collectively the "Premises"), more fully described on a separate page marked "Schedule A", annexed hereto and made a part hereof and also known as:

Street Address: 2176 GRAND CONCOURSE BRONX, NEW YORK

Tax Map Designation: BLOCK 3155 LOT 14

Together with Seller's ownership and rights, if any, to land lying in the bed of any street or highway, opened or proposed, adjoining the Premises to the center line thereof, including any right of Seller in any unpaid award by reason of any condemnation and/or for any damage to the Premises by reason of change of grade of any street or highway. Seller shall deliver at no additional cost to Purchaser, at Closing (as hereinafter defined), or thereafter, on demand, any documents that Purchaser may reasonably require for the conveyance of such title and the assignment and collection of such award or damages.

**Personal Property:** 2. This sale also includes all fixtures and articles of personal property now attached or appurtenant to the Premises, unless specifically excluded below. Seller represents and warrants that at Closing they will be paid for and owned by Seller, free and clear of all liens and encumbrances, except any existing mortgage to which this sale may be subject. They include, but are not limited to, plumbing, heating, lighting and cooking fixtures, bathroom and kitchen cabinets, mantels, door mirrors, switch plates and door hardware, venetian blinds, window treatments, shades, screens, awnings, storm windows, storm doors, window boxes, mail box, TV aerials, weather vane, flagpole, pumps, shrubbery, fencing, outdoor statuary, tool shed, dishwasher, washing machine, clothes dryer, garbage disposal unit, range, oven, refrigerator, freezer, air conditioning equipment and installations, wall to wall carpeting and built-ins not excluded below (strike out inapplicable terms): ALL AS PRESENTLY EXISTING

Excluded from this sale are furniture and household furnishings and

**Purchase Price:** 3. The purchase price is $                                          600,000.00

payable as follows:

(a) on the signing of this contract, by Purchaser's check payable to the Escrowee (as hereinafter defined), subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 6 of this contract (the "Downpayment"):        $15,000.00
(b) by allowance for the principal amount unpaid on the existing mortgage on the date hereof, payment of which Purchaser shall assume by joinder in the deed:        $0
(c) by a purchase money note and mortgage from Purchaser to Seller:        $0
(d) balance at Closing in accordance with paragraph 7:        $585,000.00

**Existing Mortgage:** 4.        (Delete if inapplicable) If this sale is subject to an existing mortgage as indicated in 3(b) above,
(a) The premises shall be conveyed subject to the continuing lien of the existing mortgage, which is presently payable, with interest at the rate of            percent per annum, in monthly installments of $            which include principal, interest and escrow amounts, if any, and with any balance of principal being due and payable on
(b) To the extent that any required payments are made on the existing mortgage between the date hereof and Closing which reduce the unpaid principal amount thereof below the amount shown in paragraph 3(b), then the balance of the price payable at Closing under paragraph 3(d) shall be increased by the amount of the payments of principal. Seller represents and warrants that the amount shown in paragraph 3(b) is substantially correct and agrees that only payments required by the existing mortgage will be made between the date hereof and Closing.
(c) If there is a mortgage escrow account, Seller shall assign it to Purchaser, if it can be assigned, and in that case Purchaser shall pay the amount in the escrow account to Seller at Closing.
(d) Seller shall deliver to Purchaser at Closing a certificate dated not more than 30 days before Closing signed by the holder of the existing mortgage, in form for recording, certifying the amount of the unpaid principal, the date to which interest has been paid and the amounts, if any, claimed to be unpaid for principal and interest, itemizing the same. Seller shall pay the fees for recording such certificate. If the holder of the existing mortgage is a bank or other institution as defined in Section 274-a of the Real Property Law ("Institutional Lender"), it may, instead of the certificate, furnish a letter signed by a duly authorized officer, employee or agent, dated not more than 30 days before Closing, containing the same information.
(e) Seller represents and warrants that (i) Seller has delivered to Purchaser true and complete copies of the existing mortgage, the note secured thereby and any extensions and modifications thereof, (ii) the existing mortgage is not now in default, and at the time of Closing will not be, in default, and (iii) the existing mortgage does not contain any provision that permits the holder of the mortgage to require its immediate payment in full or to change any other term thereof by reason of the sale or conveyance of the Premises.

**Purchase Money Mortgage:** 5.        (Delete if inapplicable) If there is to be a purchase money mortgage as indicated in 3(c) above,
(a) The purchase money note and mortgage shall be drawn by the attorney for Seller in the form attached or, if not, in the standard form adopted by the New York State Land Title Association. Purchaser shall pay at Closing the mortgage recording tax, recording fees and the attorney's fees in the amount of $            for its preparation.
(b) The purchase money note and mortgage shall also provide that it is subject and subordinate to the lien of the existing mortgage and any extensions, modifications, replacements or consolidations of the existing mortgage, provided that (i) the interest rate thereof shall not be greater than            percent per annum and the total debt service thereunder shall not be greater than $            per annum, and (ii) if the principal amount thereof shall exceed the amount of principal owing and unpaid on the existing mortgage at the time of placing such new mortgage or consolidated mortgage, the excess be paid to the holder of such purchase money mortgage in reduction of the principal thereof. The purchase money mortgage shall also provide that such payment to the holder thereof shall not affect or affect the regular installments, if any, of principal payable thereunder and that the holder thereof will, on demand and without charge therefor, execute, acknowledge and deliver any agreement or agreements further to effectuate such subordination.

**Downpayment in Escrow:** 6.        (a) Seller's attorney ("Escrowee") shall hold the Downpayment for Seller's account in a segregated bank account at            until Closing or sooner termination of this contract and shall pay over or apply the Downpayment in accordance with the terms of this paragraph. Escrowee shall hold (tad) (Delete if inapplicable) hold the Downpayment in an interest-bearing account for the benefit of the parties. If interest is held for the benefit of the parties, it shall be paid to the party entitled to the Downpayment and the party receiving the interest shall pay any income taxes thereon. If interest is not held for the benefit of the parties, the Downpayment shall be place in an IOLA account or as otherwise permitted or required by law. The Social Security or Federal Identification numbers of the parties shall be furnished to Escrowee upon request. At Closing, the Downpayment shall be paid by Escrowee to Seller. If for any reason Closing does not occur and either party gives Notice (as defined in paragraph 25) to Escrowee demanding payment of the Downpayment, Escrowee shall give prompt Notice to the other party of such demand. If Escrowee does not receive Notice of objection from such other party to the proposed payment within 10 business days after the giving of such Notice, Escrowee is hereby authorized and directed to make such payment. If Escrowee does receive such Notice of objection within such 10 day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by Notice from the parties to this contract or a final, nonappealable judgment, order or decree of a court. However,

Noble - Plaintiff's Documents
Page 98 of 250

Escrowee shall have the right at any time to deposit the Downpayment and the interest thereon with the clerk of a court in the county in which the Premises are located and shall give Notice of such deposit to Seller and Purchaser. Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

    (b) Parties acknowledge that, although Escrowee is holding the Downpayment for Seller's account, for all other purposes Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally agree to defend, indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorney's fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee.

    (c) Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel.

    (d) Escrowee acknowledges receipt of the Downpayment by check subject to collection and Escrowee's agreement as the provisions of this paragraph by signing in the place indicated on the signature page of this contract.

    (e) Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee.

**Acceptable Funds:**

7. All money payable under this contract, unless otherwise specified, shall be paid by:

    (a) Cash, but not over $1,000.00;

    (b) Good certified check of Purchaser drawn on or official check issued by any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York, unendorsed and payable to the order of Seller, or as Seller may otherwise direct upon not less than 3 business days notice (by telephone or otherwise) to Purchaser;

    (c) As to money other than the purchase price payable to Seller at Closing, uncertified check of Purchaser up to the amount of $1,000.00; and

    (d) As otherwise agreed to in writing by Seller or Seller's attorney.

**Mortgage Contingency:**

8. (Delete if inapplicable) The obligations of Purchaser hereunder are conditional upon issuance on or before ____ 9, __, 2014, (the "Commitment Date") of a written commitment from any Institutional Lender pursuant to which such Institutional Lender agrees to make a first mortgage loan, other than a VA, FHA or other governmentally insured loan, to Purchaser, at Purchaser's sole cost and expense, of $450,000.00 or such lesser sum as Purchaser shall be willing to accept, at the prevailing fixed rate of interest not to exceed prevailing or initial adjustable rate of interest not to exceed prevailing for a term of at least 30 years and on other customary commitment terms, whether or not conditional upon any factor other than an appraisal satisfactory to the Institutional Lender. Purchaser shall (a) make prompt application to an Institutional Lender for such mortgage loan, (b) furnish accurate and complete information regarding Purchaser and members of Purchaser's family, as required, (c) pay all fees, points and charges required in connection with such application and loan, (d) pursue such application with diligence, (e) cooperate in good faith with such Institutional Lender to obtain such commitment and (f) promptly give Notice to Seller of the name and address of each Institutional Lender to which Purchaser has made such application. Purchaser shall comply with all requirements of such commitment (or of any other commitment accepted by Purchaser) and shall furnish Seller with a copy thereof promptly after receipt thereof. If such commitment is not issued on or before the Commitment Date, then, unless Purchaser has accepted a commitment that does not comply with the requirements set forth above, Purchaser may cancel this contract by giving Notice to Seller within 5 business days after the Commitment Date, in which case this contract shall be deemed cancelled and thereafter neither party shall have any further rights against, or obligations or liabilities to, the other by reason of this contract, except that the Downpayment shall be promptly refunded to Purchaser and except as set forth in paragraph 27. If Purchaser fails to give such notice of cancellation then Purchaser shall be deemed to have waived Purchaser's right to cancel this contract and to receive a refund of the Downpayment by reason of the contingency contained in this paragraph.

**Permitted Exceptions:**

9. The Premises are sold and shall be conveyed subject to:

    (a) Zoning and subdivision laws and regulations, and landmark, historic or wetlands designation, provided that they are not violated by the existing buildings and improvements erected on the property or their use;

    (b) Consents for the erection of any structures on, under or above any streets on which the Premises abut;

N/N/A    (c) Encroachment of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway;

    (d) Real estate taxes that are a lien, but are not yet due and payable; and

    (e) The other matters, if any, including a survey exception, set forth in a Rider attached.

**Governmental Violations and Orders:**

10. CLOSING  (a) Seller shall comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued as of the date hereof by any governmental department having authority as to lands, housing, buildings, fire, health, environmental and labor conditions affecting the Premises. The Premises shall be conveyed free of them at Closing. Seller shall furnish Purchaser with any authorizations necessary to make the searches that could disclose these matters.

    (b) (Delete if inapplicable) All obligations affecting the Premises pursuant to the Administrative Code of the City of New York incurred prior to Closing and payable in money shall be discharged by Seller at or prior to Closing.

**Seller's Representations:**

11. (a) Seller represents and warrants to Purchaser that:

    (i) The Premises abut or have a right of access to a public road;

    (ii) Seller is the sole owner of the Premises and has the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this contract;

    (iii) Seller is not a "foreign person", as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code ("IRC") Section 1445, as amended, and the regulations promulgated thereunder (collectively "FIRPTA");

    (iv) The Premises are not affected by any exemptions or abatements of taxes; and

    (v) Seller has been known by no other name for the past ten years, except: none

    (b) Seller covenants and warrants that all of the representations and warranties set forth in this contract shall be true and correct at Closing.

    (c) Except as otherwise expressly set forth in this contract, none of Seller's covenants, representations, warranties or other obligations contained in this contract shall survive Closing.

**Condition of Property:**

12. Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other property included in this sale, based on Purchaser's own inspection and investigation thereof, and that Purchaser is entering into this contract based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or oral, as to the physical condition, state of repair, use, cost of operation or any other matter related to the Premises or the other property included in the sale, given or made by Seller or its representatives, and shall accept the same "as is" in its present condition and state of repair, subject to reasonable use, wear, tear and natural deterioration between the date hereof and the date of Closing (except as otherwise set forth in paragraph 16(f)), without any reduction in the purchase price or claim of any kind for any change in such condition by reason thereof subsequent to the date of this contract. Purchaser and its authorized representatives shall have the right, at reasonable times and upon reasonable notice (by telephone or otherwise) to Seller, to inspect the Premises before Closing.

**Insurable Title:**

13. Seller shall give and Purchaser shall accept such title as any reputable title company shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to the matters provided for in this contract.

**Closing, Deed and Title:**

14. (a) "Closing" means the settlement of the obligations of Seller and Purchaser to each other under this contract, including the payment of the purchase price to Seller, and the delivery to Purchaser of a bargain and sale deed with covenants deed in proper statutory short form for record, duly executed and acknowledged, so as to convey to Purchaser the simple title to the Premises, free of all encumbrances, except as otherwise herein stated. The deed shall contain a covenant by Seller as required by subd. 5 of Section 13 of the Lien Law.

    (b) If Seller is a corporation, it shall deliver to Purchaser at the time of Closing (i) a resolution of its Board of Directors authorizing the sale and delivery of the deed, and (ii) a certificate by the Secretary or Assistant Secretary of the corporation certifying such resolution and setting forth facts showing that the transfer is in conformity with the requirements of Section 909 of the Business Corporation Law. The deed in such case shall contain a recital sufficient to establish compliance with that Section.

**Closing Date and Place:**

15. Closing shall take place at the office of JAIME RAMIREZ ESQ at ____ o'clock on SEPTEMBER 22, 2014 or, upon reasonable notice (by telephone or otherwise) by Purchaser, at the office of LENDER'S COUNSEL.

**Conditions to Closing:**

16. This contract and Purchaser's obligation to purchase the Premises are also subject to and conditioned upon the fulfillment of the following conditions precedent:

    (a) The accuracy, as of the date of Closing, of the representations and warranties of Seller made in this contract.

    (b) The delivery by Seller to Purchaser of a valid and subsisting Certificate of Occupancy or other required certificate of compliance, or evidence that none was required, covering the building(s) and all of the other improvements located on the property authorizing their uses as a TWO family dwelling at the date of Closing.

    (c) The delivery by Seller to Purchaser of a duly executed and sworn affidavit (in form prescribed by law) claiming exemption of the sale contemplated hereby, if such be the case, under Article 31-B of the Tax Law of the State of New York and the Regulations promulgated thereunder, as the same may be amended from time to time (collectively the "Gains Tax Law"), or if such sale shall not be exempt under the Gains Tax Law, then Seller and Purchaser agree to comply in a timely manner with the requirements of the Gains Tax Law and, at Closing, Seller shall deliver to Purchaser (i) an official return showing no tax due, or (ii) an official return accompanied by a certified or official bank check drawn on a New York State banking institution payable to the order of the New York State Department of Taxation and Finance in the amount of the tax shown to be due thereon. Seller shall (x) pay promptly any additional tax that may become due under the Gains Tax Law, together with interest and penalties thereon, if any, which may be assessed or become due after Closing, and/or execute any other documents that may be required in respect thereof, and (y) indemnify, defend and save Purchaser harmless from and against any of the foregoing and any damage, liability, cost or expense (including reasonable attorney's fees) which may be suffered or incurred by Purchaser by reason of the non-payment thereof. The provisions of this subparagraph (c) shall survive Closing.

    (d) The delivery by Seller to Purchaser of a certification stating that Seller is not a foreign person, which certification shall be in the form then required by FIRPTA. If Seller fails to deliver the aforesaid certification or if Purchaser is not entitled under FIRPTA to rely on such certification, Purchaser

shall deduct and withhold from the purchase price a sum equal to 10% thereof (or any lesser amount permitted by law) and shall at Closing remit the withheld amount with the required forms to the Internal Revenue Service.

(e) The delivery of the Premises and all building(s) and improvements comprising a part thereof in broom clean condition, vacant and free of leases or tenancies, together with keys to the Premises.

(f) All plumbing (including water supply and septic systems, if any), heating and air conditioning, if any, electrical and mechanical systems, equipment and machinery in the building(s) located on the property and all appliances which are included in this sale being in working order as of the date of Closing.

(g) If the Premises are a one or two family house, delivery by the parties at Closing of affidavits in compliance with state and local law requirements to the effect that there is installed in the Premises a smoke detecting device or devices.

(h) The delivery by the parties of any other affidavit required as a condition of recording the deed.

*Deed Transfer and Recording Taxes:*

17. At Closing, certified or official bank checks payable to the order of the appropriate State, City or County officer in the amount of any applicable transfer and/or recording tax payable by reason of the delivery or recording of the deed or mortgage, if any, shall be delivered by the party required by law or by this contract to pay such transfer and/or recording tax, together with any required tax returns duly executed and sworn to, and such party shall cause any such checks and returns to be delivered to the appropriate officer promptly after Closing. The obligation to pay any additional tax or deficiency and any interest or penalties thereon shall survive Closing.

*Apportionments and Other Adjustments; Water Meter and Installment Assessments:*

18. (a) To the extent applicable, the following shall be apportioned as of midnight of the day before the day of Closing.
(i) Taxes, water charges and sewer rents, on the basis of the fiscal period for which assessed; (ii) fuel; (iii) interest on the existing mortgage; (iv) premiums on existing transferable insurance policies and renewals of those expiring prior to Closing; (v) rents as and when collected.

(b) If Closing shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the immediately preceding fiscal period applied to the latest assessed valuation.

(c) If there is a water meter on the Premises, Seller shall furnish a reading to a date not more than 30 days before Closing and the unfixed meter charge and sewer rent, if any, shall be apportioned on the basis of such last reading.

(d) If at the date of Closing the Premises are affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this contract all the unpaid installments shall be considered due and shall be paid by Seller at or prior to Closing.

(e) Any errors or omissions in computing apportionments or other adjustments at closing shall be corrected within a reasonable time following Closing. This subparagraph shall survive Closing.

*Allowance for Unpaid Taxes, etc.:*

19. Seller has the option to credit Purchaser as an adjustment to the purchase price with the amount of any unpaid taxes, assessments, water charges and sewer rents, together with any interest and penalties thereon to a date not less than five business days after closing, provided that official bills therefor computed to said date are produced at Closing.

*Use of Purchase Price to Remove Encumbrances:*

20. If at Closing there are other liens or encumbrances that Seller is obligated to pay or discharge, Seller may use any portion of the cash balance of the purchase price to pay or discharge them, provided Seller shall simultaneously deliver to Purchaser at Closing instruments in recordable form and sufficient to satisfy such liens or encumbrances of record, together with the cost of recording or filing said instruments. As an alternative Seller may deposit sufficient monies with the title insurance company employed by Purchaser acceptable to and required by it to assure their discharge, but only if the title insurance company will insure Purchaser's title clear of the matters or insure against their enforcement out of the Premises and will insure Purchaser's institutional Lender clear of such matters. Upon notice (by telephone or otherwise), given not less than 3 business days before Closing, Purchaser shall provide separate certified or official bank checks as requested to assist in clearing up these matters.

*Title Examination; Seller's Inability to Convey; Limitations of Liability:*

21. (a) Purchaser shall order an examination of title in respect of the Premises from a title company licensed or authorized to issue title insurance by the New York State Insurance Department or any agent for such title company promptly after the execution of this contract or, if this contract is subject to the mortgage contingency set forth in paragraph 8, after a mortgage commitment has been accepted by Purchaser. Purchaser shall cause a copy of the title report and of any additions thereto to be delivered to the attorney(s) for Seller promptly after receipt thereof.

(b) If at the date of Closing Seller is unable to transfer title to Purchaser in accordance with this contract, or Purchaser has other valid grounds for refusing to close, whether by reason of liens, encumbrances or other objections to title or otherwise (herein collectively called "Defects"), other than those subject to which Purchaser is obligated to accept title hereunder or which Purchaser may have waived and other that those which Seller has herein expressly agreed to remove, remedy or discharge and if Purchaser shall be unwilling to waive the same and to close title without abatement of the purchase price, then except as hereinafter set forth, Seller shall have the right, at Seller's sole election, either to take such action as Seller may deem advisable to remove, remedy, discharge or comply with such Defects or to cancel this contract; (ii) if Seller elects to take such action as to remove, remedy or comply with such Defects, Seller shall be entitled from time to time, upon Notice to Purchaser, to adjourn the date for Closing hereunder for a period or periods not exceeding 60 days in the aggregate (but not extending beyond the date upon which Purchaser's mortgage commitment, if any, shall expire), and the date for Closing shall be adjourned to a date specified by Seller not beyond such period. If for any reason whatsoever, Seller shall not have succeeded in removing, remedying or complying with such Defects at the expiration of such adjournment(s) and if Purchaser shall still be unwilling to waive the same and to close title without abatement of the purchase price, then either party may cancel this contract by Notice to the other given within 10 days after such adjourned date; (iii) notwithstanding the foregoing, the existing mortgage (unless this sale is subject to the same) and any matter created by Seller after the date hereof shall be released, discharged or otherwise cured by Seller at or prior to Closing.

(c) If this contract is cancelled pursuant to its terms, other than as a result of Purchaser's default, this contract shall terminate and come to an end, and neither party shall have any further rights, obligations or liabilities against or to the other hereunder or otherwise, except that: (i) Seller shall promptly refund or cause the Escrowee to refund the Downpayment to Purchaser and, unless cancelled as a result of Purchaser's default or pursuant to paragraph 8, to reimburse Purchaser for the net cost of examination of title, including any appropriate additional charges related thereto, and the net cost, if actually paid or incurred by Purchaser, for updating the existing survey of the Premises or of a new survey, and (ii) the obligations under paragraph 27 shall survive the termination of this contract.

*Affidavit as to Judgments, Bankruptcies, etc.:*

22. If a title examination discloses judgments, bankruptcies or other returns against persons having names the same as or similar to that of Seller, Seller shall deliver an affidavit at Closing showing that they are not against Seller.

*Defaults and Remedies:*

23. (a) If Purchaser defaults hereunder, Seller's sole remedy shall be to receive and retain the Downpayment as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be impossible to ascertain and that the Downpayment constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.

(b) If Seller defaults hereunder, Purchaser shall have such remedies as Purchaser shall be entitled to at law or in equity, including, but not limited to, specific performance.

*Purchaser's Lien:*

24. All money paid on account of this contract, and the reasonable expenses of examination of title to the Premises and of any survey and survey inspection charges, are hereby made liens on the Premises, but such liens shall not continue after default by Purchaser under this contract.

*Notices:*

25. Any notice or other communication ("Notice") shall be in writing and either (i) sent by either of the parties hereto or by their respective attorneys who are hereby authorized to do so on their behalf or by the Escrowee, by registered or certified mail, postage prepaid, or

(b) delivered in person or by overnight courier, with receipt acknowledged, to the respective addresses given in this contract for the party and the Escrowee, to whom the Notice is to be given, or to such other address as such party or Escrowee shall hereafter designate by Notice given to the other party or parties and the Escrowee pursuant to this paragraph. Each notice mailed shall be deemed given on the third business day following the date of mailing the same, except that any notice to Escrowee shall be deemed given only upon receipt by Escrowee and each Notice delivered in person or by overnight courier shall be deemed given when delivered.

*No. Assignment:*

26. This contract may not be assigned by Purchaser without the prior written consent of Seller in each instance and any purported assignment(s) made without such consent shall be void.

*Broker:*

27. Seller and Purchaser each represents and warrants to other that it has not dealt with any broker in connection with this sale other than NONE ("Broker") and Seller shall pay Broker any commission earned pursuant to a separate agreement between Seller and Broker. Seller and Purchaser shall indemnify and defend each other against any costs, claims and expenses, including reasonable attorneys' fees, arising out of the breach on their respective parts of any representations or agreements contained in this paragraph. The provisions of this paragraph shall survive Closing or, if Closing does not occur, the termination of this contract.

*Miscellaneous:*

28. (a) All prior understandings, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this contract; it completely expresses their full agreement and has been entered into after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this contract.

(b) Neither this contract nor any provision thereof may be waived, changed or cancelled except in writing. This contract shall apply to and bind the heirs, distributees, legal representatives, successors and permitted assigns of the respective parties. The parties hereby authorize their respective attorneys to agree in writing to any changes in dates and time periods provided for in this contract.

(c) Any singular word or term herein shall also be read as in the plural and the neuter shall include the masculine and feminine gender, whenever the sense of this contract may require it.

(d) The captions in this contract are for convenience of reference only and in no way define, limit or describe the scope of this contract and shall not be considered in the interpretation of this contract or any provision thereof.

(e) This contract shall not be binding or effective until duly executed and delivered by Seller and Purchaser.

(f) Seller and Purchaser shall comply with IRC reporting requirements, if applicable. This subparagraph shall survive Closing.

(g) Each party shall, at any time and from time to time, execute, acknowledge where appropriate and deliver such further instruments and

# 1st RIDER TO CONTRACT OF SALE

RIDER ATTACHED TO AND MADE A PART OF THE CONTRACT OF SALE BETWEEN:

SELLER:            MT. OLIVET CHURCH INC.

PURCHASER(S):    MARIA T. NOBLE AND OR ASSIGNEE

PREMISES:        2176 GRAND CONCOURSE BRONX NEW YORK

1. **ADDITIONAL EXCEPTIONS.** Supplementing Paragraph 9: The premises are to be sold and conveyed subject to the following matters, in addition to those matter listed in Paragraph 9:

a) Covenants, restrictions, rights of way, easements, reservations and agreements of record, if any, insofar as the same may now be in force or effect, provided same are not violated by the present structure or use of the Premises, and do not render title uninsurable;
b) Any state of facts an accurate survey of the Premises may show, provided the same does not render title unmarketable;
c) Building and zoning regulations and ordinances of the city, town or village in which the premises lie which are not violated by the existing structure or its present.
d) Rights, if any, of the municipality in which the Premises are located or of any public utility, telephone or cable television company, to install, maintain, operate and/or repair pipes, wires cables, poles and related equipment in, under, over and upon the Premises;
e) Possible encroachments of fences and variations between record lines and fences; encroachments or projections upon street or road of any stoops, areas, gratings, steps, windows, balconies, ornaments, brick, leaves, trim and cornices and the like;
f) Any state of facts a personal inspection of the Premises would show;

2.**REPAIRS.**It is understood and agreed that seller shall not be under any obligation whatsoever to make and/or pay for any repairs, alterations or improvements, including the cost of any and all inspections required by the lending institution or any other organization as a condition to the issuance of the mortgage commitment referred to previously.

3.**ASSIGNMENTS.** This contract may be assigned without the written consent of the seller.

4. **DISCLOSURES.** In the event the Seller or Purchaser or any of the principals, stockholders, directors, officers or employers of the Seller or Purchaser herein are licensed Real Estate Brokers/Salesman the Seller and/or Purchaser acknowledged that

full disclosure of this fact has been made to them, and that the purchaser is purchasing the property for possible resale at a profit.

5. <u>MORTGAGE CONTINGENCY:</u> If Purchaser is unable to obtain a commitment for such mortgage Seller's attorney shall, upon request, have the right to see copies of the application filed by the Purchaser (S) with the proposed mortgagee. If requested, Purchaser (s) will request, in writing, that mortgagee send a copy of the application to Seller's attorney.

If Purchaser is unable to obtain a firm commitment within such time, then either party may cancel this contract, subject to terms of preprinted contract, by written notice to the other party and upon refund of the down payment terminate without further liability on the part of either party to the other.

6. <u>NOTICES.</u> All notices under this contract shall be in writing, mailed, or delivered to the office of counsel for the respective parties, that have represented said parties at the signing of this contract, (or to successor counsel whose appearance has been so designated in writing). However, all notices under this contract which would have the effect of canceling and/or rescinding and/or otherwise terminating this contract, including but not limited to a Purchaser's failure to obtain mortgage commitment notice@ shall be so sent by certified mail. Notices signed by said counsel shall be sufficient.

7. <u>PERSONALITY.</u> All personal property included in this sale will be conveyed in as is condition, less normal wear and tear from the date of this contract to the closing of title.

8. <u>VIOLATIONS.</u> All notices of violation of law or municipal ordinance orders or requirement, which in the aggregate do not exceed Five Hundred ($500.00) Dollars to correct, noted in or issued by the Department of Housing and Buildings, Fire, Labor Health or other State or Municipal Authorities having jurisdiction against or affecting the premises at the date hereof shall be complied with by the Seller on or before closing and the premises shall be conveyed free of same or a credit at Seller's option in order to correct the violations. In the event cost of correcting such violations exceed Five Hundred ($500.00) Dollars in the aggregate, Seller shall have the right to elect, within ten (10) days of receipt of written notice, to cure and consummate the transaction contemplated hereby or to cancel this contract by written notice to Purchaser. In the event Seller elects to cancel the contact pursuant hereto, Seller's sole liability shall be limited to the return of the Deposit and the parties shall have no further rights or liabilities to each other under the terms and provisions of this contract. Notwithstanding the foregoing, Purchaser may elect to take the premises subject to such violations without any offset whatsoever and without any claim against or liability on the part of the Seller, except as herein provided.

Jaime Ramirez, P.C.
751 Commonwealth Avenue
Bronx, New York 10473
Tel.: 718-542-6629 Fax.: 718-542-6630
ramirezlaw@optonline.net

9. **TRAVEL ALLOWANCE.** In the event the closing of Title should take place outside of the New York City Metropolitan area, or Westchester County the buyer shall pay the sum of Three hundred Fifty ($350.00) as a travel allowance to the sellers attorney.

10. **TITLE EXAMINATION.** Purchaser agrees to order, immediately after obtaining a mortgage commitment, an examination of the title to the premises to be made on Purchaser's behalf, and, at least 10 days before the date for the closing of title, to send to the attorneys for Seller a copy of the report of such examination of title and a written statement of any objections to title of the closing of title hereunder. If Purchaser or Purchaser's attorney fails to Give Seller's attorney such notice of objection (other than bring down to date searches), then any defect or encumbrance of exception appearing on such report of title, or affecting the premises at the time of closing, shall not be deemed to be an objection to title or to the closing of title hereunder, and Purchaser shall take title subject hereto.

11. **INABILITY TO CONVEY TITLE.** If the Seller shall be unable to convey title in accordance with the provisions of this Agreement, any payments made by the Purchaser on account of the purchase price, shall be refunded, together with the reasonable expense incurred for examination of title (not exceeding the usual net charges of title issued, and the net cost of a survey), whereupon this Agreement shall be terminated and neither party hereto shall have any further rights again the other, except that, if the premises are affected by any encumbrance, outstanding interest or expression of title not expressly consented to herein by the Purchaser, which render the Seller's title to the premises unmarketable, and, which may, according to reasonable expectations, be removed within fifteen (15) days, the Seller shall have the privilege to remove or satisfy the same, and shall for this purpose be entitled to an adjournment of the closing of title to the premises marketable. The Purchaser may, nevertheless, accept such title as the Seller may be able to convey, without reduction of the purchase price, or any credit against the same and without liability on the part of the Seller.

12. **CONTRACT MODIFICATION AND EXTENSION.** Seller (s) does hereby appoint Seller's attorney herein as his agent and Purchaser(s) does hereby appoint his attorney, herein as his agent to execute any and all instrument in writing, having reference to this contract including but not limited to, modifications thereof and extensions of time for obtaining mortgage, if any, and extension of time for closing or otherwise.

13. **DEED ACCEPTANCE.** The acceptance of deed by Purchaser(s) shall be deemed to be full performance and discharge and every agreement and obligation on the part of the Seller(s) to be performed pursuant to the provisions of this agreement, except those, if any,

Jaime Ramirez, P.C.
751 Commonwealth Avenue
Bronx, New York 10473
Tel.: 718-542-6629 Fax.: 718-542-6630
ramirezlaw@optonline.net

which are herein specifically stated to survive the delivery of the deed.

14.    **SUBMISSION NOT AN OFFER.** The submission of this agreement by the Seller or their attorneys to Purchaser does not constitute an offer or an acceptance of an offer. This agreement shall not be binding upon the Sellers unless (i) the agreement has been fully executed by the Purchaser and Seller, and a fully executed copy has been delivered to each party by their respective attorneys; and (ii) Purchaser has paid the down payment pursuant to Paragraph 1 of the form printed contract.

15.    **CONTRACT CANNOT BE RECORDED.** The parties agrees that neither this agreement nor any memorandum or notice thereof shall be recorded or tendered for recording in the County Clerk's Office of the County in which the land is situated. Purchaser further agrees that if this agreement, or any memorandum or short form thereof shall be recorded in any such office, this agreement, upon notice by the Seller to the Purchaser, may be deemed to void at Seller's option and of no further force and effect and such notice, if reported, shall be deemed sufficient and adequate notice to third parties that this agreement is void and of no further force and effect.

16.    **CONFLICT.** If there is any conflict between the provisions contained in this Addendum and the provision of the printed form contract, the provisions in this addendum shall govern and be controlling to the extent necessary to resolve the conflict.

17.    **AMBIGUITY.** Both parties shall be deemed to have drafted this Agreement. In the event any provisions are found to be ambiguous, same shall not be construed against either party.

18.    Purchaser shall have the right to inspect the premises within forty-eight (48) hours prior to closing.

19.    **HEATING/COOLING BILLS.** The purchasers herein acknowledged that they have a right to the summary of the heating and/or cooling bills or a complete set of said bills, under Section 17-103, Chapter 555 of the Laws of the State of New York commonly known as the Truth in Heating Law. The purchasers herein waive their right to companies of said bills and acknowledge that they have not requested them in connection with this transaction.

20.    At closing, the premises will have an operable single station smoke detecting alarm device in accordance with the New York State Executive Law, Chapter 971, Section 270.5.

Jaime Ramirez, P.C.
751 Commonwealth Avenue
Bronx, New York 10473
Tel.: 718-542-6629 Fax.: 718-542-6630
ramirezlaw@optonline.net

Noble - Plaintiff's Documents
Page 104 of 250

21. PURCHASER REPRESENTATIONS. Purchasers warrant and represent (i) that they have assets sufficient to complete this transaction; (ii) that they have no personal knowledge of any circumstances that would render them unacceptable to any lending institution by reason of outstanding loans, obligations or jiabilities which would adversely affect their credit standing; (iii) that until the closing of title, they will not deliberately or knowingly change their financial status so as to render their mortgage application unacceptable to the lending institution. Purchasers acknowledge and represent that this transaction is not contingent on the Purchasers' ability to sell any other real or personal property.

22. CERTIFICATE OF OCCUPANCY. Supplementing paragraph #16B of the printed contract. This presentation shall not be construed to obligate Seller to incur any cost of expense to obtain a Certificate of Occupancy, Certificate of Completion and/or letter as herein above provided, and in the event that Seller cannot comply with this representation without incurring any cost, Seller shall have the option of canceling this Contract and returning to the Purchaser the down payment paid hereunder and thereupon the rights and obligations of the parities shall cease and terminate unless Purchaser waives this condition.

23. PREPARATION OF CONTRACT. In the event Purchaser is unable to obtain a mortgage commitment in accordance to the terms of the Contract, Purchaser agrees to pay the Seller's attorney the sum of one hundred and fifty ($150.00) dollars for preparation of the Contract. Seller's attorney shall be authorized to deduct said amount form the downpayment

24. TERMITE INSPECTION. Purchasers shall order a termite inspection by a reputable company, and if premises are found to be infested with termites or other wood destroying insects, the Seller shall have the option of either canceling said contract or curing premises of said infestation. Said termite inspection shall be completed within twenty (20) days from the date hereof. The purchaser shall serve written notice upon Seller's attorney within twenty (20) days after Purchaser receives the inspection report.

25. POSSESSION. Vacant and broom clean possession of the ENTIRE within described premises shall be delivered to Purchaser within 7 days after the closing of title. However, the attorney for the Seller shall hold in escrow the sum of $3,500.00 security for the faithful performance of the above agreement. In the event that Seller does not deliver vacant possession as set forth, then in that event, the attorney for the Seller is authorized to pay out of said escrow deposit the sum of $375.00 per day to the Purchaser as liquidated damages for each and every additional day that Seller remains in possession beyond the agreed period. All adjustments to be as of the day of possession.

Jaime Ramirez, P.C.<br>
751 Commonwealth Avenue<br>
Bronx, New York 10473<br>
Tel.: 718-542-6629 Fax.: 718-542-6630<br>
ramirezlaw@optonline.net

In the event Seller unable to deliver premises vacant as of the date of closing, Seller shall be entitled to an adjournment of up to ninety (90) days to bring a disposes proceeding against its current tenant.

If after (90) days, premises cannot be delivered vacant, Seller may at his option cancel this contract and return to Purchaser the down payment paid hereunder and all costs for any title expenses, mortgage application and cancellation fees, and appraisals. Purchaser, at his option, may take title to the premises on the date of Closing, subject to any tenancy remaining in the premises, whereby Seller shall assign any and all rights caused of action, etc., against tenant to Purchaser. Seller shall be relieved of all claims and shall bear no responsibility to continue or bring forth any proceedings against the tenant.

26. **APPLIANCES.** Notwithstanding the above, seller's liability in connection with any appliance shall be limited to the sum of ONE HUNDRED TWENTY FIVE ($125.00) DOLLARS 00/100 per appliance. The Purchaser shall have the right to inspect the premises within forty-eight (48) hours prior to closing and of taking possession in order to ascertain the condition of the premises.

27. **PROPERTY CONDITION DISCLOSURE.** Article 14 of the Real Property Law of the State of New York ("the Property Condition Disclosure Act" or "PCDA") provides that the Seller of a one (1) to four (4) family dwelling ("the Premises") must deliver to the prospective Purchaser of the Premises prior to signing by the Purchaser of a binding Contract of Sale a certified Property Condition Disclosure Statement ("PCDS") regarding certain conditions and information concerning the Premises which are known to the Seller. Such PCDS is not a warranty of any kind by the Seller or by any agency representing the Seller in this transaction. It is not a substitute for any inspections or test which may be conducted by the Purchaser or qualified agents on behalf of the Purchaser, and the Purchaser is encouraged to obtain his or her own independent professional engineer inspections and environmental tests and is also encouraged to check public records pertaining to the premises. Seller represents that Seller does not have actual knowledge, records or personal recollection of facts and/or events suitable to accurately complete the information requested to be set forth in the state formulated PCDS.

Section 465 of the PCDA provides that in the event that a Seller fails to deliver a PCDS before the Purchaser signs a binding Contract of Sale, the Purchaser is to receive upon the transfer of title a credit against the purchase price in the sum of $500.00. Seller hereby offers to give the Purchaser, at closing, a credit against the purchase price in the sum of $500.00. Purchaser hereby accepts the offer, in return for which credit; the Purchaser hereby released the Seller from any obligation otherwise imposed by the PCDA to deliver a PCDS.

Jaime Ramirez, P.C.
751 Commonwealth Avenue
Bronx, New York 10473
Tel.: 718-542-6629 Fax.: 718-542-6630
ramirezlaw@goptonline.net

28.  **ADJOURNMENT FEE.**  In the event the seller's attorney appears at scheduled closing and the closing has to be adjourned or cancelled through no fault of the Seller, then Purchaser shall apply to the seller's attorney a fee of $250.00.

29. **RETURNED CHECK.**  In the event the purchaser's down payment check is dishonored then in that event seller's shall be entitled to all remedies at law including contract cancellation and the purchaser shall pay seller's attorney the sum of $100.00 as a service fee in addition to replacing said dishonored check with either a certified check or official bank check.

30.  **SHORT SALE.**  ( )  Short sale (check if applicable)
This transaction shall be subject to seller's mortgagee (s) accepting a short sale application for the instant premises and shall be subject to any terms requested by mortgagee (s).  If any proposed terms are unacceptable to purchaser, purchaser shall have right to cancel transaction and receive return of down payment.  Seller acknowledges that he or she will not receive any proceeds at closing.

31.  COURT APPROVAL.  THIS TRANSACTION SHALL BE SUBJECT TO COURT APPROVAL AS REQUIRED PURSUANT TO THE APPLICABLE RELIGIOUS CORPORATION LAWS.

_____          _____
Seller                                                    Purchaser

_____          _____
Seller                                                    Purchaser

Jaime Ramirez, P.C.
751 Commonwealth Avenue
Bronx, New York 10473
Tel : 718-542-0629 Fax.: 718-542-0630
ramirezlaw@optonline.net

**Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards**

**Lead Warning Statement**

*Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.*

**Seller's Disclosure**
(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):
   (i) ☐ Known lead-based paint and/or lead-based paint hazards are present in the housing. (explain).
   _____
   (ii) ☒ Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.
(b) Records and reports available to the seller (check (i) or (ii) below):
   (i) ☐ Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).
   _____
   (ii) ☒ Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's Acknowledgment (initial)**
(c) _____ Purchaser has received copies of all information listed above.
(d) _____ Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home*.
(e) Purchaser has (check (i) or (ii) below):
   (i) ☒ received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or
   (ii) ☐ waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment (initial)**
(f) _____ Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**
The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| | | | |
|---|---|---|---|
| Seller | Date | Seller | Date |
| Maria B. Noble | | | |
| Purchaser | Date | Purchaser | Date |
| Agent | Date | Agent | Date |

Noble - Plaintiff's Documents
Page 108 of 250

documents and take such other action as may be reasonably requested by the other in order to carry out the intent and purpose of this contract. This subparagraph shall survive Closing.

(b) This contract is intended for the exclusive benefit of the parties hereto and, except as otherwise expressly provided herein, shall not be for the benefit of, and shall not create any rights in, or be enforceable by, any other person or entity.

IN WITNESS WHEREOF, this contract has been duly executed by the parties hereto.

_____
Seller
MT. OLIVET CHURCH INC.

_____ Maria B. Noble _____
Purchaser
MARIA T. NOBLE

BY: ARACELIS STAATZ

Purchaser -

Attorney for Seller: JAIME RAMIREZ

Address: 3058 CROSS BRONX EXPRESSWAY UNIT 1
BRONX, NEW YORK 10465

Tel: 718 542 6629       Fax: 718 542 6630

Attorney for Purchaser:

Address:

Tel:          Fax:

Receipt of the Down payment is acknowledged and the undersigned agrees to act in accordance with the provisions of Paragraph 6 above.

Escrowee

Contract of Sale

TITLE NO.

TO

DISTRIBUTED BY

YOUR TITLE EXPERTS
The Judicial Title Insurance Agency LLC
800-281-TITLE (8485)  FAX: 800-FAX-9396

PREMISES

DISTRICT

SECTION

BLOCK

LOT

COUNTY or TOWN

STREET NUMBER ADDRESS

EXHIBIT "L"

Reorder Form No. 8068 (3/00) - Residential contract of sale 2-91

*Jointly prepared by the Real Property Section of the New York State Bar Association, the New York State Land Title Association, the Committee on Real Property Law of the Association of the Bar of the City of New York and the Committee on Real Property Law of the New York County Lawyers' Association.*

**Warning: NO REPRESENTATION IS MADE THAT THIS FORM OR CONTRACT FOR THE SALE AND PURCHASE OF THE REAL ESTATE COMPLIES WITH SECTION 5-702 OF THE GENERAL OBLIGATIONS LAW ("PLAIN LANGUAGE").**

## CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT

**NOTE: FIRE AND CASUALTY LOSSES AND CONDEMNATION.**
This contract form does not provide for what happens in the event of fire, or other casualty loss or condemnation before the title closing. Unless different provision is made in this contract, Section 5-1311 of the General Obligations Law will apply. One part of the law makes a Purchaser responsible for fire and casualty loss upon taking possession of the Premises before the title closing.

|  |  |
|---|---|
| Date: | **CONTRACT OF SALE**, made as of . MAY 7/7 , 2015    *Residential Contract of Sale*
BETWEEN MT. OLIVET CHURCH INC. |
| Parties: | Address: 2176 GRAND CONCOURSE BRONX, NEW YORK 10456
Social Security Number/Fed. I.D. No(s):

hereinafter called "SELLER", and MARIA T. NOBLE AND/OR HER ASSIGNEE

Address: 250 GORGE ROAD APT 12 D CLIFFSIDE PARK 07010
Social Security Number/Fed. I.D. No(s):

hereinafter called "PURCHASER".

The parties hereby agree as follows: |
| Premises: | 1. Seller shall sell and convey and Purchaser shall purchase the property, together will all buildings and improvements thereon (collectively the "Premises"), more fully described on a separate page marked "Schedule A", annexed hereto and made a part hereof and also known as:

Street Address: 2176 GRAND CONCOURSE BRONX, NEW YORK

Tax Map Designation: BLOCK 3157 LOT 14

Together with Seller's ownership and rights, if any, to land lying in the bed of any street or highway, opened or proposed, adjoining the Premises to the center line thereof, including any rights of Seller to any unpaid award by reason of any taking by condemnation and/or for any damage to the Premises by reason of change of grade of any street or highway. Seller shall deliver at no additional cost to Purchaser, at Closing (as hereinafter defined), or thereafter, on demand, any documents that Purchaser may reasonably require for the conveyance of such title and the assignment and collection of such award or damages. |
| Personal Property: | 2. This sale also includes all fixtures and articles of personal property now attached or appurtenant to the Premises, unless specifically excluded below. Seller represents and warrants that at Closing they will paid for and owned by Seller, free and clear of all liens and encumbrances, except any existing mortgage to which this sale may be subject. They include, but are not limited to, plumbing, heating, lighting and cooking fixtures, bathroom and kitchen cabinets, mantels, door mirrors, switch plates and door hardware, venetian blinds, window treatments, shades, screens, awnings, storm windows, storm doors, window boxes, mail box, TV aerials, weather vane, flagpole, pumps, shrubbery, fencing, outdoor statuary, tool shed, dishwasher, washing machine, clothes dryer, garbage disposal unit, range, oven, refrigerator, freezer, air conditioning equipment and installations, wall to wall carpeting and built-ins not excluded below (strike out inapplicable items). ALL AS PRESENTLY EXISTING

Excluded from this sale are furniture and household furnishings and |
| Purchase Price: | 3. The purchase price is $                                                 500,000.00

payable as follows:

(a) on the signing of this contract, by Purchaser's check payable to the Escrowee (as hereinafter defined), subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 6 of this contract (the "Downpayment"):         $15,000.00

(b) by allowance for the principal amount unpaid on the existing mortgage on the date hereof, payment of which Purchaser shall assume by joinder in the deed:       $0

(c) by a purchase money note and mortgage from Purchaser to Seller:       $0

(d) balance at Closing in accordance with paragraph 7:       $485,000.00 |
| Existing Mortgage: | 4. *(Delete if inapplicable)* If this sale is subject to an existing mortgage as indicated in paragraph 3(b) above:

(a) The premises shall be conveyed subject to the continuing lien of the existing mortgage, which is presently payable, with interest at the rate of percent per annum, in monthly installments of $ which include principal, interest and escrow amounts, if any, and with any balance of principal being due and payable on

(b) To the extent that any required payments are made on the existing mortgage between the date hereof and Closing which reduce the unpaid principal amount thereof below the amount shown in paragraph 3(b), then the balance of the price payable at Closing under paragraph 3(d) shall be increased by the amount of the payments of principal. Seller represents and warrants that the amount shown in paragraph 3(b) is substantially correct and agrees that only payments required by the existing mortgage will be made between the date hereof and Closing.

(c) If there is a mortgage escrow account, Seller shall assign it to Purchaser, if it can be assigned, and in that case Purchaser shall pay the amount in the escrow account to Seller at Closing.

(d) Seller shall deliver to Purchaser at Closing a certificate dated not more than 30 days before Closing signed by the holder of the existing mortgage, in form for recording, certifying the amount of the unpaid principal, the date to which interest has been paid and the amounts, if any, claimed to be unpaid for principal and interest, itemizing the same. Seller shall pay the fees for recording such certificate. If the holder of the existing mortgage is a bank or other institution as defined in Section 274-a of the Real Property Law ("Institutional Lender"), it may, instead of the certificate, furnish a letter signed by a duly authorized officer, employee or agent, dated not more than 30 days before Closing, containing the same information.

(e) Seller represents and warrants that (i) Seller has delivered to Purchaser true and complete copies of the existing mortgage, the note secured thereby and any extensions and modifications thereof, (ii) the existing mortgage is not now, and at the time of Closing will not be, in default, and (iii) the existing mortgage does not contain any provision that permits the holder of the mortgage to require its immediate payment in full or to change any other term thereof by reason of the sale or conveyance of the Premises. |
| Purchase Money Mortgage: | 5. *(Delete if inapplicable)* If there is to be a purchase money mortgage as indicated in paragraph 3(c) above:

(a) The purchase money note and mortgage shall be drawn by the attorney for Seller in the form attached or, if not, in the standard form adopted by the New York State Land Title Association. Purchaser shall pay at Closing the mortgage recording tax, recording fees and the attorney's fees in the amount of $ for its preparation.

(b) The purchase money note and mortgage shall also provide that it is subject and subordinate to the lien of the existing mortgage and any extensions, modifications, replacements or consolidations of the existing mortgage, provided that (i) the interest rate thereof shall not be greater than percent per annum and the total debt service thereunder shall not be greater than $ per annum, and (ii) if the principal amount thereof shall exceed the amount of principal owing and unpaid on the existing mortgage at the time of placing such new mortgage or consolidated mortgage, the excess be paid to the holder of such purchase money mortgage in reduction of the principal thereof. The purchase money mortgage shall be paid by Purchaser to Seller. If for any reason Closing does not occur and either party gives Notice (as defined in paragraph 25) to Escrowee demanding payment of the Downpayment, Escrowee shall give prompt Notice to the other party of such demand. If Escrowee does not receive Notice of objection from such other party to the proposed payment within 10 business days after the giving of such Notice, Escrowee is hereby authorized and directed to make such payment. If Escrowee does receive such Notice of objection within such 10 day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by Notice from the parties to this contract or a final, nonappealable judgment, order or decree of a court. However, |
| Downpayment in Escrow: | 6. (a) Seller's attorney ("Escrowee") shall hold the Downpayment for Seller's account in escrow in a segregated bank account at until Closing or sooner termination of this contract and shall pay over or apply the Downpayment in accordance with the terms of this paragraph. Escrowee shall hold (not) *(Delete if inapplicable)* hold the Downpayment in an interest-bearing account for the benefit of the parties. If interest is held for the benefit of the parties, it shall be paid to the party entitled to the Downpayment and the party receiving the interest shall pay any income taxes thereon (if interest is not held for the benefit of the parties, the Downpayment shall be placed in an IOLA account or as otherwise permitted or required by law. The Social Security or Federal identification numbers of the parties shall be furnished to Escrowee upon request. At Closing, the Downpayment shall be paid by Escrowee to Seller. If for any |

Escrowee shall have the right at any time to deposit the Downpayment and the interest thereon with the clerk of a court in the county in which the Premises are located and shall give Notice of such deposit to Seller and Purchaser. Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b) Parties acknowledge that, although Escrowee is holding the Downpayment for Seller's account, for all other purposes Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally agree to defend, indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorney's fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c) Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel.

(d) Escrowee acknowledges receipt of the Downpayment by check subject to collection and Escrowee's agreement to the provision of this paragraph by signing in the place indicated on the signature page of this contract.

(e) Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee.

**Acceptable Funds:**

7. All money payable under this contract, unless otherwise specified, shall be paid by:

(a) Cash, but not over $1,000.00;

(b) Good certified check of Purchaser drawn on or official check issued by any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York, unendorsed and payable to the order of Seller, or as Seller may otherwise direct upon not less than 3 business days notice (by telephone or otherwise) to Purchaser;

(c) As to money other than the purchase price payable to Seller at Closing, uncertified check of Purchaser up to the amount of $1,000.00; and

(d) As otherwise agreed to in writing by Seller or Seller's attorney.

**Mortgage Contingency:**

8. *(Delete if inapplicable)* The obligations of Purchaser hereunder are conditioned upon issuance on or before May 9 , 2014, (the "Commitment Date") of a written commitment from any Institutional Lender pursuant to which such Institutional Lender agrees to make a first mortgage loan, ~~other than a Veterans Administration, Federal Housing Administration or~~ other governmentally insured loan, to Purchaser, in Purchaser's sole cost and expense, of $480,000.00 or such lesser sum as Purchaser shall be willing to accept, at the prevailing fixed rate of interest not to exceed prevailing or initial adjustable rate of interest not to exceed prevailing for a term of at least 30 years and on other customary commitment terms, whether or not conditional upon any factors other than an appraisal satisfactory to the Institutional Lender. Purchaser shall (a) make prompt application to an Institutional Lender for such mortgage loan, (b) furnish accurate and complete information regarding Purchaser and members of Purchaser's family, as required, (c) pay all fees, points and charges required in connection with such application and loan, (d) pursue such application with diligence, (e) cooperate in good faith with such Institutional Lender to obtain such commitment and (f) ~~promptly give Notice to Seller of~~ ~~the name and address of such Institutional Lender and the date of application.~~ Purchaser shall comply with all requirements of such commitment (or any other commitment accepted by Purchaser) and shall furnish Seller with a copy thereof promptly after receipt thereof. If such commitment is not issued on or before the Commitment Date, then, unless Purchaser has accepted a commitment that does not comply with the requirements as set forth above, Purchaser may cancel this contract by giving Notice to Seller within 5 business days after the Commitment Date, in which case this contract shall be deemed cancelled and thereafter neither party shall have any further rights against, or obligations or liabilities to, the other by reason of this contract, and the Downpayment shall be promptly refunded to Purchaser and except as set forth in paragraph 27. ~~Purchaser fails to give such notice of cancellation~~ ~~or if Purchaser shall accept a commitment that does not comply with the terms set forth above, then Purchaser shall be deemed to have waived Purchaser's~~ right to cancel this contract and to receive a refund of the Downpayment by reason of the contingency contained in this paragraph.

**Permitted Exceptions:**

9. The Premises are sold and shall be conveyed subject to:

(a) Zoning and subdivision laws and regulations, and landmark, historic or wetlands designation, provided that they are not violated by the existing buildings and improvements erected on the property or their use;

(b) Consents for the erection of any structures on, under or above any streets on which the Premises abut;

N [INIT] (c) Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway;

(d) Real estate taxes that are a lien, but are not yet due and payable; and

(e) The other matters, if any, including a survey exception, set forth in a Rider attached.

**Governmental Violations and Orders:**

*CLOSING*

10. (a) Seller shall comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued as of the ~~date hereof~~ by any governmental department having authority as to lands, housing, buildings, fire, health, environmental and labor conditions affecting the Premises. The Premises shall be conveyed free of them at Closing. Seller shall furnish Purchaser with any authorizations necessary to make the repairs which could disclose these matters.

(b) *(Delete if inapplicable)* All obligations affecting the Premises pursuant to the Administrative Code of the City of New York incurred prior to Closing and payable in money shall be discharged by Seller at or prior to Closing.

**Seller's Representations:**

11. (a) Seller represents and warrants to Purchaser that:

(i) The Premises abut or have a right of access to a public road;

(ii) Seller is the sole owner of the Premises and has the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this contract;

(iii) Seller is not a "foreign person", as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code ("IRC") Section 1445, as amended, and the regulations promulgated thereunder (Collectively "FIRPTA");

(iv) The Premises are not affected by any exemptions or abatements of taxes; and

(v) Seller has been known by no other name for the past ten years, except: none

(b) Seller covenants and warrants that all of the representations and warranties set forth in this contract shall be true and correct at Closing.

(c) Except as otherwise expressly set forth in this contract, none of Seller's covenants, representations, warranties or other obligations contained in this contract shall survive Closing.

**Condition of Property:**

12. Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other property included in this sale, based on Purchaser's own inspection and investigation thereof, and that Purchaser is entering into this contract based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or oral, as to the physical condition, state of repair, use, cost of operation or any other matter related to the Premises or the other property included in the sale, given or made by Seller or its representatives, and shall accept the same "as is" in present condition and state of repair, subject to reasonable use, wear, tear and natural deterioration between the date hereof and the date of Closing (except as otherwise set forth in paragraph 16(f)), without any reduction in the purchase price or claim of any kind for any change in such condition by reason thereof subsequent to the date of this contract. Purchaser and its authorized representatives shall have the right, at reasonable times and upon reasonable notice (by telephone or otherwise) to Seller, to inspect the Premises before Closing.

**Insurable Title:**

13. Seller shall give and Purchaser shall accept such title as any reputable title company shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to the matters provided for in this contract.

**Closing, Deed and Title:**

14. (a) "Closing" means the settlement of the obligations of Seller and Purchaser to each other under this contract, including the payment of the purchase price to Seller, and the delivery to Purchaser of a bargain and sale deed with covenants deed in proper statutory short form for record, duly executed and acknowledged, so as to convey to Purchaser fee simple title to the Premises, free of all encumbrances, except as otherwise herein stated. The deed shall contain a covenant by Seller as required by subd. 5 of Section 13 of the Lien Law.

(b) If Seller is a corporation, it shall deliver to Purchaser at the time of Closing (i) a resolution of its Board of Directors authorizing the sale and delivery of the deed, and (ii) a certificate by the Secretary or Assistant Secretary of the corporation certifying such resolution and setting forth facts showing that the transfer is in conformity with the requirements of Section 909 of the Business Corporation Law. The deed in such case shall contain a recital sufficient to establish compliance with that Section.

**Closing Date and Place:**

15. Closing shall take place at the office of JAIME RAMIREZ ESQ at        o'clock on SEPTEMBER 22, 2014 or, upon reasonable notice (by telephone or otherwise) by Purchaser, at the office of LENDER'S COUNSEL.

**Conditions to Closing:**

16. This contract and Purchaser's obligation to purchase the Premises are also subject to and conditioned upon the fulfillment of the following conditions precedent:

(a) The accuracy, as of the date of Closing, of the representations and warranties of Seller made in this contract.

(b) The delivery by Seller to Purchaser of a valid and subsisting Certificate of Occupancy or other required certificate of compliance, or evidence that none was required, covering the building(s) and all of the other improvements located on the property authorizing their uses as a TWO family dwelling at the date of Closing.

(c) The delivery by Seller to Purchaser of a duly executed and sworn affidavit (in form prescribed by law) claiming exemption of the sale contemplated hereby, if such be the case, under Article 31-B of the Tax Law of the State of New York and the Regulations promulgated thereunder, as the same may be amended from time to time (collectively the "Gains Tax Law"), or if such sale shall not be exempt under the Gains Tax Law, Seller and Purchaser agree to comply as a timely manner with the requirements of the Gains Tax Law and, at Closing, Seller shall deliver to Purchaser (i) an official return showing no tax due, or (ii) an official return accompanied by a certified or official bank check drawn on a New York State banking institution payable to the order of the New York State Department of Taxation and Finance in the amount of the tax shown to be due thereon. Seller shall pay promptly any additional tax that may become due under the Gains Tax Law, together with interest and penalties thereon, if any, which may be assessed or become due after Closing, and/or execute any other documents that may be required in respect thereof, and (y) indemnify, defend and save Purchaser harmless from and against any of the foregoing and any damage, liability, cost or expense (including reasonable attorney's fees) which may be suffered or incurred by Purchaser by reason of the nonpayment thereof. The provisions of this subparagraph (c) shall survive Closing.

(d) The delivery by Seller to Purchaser of a certification stating that Seller is not a foreign person, which certification shall be in the form then required by FIRPTA. If Seller fails to deliver the aforesaid certification or if Purchaser is not entitled under FIRPTA to rely on such certification, Purchaser

shall deduct and withheld from the purchase price a sum equal to 10% thereof (or any lesser amount permitted by law) and shall at Closing remit the withheld amount with the required forms to the Internal Revenue Service.

(e) The delivery of the Premises and all building(s) and improvements comprising a part thereof in broom clean condition, vacant and free of leases or tenancies, together with keys to the Premises.

(f) All plumbing (including water supply and septic systems, if any), heating and air conditioning, if any, electrical and mechanical systems, equipment and machinery in the building(s) located on the property and all appliances which are included in this sale being in working order as of the date of Closing.

(g) If the Premises are a one or two family house, delivery by the parties at Closing of affidavits in compliance with state and local law requirements to the effect that there is installed in the Premises a smoke detecting alarm device or devices.

(h) The delivery by the parties of any other affidavits required as a condition of recording the deed.

**Deed Transfer and Recording Taxes:**

17. At Closing, certified or official bank checks payable to the order of the appropriate State, City or County officer in the amount of any applicable transfer and/or recording tax payable by reason of the delivery or recording of the deed or mortgage, if any, shall be delivered by the party required by law or by this contract to pay such transfer and/or recording tax, together with any required tax returns duly executed and sworn to, and such party shall cause any such checks and returns to be delivered to the appropriate officer promptly after Closing. The obligation to pay any additional tax or deficiency and any interest or penalties thereon shall survive Closing.

**Apportionments and Other Adjustments; Water Meter and Installment Assessments:**

18. (a) To the extent applicable, the following shall be apportioned as of midnight of the day before the day of Closing:

(i) Taxes, water charges and sewer rents, on the basis of the fiscal period for which assessed; (ii) fuel; (iii) interest on the existing mortgage; (iv) premiums on existing transferable insurance policies and renewals of those expiring prior to Closing; (v) vault charges; (vi) rents as and when collected.

(b) If Closing shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the immediately preceding fiscal period applied to that latest assessed valuation.

(c) If there is a water meter on the Premises, Seller shall furnish a reading to a date not more than 30 days before Closing and the unfixed meter charge and sewer rent, if any, shall be apportioned on the basis of such last reading.

(d) If at the date of Closing the Premises are affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this contract all the unpaid installments shall be considered due and shall be paid by Seller at or prior to Closing.

(e) Any errors or omissions in computing apportionments or other adjustments at closing shall be corrected within a reasonable time following Closing. This subparagraph shall survive Closing.

**Allowance for Unpaid Taxes, etc.:**

19. Seller has the option to credit Purchaser as an adjustment to the purchase price with the amount of any unpaid taxes, assessments, water charges and sewer rents, together with any interest and penalties thereon to a date not less than five business days after closing, provided that official bills therefor computed to said date are produced at Closing.

**Use of Purchase Price to Remove Encumbrances:**

20. If at Closing there are other liens or encumbrances that Seller is obligated to pay or discharge, Seller may use any portion of the cash balance of the purchase price to pay or discharge them, provided Seller shall simultaneously deliver to Purchaser at Closing instruments in recordable form and sufficient to satisfy such liens or encumbrances of record, together with the cost of recording or filing said instruments. As an alternative Seller may deposit sufficient monies with the title insurance company employed by Purchaser acceptable to and required by it to assure their discharge, but only if the title insurance company will insure Purchaser's title clear of the matters or insure against their enforcement out of the Premises and will insure Purchaser's institutional Lender clear of such matters. Upon notice (by telephone or otherwise), given not less than 3 business days before Closing, Purchaser shall provide separate certified or official bank checks as requested to assist in clearing up these matters.

**Title Examination; Seller's Inability to Convey; Limitations of Liability:**

21. (a) Purchaser shall order an examination of title in respect of the Premises from a title company licensed or authorized to issue title insurance by the New York State Insurance Department or any agent for such title company promptly after the execution of this contract or, if this contract is subject to the mortgage contingency set forth in paragraph 8, after a mortgage commitment has been accepted by Purchaser. Purchaser shall cause a copy of the title report and of any additions thereto to be delivered to the attorney(s) for Seller promptly after receipt thereof.

(b) If at the date of Closing Seller is unable to transfer title to Purchaser in accordance with this contract, or Purchaser has other valid grounds for refusing to close, whether by reason of liens, encumbrances or other objections to title or otherwise (herein collectively called "Defects"), other than those subject to which Purchaser is obligated to accept title hereunder or which Purchaser may have waived and other that those which Seller has herein expressly agreed to remove, remedy or discharge and if Purchaser shall be unwilling to waive the same and to close title without abatement of the purchase price, then except as hereinafter set forth, Seller shall have the right, at Seller's sole election, either to take such action as Seller may deem advisable to remove, remedy, discharge or comply with such Defects or to cancel this contract; (ii) if Seller elects to take action to remove, remedy or comply with such Defects, Seller shall be entitled from time to time, upon Notice to Purchaser, to adjourn the date for Closing hereunder for a period or periods not exceeding 60 days in the aggregate (but not extending beyond the date upon which Purchaser's mortgage commitment, if any, shall expire), and the date for Closing shall be adjourned to a date specified by Seller not beyond such period. If for any reason whatsoever, Seller shall not have succeeding in removing, remedying or complying with such Defects at the expiration of such adjournment(s) and if Purchaser shall still be unwilling to waive the same and to close title without abatement of the purchase price, then either party may cancel this contract by Notice to the other given within 10 days after such adjourned date; (iii) notwithstanding the foregoing, the existing mortgage (unless this sale is subject to the same) and any other matter created by Seller after the date hereof shall be released, discharged or otherwise cured by Seller at or prior to Closing.

(c) If this contract is cancelled pursuant to its terms, other than as a result of Purchaser's default, this contract shall terminate and come to an end, and neither party shall have any further rights, obligations or liabilities against or to the other hereunder or otherwise, except that: (i) Seller shall promptly refund or cause the Escrowee to refund the Downpayment to Purchaser and, unless cancelled as a result of Purchaser's default or pursuant to paragraph 8, to reimburse Purchaser for the net cost of examination of title, including any appropriate additional charges related thereto, and the net cost, if actually paid or incurred by Purchaser, for updating the existing survey of the Premises or of a new survey, and (ii) the obligations under paragraph 27 shall survive the termination of this contract.

**Affidavit as to Judgments, Bankruptcies, etc.:**

22. If a title examination discloses judgments, bankruptcies or other returns against persons having names the same as or similar to that of Seller, Seller shall deliver an affidavit at Closing showing that they are not against Seller.

**Defaults and Remedies:**

23. (a) If Purchaser defaults hereunder, Seller's sole remedy shall be to receive and retain the Downpayment as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be impossible to ascertain and that the Downpayment constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.

(b) If Seller defaults hereunder, Purchaser shall have such remedies as Purchaser shall be entitled to at law or in equity, including, but not limited to, specific performance.

**Purchaser's Lien:**

24. All money paid on account of this contract, and then reasonable expenses of examination of title to the Premises and of any survey and survey inspection charges, are hereby made liens on the Premises, but such liens shall not continue after default by Purchaser under this contract.

**Notices:**

25. Any notice or other communication ("Notice") shall be in writing and either (a) sent by either of the parties hereto or by their respective attorneys who are hereby authorized to do so on their behalf or by the Escrowee, by registered or certified mail, postage prepaid, or

(b) delivered in person or by overnight courier, with receipt acknowledged, to the respective addresses given in this contract for the party and the Escrowee, to whom the Notice is to be given, or to such other address as such party or Escrowee shall hereafter designate by Notice given to the other party or parties and the Escrowee pursuant to this paragraph. Each notice mailed shall be deemed given on the third business day following the date of mailing the same, except that any notice to Escrowee shall be deemed given only upon receipt by Escrowee and each Notice delivered in person or by overnight courier shall be deemed given when delivered.

**No. Assignment:**

26. This contract may not be assigned by Purchaser without the prior written consent of Seller in each instance and any purported assignment(s) made without such consent shall be void.

**Broker:**

27. Seller and Purchaser each represents and warrants to other that it has not dealt with any broker in connection with this sale other than NONE ("Broker") and Seller shall pay Broker any commission earned pursuant to a separate agreement between Seller and Broker. Seller and Purchaser shall indemnify and defend each other against any costs, claims and expenses, including reasonable attorneys' fees, arising out of the breach on their respective parts of any representation or agreement contained in this paragraph. The provisions of this paragraph shall survive Closing or, if Closing does not occur, the termination of this contract.

**Miscellaneous:**

28. (a) All prior understandings, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this contract; it completely expresses their full agreement and has been entered into after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this contract.

(b) Neither this contract nor any provision thereof may be waived, changed or cancelled except in writing. This contract shall also apply to and bind the heirs, distributes, legal representatives, successors and permitted assigns of the respective parties. The parties hereby authorize their respective attorneys to agree in writing to any changes in dates and time periods provided for in this contract.

(c) Any singular word or term herein shall also be read as in the plural and the neuter shall include the masculine and feminine gender, whenever the sense of this contract may require it.

(d) The captions in this contract are for convenience of reference only and in no way define, limit or describe the scope of this contract and shall not be considered in the interpretation of this contract or any provision hereof.

(e) That contract shall not be binding or effective until duly executed and delivered by Seller and Purchaser.

(f) Seller and Purchaser shall comply with IRC reporting requirements, if applicable. This subparagraph shall survive Closing.

(g) Each party shall, at any time and from time to time, execute, acknowledge where appropriate and deliver such further instruments and

# 1st RIDER TO CONTRACT OF SALE

RIDER ATTACHED TO AND MADE A PART OF THE CONTRACT OF SALE BETWEEN:

**SELLER:**           MT. OLIVET CHURCH INC.

**PURCHASER(S):**   MARIA T. NOBLE AND OR ASSIGNEE

**PREMISES:**        2176 GRAND CONCOURSE BRONX NEW YORK

1. **ADDITIONAL EXCEPTIONS.** Supplementing Paragraph 9: The premises are to be sold and conveyed subject to the following matters, in addition to those matter listed in Paragraph 9:

a) Covenants, restrictions, rights of way, easements, reservations and agreements of record, if any, insofar as the same may now be in force or effect, provided same are not violated by the present structure or use of the Premises, and do not render title uninsurable;

b) Any state of facts an accurate survey of the Premises may show, provided the same does not render title unmarketable;

c) Building and zoning regulations and ordinances of the city, town or village in which the premises lie which are not violated by the existing structure or its present.

d) Rights, if any, of the municipality in which the Premises are located or of any public utility, telephone or cable television company, to install, maintain, operate and/or repair pipes, wires cables, poles and related equipment in, under, over and upon the Premises;

e) Possible encroachments of fences and variations between record lines and fences; encroachments or projections upon street or road of any stoops, areas, gratings, steps, windows, balconies, ornaments, brick, leaves, trim and cornices and the like;

f) Any state of facts a personal inspection of the Premises would show;

2. **REPAIRS.** It is understood and agreed that seller shall not be under any obligation whatsoever to make and/or pay for any repairs, alterations or improvements, including the cost of any and all inspections required by the lending institution or any other organization as a condition to the issuance of the mortgage commitment referred to previously.

3. **ASSIGNMENTS.** This contract may be assigned without the written consent of the seller.

4. **DISCLOSURES.** In the event the Seller or Purchaser or any of the principals, stockholders, directors, officers or employers of the Seller or Purchaser herein are licensed Real Estate Brokers/Salesman the Seller and/or Purchaser acknowledged that

full disclosure of this fact has been made to them, and that the purchaser is purchasing the property for possible resale at a profit.

5. **MORTGAGE CONTINGENCY:** If Purchaser is unable to obtain a commitment for such mortgage Seller's attorney shall, upon request, have the right to see copies of the application filed by the Purchaser (S) with the proposed mortgagee. If requested, Purchaser (s) will request, in writing, that mortgagee send a copy of the application to Seller's attorney.

If Purchaser is unable to obtain a firm commitment within such time, then either party may cancel this contract, subject to terms of preprinted contract, by written notice to the other party and upon refund of the down payment terminate without further liability on the part of either party to the other.

6. **NOTICES.** All notices under this contract shall be in writing, mailed, or delivered to the office of counsel for the respective parties, that have represented said parties at the signing of this contract, (or to successor counsel whose appearance has been so designated in writing). However, all notices under this contract which would have the effect of canceling and/or rescinding and/or otherwise terminating this contract, including but not limited to a Purchaser's failure to obtain mortgage commitment notice@ shall be so sent by certified mail. Notices signed by said counsel shall be sufficient.

7. **PERSONALITY.** All personal property included in this sale will be conveyed in as is condition, less normal wear and tear from the date of this contract to the closing of title.

8. **VIOLATIONS.** All notices of violation of law or municipal ordinance orders or requirement, which in the aggregate do not exceed Five Hundred ($500.00) Dollars to correct, noted in or issued by the Department of Housing and Buildings, Fire, Labor Health or other State or Municipal Authorities having jurisdiction against or affecting the premises at the date hereof shall be complied with by the Seller on or before closing and the premises shall be conveyed free of same or a credit at Seller's option in order to correct the violations. In the event cost of correcting such violations exceed Five Hundred ($500.00) Dollars in the aggregate, Seller shall have the right to elect, within ten (10) days of receipt of written notice, to cure and consummate the transaction contemplated hereby or to cancel this contract by written notice to Purchaser. In the event Seller elects to cancel the contact pursuant hereto, Seller's sole liability shall be limited to the return of the Deposit and the parties shall have no further rights or liabilities to each other under the terms and provisions of this contract. Notwithstanding the foregoing, Purchaser may elect to take the premises subject to such violations without any offset whatsoever and without any claim against or liability on the part of the Seller, except as herein provided.

Jaime Ramirez P.C.
751 Commonwealth Avenue
Bronx, New York, 10473
Tel.: 718-542-6629 Fax.: 718 542-6630
ramirezlaw@optonline.net

9. **TRAVEL ALLOWANCE.** In the event the closing of Title should take place outside of the New York City Metropolitan area, or Westchester County the buyer shall pay the sum of Three hundred Fifty ($350.00) as a travel allowance to the sellers attorney.

10. **TITLE EXAMINATION.** Purchaser agrees to order, immediately after obtaining a mortgage commitment, an examination of the title to the premises to be made on Purchaser's behalf, and, at least 10 days before the date for the closing of title, to send to the attorneys for Seller a copy of the report of such examination of title and a written statement of any objections to title of the closing of title hereunder. If Purchaser or Purchaser's attorney fails to Give Seller's attorney such notice of objection (other than bring down to date searches), then any defect or encumbrance of exception appearing on such report of title, or affecting the premises at the time of closing, shall not be deemed to be an objection to title or to the closing of title hereunder, and Purchaser shall take title subject hereto.

11. **INABILITY TO CONVEY TITLE.** If the Seller shall be unable to convey title in accordance with the provisions of this Agreement, any payments made by the Purchaser on account of the purchase price, shall be refunded, together with the reasonable expense incurred for examination of title (not exceeding the usual net charges of title issued, and the net cost of a survey), whereupon this Agreement shall be terminated and neither party hereto shall have any further rights again the other, except that, if the premises are affected by any encumbrance, outstanding interest or expression of title not expressly consented to herein by the Purchaser, which render the Seller's title to the premises unmarketable, and, which may, according to reasonable expectations, be removed within fifteen (15) days, the Seller shall have the privilege to remove or satisfy the same, and shall for this purpose be entitled to an adjournment of the closing of title to the premises marketable. The Purchaser may, nevertheless, accept such title as the Seller may be able to convey, without reduction of the purchase price, or any credit against the same and without liability on the part of the Seller.

12. **CONTRACT MODIFICATION AND EXTENSION.** Seller (s) does hereby appoint Seller's attorney herein as his agent and Purchaser(s) does hereby appoint his attorney, herein as his agent to execute any and all instrument in writing, having reference to this contract including but not limited to, modifications thereof and extensions of time for obtaining mortgage, if any, and extension of time for closing or otherwise.

13. **DEED ACCEPTANCE.** The acceptance of deed by Purchaser(s) shall be deemed to be full performance and discharge and every agreement and obligation on the part of the Seller(s) to be performed pursuant to the provisions of this agreement, except those, if any,

Jaime Ramirez, P.C.
751 Commonwealth Avenue
Bronx, New York 10473
Tel.: 718-542-6629 Fax.: 718-542-6630
ramirezlaw@optonline.net

which are herein specifically stated to survive the delivery of the deed.

14. **SUBMISSION NOT AN OFFER.** The submission of this agreement by the Seller or their attorneys to Purchaser does not constitute an offer or an acceptance of an offer. This agreement shall not be binding upon the Sellers unless (i) the agreement has been fully executed by the Purchaser and Seller, and a fully executed copy has been delivered to each party by their respective attorneys; and (ii) Purchaser has paid the down payment pursuant to Paragraph 1 of the form printed contract.

15. **CONTRACT CANNOT BE RECORDED.** The parties agrees that neither this agreement nor any memorandum or notice thereof shall be recorded or tendered for recording in the County Clerk's Office of the County in which the land is situated. Purchaser further agrees that if this agreement, or any memorandum or short form thereof shall be recorded in any such office, this agreement, upon notice by the Seller to the Purchaser, may be deemed to void at Seller's option and of no further force and effect and such notice, if reported, shall be deemed sufficient and adequate notice to third parties that this agreement is void and of no further force and effect.

16. **CONFLICT.** If there is any conflict between the provisions contained in this Addendum and the provision of the printed form contract, the provisions in this addendum shall govern and be controlling to the extent necessary to resolve the conflict.

17. **AMBIGUITY.** Both parties shall be deemed to have drafted this Agreement. In the event any provisions are found to be ambiguous, same shall not be construed against either party.

18. Purchaser shall have the right to inspect the premises within forty-eight (48) hours prior to closing.

19. **HEATING/COOLING BILLS.** The purchasers herein acknowledged that they have a right to the summary of the heating and/or cooling bills or a complete set of said bills, under Section 17-103, Chapter 555 of the Laws of the State of New York commonly known as the Truth in Heating Law. The purchasers herein waive their right to companies of said bills and acknowledge that they have not requested them in connection with this transaction.

20. At closing, the premises will have an operable single station smoke detecting alarm device in accordance with the New York State Executive Law, Chapter 971, Section 270.5.

Jaime Ramirez, P.C.
751 Commonwealth Avenue
Bronx, New York 10473
Tel.: 718-542-6629 Fax : 718-542-6650
rmirezlaw@optonline.net

Noble-Plaintiff Docs
206 of 254

21. PURCHASER REPRESENTATIONS. Purchsers warrant and represent (i) that they have assets sufficient to complete this transaction; (ii) that they have no personal knowledge of any circumstances that would render them unacceptable to any lending institution by reason of outstanding loans, obligations or liabilities which would adversely affect their credit standing; (iii) that until the closing of title, they will not deliberately or knowingly change their financial status so as to render their mortgage application unacceptable to the lending institution. Purchasers acknowledge and represent that this transaction is not contingent on the Purchasers' ability to sell any other real or personal property.

22. CERTIFICATE OF OCCUPANCY. Supplementing paragraph #16B of the printed contract. This presentation shall not be construed to obligate Seller to incur any cost or expense to obtain a Certificate of Occupancy, Certificate of Completion and/or letter as herein above provided; and in the event that Seller cannot comply with this representation without incurring any cost, Seller shall have the option of canceling this Contract and returning to the Purchaser the down payment paid hereunder and thereupon the rights and obligations of the parities shall cease and terminate unless Purchaser waives this condition.

23. PREPARATION OF CONTRACT. In the event Purchaser is unable to obtain a mortgage commitment in accordance to the terms of the Contract, Purchaser agrees to pay the Seller's attorney the sum of one hundred and fifty ($150.00) dollars for preparation of the Contract. Seller's attorney shall be authorized to deduct said amount form the downpayment

24. TERMITE INSPECTION. Purchasers shall order a termite inspection by a reputable company, and if premises are found to be infested with termites or other wood destroying insects, the Seller shall have the option of either canceling said contract or curing premises of said infestation. Said termite inspection shall be completed within twenty (20) days from the date hereof. The purchaser shall serve written notice upon Seller's attorney within twenty (20) days after Purchaser receives the inspection report.

25. POSSESSION. Vacant and broom clean possession of the ENTIRE within described premises shall be delivered to Purchaser within 7 days after the closing of title. However, the attorney for the Seller shall hold in escrow the sum of $3,500.00 security for the faithful performance of the above agreement. In the event that Seller does not deliver vacant possession as set forth, then in that event, the attorney for the Seller is authorized to pay out of said escrow deposit the sum of $375.00 per day to the Purchaser as liquidated damages for each and every additional day that Seller remains in possession beyond the agreed period. All adjustments to be as of the day of possession.

Jaime Ramirez, P.C.
751 Commonwealth Avenue
Bronx, New York 10473
Tel.: 718-842-6629 Fax.: 718 842 6630
ramirezlaw@optonline.net

Noble-Plaintiff Docs
207 of 254

In the event Seller unable to deliver premises vacant as of the date of closing, Seller shall be entitled to an adjournment of up to ninety (90) days to bring a disposes proceeding against its current tenant.

If after (90) days, premises cannot be delivered vacant, Seller may at his option cancel this contract and return to Purchaser the down payment paid hereunder and all costs for any title expenses, mortgage application and cancellation fees, and appraisals. Purchaser, at his option, may take title to the premises on the date of Closing, subject to any tenancy remaining in the premises, whereby Seller shall assign any and all rights caused of action, etc., against tenant to Purchaser. Seller shall be relieved of all claims and shall bear no responsibility to continue or bring forth any proceedings against the tenant.

26. **APPLIANCES.** Notwithstanding the above, seller's liability in connection with any appliance shall be limited to the sum of ONE HUNDRED TWENTY FIVE ($125.00) DOLLARS 00/100 per appliance. The Purchaser shall have the right to inspect the premises within forty-eight (48) hours prior to closing and of taking possession in order to ascertain the condition of the premises.

27. **PROPERTY CONDITION DISCLOSURE.** Article 14 of the Real Property Law of the State of New York ("the Property Condition Disclosure Act" or "PCDA") provides that the Seller of a one (1) to four (4) family dwelling ("the Premises") must deliver to the prospective Purchaser of the Premises prior to signing by the Purchaser of a binding Contract of Sale a certified Property Condition Disclosure Statement ("PCDS") regarding certain conditions and information concerning the Premises which are known to the Seller. Such PCDS is not a warranty of any kind by the Seller or by any agency representing the Seller in this transaction. It is not a substitute for any inspections or test which may be conducted by the Purchaser or qualified agents on behalf of the Purchaser, and the Purchaser is encouraged to obtain his or her own independent professional engineer inspections and environmental tests and is also encouraged to check public records pertaining to the premises. Seller represents that Seller does not have actual knowledge, records or personal recollection of facts and/or events suitable to accurately complete the information requested to be set forth in the state formulated PCDS.

Section 465 of the PCDA provides that in the event that a Seller fails to deliver a PCDS before the Purchaser signs a binding Contract of Sale, the Purchaser is to receive upon the transfer of title a credit against the purchase price in the sum of $500.00. Seller hereby offers to give the Purchaser, at closing, a credit against the purchase price in the sum of $500.00. Purchaser hereby accepts the offer, in return for which credit; the Purchaser hereby released the Seller from any obligation otherwise imposed by the PCDA to deliver a PCDS.

Jaime Ramirez, P.C.
751 Commonwealth Avenue
Bronx, New York 10473
Tel.: 718-542-6629 Fax : 718-542-6650
ramirezlaw@optonline.net

28. **ADJOURNMENT FEE.** In the event the seller's attorney appears at scheduled closing and the closing has to be adjourned or cancelled through no fault of the Seller, then Purchaser shall apply to the seller's attorney a fee of $250.00.

29. **RETURNED CHECK.** In the event the purchaser's down payment check is dishonored then in that event seller's shall be entitled to all remedies at law including contract cancellation and the purchaser shall pay seller's attorney the sum of $100.00 as a service fee in addition to replacing said dishonored check with either a certified check or official bank check.

30. **SHORT SALE.**         ( )   Short sale (check if applicable)
This transaction shall be subject to seller's mortgagee (s) accepting a short sale application for the instant premises and shall be subject to any terms requested by mortgagee (s). If any proposed terms are unacceptable to purchaser, purchaser shall have right to cancel transaction and receive return of down payment. Seller acknowledges that he or she will not receive any proceeds at closing.

31.    **COURT APPROVAL.**  THIS TRANSACTION SHALL BE SUBJECT TO COURT APPROVAL AS REQUIRED PURSUANT TO THE APPLICABLE RELIGIOUS CORPORATION LAWS.

_Seller_

**Seller**

_Maria G. Noble_
**Purchaser**

**Purchaser**

Jaime Ramirez, P.C.
751 Commonwealth Avenue
Bronx, New York 10473
Tel : 718-542-6629 Fax : 718-542-6930
ramirezlaw@optonline.net

Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards

**Lead Warning Statement**

*Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.*

**Seller's Disclosure**
(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):
    (i) ☐ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

    _____
    (ii) ☒ Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.
(b) Records and reports available to the seller (check (i) or (ii) below):
    (i) ☐ Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

    _____
    ☒ Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's Acknowledgment (initial)**
(c) _____ Purchaser has received copies of all information listed above.
(d) _____ Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home.*
(e) Purchaser has (check (i) or (ii) below):
    (i) ☒ received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or
    (ii) ☐ waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment (initial)**
(f) _____ Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**
The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| _____ | _____ | _____ | _____ |
|---|---|---|---|
| Seller | Date | Seller | Date |
| _Maria B. Noble_ | _____ | _____ | _____ |
| Purchaser | Date | Purchaser | Date |
| _____ | _____ | _____ | _____ |
| Agent | Date | Agent | Date |

EXHIBIT "M"

No: 3149

STATE OF NEW YORK,
COUNTY OF BRONX, } ss:

I, LUIS M. DIAZ, County Clerk and Clerk of the Supreme Court, Bronx County, do certify, that I have searched the records of this office for _Helgious Corp._ _from 1956 to present_ _no record In Bronx County Clerks office_ and find as per record attached hereto.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my official seal this ...... day of ...... June

County Clerk and Clerk of the Supreme Court, Bronx County

BRONX COUNTY CLERKS OFFICE
851 GRAND CONCOURSE
BRONX, NEW YORK 10451
DATE 06/27/2014 FRI TIME 16:04

REFERENCE #    #16296400
PBAL                        $0.00
2X              @ 5.00
1270-RECRDS SEARCH          $10.00
CHECKS PAID                 $10.00
TOTAL                       $10.00
CASH                        $10.00

MICHAEL        No.000086   00002

CERTIFICATE OF INCORPORATION

-of-

VOL **163** PAGE **145**

MT. OLIVET CHURCH, INC.
Pursuant to the provisions of the
Religious Corporation Law.

I, EMILIE STAATZ, being the Pastor and Presiding
Officer, and we DANIEL STAATZ and WILLIAM GRUNER, being In-
spectors of Election of the MT. OLIVET CHURCH, having been
present, and voting at a meeting held on January 28th, 1940,
do hereby certify as follows:

FIRST: That pursuant to Article Ten of the Religious
Corporation Law, of the State of New York, notice in conform-
ity with said Article was duly given that a meeting of the MT.
OLIVET CHURCH, an unincorporated church, would be held at its
usual place of worship, to wit: 3436 Third Avenue, in the
Borough of the Bronx, County of Bronx, City and State of New
York, on the 28th day of January, 1940, for the purpose of
incorporating such church, electing trustees thereof, and
selecting a corporate name therefor.

SECOND: That I, the said EMILIE STAATZ, was present
as Pastor and Presiding Officer, and that we DANIEL STAATZ and
WILLIAM GRUNER, were present as Inspectors of Election.

THIRD: That at said meeting, held on the 28th day
of January, 1940, at No. 3436 Third Avenue, Bronx, New York,
there were present a majority of all the persons of full age,
being more than six, who were then members in good and regular
standing of said church.

FOURTH: That at said meeting, the said EMILIE
STAATZ was elected Presiding Officer, ROSE LAZAK - Clerk,
and DANIEL STAATZ and WILLIAM GRUNER, Inspectors of Election.

FIFTH: That by vote at such meeting, it was unan-
imously decided to incorporate the said Church under the name
of the MT. OLIVET CHURCH.

SIXTH: That the principal place of worship of said
incorporated church was fixed at 3436 Third Avenue, Bronx, New
York.

-1-

SEVENTH: That the number of trustees for said Church shall be three (3).

VOL 163 PAGE 112

EIGHTH: That the following were elected to serve until the first annual election of trustees:

DANIEL STAATZ, residing at 3651 Third Avenue, in the Borough of Bronx, City of New York.

NINTH: That the following trustees were elected to serve until the second annual election of trustees:

WILLIAM GRUNER, residing at 259 Cambridge Avenue, Jersey City, New Jersey.

TENTH: That the following trustees were elected to serve until the third annual election of trustees:

JOSEPH KASOY, residing at 1490 Shakespeare Avenue, in the Borough of Bronx, City of New York.

ELEVENTH: That the date of the first annual election was fixed for the 28th day of January, 1941.

IN WITNESS WHEREOF, we, the said EMILIE STAATZ, DANIEL STAATZ and WILLIAM GRUNER, have signed and executed this certificate this 29th day of January, 1940.

*Emilie Staatz* L.S.

*Daniel Staatz* L.S.

*William Gruner* L.S.

STATE OF NEW YORK )
CITY OF NEW YORK ) SS:
COUNTY OF BRONX )

On the 29th day of January, 1940, before me personally came EMILIE STAATZ, DANIEL STAATZ and WILLIAM GRUNER, to me known to be the individuals described in, and who executed the foregoing certificate, and acknowledged that they executed the same.

2014 JUL -1 P 2:31     017996

*Jacob S. Schulman*

Com. of Deeds nyc.
Bronx Co. 4/21/41.

THAT I HAVE COMPARED THIS COPY WITH THE ORIGINAL FILED IN MY OFFICE ON

Feb 6 1940

AND THAT THE SAME IS A CORRECT

COUNTY CLERK AND CLERK OF THE SUPREME COURT, BRONX COUNTY
FACSIMILE SIGNATURE USED
FEE PAID





CERTIFICATE OF INCORPORATION

-of-

MT. OLIVET CHURCH, INC.

Pursuant to the provisions of
the Religious Corporation Law.

VOL 163 PAGE 144

FILED & RECORDED

FEB 6 9 52 AM 1940

COUNTY CLERK
BRONX COUNTY

FILED & RECORDED

FEB 6 9 52 AM 1940

COUNTY CLERK
BRONX COUNTY

CERTIFICATION DEPT.

NOV 14 1944

Mt. Olivet Church, Inc.
Filed Feb 6, 1940

123-1940

EXHIBIT "N"

## The Law Office of Jaime Ramirez, Esq.
### Attorney At Law

Tel: (718) 542-6629
Fax: (718) 542-6630
ramirezlawa@optonline.net

3058 Cross Bronx Expressway, Suite 1
Bronx, New York 10465

May 16, 2019

**VIA FEDERAL EXPRESS**
David Broderick, P.C.
70-20 Austin Street, Suite 111
Forest Hills, New York 11375

> **Re:** **Nobel v. Mt. Olivet Church, Inc.**
> **Civil Action No. 18-CV007871**

Dear Mr. Broderick:

Please find materials which were requested by your subpoena. Please note that the down payment was never deposited as I recall I had requested material from Ms. Staatz. Additionally, I did not enter into any written retainer agreements with Ms. Staaz.

Also please note that at some point Ms. Staaz substituted my office with the office of Mirna Socorro, Esq.

If you require anything additional please advise me.

Very truly yours,

Jaime Ramirez, Esq.

JR/tm
Enclosures

EXHIBIT "O"

# ORTIZ & ORTIZ, L.L.P.
Attorneys at Law
32-72 Steinway Street, Suite 402
Astoria, New York 11103

Frank A. Ortiz *(1931 to 2016)*
Norma E. Ortiz*

Tel. (718) 522-1117
Fax (718) 596-1302
email@ortizandortiz.com

Martha J. de Jesus*
* (Admitted in New York and New Jersey)

June 1, 2018

**BY CERTIFIED MAIL**

Chairman of the Board
Mount Olivet Church
2176 Grand Concourse
Bronx, New York 10457

Re:     **Mt. Olivet Church, Inc. to Noble**
**Premises: 2176 Grand Concourse**
**Bronx, New York 10457**
**Contract Date: July 9, 2014**

Ladies and Gentlemen:

My law firm was hired by Maria T. Noble, the purchaser in the above referenced sale, to commence a lawsuit for, among other things, breach of the contract to sell the property known as 2176 Grand Concourse, Bronx, New York 10457.

I have called, written to, and emailed the lawyer, Serge Joseph, to discus the sale to avoid the law suit. I have not received a response from him, and presume he no longer represents you.

My client is ready, willing, and able to proceed with the sale. I intend to schedule the closing of the sale for Friday, June 15, 2018, at 1:00 p.m. at my office if I do not hear from you by Tuesday, June 5th.

We would like your cooperation in closing this transaction. However, if we do not hear from you, we will seek court intervention to enforce the terms of the contract and compel the sale and or seek damages.

Thank you.

Very truly yours,

Norma E. Ortiz

EXHIBIT "P"

URBANY INVESTMENT GROUP LLC    11-16
250 GORGE RD.
CLIFFSIDE PARK, NJ 07010

1032

TD BANK
AMERICA'S MOST CONVENIENT BANK

55-135/812
833

5/9/2017

PAY TO THE
ORDER OF    Laura C. Browne, esq.    $ **1,000.00

One Thousand and 00/100 ******************************************************************    DOLLARS

Laura C. Browne, esq.

MEMO    Legal Fee Retainer: 2176 Grand Concourse, Bronx;

*Maria S. Noble*
AUTHORIZED SIGNATURE

⑈001032⑈ ⑆031201360⑆ 433617296 3⑈

---

URBANY INVESTMENT GROUP LLC    1032

Laura C. Browne, esq.    5/9/2017

1,000.00

URBANY INVESTME    Legal Fee Retainer: 2176 Grand Concourse, Bro    1,000.00

URBANY INVESTMENT GROUP LLC    1032

Laura C. Browne, esq.    5/9/2017

1,000.00

URBANY INVESTME    Legal Fee Retainer: 2176 Grand Concourse, Bro    1,000.00

EXHIBIT "Q"

URBANY INVESTMENT GROUP LLC     11-16

**URBANY INVESTMENT GROUP LLC**
250 GORGE RD.
CLIFFSIDE PARK, NJ 07010

TD BANK
AMERICA'S MOST CONVENIENT BANK

1034

55-135/312
832

5/16/2017

PAY TO THE
ORDER OF    Laura C. Browne, esq.                                            $ **1,000.00

One Thousand and 00/100*********************************************************************************** DOLLARS

Laura C, Browne, esq.

AUTHORIZED SIGNATURE

MEMO
Down Payment: 2176 Grand Concourse Bronx, NY

⑆001034⑆ ⑇031201360⑇ 433617296 3⑆

---

URBANY INVESTMENT GROUP LLC                                               1034

Laura C. Browne, esq.                              5/16/2017

                                                            1,000.00

URBANY INVESTME    Down Payment: 2176 Grand Concourse Bronx,              1,000.00

URBANY INVESTMENT GROUP LLC                                               1034

Laura C. Browne, esq.                              5/16/2017

                                                            1,000.00

URBANY INVESTME    Down Payment: 2176 Grand Concourse Bronx,              1,000.00

EXHIBIT "R"

Contract of Sale for New York office, commercial and multi-family residential premises.

## Contract of Sale---Office, Commercial and Multi-Family Residential Premises

### Table of Contents

Schedule A. Description of premises (to be attached)
Schedule B. Permitted exceptions
Schedule C. Purchase price
Schedule D. Miscellaneous
Schedule E. Rent schedule (to be attached)
Section 1. Sale of premises and acceptable title
Section 2. Purchase price, acceptable funds, existing mortgages, purchase money mortgage and escrow of downpayment
Section 3. The closing
Section 4. Representations and warranties of seller
Section 5. Acknowledgments of purchaser
Section 6. Seller's obligations as to leases
Section 7. Responsibility for violations

Section 8. Destruction, damage or condemnation
Section 9. Covenants of seller
Section 10. Seller's closing obligations
Section 11. Purchaser's closing obligations
Section 12. Apportionments
Section 13. Objections to title, failure of seller or purchaser to perform and
Section 14. Broker
Section 15. Notices
Section 16. Limitations on survival of representations, warranties, covenants and other obligations
Section 17. Miscellaneous provisions
Signatures and receipt by escrowee

CONTRACT dated the 16th, day of MAY, 2017,

Between

**MT. OLIVET CHURCH, INC.**

Address:
2176 GRAND CONCOURSE, BRONX, NY 10457
("Seller") and

**MARIA T. NOBLE and/or LLC to be formed**

Address:
250 GORGE ROAD, APT. 12D. CLIFFSIDE PARK, NJ 07010
("Purchaser").

Seller and Purchaser hereby covenant and agree as follows:

### Schedule A
### DESCRIPTION OF PREMISES

The Premises are located at or known as:
Street Address:2176 GRAND CONCOURSE
City:BRONX   State:NY   Zip:10457
Tax Map Designation:  Section:      Block:03157      Lot:0014

(☐ metes and bounds description attached hereto)

### Schedule B
### PERMITTED EXCEPTIONS

1. Zoning regulations and ordinances which are not violated by the existing structures or present use thereof and which do not render title uninsurable.

2. Consents by the Seller or any former owner of the Premises for the erection of any structure or structures on, under or above any street or streets on which the Premises may abut.

3. The Existing Mortgage(s) and financing statements, assignments of leases and other collateral assignments ancillary thereto.

4. Leases and Tenancies specified in the Rent Schedule and any new leases or tenancies not prohibited by this contract.

5. Unpaid installments of assessments not due and payable on or before the Closing Date.

6. Financing statements, chattel mortgages and liens on personalty filed more than 5 years prior to the Closing Date and not renewed, or filed against property or equipment no longer located on the Premises or owned by Tenants.

7.    (a)    Rights of utility companies to lay, maintain install and repair pipes, lines, poles, conduits, cable boxes and related equipment on, over and under the Premises, provided that none of such rights imposes any monetary obligation on the owner of the Premises.

(b) Encroachments of stoops, areas, cellar steps, trim cornices, lintels, window sills, awnings, canopies, ledges, fences, hedges, coping and retaining walls projecting from the Premises over any street or highway or over any adjoining property and encroachments of similar elements projecting from adjoining property over the Premises.

(c) Revocability or lack of right to maintain vaults, coal chutes, excavations or sub-surface equipment beyond the line of the Premises.

(d) Any state of facts that an accurate survey would disclose, provided that such facts do not render title unmarketable. For the purposes of this contract, none of the facts shown on the survey, if any, identified below shall be deemed to render title unmarketable, and Purchaser shall accept title subject thereto.

### Schedule C
### PURCHASE PRICE

The Purchase Price shall be paid as follows:

(a) By check subject to collection, the receipt of which is hereby acknowledged by Seller:          **$1,000.00**

(b) By check or checks delivered to Seller at the Closing in accordance with the provisions of §2.02;
(c) By acceptance of title subject to the following Existing Mortgage(s):
(d) By execution and delivery to Seller by Purchaser or its assignee of a note secured by a Purchase Money Mortgage on the Premises, in the sum of $          payable as follows:

$499,000.00
$

Interest Rate:          Term:          Monthly payment:          Prep. Fee:          Other provisions:
Making for a total Purchase Price of:

$
$500,000.00

## Schedule D
## MISCELLANEOUS

1. Title insurer designated by the parties (§1.02):

2. Last date for consent by Existing Mortgagee(s) (§2.03(b)):

3. Maximum Interest Rate of any Refinanced Mortgage (§2.04(b)):

4. Prepayment Date on or after which Purchase Money Mortgage may be prepaid (§2.04(c)):

5. Seller's tax ID Nos (§2.05) #1:          #2:          #3:          #4:

6. Buyer's tax ID Nos (§2.05) #1:          #2:          #3:          #4:

7. Scheduled time and date of Closing (§3.01): Date:WITHIN 30 days of Court approval & order.          Time:          o'clock.

8. Place of Closing (§3.01):THIS TRANSACTION IS SUBJECT TO ATTORNEY GENERAL AND COURT APPROVAL

9. Assessed valuation of Premises (§4.10):

10. Fiscal year and annual real estate taxes on Premises (§4.10): Fiscal Year:          Annual Taxes:

11. Tax abatements or exemptions affecting Premises (§4.10):0

12. Assessments on Premises (§4.13):0

13. Maximum Amount which Seller must spend to cure violations, etc. (§7.02):0

14. Maximum Expense of Seller to cure title defects, etc. (§13.02):0

15. Broker, if any (§14.01):LEDWIN ENTERPRISES

16. Party to pay broker's commission (§14.01):SELLER (5% COMMISSION)
17. Address for notices (§15.01):
    If to Seller:
    LAURA C. BROWNE, ESQ.
    1938 WILLIAMSBRIDGE ROAD, BRONX, NEW YORK 10461

        with a copy to:
    JAIME RAMIREZ, ESQ.
    3058 CROSSBRONX EXPRESSWAY, STE 1, BRONX, NEW YORK 10465

    If to Purchaser:



        with a copy to:


18 Limitation Date for actions based on Seller's surviving representations and other obligations (§16.01):5 days after closing

19. Additional Schedules or Riders (§17.08):NONE

## Schedule E
## RENT SCHEDULE

(☐ if more than four tenants, check, and annex a rent schedule rider hereto; otherwise, enter information below)

| Name | Apt. No. | Rent | Due | Security |
|------|----------|------|-----|----------|

PREMISES BEING DELIVERED VACANT AND IN "AS IS" CONDITION



Section 1. Sale of Premises and Acceptable Title

§1.01  Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, at the price and upon the terms and conditions set forth in this contract:
        (a) the parcel of land more particularly

described in Schedule A attached hereto ("Land"); (b) all buildings and improvement situated on the Land (collectively, "Building");

      (c) all right, title and interest of Seller, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof and to any unpaid award for any taking by condemnation or any damage to the Land by reason of a change of grade of any street or highway;

      (d) the appurtenances and all the estate and rights of Seller in and to the Land and Building; and

      (e) all right, title and interest of Seller, if any, in and to the fixtures, equipment and other personal property attached or appurtenant to the Building (collectively, "Premises"). The Premises are located at or known as Street Address:2176 GRAND CONCOURSE
City: BRONX State; NY Zip:10457
Tax Map Designation: Section:    Block:03157 Lot:0014

§1.02. Seller shall convey and Purchaser shall accept fee simple title to the Premises in accordance with the terms of this contract, subject only to:

      (a) the matters set forth in Schedule B attached hereto (collectively, "Permitted Exceptions"); and

      (b) such other matters as (i) the title insurer specified in Schedule D attached hereto (or if none is so specified, then any member of the New York Board of Title Underwriters) shall be willing, without special premium, to omit as exceptions to coverage or to except with insurance against collection out of or enforcement against the Premises and (ii) shall be accepted by any lender described in Section 274-a of the Real Property Law ("Institutional Lender") which has committed in writing to provide mortgage financing to Purchaser for the purchase of the Premises ("Purchaser's Institutional Lender"), except that if such acceptance by Purchaser's Institutional Lender is unreasonably withheld or delayed, such acceptance shall be deemed to have been given.

**Section 2. Purchase Price, Acceptable Funds, Existing Mortgages, Purchase Money Mortgage and Escrow of Down payment**

§2.01. The purchase price ("Purchase Price") to be paid by Purchaser to Seller for the Premises as provided in Schedule C attached hereto is $500,000.00

§2.02. All monies payable under this contract, unless otherwise specified in this contract, shall be paid by:

      (a) certified checks of Purchaser or any person making a purchase money loan to Purchaser drawn on any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York or

      (b) official bank checks drawn by any such banking institution, payable to the order of Seller, except that uncertified checks of Purchaser payable to the order of Seller up to the amount of one-half of one percent of the Purchase Price shall be acceptable for sums payable to Seller at the Closing.

§2.03. (a) If Schedule C provides for the acceptance of title by Purchaser subject to one or more existing mortgages (collectively, "Existing Mortgage(s)"), the amounts specified in Schedule C with reference thereto may be approximate. If at the Closing the aggregate principal amount of the Existing Mortgage(s), as reduced by payments required there under prior to the Closing, is less than the aggregate amount of the Existing Mortgage(s) as specified in Schedule C, the difference shall be added to the monies payable at the Closing, unless otherwise expressly provided herein.

      (b) If any of the documents constituting the Existing Mortgage(s) or the note(s) secured thereby prohibits or restricts the conveyance of the Premises or any part thereof without the prior consent of the holder or holders thereof ("Mortgagee(s)") or confers upon the Mortgagee(s) the right to accelerate payment of the indebtedness or to change the terms of the Existing Mortgage(s) in the event that a conveyance is made without consent of the Mortgagee(s), Seller shall notify

such Mortgagee(s) of the proposed conveyance to Purchaser within 10 days after execution and delivery of this contact, requesting the consent of such Mortgagee(s) thereto. Seller and Purchaser shall furnish the Mortgagee(s) with such information as may reasonably be required in connection with such request and shall otherwise cooperate with such Mortgagee(s) and with each other in an effort expeditiously to procure such consent, but neither shall be obligated to make any payment to obtain such consent. If such Mortgagee(s) shall fail or refuse to grant such consent in writing on or before the date set forth in Schedule D or shall require as a condition of the granting of such consent

      (i) that additional consideration be paid to the Mortgagee(s) and neither Seller nor Purchaser is willing to pay such additional consideration or

      (ii) that the terms of the Existing Mortgage(s) be changed and Purchaser is unwilling to accept such change, then unless Seller and Purchaser mutually agree to extend such date or otherwise modify the terms of this contract, Purchaser may terminate this contract in the manner provided in §13.02.

If Schedule C provides for a Purchase Money Mortgage (as defined in §2.04), Seller may also terminate this contract in the manner provided in §13.02 if any of the foregoing circumstances occur or if Seller is unwilling to accept any such change in the terms of the Existing Mortgage(s).

§2.04. (a) If Schedule C provides for payment of a portion of the Purchase Price by execution and delivery to Seller of a note secured by a purchase money mortgage ("Purchase Money Mortgage"), such note and Purchase Money Mortgage shall be drawn by the attorney for the Seller on the standard forms of the New York Board of Title Underwriters then in effect for notes and for mortgages of like lien, as modified by this contract. At the Closing, Purchaser shall pay the mortgage recording tax and recording fees therefore and the filing fees for any financing statements delivered in connection therewith.

      (b) If Schedule C provides for the acceptance of title by Purchaser subject to Existing Mortgage(s) prior in lien to the Purchase Money Mortgage, the Purchase Money Mortgage shall provide that it is subject and subordinate to the lien(s) of the Existing Mortgage(s) and shall be subject and subordinate to any extensions, modifications, renewals, consolidations, substitutions or replacements thereof (collectively, "Refinancing" or "Refinanced Mortgage"), provided that (i) the rate of interest payable under a Refinanced Mortgage shall not be greater than that specified in Schedule D as the Maximum Interest Rate or, if no Maximum Interest Rate is specified in Schedule D, shall not be greater than the rate of interest that was payable on the refinanced indebtedness immediately prior to such Refinancing, and (ii)  if the principal  amount of the Refinanced Mortgage plus the principal amount  of other Existing Mortgage(s), if any, remaining after placement of a Refinanced Mortgage exceeds the amount of principal owing and unpaid on all mortgages on the Premises superior to the Purchase Money Mortgage immediately prior to the Refinancing, an amount equal to the excess shall be paid at the closing of the Refinancing to the holder of the Purchase Money Mortgage in reduction of principal payments due there under in inverse order of maturity. The Purchase Money Mortgage shall further provide that the holder thereof shall, on demand and without charge therefore, execute, acknowledge and deliver any agreement or agreements reasonably required by the mortgagee to confirm such subordination.

      (c) The Purchase Money Mortgage shall contain the following additional provisions:

      (i) "The mortgagor or any owner of the mortgaged premises shall have the right to prepay the entire unpaid indebtedness together with accrued interest, but without penalty, at any time on or after [insert the day following the last day of the fiscal year of the mortgage in which the Closing occurs or, if a Prepayment Date is specified in Schedule D, the specified Prepayment Date], or not less than 10 days' written notice to the holder hereof."

(ii) "Notwithstanding anything to the contrary contained herein, the obligation of the mortgagor for the payment of the indebtedness and for the performance of the terms, covenants and conditions contained herein and in the note secured hereby is limited solely to recourse against the property secured by this mortgage, and in no event shall the mortgagor or any principal of the mortgagor, disclosed or undisclosed, be personally liable for any breach of or default under the note or this mortgage or for any deficiency resulting from or through any proceedings to foreclose this mortgage, nor shall any deficiency judgment, money judgment or other personal judgment be sought or entered against the mortgagor or any principal of the mortgagor, disclosed or undisclosed, but the foregoing shall not adversely affect the lien of this mortgage or the mortgagee's right of foreclosure."

(iii) "In addition to performing its obligations under Section 274-a of the Real Property Law, the mortgagee, if other than one of the institutions listed in Section 274-a agrees that, within 10 days after written request by the mortgagor, but not more than twice during any period of 12 consecutive months, it will execute, acknowledge and deliver without charge a certificate of reduction in recordable form (a) certifying as to (1) the then unpaid principal balance of the indebtedness secured hereby, (2) the maturity date thereof, (3) the rate of interest, (4) the last date to which interest has been paid and (5) the amount of any escrow deposits then held by the mortgagee, and (b) stating, to the knowledge of the mortgagee, whether there are any alleged defaults hereunder and, if so, specifying the nature thereof."

(iv) "All notices required or desired to be given under this mortgage shall be in writing and shall be delivered personally or shall be sent by prepaid registered or certified mail, addressed to the mortgagor and mortgagee at the addresses specified in this mortgage or to such other parties or at such other addresses, not exceeding two, as may be designated in a notice given to the other party or parties in accordance with the provisions hereof."

(v) The additional provisions, if any, specified in a rider hereto.

§2.05. (a) If the sum paid under paragraph (a) of Schedule C or any other sums paid on account of the Purchase Price prior to the Closing (collectively, "Downpayment") are paid by check or checks drawn to the order of and delivered to Seller's attorney or another escrow agent ("Escrowee"), the Escrowee shall hold the proceeds thereof in escrow in a special bank account (or as otherwise agreed in writing by Seller, Purchaser and Escrowee) until the Closing or sooner termination of this contract and shall pay over or apply such proceeds in accordance with the terms of this section. Escrowee need not hold such proceeds in an interest-bearing account, but if any interest is earned thereon, such interest shall be paid to the same party entitled to the escrowed proceeds, and the party receiving such interest shall pay any income taxes thereon. The tax identification numbers of the parties are either set forth in Schedule D or shall be furnished to Escrowee upon request. At the Closing, such proceeds and the interest thereon, if any, shall be paid by Escrowee to Seller. If for any reason the Closing does not occur and either party makes a written demand upon Escrowee for payment of such amount, Escrowee shall give written notice to the other party of such demand. If Escrowee does not receive a written objection from the other party to the proposed payment within 10 business days after the giving of such notice, Escrowee is hereby authorized to make such payment. If Escrowee does receive such written objection within such 10 day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by written instructions from the parties to this contract or a final judgment of a court. However, Escrowee shall have the right at any time to deposit the escrowed proceeds and interest thereon, if any, with the clerk of the Supreme Court of the county in which the Land is located. Escrowee shall give written notice of such deposit to Seller and Purchaser. Upon such deposit Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b) The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience, that Escrowee shall not be deemed to be the agent of either of the parties, and that Escrowee shall not be liable to either of the parties for any act or omission on its part unless taken or suffered in bad faith, in willful disregard of this contract or involving gross negligence. Seller and Purchaser shall jointly and severally indemnify and hold Escrowee harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith, in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c) Escrowee has acknowledged agreement to these provisions by signing in the place indicated on the signature page of this contract.

**Section 3. The Closing**

§3.01. Except as otherwise provided in this contract, the closing of title pursuant to this contract ("Closing") shall take place on the scheduled date and time of closing specified in Schedule D (the actual date of the Closing being herein referred to as "Closing Date") at the place specified in Schedule D.

**Section 4. Representations and Warranties of Seller**

Seller represents and warrants to Purchaser as follows:

§4.01. Unless otherwise provided in this contract, Seller is the sole owner of the Premises.

§4.02. If the Premises are encumbered by an Existing Mortgage(s), no written notice has been received from the Mortgagee(s) asserting that a default or breach exists thereunder which remains uncured and no such notice shall have been received and remain uncured on the Closing Date. If copies of documents constituting the Existing Mortgage(s) and note(s) secured thereby have been exhibited to and initialed by Purchaser or its representative, such copies are true copies of the originals and the Existing Mortgage(s) and note(s) secured thereby have not been modified or amended except as shown in such documents.

§4.03. The information concerning written leases (which together with all amendments and modifications thereof are collectively referred to as "Leases") and any tenancies in the Premises not arising out of the Leases (collectively, "Tenancies") set forth in Schedule E attached hereto ("Rent Schedule") is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof, and there are no Leases or Tenancies of any space in the Premises other than those set forth therein and any subleases or subtenancies. Except as otherwise set forth in the Rent Schedule or elsewhere in this contract:

(a) all of the Leases are in full force and effect and none of them has been modified, amended or extended;

(b) no renewal or extension options have been granted to tenants;

(c) no tenant has an option to purchase the Premises;

(d) the rents set forth are being collected on a current basis and there are no arrearages in excess of one month;

(e) no tenant is entitled to rental concessions or abatements for any period subsequent to the scheduled date of closing;

(f) Seller has not sent written notice to any tenant claiming that such tenant is in default, which default remains uncured;

(g) no action or proceeding instituted against Seller by any tenant of the Premises is presently pending in any court, except with respect to claims involving personal injury or property damage which are covered by insurance; and

(h) there are no security deposits other than those set forth in the Rent Schedule.

If any Leases which have been exhibited to and initialed by Purchaser or its representative contain provisions

that are inconsistent with the foregoing representations and warranties, such representations and warranties shall be deemed modified to the extent necessary to eliminate such inconsistency and to conform such representations and warranties to the provisions of the Leases.

§4.04. If the Premises or any part thereof are subject to the New York City Rent Stabilization Law, Seller is and on the Closing Date will be a member in good standing of the Real Estate Industry Stabilization Association, and, except as otherwise set forth in the Rent Schedule, there are no proceedings with any tenant presently pending before the Conciliation and Appeals Board in which a tenant has alleged an overcharge of rent or diminution of services or similar grievance, and there are no outstanding orders of the Conciliation and Appeals Board that have not been complied with by Seller.

§4.05. If the Premises or any part thereof are subject to the New York City Emergency Rent and Rehabilitation Law, the rents shown are not in excess of the maximum collectible rents, and, except as otherwise set forth in the Rent Schedule, no tenants are entitled to abatements as senior citizens, there are no proceedings presently pending before the rent commission in which a tenant has alleged an overcharge of rent or diminution of services or similar grievance, and there are no outstanding orders of the rent commission that have not been complied with by Seller.

§4.06. If an insurance schedule is attached hereto, such schedule lists all insurance policies presently affording coverage with respect to the Premises, and the information contained therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof.

§4.07. If a payroll schedule is attached hereto, such schedule lists all employees presently employed at the Premises, and the information contained therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof, and, except as otherwise set forth in such schedule, none of such employees is covered by a union contract and there are no retroactive increases or other accrued and unpaid sums owed to any employee.

§4.08. If a schedule of service, maintenance, supply and management contracts ("Service Contracts") is attached hereto, such schedule lists all such contracts affecting the Premises, and the information set forth therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof.

§4.09. If a copy of a certificate of occupancy for the Premises has been exhibited to and initialed by Purchaser or its representative, such copy is a true copy of the original and such certificate has not been amended, but Seller makes no representation as to compliance with any such certificate.

§4.10. The assessed valuation and real estate taxes set forth in Schedule D, if any, are the assessed valuation of the Premises and the taxes paid or payable with respect thereto for the fiscal year indicated in such schedule. Except as otherwise set forth in Schedule D, there are no tax abatements or exemptions affecting the Premises.

§4.11. Except as otherwise set forth in a schedule attached hereto, if any, if the Premises are used for residential purposes, each apartment contains a range and a refrigerator, and all of the ranges and refrigerators and all of the items of personal property (or replacements thereof) listed in such schedule, if any, are and on the Closing Date will be owned by

Seller free of liens and encumbrances other than the lien(s) of the Existing Mortgage(s), if any.

§4.12. Seller has no actual knowledge that any incinerator, boiler or other burning equipment on the Premises is being operated in violation of applicable law. If copies of a certificate or certificates of operation therefor have been exhibited to and initialed by Purchaser or its representative, such copies are true copies of the originals.

§4.13. Except as otherwise set forth in Schedule D, Seller has no actual knowledge of any assessment payable in annual installments, or any part thereof, which has become a lien on the Premises.

### Section 5. Acknowledgments of Purchaser
Purchaser acknowledges that:

§5.01. Purchaser has inspected the Premises, is fully familiar with the physical condition and state of repair thereof, and, subject to the provisions of §7.01, §8.01, and §9.04, shall accept the Premises "as is" and in their present condition, subject to reasonable use, wear, tear and natural deterioration between now and the Closing Date, without any reduction in the Purchase Price for any change in such condition by reason thereof subsequent to the date of this contract.

§5.02. Before entering into this contract, Purchaser has made such examination of the Premises, the operation, income and expenses thereof and all other matters affecting or relating to this transaction as Purchaser deemed necessary. In entering into this contract, Purchaser has not been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by Seller or any agent, employee or other representative of Seller or by any broker or any other person representing or purporting to represent Seller, which are not expressly set forth in this contract, whether or not any such representations, warranties or statements were made in writing or orally.

### Section 6. Seller's Obligations as to Leases

§6.01. Unless otherwise provided in a schedule attached to this contract, between the date of this contract and the Closing, Seller shall not, without Purchaser's prior written consent, which consent shall not be unreasonably withheld:

    (a) amend, renew or extend any Lease in any respect, unless required by law;

    (b) grant a written lease to any tenant occupying space pursuant to a Tenancy; or

    (c) terminate any Lease or Tenancy except by reason of a default by the tenant thereunder.

§6.02. Unless otherwise provided in a schedule attached to this contract, between the date of this contract and the Closing, Seller shall not permit occupancy of, or enter into any new lease for, space in the Building which is presently vacant or which may hereafter become vacant without first giving Purchaser written notice of the identity of the proposed tenant, together with

    (a) either a copy of the proposed lease or a summary of the terms thereof in reasonable detail and

    (b) a statement of the amount of the brokerage commission, if any, payable in connection therewith and the terms of payment thereof. If Purchaser objects to such proposed lease, Purchaser shall so notify Seller within 4 business days after receipt of Seller's notice if such notice was personally delivered to Purchaser, or within 7 business days after the mailing of such notice by Seller to Purchaser, in which case Seller shall not enter into the proposed lease. Unless otherwise provided in a schedule attached to this contract, Purchaser shall pay to Seller at the Closing, in the manner specified in §2.02, the rent and additional rent that would have been payable under the proposed lease from the date on which the tenant's obligation to pay rent would have commenced if Purchaser had not so objected until the Closing Date, less the amount of the brokerage commission specified in Seller's notice and the reasonable cost of decoration or other work required to be performed by the landlord under the terms of the proposed lease to suit the premises to the tenant's occupancy ("Reletting Expenses"), prorated in each case over the term of the proposed lease and apportioned as of the Closing Date. If Purchaser does not so notify Seller of its objection, Seller shall have the right to enter into the proposed lease with the tenant identified in Seller's notice and Purchaser shall pay to Seller, in the manner specified in §2.02, the Reletting Expenses, prorated in each case over the term of the lease and apportioned as of the later of the Closing Date or the rent commencement date. Such payment shall be made by Purchaser to Seller at the Closing. In no event shall the

amount so payable to Seller exceed the sums actually paid by Seller on account thereof.

§6.03. If any space is vacant on the Closing Date, Purchaser shall accept the Premises subject to such vacancy, provided that the vacancy was not permitted or created by Seller in violation of any restrictions contained in this contract. Seller shall not grant any concessions or rent abatements for any period following the Closing without Purchaser's prior written consent. Seller shall not apply all or any part of the security deposit of any tenant unless such tenant has vacated the Premises.

§6.04. Seller does not warrant that any particular Lease of Tenancy will be in force or effect at the Closing or that the tenants will have performed their obligations thereunder. The termination of any Lease or Tenancy prior to the Closing by reason of the tenant's default shall not affect the obligations of Purchaser under this contract in any manner or entitle Purchaser to an abatement of or credit against the Purchaser Price or give rise to any other claim on the part of Purchaser.

### Section 7. Responsibility for Violations

§7.01. Except as provided in §7.02 and §7.03, all notes or notices of violations of law or governmental ordinances, orders or requirements which were noted or issued prior to the date of this contract by any governmental department, agency or bureau having jurisdiction as to conditions affecting the Premises and all liens which have attached to the Premises prior to the Closing pursuant to the Administrative Code of the City of New York, if applicable, shall be removed or complied with by Seller. If such removal or compliance has not been completed prior to the Closing, Seller shall pay to Purchaser at the Closing the reasonably estimated unpaid cost to effect or complete such removal or compliance, and Purchaser shall be required to accept title to the Premises subject thereto, except that Purchaser shall not be required to accept such title and may terminate this contract as provided in §13.02 if

    (a) Purchaser's Institutional Lender reasonably refuses to provide financing by reason thereof or

    (b) the Building is a multiple dwelling and either

        (i) such violation is rent impairing and causes rent to be unrecoverable under Section 302-a of the Multiple Dwelling Law or

        (ii) a proceeding has been validly commenced by tenants and is pending with respect to such violation for a judgment directing deposit and use of rents under Article 7-A of the Real Property Actions and Proceedings Law. All such notes or notices of violations noted or issued on or after the date of this contract shall be the sole responsibility of Purchaser.

§7.02. If the reasonably estimated aggregate cost to remove or comply with any violations or liens which Seller is required to remove or comply with pursuant to the provisions of §7.01 shall exceed the Maximum Amount specified in Schedule D (or if none is so specified, the Maximum Amount shall be one-half of one percent of the Purchase Price), Seller shall have the right to cancel this contract, in which event the sole liability of Seller shall be as set forth in §13.02, unless Purchaser elects to accept title to the Premises subject to all such violations or liens, in which event Purchaser shall be entitled to a credit of an amount equal to the Maximum Amount against the monies payable at the Closing.

§7.03. Regardless of whether a violation has been noted or issued prior to the date of this contract, Seller's failure to remove or fully comply with the following violations shall not be an objection to title:

    (a) any violations of New York City Local Law 5 of 1973, as amended (relating to fire safety in office buildings), if applicable, or

    (b) any violations which a tenant is required to remove or comply with pursuant to the terms of its lease by reason of such tenant's use or occupancy. Purchaser shall accept the Premises subject to all such violations without any liability of Seller with respect thereto or any abatement of or credit against the Purchase Price, except that if Purchaser's

Institutional Lender reasonably refuses to provide financing by reason of the violations described in (b) above, Purchaser shall not be required to accept the Premises subject thereto and Purchaser shall have the right to terminate this contract in the manner provided in §13.02.

§7.04. If required, Seller, upon written request by Purchaser, shall promptly furnish to Purchaser written authorizations to make any necessary searches for the purposes of determining whether notes or notices of violations have been noted or issued with respect to the Premises or liens have attached thereto.

### Section 8. Destruction, Damage or Condemnation

§8.01. The provisions of Section 5-1311 of the General Obligations Law shall apply to the sale and purchase provided for in this contract.

### Section 9. Covenants of Seller

Seller covenants that between the date of this contract and the Closing:

§9.01. The Existing Mortgage(s) shall not be amended or supplemented or prepaid in whole or in part. Seller shall pay or make, as and when due and payable, all payments of principal and interest and all deposits required to be paid or made under the Existing Mortgage(s).

§9.02. Seller shall not modify or amend any Service Contract or enter into any new service contract unless same is terminable without penalty by the then owner of the Premises upon not more than 30 days notice.

§9.03. If an insurance schedule is attached hereto, Seller shall maintain in full force and effect until the Closing the insurance policies described in such schedule or renewals thereof for no more than one year of those expiring before the Closing.

§9.04. No fixtures, equipment or personal property included in this sale shall be removed from the Premises unless the same are replaced with similar items of at least equal quality prior to the Closing.

§9.05. Seller shall not withdraw, settle or otherwise compromise any protest or reduction proceeding affecting real estate taxes assessed against the Premises for any fiscal period in which the Closing is to occur or any subsequent fiscal period without the prior written consent of Purchaser, which consent shall not be unreasonably withheld. Real estate tax refunds and credits received after the Closing Date which are attributable to the fiscal tax year during which the Closing Date occurs shall be apportioned between Seller and Purchaser, after deducting the expenses of collection thereof, which obligation shall survive the Closing.

§9.06. Seller shall allow Purchaser or Purchaser's representatives access to the Premises, the Leases and other documents required to be delivered under this contract upon reasonable prior notice at reasonable times.

### Section 10. Seller's Closing Obligations

At the Closing, Seller shall deliver the following to Purchaser:

§10.01. A statutory form of bargain and sale deed without covenant against grantor's acts, containing the covenant required by Section 13 of the Lien Law, and properly executed in proper form for recording so as to convey the title required by this contract.

§10.02. All Leases initialed by Purchaser and all others in Seller's possession.

§10.03. A schedule of all cash security deposits and a check or credit to Purchaser in the amount of such security deposits, including any interest thereon, held by Seller on the Closing Date under the Leases or, if held by an Institutional Lender, an assignment to Purchaser and written instructions to the holder of such deposits to transfer the same to Purchaser,

and appropriate instruments of transfer or assignment with respect to any lease securities which are other than cash.

§10.04. A schedule updating the Rent Schedule and setting forth all arrears in rents and all prepayments of rents.

§10.05. All Service Contracts initialed by Purchaser and all others in Seller's possession which are in effect on the Closing Date and which are assignable by Seller.

§10.06. An assignment to Purchaser, without recourse or warranty, of all of the interest of Seller in those Service Contracts, insurance policies, certificates, permits and other documents to be delivered to Purchaser at the Closing which are then in effect and are assignable by Seller.

§10.07. (a) Written consent(s) of the Mortgagee(s), if required under §2.03(b), and(b) certificate(s) executed by the Mortgagee(s) in proper form for recording and certifying (i) the amount of the unpaid principal balance thereof, (ii) the maturity date thereof, (iii) the interest rate, (iv) the last date to which interest has been paid thereon and (v) the amount of any escrow deposits held by the Mortgagee(s).
Seller shall pay the fees for recording such certificate(s). Any Mortgagee which is an Institutional Lender may furnish a letter complying with Section 274-a of the Real Property Law in lieu of such certificate.

§10.08. An assignment of all Seller's right, title and interest in escrow deposits for real estate taxes, insurance premiums and other amounts, if any, then held by the Mortgagee(s).

§10.09. All original insurance policies with respect to which premiums are to be apportioned or, if unobtainable, true copies or certificates thereof.

§10.10. To the extent they are then in Seller's possession and not posted at the Premises, certificates, licenses, permits, authorizations and approvals issued for or with respect to the Premises by governmental and quasigovernmental authorities having jurisdiction.

§10.11. Such affidavits as Purchaser's title company shall reasonably require in order to omit from its title insurance policy all exceptions for judgments, bankruptcies or other returns against persons or entities whose names are the same as or similar to Seller's name.

§10.12. Checks to the order of the appropriate officers in payment of all applicable real property transfer taxes and copies of any required tax returns therefor executed by Seller, which checks shall be certified or official bank checks if required by the taxing authority, unless Seller elects to have Purchaser pay any of such taxes and credit Purchaser with the amount thereof.

§10.13. To the extent they are then in Seller's possession, copies of current painting and payroll records. Seller shall make all other Building and tenant files and records available to Purchaser for copying, which obligation shall survive the Closing.

§10.14. An original letter, executed by Seller or by its agent, advising the tenants of the sale of the Premises to Purchaser and directing that rents and other payments thereafter be sent to Purchaser or as Purchaser may direct.

§10.15. Notice(s) to the Mortgagee(s), executed by Seller or by its agent, advising of the sale of the Premises to Purchaser and directing that future bills and other correspondence should thereafter be sent to Purchaser or as Purchaser may direct.

§10.16. If Seller is a corporation and if required by Section 909 of the Business Corporation Law, a resolution of Seller's board of directors authorizing the sale and delivery of the deed and a certificate executed by the secretary or assistant secretary of Seller certifying as to the adoption of such resolution and setting forth facts showing that the transfer complies with the requirements of such law. The deed referred to in §10.01 shall also contain a recital sufficient to establish compliance with such law.

§10.17. Possession of the Premises in the condition required by this contract, subject to the Leases and Tenancies, and keys therefor.

§10.18. Any other documents required by this contract to be delivered by Seller.

**Section 11. Purchaser's Closing Obligations**
At the Closing, Purchaser shall:

§11.01. Deliver to Seller checks in payment of the portion of the Purchase Price payable at the Closing, as adjusted for apportionments under Section 12, plus the amount of escrow deposits, if any, assigned pursuant to §10.08.

§11.02. Deliver to Seller the Purchase Money Mortgage, if any, in proper form for recording, the note secured thereby, financing statements covering personal property, fixtures and equipment included in this sale and replacements thereof, all properly executed, and Purchaser shall pay the mortgage recording tax and recording fees for any Purchase Money Mortgage.

§11.03. Deliver to Seller an agreement indemnifying and agreeing to defend Seller against any claims made by tenants with respect to tenants' security deposits to the extent paid, credited or assigned to Purchaser under §10.03.

§11.04. Cause the deed to be recorded, duly complete all required real property transfer tax returns and cause all such returns and checks in payment of such taxes to be delivered to the appropriate officers promptly after the Closing.

§11.05. Deliver any other documents required by this contract to be delivered by Purchaser.

**Section 12. Apportionments**

§12.01. The following apportionments shall be made between the parties at the Closing as of the close of business on the day prior to the Closing Date:
 (a) prepaid rents and Additional Rents (as defined in §12.03);
 (b) interest on the Existing Mortgage(s);
 (c) real estate taxes, water charges, sewer rents and vault charges, if any, on the basis of the fiscal period for which assessed, except that if there is a water meter on the Premises, apportionment at the Closing shall be based on the last available reading, subject to adjustment after the Closing when the next reading is available;
 (d) wages, vacation pay, pension and welfare benefits and other fringe benefits of all persons employed at the Premises whose employment was not terminated at or prior to the Closing;
 (e) value of fuel stored on the Premises, at the price then charged by Seller's supplier, including any taxes;
 (f) charges under transferable Service Contracts or permitted renewals or replacements thereof;
 (g) permitted administrative charges, if any, on tenants' security deposits;
 (h) dues to rent stabilization associations, if any;
 (i) insurance premiums on transferable insurance policies listed on a schedule hereto or permitted renewals thereof;
 (j) Reletting Expenses under §6.02, if any; and
 (k) any other items listed in Schedule D.

If the Closing shall occur before a new tax rate is fixed, the apportionment of taxes at the Closing shall be upon the basis of the old tax rate for the preceding period applied to latest assessed valuation. Promptly after the new tax rate is fixed, the apportionment of taxes shall be recomputed. Any discrepancy resulting from such recomputation and any errors or omissions in computing apportionments at Closing shall be promptly corrected, which obligations shall survive the Closing.

§12.02. If any tenant is in arrears in the payment of rent on the Closing Date, rents received from such tenant after the Closing shall be applied in the following order of priority:

(a) first to the month preceding the month in which the Closing occurred;

(b) then to the month in which the Closing occurred;

(c) then to any month or months following the month in which the Closing occurred; and

(d) then to the period prior to the month preceding the month in which the Closing occurred.

If rents or any portion thereof received by Seller or Purchaser after the Closing are payable to the other party by reason of this allocation, the appropriate sum, less a proportionate share of any reasonable attorneys' fees, costs and expenses of collection thereof, shall be promptly paid to the other party, which obligation shall survive the Closing.

§12.03. If any tenants are required to pay percentage rent, escalation charges for real estate taxes, operating expenses, cost-of-living adjustments or other charges of a similar nature ("Additional Rents") and any Additional Rents are collected by Purchaser after the Closing which are attributable in whole or in part to any period prior to the Closing, then Purchaser shall promptly pay to Seller Seller's proportionate share thereof, less a proportionate share of any reasonable attorneys' fees, costs and expenses of collection thereof, if and when the tenant paying the same has made all payments of rent and Additional Rent then due to Purchaser pursuant to the tenant's Lease, which obligation shall survive the Closing.

**Section 13. Objections to Title, Failure of Seller or Purchaser to Perform and Vendee's Lien**

§13.01. Purchaser shall promptly order an examination of title and shall cause a copy of the title report to be forwarded to Seller's attorney upon receipt. Seller shall be entitled to a reasonable adjournment or adjournments of the Closing for up to 60 days or until the expiration date of any written commitment of Purchaser's Institutional Lender delivered to Purchaser prior to the scheduled date of Closing, whichever occurs first, to remove any defects in or objections to title noted in such title report and any other defects or objections which may be disclosed on or prior to the Closing Date.

§13.02. If Seller shall be unable to convey title to the Premises at the Closing in accordance with the provisions of this contract or if Purchaser shall have any other grounds under this contract for refusing to consummate the purchase provided for herein, Purchaser, nevertheless, may elect to accept such title as Seller may be able to convey with a credit against the monies payable at the Closing equal to the reasonably estimated cost to cure the same (up to the Maximum Expense described below), but without any other credit or liability on the part of Seller. If Purchaser shall not so elect, Purchaser may terminate this contract and the sole liability of Seller shall be to refund the Down payment to Purchaser and to reimburse Purchaser for the net cost of title examination, but not to exceed the net amount charged by Purchaser's title company therefor without issuance of a policy, and the net cost of updating the existing survey of the Premises or the net cost of a new survey of the Premises if there was no existing survey or the existing survey was not capable of being updated and a new survey was required by Purchaser's Institutional Lender. Upon such refund and reimbursement, this contract shall be null and void and the parties hereto shall be relieved of all further obligations and liability other than any arising under Section 14. Seller shall not be required to bring any action or proceeding or to incur any expense in excess of the Maximum Expense specified in Schedule D (or if none is so specified, the Maximum Expense shall be one-half of one percent of the Purchase Price) to cure any title defect or to enable Seller otherwise to comply with the provisions of this contract, but the foregoing shall not permit Seller to refuse to pay off at the Closing, to the extent of the monies payable at the Closing, mortgages on the Premises, other than Existing Mortgages, of which Seller has actual knowledge.

§13.03 Any unpaid taxes, assessments, water charges and sewer rents, together with the interest and penalties thereon to a date not less than two days following the Closing Date, and any other liens and encumbrances which Seller is obligated to pay and discharge or which are against corporations, estates or other persons in the chain of title, together with the cost of recording or filing any instruments necessary to discharge such liens and encumbrances of record, may be paid out of the proceeds of the monies payable at the Closing if Seller delivers to Purchaser on the Closing Date official bills for such taxes, assessments, water charges, sewer rents, interest and penalties and instruments in recordable form sufficient to discharge any other liens and encumbrances of record. Upon request made a reasonable time before the Closing, Purchaser shall provide at the Closing separate checks for the foregoing payable to the order of the holder of any such lien, charge or encumbrance and otherwise complying with §2.02. If Purchaser's title insurance company is willing to insure both Purchaser and Purchaser's Institutional Lender, if any, that such charges, liens and encumbrances will not be collected out of or enforced against the Premises, then, unless Purchaser's Institutional Lender reasonably refuses to accept such insurance in lieu of actual payment and discharge, Seller shall have the right in lieu of payment and discharge to deposit with the title insurance company such funds or assurances or to pay such special or additional premiums as the title insurance company may require in order to so insure. In such case the charges, liens and encumbrances with respect to which the title insurance company has agreed so to insure shall not be considered objections to title.

§13.04. If Purchaser shall default in the performance of its obligation under this contract to purchase the Premises, the sole remedy of Seller shall be to retain the Downpayment as liquidated damages for all loss, damage and expense suffered by Seller, including without limitation the loss of its bargain.

§13.05. Purchaser shall have a vendee's lien against the Premises for the amount of the Downpayment, but such lien shall not continue after default by Purchaser under this contract.

**Section 14. Broker**

§14.01. If a broker is specified in Schedule D, Seller and Purchaser mutually represent and warrant that such broker is the only broker with whom they have dealt in connection with this contract and that neither Seller nor Purchaser knows of any other broker who has claimed or may have the right to claim a commission in connection with this transaction, unless otherwise indicated in Schedule D. The commission of such broker shall be paid pursuant to separate agreement by the party specified in Schedule D. If no broker is specified in Schedule D, the parties acknowledge that this contract was brought about by direct negotiation between Seller and Purchaser and that neither Seller nor Purchaser knows of any broker entitled to a commission in connection with this transaction. Unless otherwise provided in Schedule D, Seller and Purchaser shall indemnify and defend each other against any costs, claims or expenses, including attorneys' fees, arising out of the breach on their respective parts of any representations, warranties or agreements contained in this paragraph. The representations and obligations under this paragraph shall survive the Closing or, if the Closing does not occur, the termination of this contract.

**Section 15. Notices**

§15.01. All notices under this contract shall be in writing and shall be delivered personally or shall be sent by prepaid registered or certified mail, addressed as set forth in Schedule D, or as Seller or Purchaser shall otherwise have given notice as herein provided.

**Section 16. Limitations on Survival of Representations, Warranties, Covenants and other Obligations**

§16.01. Except as otherwise provided in this contract, no representations, warranties, covenants or other obligations of Seller set forth in this contract shall survive the Closing, and no action base thereon shall be commenced after the Closing. The representations, warranties, covenants and other obligations of Seller set forth in §4.03, §6.01 and §6.02 shall survive until the Limitation Date specified in Scheduled D (or if none is so specified, the Limitation Date shall be the date which is six months after the Closing Date), and no action based thereon shall be commenced after the Limitation Date.

§16.02 The delivery of the deed by Seller, and the acceptance thereof by Purchaser, shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations of Seller which are expressly stated in this contract to survive the Closing.

### Section 17. Miscellaneous Provisions

§17.01. If consent of the Existing Mortgagee(s) is required under §2.03(b), Purchaser shall not assign this contract or its rights hereunder without the prior written consent of Seller. No permitted assignment of Purchaser's rights under this contract shall be effective against Seller unless and until an executed counterpart of the instrument of assignment shall have been delivered to Seller and Seller shall have been furnished with the name and address of the assignee. The term "Purchaser" shall be deemed to include the assignee under any such effective assignment.

§17.02. This contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated herein and all prior agreements, understandings, representations and statements, oral or written, are merged into this contract. Neither this contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

§17.03. This contract shall be governed by, and construed in accordance with, the law of the State of New York.

§17.04 The captions in this contract are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this contract or any of the provisions hereof.

§17.05. This contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns.

§17.06. This contract shall not be binding or effective until properly executed and delivered by Seller and Purchaser.

§17.07. As used in this contract, the masculine shall include the feminine and neuter, the singular shall include the plural and the plural shall include the singular, as the context may require.

§17.08. If the provisions of any schedule or rider to this contract are inconsistent with the provisions of this contract, the provisions of such schedule or rider shall prevail. Set forth in Schedule D is a list of any and all schedules and riders which are attached hereto but which are not listed in the Table of Contents.

**IN WITNESS WHEREOF,** the Parties hereto have duly executed this Contract as of the date first above written.

SELLER(S):

ARACELIS STAATZ, PRESIDENT
MT. OLIVET CHURCH INC.

BUYER(S):

Maria L. Noble
MARIA T. NOBLE

Receipt by Escrowee:
The undersigned Escrowee hereby acknowledges receipt of, by check subject to collection, to be held in escrow pursuant to §2.05.